# 14-1634(L)

## & 14-1729(XAP)

### United States Court of Appeals for the Second Circuit

MHANY MANAGEMENT, INC., AKA NEW YORK ACORN HOUSING COMPANY,

*Plaintiff – Appellee – Cross-Appellant*,

NEW YORK COMMUNITIES FOR CHANGE, INC.,

*Intervenor – Plaintiff – Appellee – Cross-Appellant*,

ACORN, THE NEW YORK ASSOCIATION OF COMMUNITY ORGANIZATIONS FOR REFORM NOW, DAPHNE ANDREWS, VIC DEVITA, VERNON GHULLKIE, NATALIE GUERRIDO, NEW YORK ACORN HOUSING COMPANY, INC., LISBETT HUNTER, FRANCINE MCCRAY,

*Plaintiffs*

v.

COUNTY OF NASSAU, COUNTY OF NASSAU PLANNING COMMISSION, COUNTY OF NASSAU OFFICE OF REAL ESTATE & DEVELOPMENT

*Defendants – Cross-Appellees*,

INCORPORATED VILLAGE OF GARDEN CITY, GARDEN CITY BOARD OF TRUSTEES,

*Defendants – Appellants*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK (SPATT, D.J.)

**JOINT APPENDIX VOLUME I OF XV (JA 1 – JA 245)**

*Counsel Listed on Inside Cover*

Ira M. Feinberg
HOGAN LOVELLS US LLP
875 Third Avenue
New York, NY 10022
(212) 918-3000

*Attorney for Plaintiff-Appellee-Cross Appellant MHANY Management, Inc.*

Joseph D. Rich
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1401 New York Avenue, NW
Suite 400
Washington, DC 20005
(202) 662-8331

*Attorney for Plaintiff-Appellee-Cross Appellant New York Communities for Change*

Frederick K. Brewington
LAW OFFICES OF FREDERICK K. BREWINGTON
556 Peninsula Boulevard
Hempstead, NY 11550
(516) 489-6959

*Attorney for both Plaintiffs-Appellees-Cross Appellants*

Michael A. Carvin
JONES DAY
51 Louisiana Ave. N.W.
Washington, DC 20001
(202) 879-3939

*Attorney for Defendants-Appellants*

Robert F. Vanderwaag
NASSAU COUNTY ATTORNEY'S OFFICE
1 West Street
Mineola, NY 11501
(516) 571-3954

*Attorney for Defendant-Cross Appellee*

# JOINT APPENDIX
# TABLE OF CONTENTS

## Joint Appendix – Volume I of XV

| Docket Number | Description of Entry | Date Document Entered | JA Page |
|---|---|---|---|
| | Docket Sheet for E.D.N.Y. Case No. 05-02301 | | JA 1 |
| 24 | Amended Complaint | 11/30/2005 | JA 59 |
| 211 | Judge Bianco's Order of Recusal | 03/02/2010 | JA 91 |
| 246 | Order Granting New York Communities for Change's Motion To Intervene | 06/15/2010 | JA 92 |
| 276 | Order Denying Plaintiffs' Motion To Re-Open Discovery | 07/26/11 | JA 101 |
| 283 | Declaration of R. Reissman | 07/29/2011 | JA 105 |
| 283-1 | Affidavit of Robert Walker | 07/29/2011 | JA 113 |
| 298 | Declaration of S. Brown | 08/31/2011 | JA 121 |
| 318 | Amended Complaint in Intervention by New York Communities for Change | 02/29/2012 | JA 133 |
| | Trial Transcript from June 17, 2013 | N/A | JA 162 |

## Joint Appendix – Volume II of XV

| Docket Number | Description of Entry | Date Document Entered | JA Page |
|---|---|---|---|
| | Trial Transcript from June 18, 2013 | N/A | JA 246 |
| | Trial Transcript from June 19, 2013 | N/A | JA 320 |
| | Trial Transcript from June 20, 2013 | N/A | JA 400 |
| | Trial Transcript from June 24, 2013 | N/A | JA 478 |

**Joint Appendix – Volume III of XV**

| Docket Number | Description of Entry | Date Document Entered | JA Page |
|---|---|---|---|
| | Trial Transcript from June 25, 2013 | N/A | JA 528 |
| | Trial Transcript from June 26, 2013 | N/A | JA 612 |
| | Trial Transcript from June 27, 2013 | N/A | JA 702 |

**Joint Appendix – Volume IV of XV**

| Docket Number | Description of Entry | Date Document Entered | JA Page |
|---|---|---|---|
| | Trial Transcript from July 1, 2013 | N/A | JA 786 |
| | Trial Transcript from July 2, 2013 | N/A | JA 870 |
| | Trial Transcript from July 3, 2013 | N/A | JA 939 |
| 403 | Plaintiffs' Post-Trial Memorandum | 08/05/2013 | JA 984 |
| 436 | The Village Defendants' Notice of Appeal | 05/05/2014 | JA 1042 |
| 446 | Plaintiffs' Notice of Appeal with Respect to Nassau County | 05/16/2014 | JA 1043 |

**Joint Appendix – Volume V of XV**

**Trial Exhibits**

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|
| JTX1 | Fax from F. Fish & T. Yardley to R. Schoelle, M. Fillipon & B. Ridgeway | 09/13/2002 | JA 1056 |
| JTX2 | Memo from BFJ to P Zone Committee,J. Kiernan, R. Schoelle & M. Filippon Regarding Potential Approach to P Zone changes | 11/15/2002 | JA 1057 |

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|
| JTX3 | May 2003 Draft of BFJ's "Zoning Study for the Public P District Containing the County Properties" | 05/13/2002 | JA 1064 |
| JTX4 | Letter from R. Schoelle to B. Miller Enclosing Slides Presented by F. Fish at Public Forum on May 29, 2003. | 05/29/2003 and 05/30/2003 | JA 1085 |
| JTX5 | Memo from BFJ to R. Schoelle, G. Fishberg & J. Kiernan re: Potential Land Value for the Social Services Site | 05/19/2003 | JA 1103 |
| JTX6 | BFJ/GC Board of Trustees Meeting Minutes with Attendance sheet and meeting record re: GC P Zone | 06/24/2003 | JA 1105 |
| JTX7 | July 2003 Draft of BFJ's "Zoning Study for the Public P District Containing the County Properties" | 07/09/2003 | JA 1111 |
| JTX8 | BFJ Meeting Record re: GC P-Zone | 08/19/2003 | JA 1132 |
| JTX9 | Nassau County Environmental Assessment Form | 09/08/2003 | JA 1134 |
| JTX10 | Slides Presented by F. Fish to P-Zone Committee and General Public on October 23, 2003 | 10/23/2003 | JA 1163 |
| JTX11 | November 2003 Draft of BFJ's "Zoning Study for the Public P District Containing the County Properties" | 11/2003 | JA 1184 |
| JTX12 | Transcript of Public Hearing | 02/05/2004 | JA 1208 |
| JTX13 | BFJ Presentation: A Zoning Study for the Public P District | 04/22/2004 | JA 1279 |

iii

## Joint Appendix – Volume VI of XV

## Trial Exhibits

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|
| JTX14 | Environmental Assessment Form | 05/2004 | JA 1299 |
| JTX15 | Notice of Adoption of Local Law No. 2- 2004 | 06/03/2004 | JA 1343 |
| JTX16 | BFJ Memorandum from F. Fish to R. Schoelle re: Presentation for October 13, 2003 | 09/30/2003 | JA 1351 |
| JTX17 | BFJ Memorandum from F. Fish to Public "P" Zone Committee re: Revisions to the Proposed Zoning Draft for County Property | 11/10/2003 | JA 1355 |
| JTX18 | BFJ Notes for Discussion re: Village of Garden City Zoning Discussion Social Services Site | 04/01/2004 | JA 1358 |
| JTX19 | BFJ Memorandum from F. Fish and T. Yardley to Garden City Village Trustees re: Revisions to the Proposed zoning of the Public "P" Zone | 05/04/2004 | JA 1360 |
| JTX20 | Memo from P Zone Committee to Mayor Lewis and Board of Trustees re: "Progress to Date" | 08/14/2002 | JA 1365 |
| JTX21 | Memo from BFJ to J. Kiernan, R. Schoelle and M. Filippon re: draft P Zone zoning text | 04/17/2003 | JA 1369 |
| JTX22 | BFJ memorandum to J. Kiernan, R. Schoelle, and M. Fillpon with coversheet | 04/29/2003 | JA 1380 |
| JTX23 | Memo to B. Miller and Board of Trustees re: Re-zoning - Public "P" Zone | 11/19/2003 | JA 1393 |

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|
| JTX24 | Transcript of Public Hearing | 01/08/2004 | JA 1394 |
| JTX25 | Certified Transcript of Garden City Board of Trustees May 20,2004 Meeting | 05/20/2004 | JA 1437 |
| JTX26 | Letter from R. Schoelle to T. Suozzi re: update from P-Zone committee | 09/18/2002 | JA 1503 |
| JTX27 | Resolution No. 8825-04 | 05/28/2004 | JA 1505 |
| JTX28 | Letter from M. Nelkin to S. Cohen re: Final Offer 25 Acre Development Parcel Garden City | 10/28/2004 | JA 1508 |
| JTX29 | Fax from ACORN re response to Nassau County's Request for Proposal | 09/10/2004 | JA 1510 |

**Joint Appendix – Volume VII of XV**

**Trial Exhibits**

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|
| JTX30 | Spreadsheets re: financing of housing project in Garden City | N/A | JA 1531 |
| PTX4 | Letter From the "P-Zone" Committee to Mayor R. Lewis re: Progress to Date | 11/07/2002 | JA 1630 |
| PTX17 | Flyer re: March 18,2004 Meeting | N/A | JA 1632 |
| PTX32 | Letter from Mayor G. Lundquist to Hon. T. Suozzi re: Housing Development | 06/09/2006 | JA 1635 |

## Joint Appendix – Volume VIII of XV

## Trial Exhibits

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|
| PTX45 | Fax from R. Schoelle to F. Fish re: P-Zone | 10/21/2003 | JA 1636 |
| PTX45.1 | Newspaper Notice of October 23, 2003 P-Zone Meeting | N/A | JA 1640 |
| PTX89 | Email from B. Miller to J. Cunningham & R. Schoelle re: ACORN Questions | 08/13/2004 | JA 1641 |
| PTX90 | One Liners for August 18 Meeting | N/A | JA 1645 |
| PTX133 | Letter from T. Suozzi to J. Claffey re: Garden City | 08/23/2004 | JA 1646 |
| PTX139 | Board of Trustees Meeting Minutes | 05/05/2005 | JA 1647 |
| PTX142 | Chapter 34: Adoption of Ordinances from the Village of Garden City General Code | 04/29/2008 | JA 1657 |
| PTX143 | Handwritten notes | 03/18/2004 | JA 1660 |
| PTX147 | EPOA Meeting Minutes | 01/20/2004 | JA 1663 |
| PTX148 | ACORN Bid Documents | N/A | JA 1668 |

## Joint Appendix – Volume IX of XV

## Trial Exhibits

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|
| PTX149 | Garden City Request for Proposal | 07/2004 | JA 1807 |
| PTX155 | Letter from I. Speliotis to A. Sullivan re: Garden City 25 acre development site | 07/22/2004 | JA 1868 |

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|
| PTX156 | Fax from I. Speliotis to Nassau County Planning Commission | 05/26/2004 | JA 1870 |
| PTX179 | Garden City Original Zoning Recommendations | 12/09/08 | JA 1873 |
| PTX315 | EPOA Board of Directors Meeting Minutes | 03/09/2004 | JA 1874 |
| PTX317 | EPOA Board of Directors Meeting Minutes | 11/11/2003 | JA 1880 |
| PTX348 | Board of Trustees Meeting Minutes | 03/18/2004 | JA 1885 |
| PTX349 | Board of Trustees Meeting Minutes | 03/04/2004 | JA 1896 |
| PTX350 | Board of Trustees Meeting Minutes | 04/22/2004 | JA 1901 |
| PTX351 | Board of Trustees Meeting Minutes | 06/03/2004 | JA 1905 |
| PTX354 | Article, "Public Hearing to be Held on Signage Code Revisions," The Garden City News, Vol. 80, No. 30 | 05/14/2004 | JA 1911 |
| PTX358 | Board of Trustees Meeting Minutes | 06/17/2004 | JA 1915 |

**Joint Appendix – Volume X of XV**

**Trial Exhibits**

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|
| PTX359 | "Affordable Housing Plan in Garden City Part of Doubleday Site Commercial Proposal" Markup | N/A | JA 1920 |
| PTX359.1 | E. Nagourney, "Affordable Housing Plan in Garden City Part of Doubleday Site Commercial Proposal," Newsday | 04/14/1989 | JA 1921 |
| PTX360 | Letter from T. Suozzi to Mayor G. Lundquist re: Garden City | 05/08/2006 | JA 1924 |

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|
| PTX362 | Nassau County Request for Proposal | 03/2007 | JA 1926 |
| PTX363 | Board of Trustees Meeting Minutes | 11/20/2003 | JA 1973 |
| PTX364 | EPOA Board of Directors Meeting Minutes | 02/10/2004 | JA 1981 |
| PTX365 | EPOA Meeting Minutes | 01/16/2007 | JA 1987 |
| PTX367 | Board of Trustees Meeting Minutes | 12/04/2003 | JA 1993 |
| PTX368 | Extract of Board of Trustees Meeting Minutes | 12/04/2003 | JA 1999 |
| PTX372 | EPOA Board of Directors Meeting Minutes | 12/12/2006 | JA 2002 |
| PTX378 | EPOA Meeting Minutes | 10/12/2004 | JA 2008 |
| PTX379 | Meeting Agenda | 04/13/2004 | JA 2014 |
| PTX383 | Affidavit of R. Schoelle | 01/24/2007 | JA 2021 |
| PTX384 | Chapter 200: Zoning of the Village of Garden City Rules | 06/02/2013 | JA 2024 |
| PTX385 | Board of Trustees Special Meeting Minutes | 04/01/2004 | JA 2089 |
| PTX386 | Memorandum from F. Fish to J. Kiernan | 11/25/2002 | JA 2090 |
| PTX387 | BFJ Recommends Multi-Family for Social Services Site | 04/2003 | JA 2096 |
| PTX388 | Aerial Image of Social Services Site | N/A | JA 2097 |
| PTX389 | Cherry Valley Apartments | N/A | JA 2098 |
| PTX390 | Aerial Image of Social Services Site with Zoning Overlay | N/A | JA 2099 |
| PTX394 | Potential Number of School Children Chart | N/A | JA 2100 |

viii

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|
| PTX395 | BFJ's Recommendations R-M for 1.5 Years then Reverses Position in Response to Public Opposition Chart | N/A | JA 2101 |
| PTX396 | Traffic Generation Comparison (Sept. 2003 vs. May 2004) | N/A | JA 2102 |
| PTX398 | Transcript of Public Hearing | 02/05/2004 | JA 2108 |
| PTX401 | Handwritten Notes | unknown | JA 2180 |
| PTX406 | Number of Affordable Units in NYAHC's Scenarios under Proposed R-M Zoning | N/A | JA 2185 |
| PTX407 | Financial Feasibility of NYAHC's Scenarios under Proposed R-M Zoning | N/A | JA 2186 |
| PTX409 | Nassau County Map | N/A | JA 2187 |
| PTX413 | Zoning Timeline | N/A | JA 2188 |
| PTX416 | Minority Percent of Population: 1980 and 2000 | N/A | JA 2189 |
| VGC Ex. CI | Development of R-T Zoning | N/A | JA 2190 |
| VGC Ex. CN | District Map of Garden City | 08/30/2004 | JA 2191 |
| VGC Ex. CO | Zoning Chapter 200 of General Code | 06/2001 | JA 2192 |

**Joint Appendix – Volume XI of XV**

**Summary Judgment Exhibits**

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|
| | Declaration of Ralph J. Reissman in Support of Defendant Nassau County's Motion for Summary Judgment | 07/29/2011 | JA 2197 |
| Reissman Decl. Ex. H | Deposition Transcript of Thomas R. Suozzi | 04/24/2008 | JA 2205 |
| Reissman Decl. Ex. X | Letter from R. Schoelle to S. Cohen, enclosing Article XIIA of the Garden City Code | 05/02/2003 | JA 2315 |
| Reissman Decl. Ex. AF (Plaintiffs' Trial Exhibit 45, VGC537-540) | Facsimiles from R. Schoelle, attaching notice posted in Garden City News dated October 10, 2003 | 10/21/2003 | See PTX 45 JA 1636 |
| Reissman Decl. Ex. AK | Letter from R. Schoelle to S. Cohen enclosing BFJ Report "A Zoning Study for the Public P District Containing the County Properties," report not attached | 12/05/2003 | JA 2329 |
| Reissman Decl. Ex. AQ | Letter from S. Cohen to B. Miller re: Nassau County Comments – Village of Garden City's Proposed Zoning Amendments | 05/24/2004 | JA 2330 |
| Reissman Decl. Ex. AT | Legal Notice of Request for Proposal for Sale of 25+/- Acre Redevelopment Site | 08/10/2004 | JA 2340 |
| Reissman Decl. Ex. AU | Letter from CBRE to S. Cohen, with Proposal Summary, September, 2004 | N/A | JA 2341 |

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|
| Reissman Decl. Ex. AX | 101 County Seat Drive RFP Evaluation Process timeline beginning with week of 9/27/04 | N/A | JA 2427 |
| Reissman Decl. Ex. AY | Best And Final Offer (BAFO) Bid Matrix for 25-Acre Development Site in Garden City | 10/28/2004 | JA 2429 |
| Reissman Decl. Ex. AZ | CBRE letter to Fairhaven Properties, Inc. | 11/17/2004 | JA 2430 |
| Reissman Decl. Ex. BC | Excerpt from Nassau County Capital Improvement Plan for Years 2011-2013 | N/A | JA 2431 |
| Reissman Decl. Ex. BD | Contract Details, Nassau County and LiRo Program and Construction Management, P.C. | 01/21/2011 | JA 2432 |
|  | Declaration of Stanley J. Brown in Opposition to Defendants Incorporated Village of Garden City's, Garden City Board of Trustees' and Nassau County's Motions for Summary Judgment | 08/31/2011 | JA 2434 |
| Brown Decl. Ex. 3 | Excerpts of Sheldon Cohen Deposition Transcript | 04/22/2008 | JA 2446 |

**Joint Appendix – Volume XII of XV**

**Summary Judgment Exhibits**

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|
| Brown Decl. Ex. 5 | Excerpts of Patrick Duggan Deposition Transcript | 04/10/2008 | JA 2460 |
| Brown Decl. Ex. 14 | Excerpts of Rosemary Anne Olsen Deposition Transcript | 02/13/2008 | JA 2486 |
| Brown Decl. Ex. 17 | Excerpts of Carl Schroeter Deposition Transcript | 03/24/2008 | JA 2503 |
| Brown Decl. Ex. 18 | Excerpts of Ismene Speliotis Deposition Transcript | 11/29/2007 | JA 2516 |

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|
| Brown Decl. Ex. 19 | Excerpts of Ann Sullivan Deposition Transcript | 11/28/2007 | JA 2540 |
| Brown Decl. Ex. 20 | Excerpts of Ann Sullivan Deposition Transcript | 02/15/2008 | JA 2563 |
| Brown Decl. Ex. 45 | Nassau County Consolidated Strategy and Plan for 1995-1999 (excerpts) | 07/1995 | JA 2569 |
| Brown Decl. Ex. 46 | Draft of document entitled "Housing for Nassau's Next Generation: New Initiatives for New Suburbia" | N/A | JA 2581 |
| Brown Decl. Ex. 47 | Nassau County Consolidated Strategy and Plan for period Covering Federal Fiscal Years 2000-2004 (excerpts) | 07/2000 | JA 2602 |
| Brown Decl. Ex. 48 | Nassau Urban County Consortium Five Year (2005-2009) Consolidated Plan & Annual Action Plan (excerpts) | N/A | JA 2634 |
| Brown Decl. Ex. 49 | Memorandum from S. Cohen regarding Garden City Zoning Recommendations, with handwritten notes | 06/04/2003 | JA 2663 |
| Brown Decl. Ex. 50 | E-mail from C. Schroeter to S. Cohen, C. Senior, re: Draft OCA Letter, R-M zoning | N/A | JA 2665 |
| Brown Decl. Ex. 51 | E-mail from C. Friedman re: "Garden City zoning letter," attaching draft letter | 12/23/2003 | JA 2666 |
| Brown Decl. Ex. 52 | E-mail from S. Cohen to W. Tripp Jr. et al. regarding "Thanks for all your help," attaching Real Estate Consolidation outline and chart | 07/22/2004 | JA 2670 |
| Brown Decl. Ex. 54 (Joint Trial Exhibit 12) | Transcript of Incorporated Village of Garden City Public Hearing | 02/05/2004 | See JTX 12 JA 1208 |

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|
| Brown Decl. Ex. 58 (Joint Trial Exhibit 28) | Letter from Fairview Properties, Inc. to S. Cohen re: Final Offer, 25 +/- Acre Development Parcel Garden City | 10/28/2004 | See JTX 28 JA 1508 |
| Brown Decl. Ex. 59 | Newspaper article entitled "Long Island has Failed to Stem Segregation, a Group Charges," *The New York Times* | 04/19/2005 | JA 2673 |
| Brown Decl. Ex. 60 | Letter from T. Suozzi to J. Claffey re: lack of support in Garden City for affordable housing development at 101 County Seat Drive property | 8/23/2004 | JA 2676 |
| Brown Decl. Ex. 61 (Plaintiffs' Trial Exhibit 133) | Email from J. Calderone regarding Nassau County Press Release "Suozzi Calls for 'Next Generation' Housing in Garden City" | 05/08/2006 | See PTX 133 JA 1646 |
| Brown Decl. Ex. 62 | Newspaper article, "'Next Generation' Housing Proposed Near Roosevelt Field Mall," *Garden City Life* | 05/19/2006 | JA 2677 |
| Brown Decl. Ex. 63 | Web messages and inter-departmental memoranda memorializing calls to the Office of the County Executive regarding community opposition to affordable housing | 01/18/2006 | JA 2680 |
| Brown Decl. Ex. 67 (Plaintiffs' Trial Exhibit 149) | Nassau County Request for Proposal (RFP) for 25 +/- Acre Development Cite, Garden City, Long Island, New York | 07/2004 | See PTX 149 JA 1807 |
| Brown Decl. Ex. 68 (Joint Trial Exhibit 29) | Letter from NYAHC to T. Suozzi with fax coversheets, re: response to Nassau County's Request for Proposal | 09/10/2004 | See JTX 29 JA 1510 |

xiii

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|
| Brown Decl. Ex. 69 (Joint Trial Exhibit 30) | NYAHC spreadsheets re: financing for alternative development plan in Garden City | N/A | See JTX 30 JA 1531 |
| Brown Decl. Ex. 70 (Plaintiffs' Trial Exhibit 155) | Letter from I. Speliotis to A. Sullivan re: Garden City development pro forma | 07/22/2004 | See PTX 155 JA 1868 |
| Brown Decl. Ex. 71 (Plaintiffs' Trial Exhibit 156) | Letter, via facsimile, from NYAHC to Nassau County Planning Commission | 05/26/2004 | See PTX 156 JA 1870 |
| Brown Decl. Ex. 84 | Newspaper article, "Taking Another Look at Garden City's Public Use Zone," *The Garden City News* | 11/07/2003 | JA 2703 |

## Joint Appendix – Volume XIII of XV

## Summary Judgment Exhibits

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|
| Brown Decl. Ex. 85 | Nassau County Economic Development Plan (excerpts) | 11/15/2002 | JA 2707 |
| Brown Decl. Ex. 86 | Draft Analysis of Impediments to Fair Housing Choice (excerpts) | 08/2004 | JA 2729 |
| Brown Decl. Ex. 88 | Spreadsheet entitled "Office of Housing & Homeless Services Tracking" | N/A | JA 2735 |
| Brown Decl. Ex. 89 | DRAFT Existing Public/Assisted/Affordable Housing Resources | 06/2008 | JA 2736 |

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|
| Brown Decl. Ex. 91 | Newspaper article, "The Forbidden Garden," *The New York Times* | 05/14/2006 | JA 2745 |

## Joint Appendix – Volume XIV of XV

## Summary Judgment Exhibits

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|
| Brown Decl. Ex. 94 | Declaration of Nancy McArdle | 09/12/2008 | JA 2747 |
| Brown Decl. Ex. 99 | Excerpts of Diane Goins Deposition Transcript | 02/01/2011 | JA 2778 |
| Brown Decl. Ex. 100 | Excerpts of Carl Schroeter Deposition Transcript (incorrectly dated September 28, 200**9**) | 09/28/2010 | JA 2781 |
| Brown Decl. Ex. 101 | Nassau County's Analysis of Impediments and Fair Housing Plan (excerpts) | 07/21/2010 | JA 2796 |
| Brown Decl. Ex. 104 | Nassau Urban County Consortium Five Year (2010-2014) Consolidated Plan & Annual Action Plan (excerpts) | N/A | JA 2847 |
| Brown Decl. Ex. 106 | Study entitled "Whites Only: Racial Discrimination in the Nassau County Real Estate Market and in the Public School System," published by New York ACORN Long Island | 02/2004 | JA 2861 |
| Brown Decl. Ex. 107 | Nassau Urban County Consortium, End of the Year Reporting Narratives for IDIS for Fiscal Year 2009 (excerpts) | 2009-2010 | JA 2891 |
| Brown Decl. Ex. 109 | The Racial Equity Report Card: Fair Housing on Long Island: A Report from ERASE Racism | 03/2009 | JA 2915 |

## Joint Appendix – Volume XV of XV

## Summary Judgment Exhibits

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|
| Brown Decl. Ex. 110 | Nassau County Interim Finance Authority Resolution No. 11 | 01/26/2011 | JA 2985 |
| Brown Decl. Ex. 111 | *County of Nassau v. Nassau County Interim Finance Authority*, No. 001455-11, 2001 WL 1044556 (Sup. Ct. Nassau Cnty. March 11, 2011) | 03/11/2011 | JA 3022 |
| Brown Decl. Ex. 123 | Excerpts of C. Schroeter Deposition Transcript (incorrectly dated September 28, 200**9**) | 09/28/2010 | JA 3040 |
| Brown Decl. Ex. 124 | Excerpts of D. Goins Deposition Transcript | 02/01/2011 | JA 3048 |
| Brown Decl. Ex. 126 | Letters from S. Brown to R. Reissman dated August 18, 2011 and August 29, 2011 (excerpts of full Ex. 126) | N/A | JA 3052 |

# U.S. District Court
## Eastern District of New York (Central Islip)
## CIVIL DOCKET FOR CASE #: 2:05-cv-02301-ADS-WDW

Mhany Management Inc. et al v. County Of Nassau et al
Assigned to: Judge Arthur D. Spatt
Referred to: Magistrate Judge William D. Wall
Cause: 42:405 Fair Housing Act

Date Filed: 05/12/2005
Date Terminated: 04/22/2014
Jury Demand: Plaintiff
Nature of Suit: 443 Civil Rights:
Accomodations
Jurisdiction: Federal Question

**Plaintiff**

**Vic Devita**                    represented by    **Joseph D. Rich**
Lawyers' Committee for Civil Rights
Under Law
1401 New York Avenue, NW
Suite 400
Washington, DC 20005
202-662-8331
Fax: 202-783-5113
Email: jrich@lawyerscommittee.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Peter Joseph Dennin**
Hogan Lovells US LLP
875 Third Avenue
New York, NY 10022
212-918-3000
Fax: 212-918-3100
Email: peter.dennin@hoganlovells.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Abigail E. Shafroth**
Lawyers' Committee for Civil Rights
Under Law
1401 New York Ave, Nw
Suite 400
Washington, DC 20005
202-662-8342
Fax: 202-783-0857
Email:
ashafroth@lawyerscommittee.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

JA 1

**Chava Brandriss**
Hogan Lovells US LLP
875 Third Avenue
New York, NY 10022
212-918-3000
Fax: 212-918-3100
Email:
chava.brandriss@hoganlovells.com
*ATTORNEY TO BE NOTICED*

**Joanna F. Wasick**
Hogan Lovells US LLP
875 Third Avenue
New York, NY 10022
212-918-3000
Fax: 212-918-3100
Email:
joanna.wasick@hoganlovells.com
*ATTORNEY TO BE NOTICED*

**Linda H. Mullenbach**
Lawyers' Committee For Civil Rights
Under Law
1401 New York Avenue Nw, Suite 400
Washington, DC 20005
202-662-8340
Fax: 202-783-0857
Email:
lmullenbach@lawyerscommittee.org
*ATTORNEY TO BE NOTICED*

**Luz Maria Henriquez**
Hogan Lovells US LLP
875 Third Ave
New York, NY 10022
347-712-0371
Fax: 212-918-3100
Email:
luz.henriquez@hoganlovells.com
*ATTORNEY TO BE NOTICED*

**Sabrina Helene Cochet**
Hogan Lovells US LLP
875 Third Avenue
New York, NY 10022
212-918-3000
Fax: 212-918-3100
Email:
sabrina.cochet@hoganlovells.com

*ATTORNEY TO BE NOTICED*

**Stanley Joseph Brown**
Hogan Lovells US LLP
875 Third Avenue
New York, NY 10022
212-918-3692
Fax: 212-918-3100
Email:
stanley.brown@hoganlovells.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**McCray, Francine**                    represented by    **Joseph D. Rich**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Peter Joseph Dennin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Abigail E. Shafroth**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Andrew Jaan Sein**
Hogan Lovells US LLP
875 Third Avenue
New York, NY 10022
(212)918-3582
Fax: (212)918-3100
Email: andrew.sein@hoganlovells.com
*ATTORNEY TO BE NOTICED*

**Benjamin Andrew Fleming**
Hogan Lovells US LLP
875 Third Avenue
New York, NY 10222
212-918-3283
Fax: 212-918-3100
Email:
benjamin.fleming@hoganlovells.com
*ATTORNEY TO BE NOTICED*

**Chava Brandriss**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Joanna F. Wasick**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Linda H. Mullenbach**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Luz Maria Henriquez**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sabrina Helene Cochet**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Joy Gregory**
Hogan Lovells
875 Third Avenue
New York, NY 10022
212-918-3047
Fax: 212-918-3100
Email:
sarah.gregory@hoganlovells.com
*ATTORNEY TO BE NOTICED*

**Stanley Joseph Brown**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MHANY Management, Inc.**          represented by   **Ira M. Feinberg**
*also known as*                                      Hogan Lovells US LLP
New York Acor Housing Company                        875 Third Avenue
                                                     New York, NY 10022
                                                     212-918-3000
                                                     Fax: 212-918-3100
                                                     Email: ira.feinberg@hoganlovells.com
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**Joseph D. Rich**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stanley Joseph Brown**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Abigail E. Shafroth**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Benjamin Andrew Fleming**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Caroline H. Cheng**
Hogan Lovells US LLP
875 Third Ave
New York, NY 10022
(212)918-3045
Fax: (212)918-3100
Email:
caroline.cheng@hoganlovells.com
*ATTORNEY TO BE NOTICED*

**Chava Brandriss**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Linda H. Mullenbach**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Peter Joseph Dennin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sabrina Helene Cochet**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Joy Gregory**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Intervenor Plaintiff**

**New York Communities For Change, Inc.**          represented by **Joseph D. Rich**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*

**JA 5**

*ATTORNEY TO BE NOTICED*

**Stanley Joseph Brown**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Linda H. Mullenbach**
Lawyers' Committee For Civil Rights
Under Law
1401 New York Ave Nw
Suite 400
Washington, DC 20005
202-662-8340
Fax: 202-783-0857
Email:
lmullenbach@lawyerscommittee.org
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Incorporated Village of Garden City**    represented by    **James G. Ryan**
Cullen and Dykman, LLP
100 Quentin Roosevelt Boulevard
Garden City, NY 11530
(516) 357-3700
Fax: (516) 296-9155
Email: jryan@cullenanddykman.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ariel E. Ronneburger**
Cullen and Dykman LLP
100 Quentin Roosevelt Boulevard
Garden City, NY 11530
516-296-9182
Fax: 516-296-9155
Email:
aronneburger@cullenanddykman.com
*ATTORNEY TO BE NOTICED*

**Cynthia Ann Augello**
Cullen and Dykman LLP
100 Quentin Roosevelt Boulevard
Garden City, NY 11530
516-357-3753
Fax: 516-357-3792
Email:
caugello@cullenanddykman.com

**JA 6**

*ATTORNEY TO BE NOTICED*

**Douglas J. Bohn**
Cullen and Dykman, LLP
100 Quentin Roosevelt Blvd.
Garden City, NY 11530
516-357-3700
Fax: 516-296-9155
Email: dbohn@cullenanddykman.com
*ATTORNEY TO BE NOTICED*

**Jennifer A. McLaughlin**
Cullen and Dykman Bleakley Platt,
LLP
100 Quentin Roosevelt Boulevard
Garden City, NY 11530
516-357-3713
Fax: 516-296-9155
Email:
jmclaughlin@cullenanddykman.com
*ATTORNEY TO BE NOTICED*

**Michael A. Carvin**
Jones Day
51 Louisiana Avenue, NW
Washington, DC 20001
202-879-3939
Fax: 202-626-1700
Email: macarvin@jonesday.com
*ATTORNEY TO BE NOTICED*

**Sardar Mohammad Asadullah**
Cullen and Dykman LLP
100 Quentin Roosevelt Blvd
Garden City, NY 11530
516-357-3700
Fax: 516-296-9155
Email:
sasadullah@cullenanddykman.com
*ATTORNEY TO BE NOTICED*

**Thomas B. Wassel**
Cullen and Dykman LLP
100 Quentin Roosevelt Boulevard
Garden City, NY 11530
516-357-3868
Fax: 516-296-9155
Email: twassel@cullenanddykman.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Garden City Board of Trustees**                 represented by  **James G. Ryan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ariel E. Ronneburger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Cynthia Ann Augello**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Douglas J. Bohn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jennifer A. McLaughlin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sardar Mohammad Asadullah**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Thomas B. Wassel**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/12/2005 | 1 | COMPLAINT *(Receipt #309802)* against all defendants $ 250, filed by all plaintiffs. (Attachments: # 1 Civil Cover Sheet)(Carine, Sandra) (Entered: 05/16/2005) |
| 05/12/2005 | | Summons Issued as to County of Nassau, Nassau County Planning Commission, Nassau County Office of Real Estate & Development, Incorporated Village of Garden City, Garden City Board of Trustees. (Carine, Sandra) (Entered: 05/16/2005) |
| 05/12/2005 | 2 | DISCLOSURE of Interested Parties by Vernon Ghullkie, Natalie Guerrido, Acorn, Daphne Andrews, Vic Devita.(Carine, Sandra) (Entered: 05/16/2005) |
| 05/16/2005 | | Case Ineligible for Arbitration(Bollbach, Jean) (Entered: 05/16/2005) |
| 05/19/2005 | 3 | SUMMONS Returned Executed by Vernon Ghullkie, Natalie Guerrido, Daphne Andrews, Vic Devita. Nassau County Office of Real Estate & Development served on 5/13/2005, answer due 6/2/2005. (Bridges, Kim) (Entered: 05/19/2005) |
| 05/19/2005 | 4 | SUMMONS Returned Executed by Vernon Ghullkie, Natalie Guerrido, |

**JA 8**

| | | |
|---|---|---|
| | | Daphne Andrews, Vic Devita. County of Nassau served on 5/13/2005, answer due 6/2/2005. (Bridges, Kim) (Entered: 05/19/2005) |
| 05/19/2005 | 5 | SUMMONS Returned Executed by Vernon Ghullkie, Natalie Guerrido, Daphne Andrews, Vic Devita. Nassau County Planning Commission served on 5/13/2005, answer due 6/2/2005. (Bridges, Kim) (Entered: 05/19/2005) |
| 05/19/2005 | 6 | SUMMONS Returned Executed by Vernon Ghullkie, Natalie Guerrido, Daphne Andrews, Vic Devita. Incorporated Village of Garden City served on 5/13/2005, answer due 6/2/2005. (Bridges, Kim) (Entered: 05/19/2005) |
| 05/19/2005 | 7 | SUMMONS Returned Executed by Vernon Ghullkie, Natalie Guerrido, Daphne Andrews, Vic Devita. Garden City Board of Trustees served on 5/13/2005, answer due 6/2/2005. (Bridges, Kim) (Entered: 05/19/2005) |
| 06/08/2005 | 8 | AFFIDAVIT *of Service* by Acorn. (Brewington, Frederick) (Entered: 06/08/2005) |
| 06/08/2005 | 9 | AFFIDAVIT *of service* by Acorn. (Brewington, Frederick) (Entered: 06/08/2005) |
| 06/08/2005 | 10 | AFFIDAVIT *of service* by Acorn. (Brewington, Frederick) (Entered: 06/08/2005) |
| 06/08/2005 | 11 | AFFIDAVIT *of service* by Acorn. (Brewington, Frederick) (Entered: 06/08/2005) |
| 06/08/2005 | 12 | AFFIDAVIT *of service* by Acorn. (Brewington, Frederick) (Entered: 06/08/2005) |
| 06/08/2005 | 13 | STIPULATION *to Extend Time to Answer* by County of Nassau, Nassau County Planning Commission, Nassau County Office of Real Estate & Development. (Attachments: # 1 Stipulation to Extend Time to Answer) (Bresnaider O'Neill, Bethany) (Entered: 06/08/2005) |
| 06/09/2005 | | ORDER The stipulation extending the Nassau County Defendants' time to answer, docketed as attacment #1 to 13, is hereby SO ORDERED. Ordered by Judge William D. Wall on 6/9/05. (Disbrow, Sandra) (Entered: 06/09/2005) |
| 06/14/2005 | 14 | Notice of MOTION for Limited Admission *of Jonathan P. Hooks and Nicole J. De Sario* by Vernon Ghullkie, Natalie Guerrido, Daphne Andrews, Vic Devita. (Attachments: # 1 Affidavit of Paul B. Sweeney in Support# 2 Affidavit of Jonathan P. Hooks# 3 Affidavit of Nicole J. De Sario# 4 Text of Proposed Order # 5 Certificate of Service)(Sweeney, Paul) (Entered: 06/14/2005) |
| 06/15/2005 | | ORDER granting 14 Motion for Limited Admission Pro Hac Vice, contingent upon payment of the appropriate fees pursuant to Local Civil Rule 1.3. Ordered by JudgeWilliam D. Wall on 6/15/05. (Disbrow, Sandra) (Entered: 06/15/2005) |
| 06/17/2005 | | FILING FEE: $ 50.00, receipt number 310886 for the admission pro hac vice of Jonathan Hooks and Nicole DeSario (Talbott, Thomas) (Entered: 06/27/2005) |

| 06/23/2005 | 15 | STIPULATION re 1 Complaint *Extending Time to Answer* by Incorporated Village of Garden City, Garden City Board of Trustees. (Ryan, James) (Entered: 06/23/2005) |
|---|---|---|
| 06/23/2005 | 16 | NOTICE of Appearance by James G. Ryan on behalf of Incorporated Village of Garden City, Garden City Board of Trustees (Attachments: # 1 Affidavit of Service)(Ryan, James) (Entered: 06/23/2005) |
| 06/27/2005 | | ORDER re 15 The stipulation extending the Garden City Defendants' time to answer is hereby SO ORDERED. Ordered by Judge William D. Wall on 6/27/05. (Disbrow, Sandra) (Entered: 06/27/2005) |
| 07/07/2005 | 17 | Letter MOTION for Hearing *for Motion to Dismiss* by Incorporated Village of Garden City, Garden City Board of Trustees. (Ryan, James) (Entered: 07/07/2005) |
| 07/11/2005 | 18 | Letter from David B. Goldin to Hon. Leonard D. Wexler Regarding a request for a pre-motion conference. (Goldin, David) (Entered: 07/11/2005) |
| 07/13/2005 | 19 | NOTICE of Appearance by David Bruce Goldin on behalf of County of Nassau, Nassau County Planning Commission, Nassau County Office of Real Estate & Development (Goldin, David) (Entered: 07/13/2005) |
| 07/13/2005 | 20 | AFFIDAVIT of Service for Notice of Appearance served on Paul B. Sweeney, Esq., James G. Ryan, Esq., and Law Offices of Frederick K. Brewington on July 13, 2005, filed by County of Nassau, Nassau County Planning Commission, Nassau County Office of Real Estate & Development. (Goldin, David) (Entered: 07/13/2005) |
| 07/22/2005 | 21 | Letter from Paul B. Sweeney to The Honorable Leonard D. Wexler Regarding plaintiffs' response to the defendants' requests for a pre-motion conference regarding their anticipated motions to dismiss. (Sweeney, Paul) (Entered: 07/22/2005) |
| 09/02/2005 | 22 | Letter from Paul Sweeney to Judge Wexler Regarding Pre-Motion Conference. (Sweeney, Paul) (Entered: 09/02/2005) |
| 09/12/2005 | 23 | Minute Entry for proceedings held before Leonard D. Wexler on 9/12/05 at 11:00 am. Case called. Counsel for all parties present. Conf. held. Deft's request to file motion to dismiss is GRANTED. Dft's request to stay discovery is GRANTED. Parties to agree on briefing schedule. Conf. concluded. (Montero, Edher) (Entered: 09/19/2005) |
| 09/12/2005 | | Motion terminated, 17 Letter MOTION for Hearing *for Motion to Dismiss* filed by Incorporated Village of Garden City, Garden City Board of Trustees. Hearing held on 9/12/05. (Talbott, Thomas) (Entered: 01/30/2006) |
| 11/30/2005 | 24 | AMENDED COMPLAINT against County of Nassau, Incorporated Village of Garden City, Garden City Board of Trustees, filed by Lisbett Hunter, McCray, Francine, New York Acorn Housing Company, Vernon Ghullkie, Natalie Guerrido, Acorn, Vic Devita. (Attachments: # 1 Certificate of Service) (Sweeney, Paul) (Entered: 11/30/2005) |
| 11/30/2005 | 25 | DISCLOSURE of Interested Parties by New York Acorn Housing Company. |

| | | |
|---|---|---|
| | | (Sweeney, Paul) (Entered: 11/30/2005) |
| 11/30/2005 | 26 | NOTICE by McCray, Francine, New York Acorn Housing Company, Vernon Ghullkie, Natalie Guerrido, Acorn, Lisbett Hunter, Vic Devita *of Dismissal of Claims Against Certain Defendants* (Attachments: # 1 Certificate of Service) (Sweeney, Paul) (Entered: 11/30/2005) |
| 12/02/2005 | 27 | Letter from Paul B. Sweeney to The Honorable Leonard D. Wexler Regarding filing of amended complaint and motions to dismiss. (Sweeney, Paul) (Entered: 12/02/2005) |
| 12/06/2005 | | ENDORSED ORDER re 26 Notice filed by plaintiffs: Plaintiffs hereby voluntarily dismiss, without prejudice all claims against defts, Nassau County Planning Commission and Nassau County Office of Real Estate & Development. (Ordered by Judge Leonard D. Wexler on 12/6/05). c/m eod #26(Montero, Edher) (Entered: 12/12/2005) |
| 12/14/2005 | 28 | Letter from Paul B. Sweeney to The Honorable Leonard D. Wexler Regarding briefing schedule for motion to dismiss amended complaint. (Sweeney, Paul) (Entered: 12/14/2005) |
| 12/16/2005 | | ORDER re 18 Letter. A pre-motion conference is unnecessary; the parties' proposed briefing schedule is So Ordered by Judge Leonard D. Wexler on 12/16/05. (Ausili, Peter) (Entered: 12/16/2005) |
| 02/09/2006 | | Case reassigned to Judge Joseph F. Bianco. Judge Leonard D. Wexler no longer assigned to the case. (Bowens, Priscilla) (Entered: 02/10/2006) |
| 02/14/2006 | 29 | Letter *Plaintiffs' Letter Requesting Extension to Page Limit for Opposition to Motions to Dismiss* by McCray, Francine, New York Acorn Housing Company, Vernon Ghullkie, Natalie Guerrido, Acorn, Lisbett Hunter, Vic Devita. (Sweeney, Paul) (Entered: 02/14/2006) |
| 02/15/2006 | | ORDER re 29 Letter filed by counsel for plaintiffs. The unopposed request by plaintiffs to file a 40 page opposition brief is GRANTED. Ordered by Judge Joseph F. Bianco on 2/15/06. (Blanche, Todd) (Entered: 02/15/2006) |
| 03/10/2006 | 30 | Notice of MOTION to Dismiss by County of Nassau. Responses due by 3/10/2006 (Attachments: # 1 Nassau County's Memorandum of Law in Support of Motion to Dismiss the Amended Complaint# 2 Affidavit Defendant (Nassau County) Affidavit of Service)(Bresnaider O'Neill, Bethany) (Entered: 03/10/2006) |
| 03/10/2006 | 31 | RESPONSE in Opposition re 30 Notice of MOTION to Dismiss *the amended complaint* filed by all plaintiffs. (Bresnaider O'Neill, Bethany) (Entered: 03/10/2006) |
| 03/10/2006 | 32 | REPLY to Response to Motion re 30 Notice of MOTION to Dismiss *the amended complaint* filed by County of Nassau. (Bresnaider O'Neill, Bethany) (Entered: 03/10/2006) |
| 03/10/2006 | 33 | Letter *requesting oral argument of the Defendant's Motion to Dismiss the Amended Complaint (Document Number 30)* by County of Nassau. (Bresnaider O'Neill, Bethany) (Entered: 03/10/2006) |

| 03/10/2006 | 34 | MOTION to Dismiss *Amended Complaint* by Incorporated Village of Garden City, Garden City Board of Trustees. Responses due by 3/10/2006 (Attachments: # 1 # 2 # 3 # 4 # 5 # 6 # 7 # 8 # 9 # 10 # 11 # 12 # 13)(Ryan, James) (Entered: 03/10/2006) |
|---|---|---|
| 06/09/2006 | 35 | ORDER: SEE ATTACHED ORDER setting oral argument on the outstanding motions on June 26, 2006 at 2:00 p.m. in the United States Federal Courthouse, 100 Federal Plaza, Central Islip, New York, Courtroom 920. Ordered by Judge Joseph F. Bianco on 6/9/06. (Blanche, Todd) (Entered: 06/09/2006) |
| 06/26/2006 | 36 | Calendar Entry for proceedings held before The Honorable Joseph F. Bianco, United States District Judge on 6/26/06 at 2:00 p.m. for Civil Cause for Oral Argument; Appearances: Pltff(s). Attny: Paul B. Sweeney, present; Jonathan P. Hooks, present; Deft(s). Attny.: James G. Ryan, present; Esther D. Miller, present; Reporter: Perry Auerbach; Courtroom Deputy: Michele Savona. Case called. Argument heard. Decision: Reserved. (Fagan, Linda) (Entered: 06/26/2006) |
| 07/21/2006 | 37 | MEMORANDUM AND ORDER. SEE ATTACHED memorandum and order denying 30 34 motions to dismiss, and directing the parties to proceed with discovery in accordance with the direction of Magistrate Judge Wall. Ordered by Judge Joseph F. Bianco on 7/21/06. (Blanche, Todd) (Entered: 07/21/2006) |
| 07/21/2006 | 38 | ORDER: Scheduling initial conference for 9/6/06. See order and attachments. Ordered by Judge William D. Wall on 7/21/06. (Attachments: # 1 WDW rules# 2 ECF notice) c/e(Disbrow, Sandra) (Entered: 07/21/2006) |
| 07/25/2006 | 39 | MOTION to Withdraw as Attorney by all plaintiffs. (Desario, Nicole) (Entered: 07/25/2006) |
| 08/04/2006 | 40 | NOTICE of Appearance by Andrew Reginald Scott on behalf of County of Nassau (Scott, Andrew) (Entered: 08/04/2006) |
| 08/04/2006 | 41 | First MOTION for Extension of Time to File Answer by County of Nassau. (Scott, Andrew) (Entered: 08/04/2006) |
| 08/04/2006 | 42 | First MOTION for Extension of Time to File Answer *to Amended Complaint (corrected)* by County of Nassau. (Scott, Andrew) (Entered: 08/04/2006) |
| 08/04/2006 | 43 | Letter *Extending Time to Answer Amended Complaint by Incorporated Village of Garden City Board of Trustees and* by Incorporated Village of Garden City. (Ryan, James) (Entered: 08/04/2006) |
| 08/04/2006 | | Motions terminated; 41 First MOTION for Extension of Time to File Answer filed by County of Nassau. (See 42 (corrected) Motion.) (Fagan, Linda) (Entered: 08/07/2006) |
| 08/07/2006 | | ORDER granting 42 Motion for Extension of Time to File Answer to Amended Complaint (corrected). County of Nassau answer due 8/18/2006. Ordered by Judge William D. Wall on 08/07/06. (Hepworth, F.) (Entered: 08/07/2006) |
| 08/07/2006 | | ORDER TO ANSWER re 43 Letter filed by Incorporated Village of Garden |

| | | |
|---|---|---|
| | | City. Garden City Board of Trustees answer due 8/18/2006. The parties are advised that, in future, all requests to Judge Wall for court intervention must be docketed as letter motions or motions, not as letters, pursuant to the undersigned's Individual Rules1(C), 2(C), and/or 3(A), or the application will be rejected. Ordered by Judge William D. Wall on 08/07/06. (Hepworth, F.) (Entered: 08/07/2006) |
| 08/18/2006 | 44 | ANSWER to Amended Complaint *by Garden City Board of Trustees and* by Incorporated Village of Garden City.(Ryan, James) (Entered: 08/18/2006) |
| 08/18/2006 | 45 | ANSWER to Amended Complaint by County of Nassau.(Miller, Esther) (Entered: 08/18/2006) |
| 08/22/2006 | 46 | NOTICE of Appearance by Jenny Rubin Robertson on behalf of McCray, Francine, Vernon Ghullkie, Natalie Guerrido, Lisbett Hunter, Vic Devita (Attachments: # 1 Certificate of Service)(Robertson, Jenny) (Entered: 08/22/2006) |
| 08/24/2006 | 47 | NOTICE of Appearance by Cynthia Dorsainvil Sleet on behalf of McCray, Francine, Vernon Ghullkie, Natalie Guerrido, Lisbett Hunter, Vic Devita (Attachments: # 1 Certificate of Service)(Sleet, Cynthia) (Entered: 08/24/2006) |
| 08/25/2006 | 48 | REPORT of Rule 26(f) Planning Meeting. (Attachments: # 1 Certificate of Service)(Sweeney, Paul) (Entered: 08/25/2006) |
| 08/25/2006 | | Incorrect Case/Document/Entry Information. Document 49 REPORT of Rule 26(f) Planning Meeting, filed on 8/25/06 has been deleted. (The document was a duplicate to the 48 Report of Rule 26(f) Planning Meeting. All corrections have been made.) (Fagan, Linda) (Entered: 08/28/2006) |
| 09/06/2006 | 49 | Minute Entry & ORDER for proceedings held before William D. Wall : Initial Conference held on 9/6/2006. The court has adopted and So Ordered the joint proposed discovery plan 48 , with the exception of paragraph 6 which is stricken. Next status conference 1/10/07. See attached order. Ordered by William D. Wall on 9/6/06. c/g (Disbrow, Sandra) (Entered: 09/06/2006) |
| 10/23/2006 | 50 | STIPULATION of Dismissal *as to all defendants* by Natalie Guerrido. (Bridges, Kim) (Entered: 10/23/2006) |
| 10/24/2006 | 51 | ORDER re 50 Stipulation of Dismissal filed by Natalie Guerrido; It Is Stipulated And Agreed, that all claims brought by pltff Natalie Guerrido shall be dismissed without prejudice as to all defts purs. to Rule 41(a)(1)(ii) of the F.R.C.P., and with each party to bear its own costs and attorneys' fees; that only claims brought by Natalie Guerrido shall be dismissed; and that the other pltffs shall proceed with their claims. So Ordered. ( Ordered by Judge Joseph F. Bianco on 10/24/06. )(Fagan, Linda) (Entered: 10/24/2006) |
| 11/21/2006 | 52 | Letter MOTION to Compel *Discovery* by McCray, Francine, Vernon Ghullkie, Lisbett Hunter, Vic Devita. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D# 5 Exhibit E# 6 Exhibit F# 7 Exhibit G# 8 Exhibit H# 9 Exhibit I)(Robertson, Jenny) (Entered: 11/21/2006) |
| 11/22/2006 | 53 | Notice of MOTION for Leave to Appear Pro Hac Vice *of Joseph D. Rich and* |

| | | |
|---|---|---|
| | | *Nicole L. Birch* by McCray, Francine, Vernon Ghullkie, Lisbett Hunter, Vic Devita. (Attachments: # 1 Proposed Order for Admission# 2 Declaration of Kim F. Bridges# 3 Affidavit of Joseph D. Rich# 4 Affidavit of Nicole L. Birch# 5 Certificate of Service)(Bridges, Kim) (Entered: 11/22/2006) |
| 11/27/2006 | | ELECTRONIC ORDER granting 53 Motion for Leave to Appear pro hac vice Joseph D. Rich and Nicole Birch for plaintiffs. The motion is granted contingent upon payment of the appropriate fees pursuant to Local Civil Rule 1.3. Counsel is further directed to register for ECF immediately. Ordered by JudgeWilliam D. Wall on 11/27/06. (Disbrow, Sandra) (Entered: 11/27/2006) |
| 11/27/2006 | 54 | RESPONSE in Opposition re 52 Letter MOTION to Compel *Discovery with exhibits* filed by County of Nassau. (Attachments: # 1 Exhibit County Exhibits A-H)(Scott, Andrew) (Entered: 11/27/2006) |
| 12/01/2006 | 55 | Letter MOTION for Discovery *in opposition to Defendant Nassau County's cross-motion for a protective order* by all plaintiffs. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D# 5 Exhibit E# 6 Exhibit F# 7 Exhibit G)(Sweeney, Paul) (Entered: 12/01/2006) |
| 12/04/2006 | | ELECTRONIC ORDER denying 55 . The filing is rejected for failure to comply with Local Civil Rule 37.3(c) and the undersigned's individual rules. Responses to letter motions may not exceed 3 pages. Additionally, responses in opposition must be filed as such and not as an additional motion. Plaintiffs may refile their response accordingly. Ordered by JudgeWilliam D. Wall on 12/4/06. (Disbrow, Sandra) (Entered: 12/04/2006) |
| 12/05/2006 | 56 | Letter *in opposition to Defendant County of Nassau's cross-motion for a protective order in its 11/27/06 letter* by McCray, Francine, New York Acorn Housing Company, Vernon Ghullkie, Acorn, Daphne Andrews, Lisbett Hunter, Vic Devita. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D# 5 Exhibit E# 6 Exhibit F# 7 Exhibit G)(Bridges, Kim) (Entered: 12/05/2006) |
| 12/08/2006 | | ELECTRONIC ORDER: A conference regarding the pending discovery motions has been scheduled for 12/14/06 at 1:30 p.m. Any motion to adjourn this conference must include proposed alternae dates acceptable to all parties. Ordered by Judge William D. Wall on 12/8/06. (Disbrow, Sandra) (Entered: 12/08/2006) |
| 12/14/2006 | | Minute Entry for proceedings held before William D. Wall : Discovery conference held on 12/14/2006. (Disbrow, Sandra) (Entered: 12/14/2006) |
| 12/14/2006 | 57 | ORDER denying as moot, without prejudice, 52 Motion to Compel and 54 cross-motion for protective order. The parties shall meet and confer on all the issues raised in the motions. Next status conference will be held on 1/10/07. See attached order. Ordered by JudgeWilliam D. Wall on 12/14/06. c/g (Disbrow, Sandra) (Entered: 12/14/2006) |
| 01/03/2007 | 58 | Letter MOTION to Compel *Testimony and Documents from the Garden City Defendants* by McCray, Francine, Vernon Ghullkie, Lisbett Hunter, Vic Devita. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C) (Bridges, Kim) (Entered: 01/03/2007) |

| 01/04/2007 | 59 | NOTICE of Appearance by Ralph J. Reissman on behalf of County of Nassau (Reissman, Ralph) (Entered: 01/04/2007) |
|---|---|---|
| 01/08/2007 | 60 | RESPONSE in Opposition re 58 Letter MOTION to Compel *Testimony and Documents from the Garden City Defendants Incorporated Village of Garden City and Garden City Board of Trustees* filed by Incorporated Village of Garden City, Garden City Board of Trustees. (Attachments: # 1) (Ryan, James) (Entered: 01/08/2007) |
| 01/08/2007 | 61 | NOTICE of Appearance by Ralph J. Reissman on behalf of County of Nassau (Reissman, Ralph) (Entered: 01/08/2007) |
| 01/09/2007 | 62 | NOTICE of Appearance by Peter Joseph Dennin on behalf of McCray, Francine, Vernon Ghullkie, Lisbett Hunter, Vic Devita (Attachments: # 1 Certificate of Service) (Dennin, Peter) (Entered: 01/09/2007) |
| 01/09/2007 | 63 | NOTICE of Change of ADD ATTORNEY TO E-MAIL NOTICE OF ELECTRONIC CASE FILINGS -- NEW E-MAIL ADDRESS by Ralph J. Reissman (Reissman, Ralph) (Entered: 01/09/2007) |
| 01/10/2007 | 64 | Minute Order. Proceedings held before Judge William D. Wall : Status Conference held on 1/10/2007. The parties shall submit briefs regarding the assertion of legislative privilege no later than 1/24/07. Next status confernece will be held on 2/28/07 at 10:00 a.m. Ordered by William D. Wall on 1/10/07. c/g (Disbrow, Sandra) (Entered: 01/10/2007) |
| 01/12/2007 | 65 | Letter *requesting confidentiality order be so ordered* by Incorporated Village of Garden City, Garden City Board of Trustees (Attachments: # 1 Confidentiality Order) (McLaughlin, Jennifer) (Entered: 01/12/2007) |
| 01/19/2007 | | ELECTRONIC ORDER The Stipulation and Order for the Protection of Confidential Information submitted by the parties and docketed as [65-2] is hereby So Ordered. Ordered by Judge William D. Wall on 1/19/07. (Disbrow, Sandra) (Entered: 01/19/2007) |
| 01/24/2007 | 66 | Notice of MOTION to Compel *Deposition Testimony and Documents from the Garden City Defendants* by all plaintiffs. (Bridges, Kim) (Entered: 01/24/2007) |
| 01/24/2007 | 67 | MEMORANDUM in Support re 66 Notice of MOTION to Compel *Deposition Testimony and Documents from the Garden City Defendants* by all plaintiffs. (Bridges, Kim) (Entered: 01/24/2007) |
| 01/24/2007 | 68 | CERTIFICATE OF SERVICE by McCray, Francine, New York Acorn Housing Company, Vernon Ghullkie, Natalie Guerrido, Acorn, Daphne Andrews, Lisbett Hunter, Vic Devita re 67 Memorandum in Support, 66 Notice of MOTION to Compel *Deposition Testimony and Documents from the Garden City Defendants* (Bridges, Kim) (Entered: 01/24/2007) |
| 01/24/2007 | 69 | RESPONSE in Opposition re 66 Notice of MOTION to Compel *Deposition Testimony and Documents from the Garden City Defendants*, 58 Letter MOTION to Compel *Testimony and Documents from the Garden City Defendants Memorandum of Law* filed by Incorporated Village of Garden City, Garden City Board of Trustees. (Attachments: # 1 Affidavit Robert L. |

| | | Schoelle, Jr.# 2 Affidavit Michael D. Fillipon# 3 Exhibit A to Filippon Affidavit) (Ryan, James) (Entered: 01/24/2007) |
|---|---|---|
| 01/24/2007 | 70 | Letter *Federal Expressing to Judge Wall courtesy copies of Memorandum of Law Supplementing Letter Submission Dated January 8, 2007* by Incorporated Village of Garden City, Garden City Board of Trustees (Ryan, James) (Entered: 01/24/2007) |
| 01/25/2007 | 71 | ORDER granting 39 Motion to Withdraw as Attorney. The Court grants leave for Nicole J. DeSario to withdraw as counsel for plaintiffs. She is relieved of futher responsibility to the Court. SO ORDERED. Ordered by Judge Joseph F. Bianco on 1/25/2007. (Fee, Adam) Additional attachment(s) added on 1/29/2007 (Fagan, Linda). (Entered: 01/25/2007) |
| 02/28/2007 | 72 | Minute Entry & ORDER for proceedings held before William D. Wall : Status Conference held on 2/28/2007. Next status conference will be held on 4/18/07. Ordered by William D. Wall on 2/28/07. c/g (Disbrow, Sandra) (Entered: 02/28/2007) |
| 03/12/2007 | 73 | Supplemental MOTION to Compel *Testimony and Documents from the Garden City Defendants by all Plaintiffs* by McCray, Francine, New York Acorn Housing Company, Vernon Ghullkie, Acorn, Lisbett Hunter, Vic Devita. (Bridges, Kim) (Entered: 03/12/2007) |
| 03/12/2007 | 74 | Letter *supplementing submission with regard to legislative privilege* by Incorporated Village of Garden City, Garden City Board of Trustees (McLaughlin, Jennifer) (Entered: 03/12/2007) |
| 03/29/2007 | 75 | NOTICE of Appearance by Karen Schmidt on behalf of County of Nassau (aty to be noticed) (Schmidt, Karen) (Entered: 03/29/2007) |
| 04/17/2007 | | ELECTRONIC ORDER: The status conference scheduled for 4/18/07 is adjourned to 4/20/07 at 10:00 a.m. Ordered by Judge William D. Wall on 4/16/07. (Disbrow, Sandra) (Entered: 04/17/2007) |
| 04/20/2007 | 76 | Minute Entry & ORDER for proceedings held before William D. Wall : Status Conference held on 4/20/2007. Discovery is ongoing. The parties shall submit a joint proposed amended discovery plan within 10 days. Ordered by William D. Wall on 4/20/07. c/g (Disbrow, Sandra) (Entered: 04/20/2007) |
| 04/26/2007 | 77 | NOTICE by McCray, Francine, Vernon Ghullkie, Lisbett Hunter, Vic Devita *Amended Report of Parties' Discovery Planning Conference Pursuant to Rule 26(F)* (Bridges, Kim) (Entered: 04/26/2007) |
| 05/07/2007 | 78 | STATUS REPORT *with regard to amending November 27, 2006 privilege log* by Incorporated Village of Garden City, Garden City Board of Trustees (McLaughlin, Jennifer) (Entered: 05/07/2007) |
| 05/11/2007 | 79 | Letter *enclosing amended privilege log of BFJ documents* by Incorporated Village of Garden City, Garden City Board of Trustees (McLaughlin, Jennifer) (Entered: 05/11/2007) |
| 05/14/2007 | | ELECTRONIC ORDER: The proposed amended discovery plan 77 submitted by the parties is hereby So Ordered. A status conference is scheduled for |

| | | |
|---|---|---|
| | | 7/10/07 at 11:00 a.m. Ordered by Judge William D. Wall on 5/14/07. (Disbrow, Sandra) (Entered: 05/14/2007) |
| 07/05/2007 | 80 | Letter MOTION to Compel *the Production of Certain Documents by Defendant Nassau County, motion filed* by McCray, Francine, Vernon Ghullkie, Lisbett Hunter, Vic Devita. (Attachments: # 1 Exhibit A# 2 Exhibit B) (Dennin, Peter) (Entered: 07/05/2007) |
| 07/10/2007 | 81 | RESPONSE in Opposition re 80 Letter MOTION to Compel *the Production of Certain Documents by Defendant Nassau County, motion filed by plaintiffs; opposition to motion* filed by County of Nassau. (Reissman, Ralph) (Entered: 07/10/2007) |
| 07/10/2007 | 82 | Minute Entry & ORDER for proceedings held before William D. Wall : Status Conference held on 7/10/2007. Next status conference will be held on 9/24/07 at 11:00 a.m. Ordered by William D. Wall on 7/10/07. c/g (Disbrow, Sandra) (Entered: 07/10/2007) |
| 09/17/2007 | 83 | Letter MOTION to Take Deposition by McCray, Francine, Vernon Ghullkie, Lisbett Hunter, Vic Devita. (Sweeney, Paul) (Entered: 09/17/2007) |
| 09/17/2007 | 84 | RESPONSE to Motion re 83 Letter MOTION to Take Deposition filed by County of Nassau. (Schmidt, Karen) (Entered: 09/17/2007) |
| 09/18/2007 | 85 | RESPONSE in Opposition re 83 Letter MOTION to Take Deposition filed by Incorporated Village of Garden City, Garden City Board of Trustees. (Ryan, James) (Entered: 09/18/2007) |
| 09/24/2007 | 86 | Minute Entry & ORDER for proceedings held before William D. Wall : Status Conference held on 9/24/2007. Next status conference will be held on 12/6/07 at 11:00 a.m. Ordered by William D. Wall on 9/24/07. c/g (Disbrow, Sandra) (Entered: 09/24/2007) |
| 09/25/2007 | 87 | ORDER granting in part and denying in part 58 plaintiffs' Motion to Compel. See attached order. Ordered by JudgeWilliam D. Wall on 9/25/07. (Disbrow, Sandra) (Entered: 09/25/2007) |
| 09/25/2007 | | Motions terminated, docketed incorrectly: 73 Supplemental MOTION to Compel *Testimony and Documents from the Garden City Defendants by all Plaintiffs,* 66 *Notice of MOTION to Compel Deposition Testimony and Documents. Filings were made in support of 60 motion and were not separate motions. (Disbrow, Sandra) (Entered: 09/25/2007)* |
| 09/25/2007 | | Email Notification Test - DO NOT REPLY. (Coleman, Laurie) (Entered: 09/25/2007) |
| 10/10/2007 | 88 | NOTICE by McCray, Francine, Vernon Ghullkie, Lisbett Hunter, Vic Devita *Plaintiffs' Memorandum Of Law In Support Of Plaintiffs' Objection To Magistrate Judge Wall's Report And Recommendation Granting In Part And Denying In Part Plaintiffs' Motion To Compel Deposition Testimony And Documents From The Garden City Defendants* (Attachments: # 1 Certificate of Service) (Sweeney, Paul) (Entered: 10/10/2007) |
| 10/10/2007 | 89 | NOTICE by McCray, Francine, Vernon Ghullkie, Lisbett Hunter, Vic Devita |

| | | |
|---|---|---|
| | | *Declaration Of Peter J. Dennin In Further Support Of Plaintiffs' Objection To Magistrate Judge Wall's Report And Recommendation Granting In Part And Denying In Part Plaintiffs' Motion To Compel Deposition Testimony And Documents From The Garden City Defendants* (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D# 5 Exhibit E# 6 Exhibit F# 7 Exhibit G# 8 Exhibit H# 9 Exhibit I# 10 Exhibit J# 11 Exhibit K# 12 Exhibit L# 13 Exhibit M# 14 Certificate of Service) (Sweeney, Paul) (Entered: 10/10/2007) |
| 10/19/2007 | 90 | NOTICE by Incorporated Village of Garden City, Garden City Board of Trustees *McLaughlin Affidavit in Opposition to Plaintiffs' Objection to Magistrate Judge Wall's Report and Recommendation* (Attachments: # 1 Exhibit Exhibit A to McLaughlin Affidavit# 2 Exhibit Exhibit B to McLaughlin Affidavit# 3 Affidavit Affidavit of Service of McLaughlin Affidavit) (McLaughlin, Jennifer) (Entered: 10/19/2007) |
| 10/19/2007 | 91 | NOTICE by Incorporated Village of Garden City, Garden City Board of Trustees *Memorandum of Law of Defendants in Opposition to Plaintiffs' Objection to Magistrate Judge Wall's Report and Recommendation* (Attachments: # 1 Affidavit Affidavit of Service of MOL) (McLaughlin, Jennifer) (Entered: 10/19/2007) |
| 10/26/2007 | 92 | NOTICE by McCray, Francine, Vernon Ghullkie, Lisbett Hunter, Vic Devita *Plaintiffs' Memorandum Of Law In Support Of Plaintiffs' Reply To Garden City Defendants' Opposition To Plaintiffs' Objection To Magistrate Judge Wall's September 25, 2007 Report And Recommendation* (Attachments: # 1 Certificate of Service) (Sweeney, Paul) (Entered: 10/26/2007) |
| 11/05/2007 | | ELECTRONIC ORDER re 80 Letter MOTION to Compel. The Nassau County defendants shall submit to the court, for in camera review, copies of those documents for which it is asserting public interest and/or deliberative process privilege as listed in the privilege log. Ordered by Judge William D. Wall on 11/5/07. (Disbrow, Sandra) (Entered: 11/05/2007) |
| 11/06/2007 | 93 | Letter *advising when first report of Buckhurst Fish & Jacqueman was issued to Board* by Incorporated Village of Garden City, Garden City Board of Trustees (McLaughlin, Jennifer) (Entered: 11/06/2007) |
| 11/08/2007 | 94 | Letter *In Response To Garden City's Letter Dated November 6, 2007* by McCray, Francine, Vernon Ghullkie, Lisbett Hunter, Vic Devita (Sweeney, Paul) (Entered: 11/08/2007) |
| 11/09/2007 | 95 | Letter *to Magistrate Wall in response to plaintiff's letter of November 8, 2007* by Incorporated Village of Garden City, Garden City Board of Trustees (McLaughlin, Jennifer) (Entered: 11/09/2007) |
| 11/14/2007 | 96 | ORDER: The temporal marker for the purposes of implementing 87 Order will be May 14, 2003. See attached order. Ordered by Magistrate-Judge William D. Wall on 11/14/07. c/e (Disbrow, Sandra) (Entered: 11/14/2007) |
| 11/30/2007 | 97 | Letter *accompanying ex parte submission to Magistrate Wall* by County of Nassau (Schmidt, Karen) (Entered: 11/30/2007) |
| 12/03/2007 | 98 | Letter *accompanying supplemental ex parte submission to Magistrate Wall* by |

| | | County of Nassau (Schmidt, Karen) (Entered: 12/03/2007) |
|---|---|---|
| 12/05/2007 | 99 | NOTICE of Appearance by Toby William Smith on behalf of McCray, Francine, Vernon Ghullkie, Lisbett Hunter, Vic Devita (aty to be noticed) (Attachments: # 1 Certificate of Service) (Smith, Toby) (Entered: 12/05/2007) |
| 12/06/2007 | 100 | Minute Entry for proceedings held before Magistrate Judge William D. Wall:Status Conference held on 12/6/2007. The court will issue an amended discovery order consistent with the parties' submission. Ordered by William D. Wall on 12/6/07. (Disbrow, Sandra) (Entered: 12/06/2007) |
| 12/06/2007 | 101 | AMENDED SCHEDULING ORDER: The parties have proposed an amended discovery schedule which is adopted as indicated in the attached order. Pretrial Conference set for 11/14/2008. Ordered by Judge William D. Wall on 12/6/07. (Disbrow, Sandra) (Entered: 12/06/2007) |
| 01/08/2008 | 102 | Letter *dated, January 8, 2008 to Mag. Judge William D. Wall regarding pending Motion to Compel* by McCray, Francine, Vernon Ghullkie, Lisbett Hunter, Vic Devita (Sweeney, Paul) (Entered: 01/08/2008) |
| 02/15/2008 | 103 | Letter *dated, February 15, 2008 to Mag. Judge William D. Wall regarding pending Motion to Compel* by McCray, Francine, Vernon Ghullkie, Lisbett Hunter, Vic Devita (Sweeney, Paul) (Entered: 02/15/2008) |
| 03/04/2008 | 104 | Letter *dated, March 4, 2008 to Mag. Judge William D. Wall regarding pending Motion to Compel* by McCray, Francine, Vernon Ghullkie, Lisbett Hunter, Vic Devita (Sweeney, Paul) (Entered: 03/04/2008) |
| 03/14/2008 | 105 | ORDER granting in part and denying in part 80 plaintiffs' Motion to Compel production of documents from defendant Nassau County. Ordered by Magistrate Judge William D. Wall on 3/14/08. c/e (Disbrow, Sandra) (Entered: 03/14/2008) |
| 04/22/2008 | 106 | NOTICE of Appearance by Stanley Joseph Brown on behalf of McCray, Francine, Vernon Ghullkie, Lisbett Hunter, Vic Devita (aty to be noticed) (Brown, Stanley) (Entered: 04/22/2008) |
| 04/22/2008 | | ELECTRONIC ORDER terminating 83 Motion to Take Deposition as moot in light of the court's orders on the privilege motions. Ordered by Judge William D. Wall on 4/21/08. (Disbrow, Sandra) (Entered: 04/22/2008) |
| 04/24/2008 | 107 | Letter MOTION to Compel *Eastern Property Owners Association of Garden City* by McCray, Francine, New York Acorn Housing Company, Acorn, Vic Devita. (Sweeney, Paul) (Entered: 04/24/2008) |
| 04/24/2008 | 108 | AFFIDAVIT/DECLARATION in Support re 107 Letter MOTION to Compel *Eastern Property Owners Association of Garden City* filed by McCray, Francine, New York Acorn Housing Company, Acorn, Vic Devita. (Sweeney, Paul) (Entered: 04/24/2008) |
| 05/12/2008 | 109 | Letter MOTION to Compel *Defendant Nassau County* by McCray, Francine, New York Acorn Housing Company, Acorn, Vic Devita. (Sweeney, Paul) (Entered: 05/12/2008) |

**JA 19**

| 05/12/2008 | 110 | AFFIDAVIT/DECLARATION in Support re 109 Letter MOTION to Compel *Defendant Nassau County with exhibits 1 thru 10* filed by McCray, Francine, New York Acorn Housing Company, Acorn, Vic Devita. (Sweeney, Paul) (Entered: 05/12/2008) |
|---|---|---|
| 05/15/2008 | 111 | RESPONSE in Opposition re 109 Letter MOTION to Compel *Defendant Nassau County* filed by County of Nassau. (Reissman, Ralph) (Entered: 05/15/2008) |
| 05/16/2008 | 112 | Letter *to inform the Court that we hereby withdraw our Letter Motion, dated April 24, 2008.* by McCray, Francine, New York Acorn Housing Company, Acorn, Vic Devita (Sweeney, Paul) (Entered: 05/16/2008) |
| 05/16/2008 | | ELECTRONIC ORDER withdrawing 107 Motion to Compel in light of movant's letter 112 . Ordered by Judge William D. Wall on 5/16/08. (Disbrow, Sandra) (Entered: 05/16/2008) |
| 05/16/2008 | | ELECTRONIC ORDER Setting Hearing on Motion 109 Letter MOTION to Compel for 5/28/2008 at 2:00 PM before Judge William D. Wall. Any motion to adjourn this conference must include alternate dates acceptable to all parties. Ordered by Judge William D. Wall on 5/16/08. (Disbrow, Sandra) (Entered: 05/16/2008) |
| 05/22/2008 | 113 | STIPULATION *of Partial Dismissal Pursuant to FED. R. CIV. P. 41(a)(1)(ii)* by Vernon Ghullkie, Lisbett Hunter (Sweeney, Paul) (Entered: 05/22/2008) |
| 05/22/2008 | 114 | STIPULATION AND ORDER of partial dismissal as to plaintiffs Vernon Ghullkie and Lisbett Hunter - both parties terminated.. Ordered by Judge Joseph F. Bianco on 5/22/08. (Bollbach, Jean) (Entered: 05/27/2008) |
| 05/29/2008 | 115 | Minute Order. for proceedings held before Magistrate Judge William D. Wall:granting 109 Motion to Compel; Motion Hearing held on 5/28/2008. The County defendants shall comply with the demands by 6/4/08. Additional deadlines extended--see attached order. Ordered by Judge William D. Wall on 5/28/08. c/g (Disbrow, Sandra) (Entered: 05/29/2008) |
| 06/11/2008 | 116 | Letter MOTION for Sanctions by McCray, Francine, New York Acorn Housing Company, Acorn, Vic Devita. (Sweeney, Paul) (Entered: 06/11/2008) |
| 06/11/2008 | 117 | DECLARATION re 116 Letter MOTION for Sanctions by McCray, Francine, New York Acorn Housing Company, Acorn, Vic Devita (Sweeney, Paul) (Entered: 06/11/2008) |
| 06/13/2008 | 118 | Letter MOTION for Extension of Time to File Response/Reply *to Plaintiffs' Letter Motion dated June 11, 2008* by County of Nassau. (Schmidt, Karen) (Entered: 06/13/2008) |
| 06/13/2008 | | ELECTRONIC ORDER granting 118 Motion for Extension of Time to File Response/Reply re 116 Letter MOTION for Sanctions. Responses due by 6/20/2008. Ordered by Judge William D. Wall on 6/13/08. (Disbrow, Sandra) (Entered: 06/13/2008) |
| 06/19/2008 | 119 | Letter MOTION for Discovery *and Adjournment of Expert Report Submission Date* by McCray, Francine, New York Acorn Housing Company, Acorn, |

| | | Daphne Andrews, Vic Devita. (Attachments: # 1 Exhibit) (Sweeney, Paul) (Entered: 06/19/2008) |
|---|---|---|
| 06/20/2008 | 120 | Letter MOTION for Summary Judgment *Requesting Pre-Motion Conference* by County of Nassau. (Schmidt, Karen) (Entered: 06/20/2008) |
| 06/20/2008 | 121 | RESPONSE in Opposition re 116 Letter MOTION for Sanctions *(Opposition to Plaintiffs' Motion),* filed by County of Nassau. (Reissman, Ralph) (Entered: 06/20/2008) |
| 06/23/2008 | 123 | RESPONSE to Motion re 119 Letter MOTION for Discovery *and Adjournment of Expert Report Submission Date* filed by Incorporated Village of Garden City, Garden City Board of Trustees. (Ryan, James) (Entered: 06/23/2008) |
| 06/23/2008 | | Incorrect Document/Entry Information. The RESPONSE to Motion re 119 Letter MOTION for Discovery filed as document # 122 has been deleted at the request of counsel. Lee Liotta for Jim Ryan has refiled it as #123 with the correct pdf document attached. (Mahon, Cinthia) (Entered: 06/23/2008) |
| 06/23/2008 | | ORDER: By letter dated June 20, 2008, defendants request a pre-motion conference in anticipation of filing a motion for summary judgment. IT IS HEREBY ORDERED that defendants' request is granted. Counsel for all parties shall participate in a telephone pre-motion conference on Friday, July 11, 2008 at 4:30 p.m. At that time, counsel for defendants shall initiate the call and, with all parties on the line, contact Chambers at (631) 712-5670. Prior to the conference, counsel for plaintiffs may submit a letter to the Court, in accordance with the Court's Individual Rule III.A, explaining why defendants' motion is likely to be unsuccessful. SO ORDERED. Ordered by Judge Joseph F. Bianco on 6/23/08. (Rothstein, Joshua) (Entered: 06/23/2008) |
| 06/24/2008 | 124 | RESPONSE to Motion re 120 Letter MOTION for Summary Judgment *Requesting Pre-Motion Conference* filed by McCray, Francine, New York Acorn Housing Company, Acorn, Daphne Andrews, Vic Devita. (Sweeney, Paul) (Entered: 06/24/2008) |
| 06/24/2008 | 125 | RESPONSE in Opposition re 119 Letter MOTION for Discovery *and Adjournment of Expert Report Submission Date* filed by County of Nassau. (Reissman, Ralph) (Entered: 06/24/2008) |
| 06/24/2008 | | SCHEDULING ORDER: The pre-motion conference previously scheduled for July 11, 2004 at 4:30 p.m. is adjourned. The Court will reschedule the conference, at the request of counsel, after notified by Magistrate Judge Wall that all outstanding discovery, which relates to this motion, is resolved. SO ORDERED. Ordered by Judge Joseph F. Bianco on 6/24/08. (Rothstein, Joshua) (Entered: 06/24/2008) |
| 06/25/2008 | | ELECTRONIC ORDER Setting Conference on Motion 116 Letter MOTION for Sanctions and 119 Letter MOTION for Discovery. Motion conference set for 7/2/2008 at 2:00 PM before Judge William D. Wall. Any motion to adjourn this conference must include proposed alternate dates acceptable to all parties. The deadline for submission of plaintiffs' expert reports is adjourned without date pending a determination of the discovery motions. Ordered by |

| | | Judge William D. Wall on 6/25/08. (Disbrow, Sandra) (Entered: 06/25/2008) |
|---|---|---|
| 06/25/2008 | 126 | RESPONSE to Motion re 119 Letter MOTION for Discovery *and Adjournment of Expert Report Submission Date , Informational Letter re: HUD Website* filed by County of Nassau. (Reissman, Ralph) (Entered: 06/25/2008) |
| 07/01/2008 | | ELECTRONIC ORDER: Due to a change in the court's calendar, the motion conference scheduled for 7/2/08 is adjourned to 7/11/08 at 2:00 p.m. Ordered by Magistrate Judge William D. Wall on 7/1/08. (Disbrow, Sandra) (Entered: 07/01/2008) |
| 07/11/2008 | 127 | Minute Entry for proceedings held before Magistrate Judge William D. Wall:Motion Hearing held on 7/11/2008. Re: 116 MOTION for sanctions by plaintiffs. Hearing concluded, decision reserved. (archive F:) (Talbott, Thomas) Modified on 7/15/2008 to reflect a hearing on the 116 motion (Talbott, Thomas). (Entered: 07/15/2008) |
| 07/11/2008 | | Motions terminated: 119 Letter MOTION for Discovery *and Adjournment of Expert Report Submission Date* filed by New York Acorn, McCray, Andrews, Devita, Acorn.. Ordered by Magistrate Judge William D. Wall at the hearing held on 7/11/08, 127 . (Talbott, Thomas) (Entered: 03/13/2009) |
| 07/15/2008 | 128 | Letter *attaching a proposed order* by McCray, Francine, New York Acorn Housing Company, Acorn, Vic Devita (Attachments: # 1 Proposed Order) (Smith, Toby) (Entered: 07/15/2008) |
| 07/15/2008 | 129 | Letter *regarding Plaintiffs' Proposed Order* by County of Nassau (Schmidt, Karen) (Entered: 07/15/2008) |
| 07/17/2008 | 130 | Letter *from Toby W. Smith to Hon. William D. Wall regarding the motion for additional discovery (Docket Entry # 119)* by McCray, Francine, New York Acorn Housing Company, Acorn, Vic Devita (Smith, Toby) (Entered: 07/17/2008) |
| 07/21/2008 | 131 | AFFIDAVIT/DECLARATION in Opposition re 116 Letter MOTION for Sanctions , *Reissman Declaration and Lassandro Affidavit certifying that Nassau County does not possess information sought by plaintiffs,* filed by County of Nassau. (Reissman, Ralph) (Entered: 07/21/2008) |
| 08/05/2008 | 132 | Letter *From Toby W. Smith To The Honorable William D. Wall Regarding Expert Discovery Schedule* by McCray, Francine, New York Acorn Housing Company, Acorn, Vic Devita (Smith, Toby) (Entered: 08/05/2008) |
| 08/26/2008 | 133 | MOTION to Withdraw as Attorney by McCray, Francine, New York Acorn Housing Company, Acorn, Daphne Andrews, Vic Devita. (Birch, Nicole) (Entered: 08/26/2008) |
| 09/04/2008 | 134 | Letter *from Toby W. Smith to the Honorable William D. Wall regarding expert discovery schedule* by McCray, Francine, New York Acorn Housing Company, Acorn, Daphne Andrews, Vic Devita (Smith, Toby) (Entered: 09/04/2008) |
| 09/25/2008 | 135 | Letter MOTION for Extension of Time to File *Request for Pre-Motion* |

| | | |
|---|---|---|
| | | *Conference* by Incorporated Village of Garden City. (Ryan, James) (Entered: 09/25/2008) |
| 09/26/2008 | | ELECTRONIC ORDER granting [135] Motion for Extension of Time. Any party wishing to make a dispositive motion shall take the first step in the process no later than three weeks after the close of discovery. Ordered by Magistrate Judge William D. Wall on 9/26/08. (Disbrow, Sandra) (Entered: 09/26/2008) |
| 12/29/2008 | 136 | Letter MOTION for Extension of Time to File *Letter Requesting Permission to File a Dispositive Motion* by Incorporated Village of Garden City, Garden City Board of Trustees. (Ryan, James) (Entered: 12/29/2008) |
| 01/08/2009 | | ELECTRONIC ORDER granting [136] Motion for Extension of Time to commence dispositive motion practice. Any party wishing to file a dispositive motion shall electronically file a letter request to Judge Bianco by 1/31/09. Ordered by Magistrate Judge William D. Wall on 1/7/09. (Disbrow, Sandra) (Entered: 01/08/2009) |
| 01/30/2009 | 137 | Letter MOTION for pre motion conference *to discuss filing a summary judgment motion and to preclude one of plaintiff's expert witnesses* by Incorporated Village of Garden City, Garden City Board of Trustees. (McLaughlin, Jennifer) (Entered: 01/30/2009) |
| 01/30/2009 | 138 | Letter *requesting pre-motion conference and permission to file Rule 56 motion for summary judgment* by County of Nassau (Reissman, Ralph) (Entered: 01/30/2009) |
| 01/30/2009 | | ORDER granting [137] Motion for Pre Motion Conference: By letter dated January 29, 2009, counsel for the Garden City Defendants moved for a pre-motion conference in anticipation of filing a motion for summary judgment. IT IS HEREBY ORDERED that the Garden City Defendants' motion is granted. Counsel for all parties shall participate in a telephone pre-motion conference on Thursday, February 12, 2009, at 9:30 a.m. At that time, counsel for the Garden City Defendants shall initiate the call and, with all parties on the line, contact Chambers at (631) 712-5670. Prior to the conference, counsel for plaintiffs may submit a letter to the Court, in accordance with the Court's Individual Rule III.A, explaining why the proposed motion is likely to be unsuccessful. SO ORDERED. Ordered by Judge Joseph F. Bianco on 1/30/2009. (McFadden, JoAnna) (Entered: 01/30/2009) |
| 01/30/2009 | | ORDER: IT IS HEREBY ORDERED that the telephone pre-motion conference scheduled for Thursday, February 12, 2009, will now take place on Friday, February 13, 2009, at 10:00 a.m. At that time, counsel for the Garden City Defendants shall initiate the call and, with all parties on the line, contact Chambers at (631) 712-5670. SO ORDERED. Ordered by Judge Joseph F. Bianco on 1/30/2009. (McFadden, JoAnna) (Entered: 01/30/2009) |
| 02/06/2009 | 139 | Letter *In Reponse To Defendants' Letters Seeking Permission To File A Motion For Summary Judgment* by McCray, Francine, New York Acorn Housing Company, Acorn, Daphne Andrews, Vic Devita (Sweeney, Paul) (Entered: 02/06/2009) |
| | | |

**JA 23**

| 02/13/2009 | 140 | Minute Entry for proceedings held before Judge Joseph F. Bianco:Telephone Conference held on 2/13/2009; case called; all sides present; conf. held; motion to be filed by 3/31/09; response by 5/15/09; reply by 6/3/09; oral argument set for 7/10/09 2:00 pm (Tape #10:07 - 10:13.) (Bollbach, Jean) (Entered: 02/13/2009) |
| --- | --- | --- |
| 02/24/2009 | | ELECTRONIC ORDER granting 133 Motion to Withdraw as Attorney. Attorney Nicole Birch terminated. Ordered by Judge William D. Wall on 2/24/2009. (Disbrow, Sandra) (Entered: 02/24/2009) |
| 03/04/2009 | 141 | Letter *From Paul Sweeney To The Honorable Joseph F. Bianco With Attached Plaintiffs' Memorandum of Law In Support Of Plaintiffs' Objection To Magistrate Judge Wall's Report And Recommendation Granting In Part And Denying In Part Plaintiffs' Motion To Compel Deposition Testimony And Documents From The Garden City Defendants.* by McCray, Francine, New York Acorn Housing Company, Acorn, Daphne Andrews, Vic Devita (Sweeney, Paul) (Entered: 03/04/2009) |
| 03/09/2009 | 142 | ORDER granting in part and denying in part 116 Motion for Sanctions. See attached order. Ordered by Judge William D. Wall on 3/9/2009. (Disbrow, Sandra) (Entered: 03/09/2009) |
| 03/17/2009 | 143 | Letter MOTION for Reconsideration re 142 Order on Motion for Sanctions *seeking limited clarification* by Incorporated Village of Garden City, Garden City Board of Trustees. (McLaughlin, Jennifer) (Entered: 03/17/2009) |
| 03/17/2009 | 144 | Notice of MOTION for Reconsideration re 142 Order on Motion for Sanctions *pursuant to Rule 72* by Incorporated Village of Garden City, Garden City Board of Trustees. (McLaughlin, Jennifer) (Entered: 03/17/2009) |
| 03/18/2009 | 145 | NOTICE of Appearance by Sabrina Helene Cochet on behalf of McCray, Francine, Vic Devita (aty to be noticed) (Cochet, Sabrina) (Entered: 03/18/2009) |
| 03/23/2009 | 146 | APPEAL OF MAGISTRATE JUDGE DECISION to District Court by County of Nassau re 142 Order on Motion for Sanctions (Attachments: # 1 Exhibit A, # 2 Exhibit B1, # 3 Exhibit B2, # 4 Exhibit C) (Miller, Esther) (Entered: 03/23/2009) |
| 03/24/2009 | | Email Notification Test - DO NOT REPLY. (Brucella, Michelle) (Entered: 03/24/2009) |
| 03/31/2009 | 147 | MOTION for Summary Judgment by Incorporated Village of Garden City, Garden City Board of Trustees. (Attachments: # 1 Notice of Motion Notice of Motion, # 2 Affidavit Michael Filippon, # 3 Affidavit Peter Bee, # 4 Affidavit James G. Ryan, # 5 Exhibit Exhibit Statement, # 6 Rule 56.1 Statement Statement of Material Facts, # 7 Memorandum in Support Memorandum of Law, # 8 Affidavit of Service Affidavit of Service - Notice of Motion, # 9 Affidavit of Service Affidavit of Service - Rule 56.1, # 10 Affidavit of Service Affidavit of Service - Memorandum of Law, # 11 Letter to Judge Bianco) (McLaughlin, Jennifer) (Entered: 03/31/2009) |
| 03/31/2009 | 148 | Notice of MOTION for Summary Judgment by County of Nassau. Responses |

| | | due by 5/15/2009 (Attachments: # 1 Affidavit in Support of Rosemary Olsen, # 2 Rule 56.1 Statement, # 3 Memorandum in Support, # 4 Notice of Motion Letter to Court, # 5 Certificate of Service, # 6 Affidavit in Support Declaration of Ralph J. Reissman) (Reissman, Ralph) (Entered: 03/31/2009) |
|---|---|---|
| 03/31/2009 | 149 | Letter *In Opposition To Defendant Garden City's Letter Motion, Dated March 17, 2009, Seeking Clarification Concerning Magistrate Judge Wall's Order.* by McCray, Francine, New York Acorn Housing Company, Acorn, Vic Devita (Attachments: # 1 Memorandum in Opposition, # 2 Declaration of Sabrina H. Cochet, # 3 Ex. A to Declaration, # 4 Ex. B to Declaration, # 5 Ex. C to Declaration, # 6 Ex. D to Declaration, # 7 Ex. E to Declaration, # 8 Ex. F to Declaration, # 9 Ex. G to Declaration, # 10 Ex. H to Declaration, # 11 Ex. I to Declaration, # 12 Ex. J to Declaration, # 13 Ex. K to Declaration, # 14 Ex. L to Declaration, # 15 Certificate of Service) (Sweeney, Paul) (Entered: 03/31/2009) |
| 03/31/2009 | 150 | MEMORANDUM in Opposition re 144 Notice of MOTION for Reconsideration re 142 Order on Motion for Sanctions *pursuant to Rule 72* filed by McCray, Francine, New York Acorn Housing Company, Acorn, Vic Devita. (Attachments: # 1 Certificate of Service) (Sweeney, Paul) (Entered: 03/31/2009) |
| 03/31/2009 | 151 | AFFIDAVIT/DECLARATION in Opposition re 144 Notice of MOTION for Reconsideration re 142 Order on Motion for Sanctions *pursuant to Rule 72* filed by McCray, Francine, New York Acorn Housing Company, Acorn, Vic Devita. (Attachments: # 1 Ex. A, # 2 Ex. B, # 3 Ex. C, # 4 Ex. D, # 5 Ex. E, # 6 Ex. F, # 7 Ex. G, # 8 Ex. H, # 9 Ex. I, # 10 Ex. J, # 11 Ex. K, # 12 Ex. L, # 13 Certificate of Service) (Sweeney, Paul) (Entered: 03/31/2009) |
| 04/02/2009 | 152 | DECLARATION re 148 Notice of MOTION for Summary Judgment *Certificate of Service upon Cullen & Dykman and filing in Court by Gary Duffy* by County of Nassau (Reissman, Ralph) (Entered: 04/02/2009) |
| 04/02/2009 | 153 | DECLARATION re 148 Notice of MOTION for Summary Judgment *Certificate of overnight service upon Hogan Hartson* by County of Nassau (Reissman, Ralph) (Entered: 04/02/2009) |
| 04/06/2009 | 154 | MEMORANDUM in Opposition re 146 Appeal of Magistrate Judge Decision to District Court filed by all plaintiffs. (Attachments: # 1 Certificate of Service) (Sweeney, Paul) (Entered: 04/06/2009) |
| 04/06/2009 | 155 | DECLARATION *Of Toby W. Smith In Support Of Plaintiffs' Opposition To Defendant Nassau County's Objections To Magistrate Judge Wall's March 9, 2009 Order* by McCray, Francine, New York Acorn Housing Company, Acorn, Daphne Andrews, Vic Devita (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4) (Sweeney, Paul) (Entered: 04/06/2009) |
| 04/29/2009 | 156 | DECLARATION *Of Toby W. Smith In Support Of Application For Attorneys Fees And Costs* by McCray, Francine, Vic Devita (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Certificate Of Service) (Sweeney, Paul) (Entered: 04/29/2009) |
| 04/30/2009 | 157 | Letter MOTION for Extension of Time to File Response/Reply *to Plaintiffs'* |

| | | |
|---|---|---|
| | | *Application for Costs* by County of Nassau. (Schmidt, Karen) (Entered: 04/30/2009) |
| 05/01/2009 | | ORDER: IT IS HEREBY ORDERED that the Court will hear oral argument on pending appeals of discovery orders when it hears oral argument on defendants' motion for summary judgment, on July 10, 2009 at 2:00 p.m. SO ORDERED. Ordered by Judge Joseph F. Bianco on 5/1/2009. (McFadden, JoAnna) (Entered: 05/01/2009) |
| 05/07/2009 | 158 | STIPULATION *regarding an amended summary judgment briefing schedule* by McCray, Francine, New York Acorn Housing Company, County of Nassau, Incorporated Village of Garden City, Garden City Board of Trustees, Acorn, Daphne Andrews, Vic Devita (Attachments: # 1 Proposed Order) (Cochet, Sabrina) (Entered: 05/07/2009) |
| 05/07/2009 | 159 | STIPULATION AND ORDER - see documents for full details. Ordered by Judge Joseph F. Bianco on 5/7/2009. (Bollbach, Jean) (Entered: 05/07/2009) |
| 05/13/2009 | 160 | Letter *from Sabrina H. Cochet to Judge Wall in response to the Nassau County Defendants' letter of April 30, 2009* by McCray, Francine, New York Acorn Housing Company, Acorn, Daphne Andrews, Vic Devita (Cochet, Sabrina) (Entered: 05/13/2009) |
| 05/15/2009 | | ELECTRONIC ORDER granting 157 Motion for Extension of Time to File Response/Reply to plaintiffs' application for costs 156 . Ordered by Magistrate Judge William D. Wall on 5/15/2009. (Disbrow, Sandra) (Entered: 05/15/2009) |
| 06/15/2009 | 161 | MOTION to Strike *Motion to Exclude Testimony of Patrick Cleary* by McCray, Francine, New York Acorn Housing Company, Acorn, Vic Devita. (Cochet, Sabrina) (Entered: 06/15/2009) |
| 06/15/2009 | 162 | MEMORANDUM in Support re 161 MOTION to Strike *Motion to Exclude Testimony of Patrick Cleary* filed by McCray, Francine, New York Acorn Housing Company, Acorn, Vic Devita. (Cochet, Sabrina) (Entered: 06/15/2009) |
| 06/15/2009 | 163 | AFFIDAVIT/DECLARATION in Support re 161 MOTION to Strike *Motion to Exclude Testimony of Patrick Cleary* filed by McCray, Francine, New York Acorn Housing Company, Acorn, Vic Devita. (Attachments: # 1 Exhibit 2.1, # 2 Exhibit 2.2, # 3 Exhibit 2.3, # 4 Exhibit 2.4, # 5 Exhibit 2.5, # 6 Exhibit 2.6, # 7 Exhibit 2.7, # 8 Exhibit 2.8, # 9 Exhibit 2.9, # 10 Exhibit 2.10, # 11 Exhibit 2.11, # 12 Exhibit 2.12, # 13 Exhibit 2.13, # 14 Exhibit 2.14, # 15 Exhibit 2.15, # 16 Exhibit 2.16, # 17 Exhibit 2.17, # 18 Exhibit 2.18, # 19 Exhibit 2.19) (Cochet, Sabrina) (Entered: 06/15/2009) |
| 06/15/2009 | 164 | MEMORANDUM in Opposition re 147 MOTION for Summary Judgment *(Motion to Exclude Peter Marcuse)* filed by McCray, Francine, New York Acorn Housing Company, Acorn, Vic Devita. (Cochet, Sabrina) (Entered: 06/15/2009) |
| 06/15/2009 | 165 | AFFIDAVIT/DECLARATION in Opposition re 147 MOTION for Summary Judgment *(Motion to Exclude Peter Marcuse)* filed by McCray, Francine, |

| | | |
|---|---|---|
| | | New York Acorn Housing Company, Acorn, Vic Devita. (Attachments: # 1 Exhibit 1.1, # 2 Exhibit 1.2, # 3 Exhibit 1.3, # 4 Exhibit 1.4) (Cochet, Sabrina) (Entered: 06/15/2009) |
| 06/15/2009 | 166 | RULE 56.1 STATEMENT re 147 MOTION for Summary Judgment *(Response to Garden City Rule 56.1 Statement)* filed by McCray, Francine, New York Acorn Housing Company, Acorn, Vic Devita. (Cochet, Sabrina) (Entered: 06/15/2009) |
| 06/15/2009 | 167 | RULE 56.1 STATEMENT re 147 MOTION for Summary Judgment *(Response to Nassau County Rule 56.1 Statement)* filed by McCray, Francine, New York Acorn Housing Company, Acorn, Vic Devita. (Cochet, Sabrina) (Entered: 06/15/2009) |
| 06/16/2009 | 168 | RULE 56.1 STATEMENT *Of Additional Material Facts* filed by McCray, Francine, New York Acorn Housing Company, Acorn, Vic Devita. (Cochet, Sabrina) (Entered: 06/16/2009) |
| 06/16/2009 | 169 | MEMORANDUM in Opposition re 147 MOTION for Summary Judgment filed by McCray, Francine, New York Acorn Housing Company, Acorn, Vic Devita. (Cochet, Sabrina) (Entered: 06/16/2009) |
| 06/16/2009 | 170 | AFFIDAVIT/DECLARATION in Opposition re 147 MOTION for Summary Judgment filed by McCray, Francine, New York Acorn Housing Company, Acorn, Vic Devita. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 Exhibit 34, # 35 Exhibit 35, # 36 Exhibit 36, # 37 Exhibit 37, # 38 Exhibit 38, # 39 Exhibit 39, # 40 Exhibit 40, # 41 Exhibit 41, # 42 Exhibit 42, # 43 Exhibit 43, # 44 Exhibit 44, # 45 Exhibit 45, # 46 Exhibit 45A, # 47 Exhibit 45B, # 48 Exhibit 45C, # 49 Exhibit 46, # 50 Exhibit 47, # 51 Exhibit 47A, # 52 Exhibit 47B, # 53 Exhibit 48, # 54 Exhibit 48A, # 55 Exhibit 48B, # 56 Exhibit 48C, # 57 Exhibit 48D, # 58 Exhibit 49, # 59 Exhibit 50, # 60 Exhibit 51, # 61 Exhibit 52, # 62 Exhibit 53, # 63 Exhibit 54, # 64 Exhibit 55, # 65 Exhibit 56, # 66 Exhibit 57, # 67 Exhibit 58, # 68 Exhibit 59, # 69 Exhibit 60, # 70 Exhibit 61, # 71 Exhibit 62, # 72 Exhibit 63, # 73 Exhibit 64, # 74 Exhibit 65, # 75 Exhibit 66, # 76 Exhibit 67, # 77 Exhibit 68, # 78 Exhibit 69, # 79 Exhibit 70, # 80 Exhibit 71, # 81 Exhibit 72, # 82 Exhibit 73, # 83 Exhibit 74, # 84 Exhibit 75, # 85 Exhibit 76, # 86 Exhibit 77, # 87 Exhibit 78, # 88 Exhibit 79, # 89 Exhibit 80, # 90 Exhibit 81, # 91 Exhibit 82, # 92 Exhibit 83, # 93 Exhibit 84, # 94 Exhibit 85, # 95 Exhibit 85A, # 96 Exhibit 86, # 97 Exhibit 86A, # 98 Exhibit 86B, # 99 Exhibit 87, # 100 Exhibit 88, # 101 Exhibit 89, # 102 Exhibit 90, # 103 Exhibit 91, # 104 Exhibit 92, # 105 Exhibit 93, # 106 Exhibit 93A, # 107 Exhibit 94, # 108 Exhibit 95, # 109 Exhibit 96, # 110 Exhibit 97, # 111 Exhibit 98) (Cochet, Sabrina) (Entered: 06/16/2009) |
| 06/16/2009 | 171 | CERTIFICATE OF SERVICE by McCray, Francine, New York Acorn |

| | | Housing Company, Acorn, Vic Devita re [164] Memorandum in Opposition, [168] Rule 56.1 Statement, [170] Affidavit in Opposition to Motion,,,,,,,,, [165] Affidavit in Opposition to Motion, [169] Memorandum in Opposition, [163] Affidavit in Support of Motion,, [167] Rule 56.1 Statement, [166] Rule 56.1 Statement, [162] Memorandum in Support, [161] MOTION to Strike *Motion to Exclude Testimony of Patrick Cleary* (Cochet, Sabrina) (Entered: 06/16/2009) |
|---|---|---|
| 07/15/2009 | [172] | REPLY in Support *, NASSAU COUNTY REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION FOR SUMMARY JUDGMENT,* filed by County of Nassau. (Reissman, Ralph) (Entered: 07/15/2009) |
| 07/15/2009 | [173] | DECLARATION re [172] Reply in Support *, Declaration of Service* by County of Nassau (Reissman, Ralph) (Entered: 07/15/2009) |
| 07/15/2009 | [174] | MEMORANDUM in Opposition *to Exclude Cleary* filed by Garden City Board of Trustees, Incorporated Village of Garden City. (McLaughlin, Jennifer) (Entered: 07/15/2009) |
| 07/15/2009 | [175] | MEMORANDUM in Support *of Motion to Exclude Marcuse* filed by Garden City Board of Trustees, Incorporated Village of Garden City. (McLaughlin, Jennifer) (Entered: 07/15/2009) |
| 07/15/2009 | [176] | MEMORANDUM in Support *of Motion for Summary Judgment* filed by Garden City Board of Trustees, Incorporated Village of Garden City. (McLaughlin, Jennifer) (Entered: 07/15/2009) |
| 07/15/2009 | [177] | RESPONSE in Opposition re [161] MOTION to Strike *Motion to Exclude Testimony of Patrick Cleary* filed by Garden City Board of Trustees, Incorporated Village of Garden City. (Attachments: # [1] Exhibit, # [2] Exhibit) (McLaughlin, Jennifer) (Entered: 07/15/2009) |
| 07/15/2009 | [178] | Letter MOTION for pre motion conference by Garden City Board of Trustees, Incorporated Village of Garden City. (McLaughlin, Jennifer) (Entered: 07/15/2009) |
| 07/15/2009 | [179] | RULE 56.1 STATEMENT *Defendants' Response to Statement of Additional Material Facts* filed by Garden City Board of Trustees, Incorporated Village of Garden City. (McLaughlin, Jennifer) (Entered: 07/15/2009) |
| 07/16/2009 | | ORDER denying as moot [178] Motion for Pre Motion Conference: The Court received the Garden City defendants' letter, dated July 15, 2009, seeking either a pre-motion conference in anticipation of filing a motion to strike portions of plaintiffs' Rule 56.1 counterstatements of fact or a briefing schedule for such a motion. IT IS HEREBY ORDERED that the Court will hear arguments from plaintiffs and defendants regarding defendants' desire to strike portions of the Rule 56.1 counterstatement of facts when it hears oral argument for the pending motion for summary judgment and appeal of certain discovery orders, on August 21, 2009. No further submissions regarding the motion to strike are required. SO ORDERED. Ordered by Judge Joseph F. Bianco on 7/16/2009. (McFadden, JoAnna) (Entered: 07/16/2009) |
| 07/27/2009 | [180] | REPLY in Support *of Motion to Exclude Cleary* filed by Acorn, Vic Devita, McCray, Francine, New York Acorn Housing Company. (Cochet, Sabrina) |

| | | (Entered: 07/27/2009) |
|---|---|---|
| 08/05/2009 | 181 | Letter *, Dated August 5, 2009 From Stanley J. Brown To Honorable Joseph F. Bianco re: Requesting A Schedule Of Time To Be Allocated For Each Of The Matters Scheduled To Be Heard On August 21, 2009* by Acorn, Vic Devita, McCray, Francine, New York Acorn Housing Company (Brown, Stanley) (Entered: 08/05/2009) |
| 08/06/2009 | | ORDER: Pursuant to plaintiffs' request, filed on August 6, 2009, IT IS HEREBY ORDERED that the Court shall hear oral argument on August 21, 2009 at 2 p.m. as follows: plaintiffs and the Garden City defendants shall have five minutes each to argue their respective motions to strike the Cleary and Marcuse reports, for a total of ten minutes; plaintiffs, the Garden City defendants, and the County of Nassau shall have ten minutes each to argue their respective appeals of discovery orders issued by Magistrate Judge Wall, for a total of thirty minutes; and plaintiffs, the Garden City defendants and the County of Nassau shall have twenty minutes each to argue their respective motions opposing and supporting summary judgment in this matter, for a total of sixty minutes. Oral argument shall last one hour and forty minutes. SO ORDERED. Ordered by Judge Joseph F. Bianco on 8/6/2009. (McFadden, JoAnna) (Entered: 08/06/2009) |
| 08/19/2009 | 182 | Letter *from Stanley J. Brown to the Honorable Joseph F.Bianco submitting supplemental authority* by Acorn, Daphne Andrews, Vic Devita, McCray, Francine, New York Acorn Housing Company (Brown, Stanley) (Entered: 08/19/2009) |
| 08/21/2009 | 183 | Minute Entry for proceedings held before Judge Joseph F. Bianco:Oral Argument held on 8/21/2009; case called; conf. held; argument heard; decision reserved; affidavit is due by 9/4/09. Letter to be submitted by 9/11/09 (Court Reporter FTR 2:14 -3:01 and 3:08 - 4:12.) (Bollbach, Jean) (Entered: 08/24/2009) |
| 08/28/2009 | 184 | Letter *responding to plaintiffs' August 19, 2009 letter enclosing four cases,* by County of Nassau (Reissman, Ralph) (Entered: 08/28/2009) |
| 09/04/2009 | 185 | Letter *to Judge Bianco re Summary Judgment motion* by Garden City Board of Trustees, Incorporated Village of Garden City (Ryan, James) (Entered: 09/04/2009) |
| 09/04/2009 | 186 | Letter *responding to plaintiffs' August 19, 2009 supplemental letter* by Garden City Board of Trustees, Incorporated Village of Garden City (Ryan, James) (Entered: 09/04/2009) |
| 09/04/2009 | 187 | DECLARATION re 146 Appeal of Magistrate Judge Decision to District Court *Judge Bianco* by County of Nassau, Nassau County Office of Real Estate & Development, Nassau County Planning Commission (Miller, Esther) (Entered: 09/04/2009) |
| 09/04/2009 | 188 | Letter *to Judge Bianco re Summary Judgment Motion* by Acorn, Daphne Andrews, Vic Devita, McCray, Francine, New York Acorn Housing Company (Cochet, Sabrina) (Entered: 09/04/2009) |
| | | |

| 09/04/2009 | 189 | Letter *in response to docket entry #185 and 186* by Acorn, Vic Devita, McCray, Francine, New York Acorn Housing Company (Cochet, Sabrina) (Entered: 09/04/2009) |
|---|---|---|
| 09/10/2009 | 190 | MEMORANDUM AND ORDER. For the reasons stated in the attached Memorandum & Order, IT IS HEREBY ORDERED that plaintiffs' motion seeking to set aside the September 5, 2007 discovery order of Magistrate Judge Wall is denied. Magistrate Judge Wall can now expeditiously review in camera the twenty-two documents submitted by the Garden City defendants. The documents will be reviewed within the framework set forth in the September 25, 2007 Order, with the additional instruction that any documents illustrating that racial considerations were part of the legislative deliberations must also be produced. SO ORDERED. Ordered by Judge Joseph F. Bianco on 9/10/2009. (Howard, Timothy) (Entered: 09/10/2009) |
| 09/11/2009 | 191 | Letter *Dated September 11, 2009 In Response To The County's Submission Of Esther Miller's September 4, 2009 Affidavit.* by Acorn, Vic Devita, McCray, Francine, New York Acorn Housing Company (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D) (Cochet, Sabrina) (Entered: 09/11/2009) |
| 09/15/2009 | 192 | Letter *regarding plaintiffs' September 11, 2009 letter re: Affidavit of Esther Miller,* by County of Nassau (Reissman, Ralph) (Entered: 09/15/2009) |
| 10/01/2009 | 193 | Letter *requesting correction to reported list of attorneys representing County in future Court decisions, orders or memoranda,* by County of Nassau (Reissman, Ralph) (Entered: 10/01/2009) |
| 10/08/2009 | 194 | ORDER - see document for full details. Court refers the matter back to M.J. Wall in order to allow him to consider the declaration of Esther D. Miller in support of Countys objections to the 3/9/09 order.. Ordered by Judge Joseph F. Bianco on 10/8/2009. (Bollbach, Jean) (Entered: 10/09/2009) |
| 11/02/2009 | 195 | ORDER re: in camera review of documents withheld from production by defendants Incorporated Village of Garden City and Garden City Board of Trustees on the ground of legislative privilege. That review has been completed and the asserted privilege is hereby upheld. See attached order. Ordered by Judge William D. Wall on 11/2/2009. c/e (Disbrow, Sandra) (Entered: 11/02/2009) |
| 11/05/2009 | 196 | ORDER: On 3/9/09, the undersigned issued an order 142 granting plaintiffs motion 116 in part and denying it in part. Nassau County appealed, and by order 194 dated 10/8/09, District Judge Bianco referred the matter back to the undersigned to consider a declaration provided by the County on its appeal. Upon that review, the court makes the following rulings: Part I of the courts order 142 is hereby vacated; for the reasons set forth herein, plaintiffs motion is denied. Part II of the court's order 142 is unaffected by this order. Ordered by Judge William D. Wall on 11/5/2009. c/e (Disbrow, Sandra) (Entered: 11/05/2009) |
| 11/05/2009 | | ELECTRONIC ORDER denying as moot 143 Motion for Reconsideration. In light of the Order 196 vacating that part of the prior order for which defendant sought reconsideration, the motion is denied as moot. Ordered by Magistrate |

| | | |
|---|---|---|
| | | Judge William D. Wall on 11/5/2009. (Disbrow, Sandra) (Entered: 11/05/2009) |
| 11/05/2009 | | ORDER denying as moot 144 Motion for Reconsideration. In light of Magistrate Judge Wall's Order 196 vacating that part of the prior order for which defendant sought reconsideration, the motion is denied as moot. SO ORDERED. Ordered by Judge Joseph F. Bianco on 11/5/2009. (Alexander, John) (Entered: 11/05/2009) |
| 11/16/2009 | 197 | APPEAL OF MAGISTRATE JUDGE DECISION to District Court by Acorn, Vic Devita, McCray, Francine, New York Acorn Housing Company (Attachments: # 1 Affidavit Declaration of Sabrina H. Cochet, # 2 Exhibit Ex. 1 to the Declaration, # 3 Exhibit Ex. 2 to the Declaration, # 4 Exhibit Ex. 3 to the Declaration, # 5 Exhibit Ex. 4 to the Declaration, # 6 Exhibit EX. 5 to the Declaration) (Cochet, Sabrina) (Entered: 11/16/2009) |
| 11/23/2009 | 198 | Letter MOTION for Extension of Time to File Response/Reply *to Objections to Judge Wall's Decision* by County of Nassau, Nassau County Office of Real Estate & Development, Nassau County Planning Commission. (Miller, Esther) (Entered: 11/23/2009) |
| 11/24/2009 | | ORDER granting in part 198 Motion for Extension of Time to File Response/Reply. By letter dated November 23, 2009, defendant Nassau County requested an extension of time to respond to plaintiff's objections to Magistrate Judge Wall's November 5, 2009 Order. Defendant intends to file a motion for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure, and requests an extension of time to respond to plaintiff's objections until after the Court's determination of the anticipated motion for sanctions. IT IS HEREBY ORDERED that defendant shall, in accordance with Rule 11, serve its motion for sanctions on plaintiff by December 9, 2009. IT IS FURTHER ODERED that defendant shall file its response to plaintiff's objections and a separate motion for sanctions by January 5, 2009. IT IS FURTHER ORDERED that plaintiff shall respond to defendant's response to plaintiff's objections, and defendant's motion for sanctions, by January 19, 2010. IT IS FURTHER ORDERED that defendant shall submit any reply in further support of its motion for sanctions by January 26, 2010. SO ORDERED. Ordered by Judge Joseph F. Bianco on 11/24/2009. (Alexander, John) (Entered: 11/24/2009) |
| 12/11/2009 | 199 | CERTIFICATE OF SERVICE by County of Nassau, Nassau County Office of Real Estate & Development, Nassau County Planning Commission re Order on Motion for Extension of Time to File Response/Reply,,,, *and Filing of Rule 11 Motion* (Miller, Esther) (Entered: 12/11/2009) |
| 12/21/2009 | 200 | NOTICE of Appearance by Joanna F. Wasick on behalf of Vic Devita, McCray, Francine (aty to be noticed) (Wasick, Joanna) (Entered: 12/21/2009) |
| 12/23/2009 | 201 | Letter *To Remove Former Hogan & Hartson Attorneys From Noticed Attorneys List* by Vic Devita, McCray, Francine (Wasick, Joanna) (Entered: 12/23/2009) |
| 01/05/2010 | 202 | MEMORANDUM in Opposition re 197 Appeal of Magistrate Judge Decision to District Court, *(Response to Plaintiffs' Objections to Mag. Judge Wall's* |

**JA 31**

| | | |
|---|---|---|
| | | *November 5, 2009 Order),* filed by County of Nassau. (Reissman, Ralph) (Entered: 01/05/2010) |
| 01/05/2010 | 203 | Notice of MOTION for Sanctions *against Plaintiffs under Rule 11,* by County of Nassau. (Attachments: # 1 Memorandum in Support MEMO OF LAW) (Reissman, Ralph) (Entered: 01/05/2010) |
| 01/06/2010 | 204 | Letter *notifying Court of names of three attorneys to be marked "Terminated" on the Docket Sheet,* by County of Nassau (Reissman, Ralph) (Entered: 01/06/2010) |
| 01/14/2010 | 206 | ORDERED that Ester D Miller, Andrew Reginald Scott and Karen Schmidt as atty for County are terminated as no longer represent the County,. Ordered by Judge Joseph F. Bianco on 1/14/2010. (Bollbach, Jean) (Entered: 01/20/2010) |
| 01/19/2010 | 205 | MEMORANDUM in Opposition re 203 Notice of MOTION for Sanctions *against Plaintiffs under Rule 11,,* MEMORANDUM in Support re 197 Appeal of Magistrate Judge Decision to District Court, *(In Further Support Of Doc.#197)* filed by Acorn, Vic Devita, McCray, Francine, New York Acorn Housing Company. (Attachments: # 1 Certificate of Service, # 2 Declaration of Joanna F. Wasick, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C, # 6 Exhibit D, # 7 Exhibit E, # 8 Exhibit F) (Brown, Stanley) (Entered: 01/19/2010) |
| 01/25/2010 | 207 | First MOTION for Extension of Time to File Response/Reply as to 205 Memorandum in Opposition, Memorandum in Support,,,, *to February 5, 2010,* by County of Nassau. (Reissman, Ralph) (Entered: 01/25/2010) |
| 01/25/2010 | 208 | RESPONSE to Motion re 207 First MOTION for Extension of Time to File Response/Reply as to 205 Memorandum in Opposition, Memorandum in Support,,,, *to February 5, 2010,* filed by Acorn, Vic Devita, McCray, Francine, New York Acorn Housing Company. (Brown, Stanley) (Entered: 01/25/2010) |
| 01/26/2010 | | ORDER granting 207 Motion for Extension of Time to File Response/Reply. By letter dated January 25, 2010, defendant requested an extension of time until February 5, 2010 to file its reply brief in support of its Rule 11 motion. By letter dated January 25, 2010, plaintiff opposed the request. Because the additional time requested by defendant will not affect the timing of the Court's disposition of the motion, IT IS HEREBY ORDERED that defendant's request is granted. Defendant shall submit its reply brief by February 5, 2010. SO ORDERED. Ordered by Judge Joseph F. Bianco on 1/26/2010. (Alexander, John) (Entered: 01/26/2010) |
| 01/26/2010 | 209 | Letter *to Judge Bianco re: Memorandum In Further Support* by Acorn, Vic Devita, McCray, Francine, New York Acorn Housing Company (Attachments: # 1 Memorandum In Further Support, # 2 Exhibit A) (Brown, Stanley) (Entered: 01/26/2010) |
| 02/05/2010 | 210 | MEMORANDUM in Support re 203 Notice of MOTION for Sanctions *against Plaintiffs under Rule 11, REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION FOR SANCTIONS AGAINST PLAINTIFFS,* filed by County of Nassau. (Reissman, Ralph) (Entered: 02/05/2010) |

JA 32

| 02/19/2010 | | ORDER. IT IS HEREBY ORDERED that the parties participate in a telephone conference on Tuesday, March 2, 2010 at 1:30 p.m. to address a recusal issue that has arisen. At that time, counsel for the Garden City defendants shall initiate the call and, once all parties are on the line, contact Chambers at (631)-712-5670. SO ORDERED. Ordered by Judge Joseph F. Bianco on 2/19/2010. (Quigley, Brendan) (Entered: 02/19/2010) |
|---|---|---|
| 03/02/2010 | 211 | ORDER OF RECUSAL. Judge Joseph F. Bianco recused.. Ordered by Judge Joseph F. Bianco on 3/2/2010. (Bollbach, Jean) (Entered: 03/02/2010) |
| 03/02/2010 | 212 | Minute Entry for proceedings held before Judge Joseph F. Bianco:Telephone pre motion Conference held on 3/2/2010; I recuse myself from case. (Court Reporter FTR 1:43 - 1:54.) (Bollbach, Jean) (Entered: 03/02/2010) |
| 03/08/2010 | 213 | ORDER REASSIGNING CASE. Case reassigned to Judge Sandra J. Feuerstein for all further proceedings.. Ordered by Chief Judge Raymond J. Dearie on 3/8/2010. (Bowens, Priscilla) (Entered: 03/09/2010) |
| 03/11/2010 | | ORDER OF RECUSAL. Judge Sandra J. Feuerstein recused. Case reassigned to Senior Judge Arthur D. Spatt for all further proceedings Type of Recusal Attorney. Ordered by Judge Sandra J. Feuerstein on 3/11/2010. (Adell, April) (Entered: 03/11/2010) |
| 03/15/2010 | 214 | ORDER - The instant case was reassigned to this Court on March 11, 2010 with several motions pending. The Court hereby dismisses the pending motions without prejudice and with leave to refile in accordance with Judge Spatts Individual Motion Practice Rules. In addition to refiling on ECF, the parties are directed to furnish the Court with courtesy copies of any and all papers relevant to the pending motions. Signed by Senior Judge Arthur D. Spatt, on 3/15/10. Terminating 147 Motion for Summary Judgment; 148 Motion for Summary Judgment; 161 Motion to Strike ; 203 Motion for Sanctions pursuant to herein.. Ordered by Senior Judge Arthur D. Spatt on 3/15/2010. (Coleman, Laurie) (Entered: 03/16/2010) |
| 03/24/2010 | 215 | Letter *To Judge Spatt Re: Post-Reassignment Conference* by Acorn, Vic Devita, McCray, Francine, New York Acorn Housing Company (Brown, Stanley) (Entered: 03/24/2010) |
| 03/26/2010 | 216 | Letter MOTION to Adjourn Conference *of April 6, 2010 due to religious observance,* by County of Nassau. (Reissman, Ralph) (Entered: 03/26/2010) |
| 03/26/2010 | 219 | ORDER granting 216 Motion to Adjourn Conference- conf 4/6/10 at 9:30. Ordered by Senior Judge Arthur D. Spatt on 3/26/2010. (Bollbach, Jean) (Entered: 03/30/2010) |
| 03/29/2010 | 217 | Letter *To Judge Spatt re: In Response to Mr. Reissman's March 26, 2010 Letter* by Acorn, Vic Devita, McCray, Francine, New York Acorn Housing Company (Brown, Stanley) (Entered: 03/29/2010) |
| 03/30/2010 | 218 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on AUGUST 21, 2009,CIVIL CAUSE FOR ORAL ARGUMENT HELD before Judge HON. JUDGE JOSEPH F. BIANCO. Court Reporter/Transcriber ROSALIE LOMBARDI & LINDA FERRARA, Telephone number (516) 358- |

| | | |
|---|---|---|
| | | 7352. Email address: TRANSCRIPTIONS2@VERIZON.NET. Tape Number: FTR/DRIVE/TIME:. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 4/20/2010. Redacted Transcript Deadline set for 4/30/2010. Release of Transcript Restriction set for 6/28/2010.KEITH ANGELO JONES. (Jones, Keith) (Entered: 03/30/2010) |
| 03/30/2010 | 220 | ORDER, ( Pre-Motion Conference reset for 4/7/2010 09:30 AM before Senior Judge Arthur D. Spatt.) Movants counsel directed to serve a copy of this order on all parties upon receipt via facsimile. Ordered by Senior Judge Arthur D. Spatt on 3/30/2010. (Bollbach, Jean) (Entered: 03/31/2010) |
| 04/02/2010 | 231 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings CIVIL CAUSE FOR A TELEPHONE PRE-MOTION CONFERENCE held on MARCH 02, 2010, before HON.JUDGE JOSEPH F. BIANCO. Court Reporter/Transcriber MARY GRECO OF TypeWrite Word Processing Service @ 211 N. Milton Road Saratoga Springs, New York. 12866, Telephone number (518) 581-8973 or (718) 966-1401; Fax#(718) 967-4843. Tape Number: FTR/DRIVE/TIME:. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 4/23/2010. Redacted Transcript Deadline set for 5/3/2010. Release of Transcript Restriction set for 7/1/2010.KEITH ANGELO JONES. (Jones, Keith) (Entered: 04/20/2010) |
| 04/05/2010 | 221 | Letter *regarding issues that will be presented to the Court at the pre-motion conference 4-7-10* by Garden City Board of Trustees, Incorporated Village of Garden City (Ryan, James) (Entered: 04/05/2010) |
| 04/06/2010 | 222 | Letter *regarding April 7, 2010 conference* by Acorn, Vic Devita, McCray, Francine, New York Acorn Housing Company (Brown, Stanley) (Entered: 04/06/2010) |
| 04/07/2010 | 232 | MINUTE ENTRY for proceedings held before Senior Judge Arthur D. Spatt:Pre-Motion Conference held on 4/7/2010 at 9:40 a.m. Court Deputy: Mary Ellen Schaffner. Case called. Counsel for all sides present. Pre-motion conference held. Other: Proposed scheduling order submitted to the Court. (Coleman, Laurie) (Entered: 04/22/2010) |
| 04/09/2010 | 223 | Letter MOTION to Amend/Correct/Supplement *(Seeking Name Change)* by New York Acorn Housing Company. (Attachments: # 1 Certificate of Amendment, # 2 Proposed Order) (Rich, Joseph) (Entered: 04/09/2010) |
| 04/12/2010 | 224 | Letter MOTION to Amend/Correct/Supplement *no objection to change of name of New York ACORN Housing Company, Inc.* by Garden City Board of Trustees, Incorporated Village of Garden City. (Ryan, James) (Entered: 04/12/2010) |
| 04/13/2010 | 230 | ORDER Re: 223 Motion amend docket to reflect the name change of Plaintiff New York ACORN Housing Company, Inc. to MHANY Management, Inc. Signed by Senior Judge Arthur D. Spatt on 4/13/2010. Caption amended pursuant to herein. (Coleman, Laurie) (Entered: 04/15/2010) |

JA 34

| 04/13/2010 | | Motions terminated, docketed incorrectly: 224 Letter MOTION to Amend/Correct/Supplement *no objection to change of name of New York ACORN Housing Company, Inc.* filed by Garden City Board of Trustees, Incorporated Village of Garden City. It's a response to the #223 motion to amend (which was decided by the 4/13/10 Order of District Judge Spatt). (Talbott, Thomas) (Entered: 07/16/2010) |
|---|---|---|
| 04/14/2010 | 225 | MOTION to Intervene by Acorn, Daphne Andrews, Vic Devita, McCray, Francine, New York Acorn Housing Company, New York Communities For Change, Inc.. (Attachments: # 1 Certificate of Service) (Rich, Joseph) (Entered: 04/14/2010) |
| 04/14/2010 | 226 | MEMORANDUM in Support re 225 MOTION to Intervene filed by Acorn, Daphne Andrews, Vic Devita, McCray, Francine, New York Acorn Housing Company, New York Communities For Change, Inc.. (Rich, Joseph) (Entered: 04/14/2010) |
| 04/14/2010 | 227 | AFFIDAVIT/DECLARATION in Support re 225 MOTION to Intervene filed by Acorn, Daphne Andrews, Vic Devita, McCray, Francine, New York Acorn Housing Company, New York Communities For Change, Inc.. (Attachments: # 1 Exhibit 1) (Rich, Joseph) (Entered: 04/14/2010) |
| 04/14/2010 | 228 | AFFIDAVIT/DECLARATION in Support re 225 MOTION to Intervene filed by Acorn, Daphne Andrews, Vic Devita, McCray, Francine, New York Acorn Housing Company, New York Communities For Change, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Rich, Joseph) (Entered: 04/14/2010) |
| 04/15/2010 | 229 | EXHIBIT *C* by Acorn, Daphne Andrews, Vic Devita, McCray, Francine, New York Acorn Housing Company, New York Communities For Change, Inc.. Related document: 228 Affidavit in Support of Motion, filed by New York Acorn Housing Company, McCray, Francine, Daphne Andrews, New York Communities For Change, Inc., Vic Devita, Acorn. (Rich, Joseph) (Entered: 04/15/2010) |
| 04/23/2010 | 233 | MOTION to Intervene *Memorandum of Law in Opposition* by Garden City Board of Trustees, Incorporated Village of Garden City. (Attachments: # 1 Affidavit of Service) (McLaughlin, Jennifer) (Entered: 04/23/2010) |
| 04/23/2010 | 234 | RESPONSE in Opposition re 225 MOTION to Intervene *(Letter in Opposition)* filed by County of Nassau. (Reissman, Ralph) (Entered: 04/23/2010) |
| 04/23/2010 | 235 | MOTION for Leave to Appear Pro Hac Vice *(Abigail Evans Shafroth)* Filing fee $ 25, receipt number 0207-4110729. by Acorn, Vic Devita, MHANY Management, Inc., McCray, Francine, New York Acorn Housing Company, Inc.. (Attachments: # 1 Declaration Of Joanna F. Wasick, # 2 Affidavit Of Abigail Evans Shafroth, # 3 Certificate Of Good Standing, # 4 Proposed Order) (Wasick, Joanna) (Entered: 04/23/2010) |
| 04/28/2010 | 236 | Letter *regarding outstanding motions* by Acorn, Vic Devita, MHANY Management, Inc., McCray, Francine, New York Acorn Housing Company, Inc., New York Communities For Change, Inc. (Brown, Stanley) (Entered: 04/28/2010) |

| | | |
|---|---|---|
| 04/28/2010 | 237 | Letter *regarding removal of attorneys from counsel list* by Vic Devita, McCray, Francine (Brown, Stanley) (Entered: 04/28/2010) |
| 04/29/2010 | 238 | Letter *in response to plaintiffs' 4-28-10 letter regarding motion* by Garden City Board of Trustees, Incorporated Village of Garden City (Ryan, James) (Entered: 04/29/2010) |
| 04/29/2010 | 239 | ORDER endorsed on letter dtd. 4/28/10 - request in letter is denied. Upon the courts determination of the plaintiff's motion to intervene, the parties may re-submit a proposed briefing schedule for any motion for summary judgment. Ordered by Senior Judge Arthur D. Spatt on 4/29/10. (Bollbach, Jean) (Entered: 05/04/2010) |
| 04/29/2010 | 240 | ORDER endorsed on letter dtd. 4/28/10 - Request is granted. So Ordered. Toby William Smith and Jenny Rubin Robertson are no longer associated with this office and are to be removed.. Ordered by Senior Judge Arthur D. Spatt on 4/29/10. (Bollbach, Jean) (Entered: 05/04/2010) |
| 05/04/2010 | 241 | NOTICE by Vic Devita, McCray, Francine *(Change of Firm Name and Email Address)* (Brown, Stanley) (Entered: 05/04/2010) |
| 05/04/2010 | 242 | NOTICE by Vic Devita, McCray, Francine *(Change of Firm Name and Email Address)* (Dennin, Peter) (Entered: 05/04/2010) |
| 05/04/2010 | 243 | NOTICE of Change of Firm Name and Email Address by Joanna F. Wasick (Wasick, Joanna) (Entered: 05/04/2010) |
| 05/04/2010 | 244 | NOTICE of Change of Firm Name and Email Address by Sabrina Helene Cochet (Cochet, Sabrina) (Entered: 05/04/2010) |
| 05/05/2010 | 245 | REPLY in Support re 225 MOTION to Intervene filed by New York Communities For Change, Inc.. (Attachments: # 1 Certificate of Service) (Rich, Joseph) (Entered: 05/05/2010) |
| 05/14/2010 | | ELECTRONIC ORDER granting 235 Motion for Leave to Appear pro hac vice, Abigail Evans Shafroth for plaintiffs. Ordered by Judge William D. Wall on 5/14/2010. (Disbrow, Sandra) (Entered: 05/14/2010) |
| 05/14/2010 | | Email Notification Test - DO NOT REPLY. (Coleman, Laurie) (Entered: 06/22/2010) |
| 06/15/2010 | 246 | ORDER - it is hereby ORDERED that NYCCs 233 motion to intervene pursuant to Rule 24(b) is granted; and it is further ORDERED that, within twenty days of the date hereof, NYCC may file a complaint substantially similar to the proposed complaint by NYCC presently filed with the Court; and it is further ORDERED that the parties are directed to appear before United States Magistrate Judge William D. Wall for a conference concerning any additional discovery in this case on June 25, 2010 at 11:00; and it is further ORDERED that, pending the submission of NYCCs complaint, the Clerk of the Court is directed to amend the caption for this case to read as follows: (see Order). Ordered by Senior Judge Arthur D. Spatt on 6/15/10. (Coleman, Laurie) (Entered: 06/16/2010) |
| 06/24/2010 | 247 | Letter *Regarding Discovery Conference Before Mag. Judge Wall* by Acorn, |

| | | |
|---|---|---|
| | | Vic Devita, MHANY Management, Inc., McCray, Francine (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4) (Brown, Stanley) (Entered: 06/24/2010) |
| 06/25/2010 | 248 | Minute Order for proceedings held before Magistrate Judge William D. Wall:Status Conference held on 6/25/2010. Plaintiff's motion to re-open discovery is granted. All additional discovery shall be completed by 10/15/10. Next telephone status conference will be held on 10/20/10. See attached order. Ordered by Judge William D. Wall on 6/25/10. c/g (Disbrow, Sandra) (Entered: 06/25/2010) |
| 06/29/2010 | 249 | Letter *requesting names of attorneys no longer representing County to be withdrawn from docket,* by County of Nassau (Reissman, Ralph) (Entered: 06/29/2010) |
| 06/30/2010 | 250 | Intervenor COMPLAINT, filed by New York Communities For Change, Inc.. (Rich, Joseph) (Entered: 06/30/2010) |
| 08/26/2010 | 251 | ANSWER to Complaint *in Intervention for Declaratory Judgment and Injunctive Relief* by Garden City Board of Trustees, Incorporated Village of Garden City. (Attachments: # 1 Affidavit of Service) (Ryan, James) (Entered: 08/26/2010) |
| 09/16/2010 | 252 | *Defendant Nassau County's* ANSWER to Complaint *in Intervention of New York Communities for Change, Inc.,* by County of Nassau. (Reissman, Ralph) (Entered: 09/16/2010) |
| 10/13/2010 | 253 | Joint MOTION for Extension of Time to Complete Discovery, Joint MOTION to Adjourn Conference by County of Nassau. (Reissman, Ralph) (Entered: 10/13/2010) |
| 10/13/2010 | | ORDER granting 253 Motion for Extension of Time to Complete Discovery; granting 253 Motion to Adjourn Conference. The discovery deadline is extended to November 5, 2010. The telephone status conference scheduled for 10/20/10 is adjourned to 11/8/10 at 11:30 a.m. Ordered by Magistrate Judge William D. Wall on 10/13/2010. (Hepworth, F.) (Entered: 10/13/2010) |
| 10/19/2010 | 254 | Letter *to Magistrate judge William D. Wall re: Stipulation and Order for the Protection of Confidential Information* by Vic Devita, MHANY Management, Inc., McCray, Francine, New York Communities For Change, Inc. (Attachments: # 1 Stipulation and Order for the Protection of Confidential Information) (Shafroth, Abigail) (Entered: 10/19/2010) |
| 10/20/2010 | | ELECTRONIC ORDER: re 254 Letter. The Confidentiality Order submitted by the parties as an attachment to 254 is So Ordered. Ordered by Judge William D. Wall on 10/20/2010. (Disbrow, Sandra) (Entered: 10/20/2010) |
| 11/08/2010 | | Minute Entry for proceedings held before Magistrate Judge William D. Wall:Telephone Status Conference held on 11/8/2010. (Disbrow, Sandra) (Entered: 11/08/2010) |
| 11/08/2010 | 255 | ORDER: All discovery shall be completed by 12/31/10. Any party intending to file a Rule 56 Motion shall serve a Rule 56.1 Statement no later than 1/31/11. The pretrial conference is adjourned without date pending Judge |

| | | |
|---|---|---|
| | | Spatt's resolution of the motion. Ordered by Judge William D. Wall on 11/8/2010. c/e (Disbrow, Sandra) (Entered: 11/08/2010) |
| 12/23/2010 | 256 | Letter MOTION for Extension of Time to File by Vic Devita, MHANY Management, Inc., McCray, Francine, New York Communities For Change, Inc.. (Attachments: # 1 Stipulation and Order) (Brown, Stanley) (Entered: 12/23/2010) |
| 12/29/2010 | | ELECTRONIC ORDER granting 256 Motion. The stipulation is So Ordered. Ordered by Judge William D. Wall on 12/29/2010. (Disbrow, Sandra) (Entered: 12/29/2010) |
| 03/03/2011 | 257 | Joint MOTION for Extension of Time to File *(serve) Local Rule 56.1 Statements* by County of Nassau. (Attachments: # 1 Exhibit) (Reissman, Ralph) (Entered: 03/03/2011) |
| 03/04/2011 | | ELECTRONIC ORDER granting 257 Motion for Extension of Time to File. The stipulation attached to the motion is So Ordered. Ordered by Judge William D. Wall on 3/4/2011. (Disbrow, Sandra) (Entered: 03/04/2011) |
| 04/29/2011 | 258 | Letter MOTION to Strike *and declare null and void, plaintiffs' Statement of Additional Material Facts, as in violation of Local Rule 56.1 and the Court's Individual Motion Practices,* by County of Nassau. (Reissman, Ralph) (Entered: 04/29/2011) |
| 05/12/2011 | 260 | ORDER granting 258 Motion to Strike. The defendants' unopposed motion to strike is granted. So Ordered by Senior Judge Arthur D. Spatt on 5/12/2011. (Padilla, Kristin) (Entered: 05/16/2011) |
| 05/13/2011 | 259 | Letter MOTION to Withdraw 258 Letter MOTION to Strike *and declare null and void, plaintiffs' Statement of Additional Material Facts, as in violation of Local Rule 56.1 and the Court's Individual Motion Practices, since Plaintiffs have served an acceptable Amended Statement of Additional Material Facts,* by County of Nassau. (Reissman, Ralph) (Entered: 05/13/2011) |
| 05/13/2011 | | Motions Terminated, Docketed Incorrectly: Terminating 259 Letter MOTION to Withdraw 258 Letter MOTION to Strike *and declare null and void, plaintiffs' Statement of Additional Material Facts, as in violation of Local Rule 56.1 and the Court's Individual Motion Practices, filed by County of Nassau. Pursuant to chambers this should not have been docketed as a motion. It is withdrawing (resolving) docket 258 . (Coleman, Laurie) (Entered: 03/13/2012)* |
| 05/16/2011 | 261 | MOTION to Vacate *Order Granting Defendant Nassau County's Motion to Strike Plaintiffs' Statement of Additional Material Facts Pursuant to Local Rule 56.1* by Vic Devita. (Brown, Stanley) (Entered: 05/16/2011) |
| 05/18/2011 | 264 | ORDER Re: 261 Motion requesting the Court withdraw the May 12 Order, and take notice of the County's withdrawal of its April 29, 2011 motion to strike. The Court's May 12, 2011 Order striking the plaintiff's Rule 56.1 Statement is vacated. Signed by Senior Judge Arthur D. Spatt on 5/18/11. Movant's counsel is directed to serve a copy of this order on all parties upon receipt via facsimile. (Coleman, Laurie) (Main Document 264 replaced on |

| | | 5/20/2011) (Coleman, Laurie). (Entered: 05/20/2011) |
|---|---|---|
| 05/20/2011 | 262 | NOTICE of Appearance by Chava Brandriss on behalf of Vic Devita, McCray, Francine (aty to be noticed) (Brandriss, Chava) (Entered: 05/20/2011) |
| 05/20/2011 | 263 | AFFIDAVIT of Service for Order of the Honorable Arthur D. Spatt on May 18, 2011, filed by Vic Devita, McCray, Francine. (Brandriss, Chava) (Entered: 05/20/2011) |
| 05/23/2011 | 265 | Letter *requesting pre-motion conference* by Garden City Board of Trustees, Incorporated Village of Garden City (McLaughlin, Jennifer) (Entered: 05/23/2011) |
| 05/24/2011 | 266 | Letter MOTION for pre motion conference *for permission to file motion for summary judgment,* by County of Nassau. (Attachments: # 1 Rule 56.1 Statement Part 1 of 3 Parts, # 2 Rule 56.1 Statement Part 2 of 3 Parts, # 3 Rule 56.1 Statement Part 3 of 3 Parts, # 4 Rule 56.1 Statement Plaintiffs' Response Part 1 of 3 Parts, # 5 Rule 56.1 Statement Plaintiffs' Response Part 2 of 3 Parts, # 6 Rule 56.1 Statement Plaintiffs' Response Part 3 of 3 Parts, # 7 Rule 56.1 Statement Plaintiffs' Amended Statement of Additional Material Facts) (Reissman, Ralph) (Entered: 05/24/2011) |
| 05/26/2011 | 267 | ORDER re 265 Letter filed by Garden City Board of Trustees, Incorporated Village of Garden City, Application granted. A pre-motion conference is set for June 29, 2011 in courtroom 1020. Counsel shall have authority to discuss settlement at this conference. Movant's counsel is directed to serve a copy of this order on all parties upon receipt via facsmile.. Ordered by Senior Judge Arthur D. Spatt on 5/26/2011. (Padilla, Kristin) (Entered: 05/31/2011) |
| 05/31/2011 | 268 | Letter *in Response to defendants' letter, dated May 23, 2011(Garden City) and May 24, 2011 (Nassau County).* by Vic Devita, McCray, Francine (Brown, Stanley) (Entered: 05/31/2011) |
| 06/21/2011 | 269 | MOTION for Leave to Appear Pro Hac Vice *(Linda H. Mullenbach)* Filing fee $ 25, receipt number 0207-4862589. by Vic Devita, MHANY Management, Inc., McCray, Francine. (Attachments: # 1 Proposed Order) (Brown, Stanley) (Entered: 06/21/2011) |
| 06/21/2011 | 270 | AFFIDAVIT/DECLARATION in Support re 269 MOTION for Leave to Appear Pro Hac Vice *(Linda H. Mullenbach)* Filing fee $ 25, receipt number 0207-4862589. filed by Vic Devita, MHANY Management, Inc., McCray, Francine. (Brown, Stanley) (Entered: 06/21/2011) |
| 06/21/2011 | 271 | AFFIDAVIT/DECLARATION in Support re 269 MOTION for Leave to Appear Pro Hac Vice *(Linda H. Mullenbach)* Filing fee $ 25, receipt number 0207-4862589. filed by Vic Devita, MHANY Management, Inc., McCray, Francine. (Brown, Stanley) (Entered: 06/21/2011) |
| 06/21/2011 | | ELECTRONIC ORDER granting 269 Motion for Leave to Appear pro hac vice, Linda H. Mullenbach for plaintiffs. Ms. Mullenbach is directed to register for ECF and to electronically file a notice of appearance. Ordered by Judge William D. Wall on 6/21/2011. (Disbrow, Sandra) (Entered: |

**JA 39**

| | | 06/21/2011) |
|---|---|---|
| 06/27/2011 | 272 | NOTICE of Appearance by Linda H. Mullenbach on behalf of Acorn, Daphne Andrews, Vic Devita, Vernon Ghullkie, Natalie Guerrido, Lisbett Hunter, MHANY Management, Inc., McCray, Francine, New York Acorn Housing Company, Inc. (aty to be noticed) (Mullenbach, Linda) (Entered: 06/27/2011) |
| 07/07/2011 | 273 | Letter MOTION for Discovery *(Re-opening of Discovery on an Expedited Basis)* by Vic Devita, MHANY Management, Inc., McCray, Francine. (Brown, Stanley) (Entered: 07/07/2011) |
| 07/12/2011 | 274 | RESPONSE in Opposition re 273 Letter MOTION for Discovery *(Re-opening of Discovery on an Expedited Basis)* filed by County of Nassau. (Reissman, Ralph) (Entered: 07/12/2011) |
| 07/15/2011 | 275 | REPLY in Support re 273 Letter MOTION for Discovery *(Re-opening of Discovery on an Expedited Basis)* filed by Acorn, Daphne Andrews, Vic Devita, Vernon Ghullkie, Natalie Guerrido, Lisbett Hunter, MHANY Management, Inc., McCray, Francine, New York Acorn Housing Company, Inc.. (Attachments: # 1 Certificate of Service) (Brown, Stanley) (Entered: 07/15/2011) |
| 07/21/2011 | 286 | ORDER Re: 273 Letter requesting to reopen discovery. The plaintiffs request is referred to United States Magistrate Judge William D. Wall. The parties are directed to contact Judge Wall's chambers to determine whether he wishes to conduct a conference or hearing concerning this motion. Signed by Senior Judge Arthur D. Spatt on 7/21/11. (Coleman, Laurie) (Entered: 08/02/2011) |
| 07/26/2011 | 276 | ORDER denying 273 Motion for Discovery to the extent indicated in the attached order. Ordered by Judge William D. Wall on 7/26/2011. (Disbrow, Sandra) (Entered: 07/26/2011) |
| 07/27/2011 | 277 | Letter MOTION for Leave to File *Motion for Summary Judgment in "hard copy" with Clerk of the Court (in addition to filing primary documents by ECF)* by County of Nassau. (Reissman, Ralph) (Entered: 07/27/2011) |
| 07/28/2011 | 288 | ORDER granting 277 Motion for Leave to File. Request Granted. So Ordered. Ordered by Senior Judge Arthur D. Spatt on 7/28/2011. (Padilla, Kristin) (Entered: 08/09/2011) |
| 07/29/2011 | 278 | MOTION for Summary Judgment by Garden City Board of Trustees, Incorporated Village of Garden City. (Attachments: # 1 Affidavit, # 2 Affidavit, # 3 Affidavit, # 4 Exhibit, # 5 Memorandum in Support) (Ryan, James) (Entered: 07/29/2011) |
| 07/29/2011 | 279 | NOTICE by Garden City Board of Trustees, Incorporated Village of Garden City *Statement of Material Facts Pursuant to Local Rule 56.1* (Ryan, James) (Entered: 07/29/2011) |
| 07/29/2011 | 280 | Letter by Garden City Board of Trustees, Incorporated Village of Garden City (Ryan, James) (Entered: 07/29/2011) |
| 07/29/2011 | 281 | AFFIDAVIT/AFFIRMATION *of Personal Service of Notice of Motion and Supporting Documents* by Garden City Board of Trustees, Incorporated |

| | | |
|---|---|---|
| | | Village of Garden City (Ryan, James) (Entered: 07/29/2011) |
| 07/29/2011 | 282 | AFFIDAVIT/AFFIRMATION *of Service via Federal Express Overnight of Notice of Motion and Supporting Documents* by Garden City Board of Trustees, Incorporated Village of Garden City (Ryan, James) (Entered: 07/29/2011) |
| 07/29/2011 | 283 | MOTION for Summary Judgment *(Notice of Motion with Declaration of Ralph J. Reissman, hard copy of exhibits filed with Clerk and served)* by County of Nassau. Responses due by 8/31/2011 (Attachments: # 1 Affidavit Rob Walker Affidavit (Hard copy of exhibits filed with Clerk and served), # 2 Affidavit Connie Lassandro Affidavit (Hard copy of exhibits filed with Clerk and served, # 3 Affidavit Kevin Crean Affidavit (Hard copy of exhibits filed with Clerk and served), # 4 Rule 56.1 Statement Part 1 of 3 Parts (pages 1-35), # 5 Rule 56.1 Statement Part 1 of 3 Parts (pages 36-68), # 6 Rule 56.1 Statement Part 2 of 3 Parts, # 7 Rule 56.1 Statement Part 3 of 3 Parts, # 8 Memorandum in Support) (Reissman, Ralph) (Entered: 07/29/2011) |
| 07/29/2011 | 284 | DECLARATION re 283 MOTION for Summary Judgment *(Notice of Motion with Declaration of Ralph J. Reissman, hard copy of exhibits filed with Clerk and served) upon Cullen & Dykman* by County of Nassau (Reissman, Ralph) (Entered: 07/29/2011) |
| 07/29/2011 | 285 | DECLARATION re 283 MOTION for Summary Judgment *(Notice of Motion with Declaration of Ralph J. Reissman, hard copy of exhibits filed with Clerk and served) upon Hogan Lovells and Joseph Rich* by County of Nassau (Reissman, Ralph) (Entered: 07/29/2011) |
| 08/08/2011 | 287 | Letter *requesting Oral Argument of summary judgment motion [DE 283]* by County of Nassau (Reissman, Ralph) (Entered: 08/08/2011) |
| 08/09/2011 | 289 | ORDER re 287 Letter filed by County of Nassau Request Denied. The Court will inform the parties if it wishes to hear oral argument on the defendant's motion. So Ordered. Ordered by Senior Judge Arthur D. Spatt on 8/09/2011. (Padilla, Kristin) (Entered: 08/10/2011) |
| 08/26/2011 | 290 | MOTION to Amend/Correct/Supplement 250 Intervenor Complaint by New York Communities For Change, Inc.. (Attachments: # 1 Proposed Order) (Mullenbach, Linda) (Entered: 08/26/2011) |
| 08/26/2011 | 291 | MEMORANDUM in Support re 290 MOTION to Amend/Correct/Supplement 250 Intervenor Complaint filed by New York Communities For Change, Inc.. (Mullenbach, Linda) (Entered: 08/26/2011) |
| 08/26/2011 | 292 | AFFIDAVIT/DECLARATION in Support re 290 MOTION to Amend/Correct/Supplement 250 Intervenor Complaint filed by New York Communities For Change, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C) (Mullenbach, Linda) (Entered: 08/26/2011) |
| 08/26/2011 | 293 | CERTIFICATE OF SERVICE by New York Communities For Change, Inc. re 292 Affidavit in Support of Motion, 291 Memorandum in Support, 290 MOTION to Amend/Correct/Supplement 250 Intervenor Complaint (Mullenbach, Linda) (Entered: 08/26/2011) |
| | | |

| | | |
|---|---|---|
| 08/31/2011 | 294 | RULE 56.1 STATEMENT *Plaintiffs' Response To Defendant Garden City's Statement of Material Facts Pursuant to Local Rule 56.1* filed by Vic Devita, MHANY Management, Inc., McCray, Francine, New York Communities For Change, Inc.. (Brown, Stanley) (Entered: 08/31/2011) |
| 08/31/2011 | 295 | RULE 56.1 STATEMENT *Plaintiffs' Response To Part 1 of 3 Parts Of Defendant County of Nassau's Statement Of Material Facts Pursuant To Local Rule 56.1* filed by Vic Devita, MHANY Management, Inc., McCray, Francine, New York Communities For Change, Inc.. (Attachments: # 1 Plaintiff's Response To Part 2 of 3 Parts of Defendant County of Nassau' s Statement Of Material Facts Pursuant To Local Rule 56.1, # 2 Plaintiff's Response to Part 3 of 3 Parts of Defendant County Of Nassau's Statement Of Material Facts Pursuant To Local Rule 56.1) (Brown, Stanley) (Entered: 08/31/2011) |
| 08/31/2011 | 296 | RULE 56.1 STATEMENT *Plaintiffs' Amended Statement Of Material Facts* filed by Vic Devita, MHANY Management, Inc., McCray, Francine, New York Communities For Change, Inc.. (Brown, Stanley) (Entered: 08/31/2011) |
| 08/31/2011 | 297 | MEMORANDUM in Opposition re 283 MOTION for Summary Judgment *(Notice of Motion with Declaration of Ralph J. Reissman, hard copy of exhibits filed with Clerk and served)*, 278 MOTION for Summary Judgment *Plaintiffs' Consolidated Opposition To Defendants Incorporated Village Of Garden City's, Garden City Board Of Trustees' And Nassau County's Motions For Summary Judgment* filed by Vic Devita, MHANY Management, Inc., McCray, Francine, New York Communities For Change, Inc.. (Brown, Stanley) (Entered: 08/31/2011) |
| 08/31/2011 | 298 | AFFIDAVIT/DECLARATION in Opposition re 283 MOTION for Summary Judgment *(Notice of Motion with Declaration of Ralph J. Reissman, hard copy of exhibits filed with Clerk and served)*, 278 MOTION for Summary Judgment filed by Vic Devita, MHANY Management, Inc., McCray, Francine, New York Communities For Change, Inc.. (Attachments: # 1 Notice Regarding Filing Of Exhibits In Paper Form) (Brown, Stanley) (Entered: 08/31/2011) |
| 08/31/2011 | 299 | CERTIFICATE OF SERVICE by Vic Devita, MHANY Management, Inc., McCray, Francine, New York Communities For Change, Inc. re 298 Affidavit in Opposition to Motion, 296 Rule 56.1 Statement, 295 Rule 56.1 Statement,, 297 Memorandum in Opposition,, 294 Rule 56.1 Statement, (Brown, Stanley) (Entered: 08/31/2011) |
| 08/31/2011 | 300 | NOTICE by Vic Devita, MHANY Management, Inc., McCray, Francine, New York Communities For Change, Inc. *Certificate Of Service Dated April 8, 2011* (Brown, Stanley) (Entered: 08/31/2011) |
| 08/31/2011 | 301 | NOTICE by Vic Devita, MHANY Management, Inc., McCray, Francine, New York Communities For Change, Inc. *Certificate Of Service Dated May 9, 2011* (Brown, Stanley) (Entered: 08/31/2011) |
| 09/02/2011 | 302 | MEMORANDUM in Opposition re 290 MOTION to Amend/Correct/Supplement 250 Intervenor Complaint filed by County of Nassau. (Reissman, Ralph) (Entered: 09/02/2011) |
| 09/02/2011 | 308 | EXHIBITS 1 -47 (Vol. 1 of 3) of Plaintiffs Re: Declaration of Stanley J. |

| | | |
|---|---|---|
| | | Brown in Opposition to Defendants Incorporated Village of Garden City's, Garden City Board of Trustees' and Nassau County's Motion for Summary Judgment.(Original Document/Not Scanned). (Coleman, Laurie) (Entered: 09/15/2011) |
| 09/02/2011 | 309 | EXHIBITS 48-90 (Vol. 2 of 3) of Plaintiffs Re: Declaration of Stanley J. Brown in Opposition to Defendants Incorporated Village of Garden City's, Garden City Board of Trustees' and Nassau County's Motion for Summary Judgment. (Original Document/Not Scanned). (Coleman, Laurie) (Entered: 09/15/2011) |
| 09/02/2011 | 310 | EXHIBITS 91-126 (Vol. 3 of 3) of Plaintiffs Re: Declaration of Stanley J. Brown in Opposition to Defendants Incorporated Village of Garden City's, Garden City Board of Trustees' and Nassau County's Motion for Summary Judgment. (Original Document/Not Scanned). (Coleman, Laurie) (Entered: 09/15/2011) |
| 09/08/2011 | 303 | Letter MOTION for Leave to File Excess Pages by Garden City Board of Trustees, Incorporated Village of Garden City. (McLaughlin, Jennifer) (Entered: 09/08/2011) |
| 09/09/2011 | 304 | MEMORANDUM in Opposition filed by Garden City Board of Trustees, Incorporated Village of Garden City. (Attachments: # 1 Affidavit of Service) (Ronneburger, Ariel) (Entered: 09/09/2011) |
| 09/09/2011 | 307 | ORDER denying 303 Motion for Leave to File Excess Pages. Request Denied. So Ordered.. Ordered by Senior Judge Arthur D. Spatt on 9/9/2011. (Padilla, Kristin) (Entered: 09/13/2011) |
| 09/12/2011 | 305 | MEMORANDUM in Opposition re 303 Letter MOTION for Leave to File Excess Pages filed by Vic Devita, MHANY Management, Inc., McCray, Francine, New York Communities For Change, Inc.. (Brown, Stanley) (Entered: 09/12/2011) |
| 09/12/2011 | 306 | REPLY in Support re 290 MOTION to Amend/Correct/Supplement 250 Intervenor Complaint filed by New York Communities For Change, Inc.. (Rich, Joseph) (Entered: 09/12/2011) |
| 09/16/2011 | 311 | REPLY in Support re 283 MOTION for Summary Judgment *(Notice of Motion with Declaration of Ralph J. Reissman, hard copy of exhibits filed with Clerk and served)* filed by County of Nassau. (Attachments: # 1 Affidavit in Support) (Reissman, Ralph) (Entered: 09/16/2011) |
| 09/16/2011 | 313 | REPLY in Support re 278 MOTION for Summary Judgment filed by Garden City Board of Trustees, Incorporated Village of Garden City. (Ronneburger, Ariel) (Entered: 09/16/2011) |
| 09/16/2011 | | INCORRECT CASE/DOCUMENT ENTRY INFORMATION - The Memorandum previously seen as document #312 has been deleted from the above-referenced case at the request of counsel and with permission of Chambers due to a clerical error. Counsel has already re-filed a corrected copy of the Memorandum seen as document #313. (Coleman, Laurie) (Entered: 09/19/2011) |
| | | |

| 09/20/2011 | 314 | LETTER (undated) from Marjorie Mesidor to the Court Re: Request that this Court's records refect the change of address noted herein and that I be marked as "terminated" as an attorney in this matter. Frederick Brewington will continue to be counsel of record on these matters. (Coleman, Laurie) (Entered: 09/30/2011) |
| --- | --- | --- |
| 09/20/2011 | | ORDER Re: 314 Letter to "terminate" Majorie Mesidor in this matter. Signed by Senior Judge Arthur D. Spatt on 9/20/11.EOD #314 (Coleman, Laurie) (Entered: 09/30/2011) |
| 02/15/2012 | 315 | MEMORANDUM OF DECISION AND ORDER - It is hereby ORDERED that the Defendant Countys 283 motion for summary judgment dismissing all claims against it is GRANTED; and it is further ORDERED that the Garden City Defendants 278 motion for summary judgment dismissing all claims against it is DENIED in all respects; and it is further ORDERED that the Inventor-Plaintiff NYCCs 290 motion to amend the intervenor complaint to include a cause of action for violations of the Civil Rights Act of 1871, 42 U.S.C. §1983 and the Equal Protection Clause of the Fourteenth Amendment is GRANTED. NYCC is directed to file an amended complaint only as against the Garden City Defendants in conformance with the rulings set forth in this Memorandum of Decision and Order within 20 days of the date of this Order; and it is further ORDERED that the Plaintiffs and the Garden City Defendants are directed to appear on Thursday, February 23, 2012 at 9:00am for a conference to set a trial date. Signed by Senior Judge Arthur D. Spatt on 2/15/2012. (Coleman, Laurie) (Entered: 02/15/2012) |
| 02/17/2012 | 316 | Letter MOTION to Adjourn Conference *on consent* by Garden City Board of Trustees, Incorporated Village of Garden City. (Ryan, James) (Entered: 02/17/2012) |
| 02/21/2012 | 317 | ORDER Re: 316 Motion requesting to adjourn the 2/23/12 conference. Request granted. Conference is adjourned to 3/8/12 at 9:00 a.m. Signed by Senior Judge Arthur D. Spatt on 2/21/12. C/F. (Coleman, Laurie) (Entered: 02/28/2012) |
| 02/29/2012 | 318 | AMENDED COMPLAINT *in Intervention for Declaratory Judgment and Injunctive Relief* against Garden City Board of Trustees, Incorporated Village of Garden City, filed by New York Communities For Change, Inc.. (Rich, Joseph) (Entered: 02/29/2012) |
| 04/05/2012 | 319 | NOTICE of Appearance by Luz Maria Henriquez on behalf of Vic Devita, McCray, Francine (aty to be noticed) (Henriquez, Luz) (Entered: 04/05/2012) |
| 07/06/2012 | 320 | Letter *from Stanley J. Brown to Honorable Arthur D. Spatt* by Garden City Board of Trustees, Incorporated Village of Garden City, MHANY Management, Inc., McCray, Francine, New York Communities For Change, Inc. (Brown, Stanley) (Entered: 07/06/2012) |
| 07/12/2012 | 321 | ORDER re 320 Letter filed by MHANY Management, Inc., McCray, Francine, New York Communities For Change, Inc., Garden City Board of Trustees, Incorporated Village of Garden City> So Ordered that the Parties are directed to contact chambers in writintg when the mediation is completed to report on the status. At that time, the Court will decide whether to set a |

JA 44

| | | |
|---|---|---|
| | | telephone conference. So Ordered.. Ordered by Judge Arthur D. Spatt on 7/12/2012. (Padilla, Kristin) (Entered: 07/17/2012) |
| 08/16/2012 | 322 | Letter *from Stanley J. Brown to Honorable Arthur D. Spatt regarding the status of mediation* by Garden City Board of Trustees, Incorporated Village of Garden City, MHANY Management, Inc., McCray, Francine, New York Communities For Change, Inc. (Brown, Stanley) (Entered: 08/16/2012) |
| 11/09/2012 | 323 | Letter *From Stanley J. Brown to Hon. Arthur D. Spatt requesting a pre-trial status conference, to set a pre-trial order with deadlines for parties to submit the joint pre-trial order as well as motions in limine.* by Vic Devita, MHANY Management, Inc., McCray, Francine (Brown, Stanley) (Entered: 11/09/2012) |
| 11/12/2012 | 324 | Letter *Requesting Pre-Trial Conference* by Garden City Board of Trustees, Incorporated Village of Garden City (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Ryan, James) (Entered: 11/12/2012) |
| 11/12/2012 | 325 | Letter *regarding confidentiality in plaintiffs' 11.9.12 letter* by Garden City Board of Trustees, Incorporated Village of Garden City (Ryan, James) (Entered: 11/12/2012) |
| 11/12/2012 | 326 | Letter *Responding to Defendants' Letter Regarding Confidentiality* by MHANY Management, Inc., McCray, Francine, New York Communities For Change, Inc. (Brown, Stanley) (Entered: 11/12/2012) |
| 11/16/2012 | 327 | NOTICE of Appearance by Douglas J. Bohn on behalf of Garden City Board of Trustees, Incorporated Village of Garden City (aty to be noticed) (Bohn, Douglas) (Entered: 11/16/2012) |
| 11/27/2012 | 328 | ORDER 323 Letter. The plaintiff's request for a pre-trial status conference is granted. The conference will be held on Thursday, 12/6/12 at 9:30 a.m. The Village defendant's request to remove this letter from the public record (DE 325) is denied. Signed by Judge Arthur D. Spatt on 11/27/2012. (Coleman, Laurie) (Entered: 11/27/2012) |
| 11/27/2012 | | Set/Reset Hearings: Pretrial Conference set for 12/6/2012 09:30 AM in Courtroom 1020 before Judge Arthur D. Spatt. (Coleman, Laurie) (Entered: 11/27/2012) |
| 11/28/2012 | | ORDER In preparation for the pretrial conference set by Judge Spatt for December 6, 2012, the parties are directed to file a joint proposed pretrial order in accordance with Judge Spatt's individual rules no later than December 4, 2012. Ordered by Magistrate Judge William D. Wall on 11/28/2012. (Kennedy, Michael) (Entered: 11/28/2012) |
| 12/03/2012 | 329 | NOTICE of Appearance by Cynthia Ann Augello on behalf of Garden City Board of Trustees, Incorporated Village of Garden City (aty to be noticed) (Augello, Cynthia) (Entered: 12/03/2012) |
| 12/03/2012 | 330 | NOTICE of Appearance by Ariel E. Ronneburger on behalf of Garden City Board of Trustees, Incorporated Village of Garden City (aty to be noticed) (Ronneburger, Ariel) (Entered: 12/03/2012) |
| 12/04/2012 | 331 | Proposed Pretrial Order *(Joint)* by Vic Devita, MHANY Management, Inc., |

| | | |
|---|---|---|
| | | McCray, Francine, New York Communities For Change, Inc. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G) (Brown, Stanley) (Entered: 12/04/2012) |
| 12/05/2012 | | ORDER The parties have submitted their proposed Joint Pretrial Order. After examination of the order, this Court finds that it substantially complies with the requirements of the District Judge. Accordingly, the Joint Pretrial Order is accepted for filing and the action is deemed ready for trial. The action will be tried in accordance with the discretion and the trial calendar of the District Judge. Ordered by Magistrate Judge William D. Wall on 12/5/2012. (Kennedy, Michael) (Entered: 12/05/2012) |
| 12/06/2012 | 333 | MINUTE ENTRY for proceedings held before Judge Arthur D. Spatt: Criminal Cause for Conference held on 12/6/12 from 9:39 a.m. - 10:41 a.m. Case called. Counsel for all sides present. Other: Every new witness, or any side, will be deposed. Party requesting the deposition is to pay for it. Other rulings on the record. (Coleman, Laurie) (Entered: 01/04/2013) |
| 12/17/2012 | 332 | NOTICE of Appearance by Andrew Jaan Sein on behalf of McCray, Francine (aty to be noticed) (Sein, Andrew) (Entered: 12/17/2012) |
| 01/30/2013 | 334 | Letter MOTION to Quash *subpoenas* by Garden City Board of Trustees, Incorporated Village of Garden City. (Attachments: # 1 Exhibit) (Ronneburger, Ariel) (Entered: 01/30/2013) |
| 02/01/2013 | 335 | RESPONSE in Opposition re 334 Letter MOTION to Quash *subpoenas* filed by All Plaintiffs. (Brown, Stanley) (Entered: 02/01/2013) |
| 02/05/2013 | 336 | ORDER Re 334 Motion to Quash. The Defendant's motion to quash the four subpoenas for the individual depositions of Lauren Davies, Sheila DiMasso, Kenneth Drummond, and Arlnold Greene, is granted. The "Order" relief upon by the Plaintiffs is merely a minute entry. At the 12/6/12 conference, this Court permitted the Plaintiffs to depose only the witnesses that the defendant had included in the pre-trial order that the Plaintiffs had not yet had the opportunity to depose. Signed by Judge Arthur D. Spatt on 2/5/13. (Coleman, Laurie) (Entered: 02/06/2013) |
| 02/14/2013 | 337 | NOTICE of Appearance by Sarah Joy Gregory on behalf of McCray, Francine (aty to be noticed) (Gregory, Sarah) (Entered: 02/14/2013) |
| 03/06/2013 | 338 | MOTION to Amend/Correct/Supplement 331 Proposed Pretrial Order, Pretrial Order, by Vic Devita, McCray, Francine. (Brandriss, Chava) (Entered: 03/06/2013) |
| 03/06/2013 | 339 | MEMORANDUM in Support re 338 MOTION to Amend/Correct/Supplement 331 Proposed Pretrial Order, Pretrial Order, filed by Vic Devita, McCray, Francine. (Brandriss, Chava) (Entered: 03/06/2013) |
| 03/06/2013 | 340 | AFFIDAVIT/DECLARATION in Support re 338 MOTION to Amend/Correct/Supplement 331 Proposed Pretrial Order, Pretrial Order, *Declaration of Chava Brandriss in Support of Motion to Amend the Joint Pre-Trial Order* filed by Vic Devita, McCray, Francine. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 |

| | | |
|---|---|---|
| | | Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10) (Brandriss, Chava) (Entered: 03/06/2013) |
| 03/19/2013 | 341 | AFFIDAVIT/DECLARATION in Opposition re 338 MOTION to Amend/Correct/Supplement 331 Proposed Pretrial Order, Pretrial Order, filed by Garden City Board of Trustees, Incorporated Village of Garden City. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D) (Ronneburger, Ariel) (Entered: 03/19/2013) |
| 03/19/2013 | 342 | MEMORANDUM in Opposition filed by Garden City Board of Trustees, Incorporated Village of Garden City. (Ronneburger, Ariel) (Entered: 03/19/2013) |
| 03/26/2013 | 343 | REPLY to Response to Motion re 338 MOTION to Amend/Correct/Supplement 331 Proposed Pretrial Order, Pretrial Order, filed by Vic Devita, McCray, Francine. (Attachments: # 1 Certificate of Service) (Brown, Stanley) (Entered: 03/26/2013) |
| 03/26/2013 | 344 | AFFIDAVIT/DECLARATION in Support re 338 MOTION to Amend/Correct/Supplement 331 Proposed Pretrial Order, Pretrial Order, *Declaration of Andrew Sein in Further Support of Plaintiff's Motion for Leave to Amend the Joint Pre-Trial Order* filed by Vic Devita, McCray, Francine. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Certificate of Service) (Brown, Stanley) (Entered: 03/26/2013) |
| 04/29/2013 | 345 | MEMORANDUM OF DECISION AND ORDER - It is hereby: ORDERED, that the Plaintiffs 338 motion to amend the joint pretrial order is granted as set forth above; and it is further ORDERED, that the Plaintiffs are directed to file an amended joint pretrial order in accordance with this decision on or before May 6, 2013; and it is further ORDERED, that the Plaintiffs request for a telephone conference is denied as unnecessary; and it is further ORDERED, that every party may depose the four additional individuals that will be included in the amended joint pretrial order, with each party paying the costs of their own depositions. Signed by Judge Arthur D. Spatt on 4/29/13. (Coleman, Laurie) (Entered: 04/30/2013) |
| 05/06/2013 | 346 | Proposed Pretrial Order *(AMENDED JOINT)* by Vic Devita, MHANY Management, Inc., McCray, Francine, New York Communities For Change, Inc. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G) (Brown, Stanley) (Entered: 05/06/2013) |
| 05/17/2013 | 347 | Notice of MOTION in Limine *to Exclude Plaintiff's Experts* by Garden City Board of Trustees, Incorporated Village of Garden City. (Attachments: # 1 Affidavit in Support, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Memorandum in Support) (Bohn, Douglas) (Entered: 05/17/2013) |
| 05/17/2013 | 348 | MOTION in Limine by Garden City Board of Trustees, Incorporated Village of Garden City. (Attachments: # 1 Affidavit in Support, # 2 Exhibit 1, # 3 Memorandum in Support) (Ronneburger, Ariel) (Entered: 05/17/2013) |
| 05/17/2013 | 349 | MOTION in Limine *to Preclude Trial Evidence* by Vic Devita, McCray, Francine. (Attachments: # 1 Certificate of Service) (Brown, Stanley) (Entered: |

| | | 05/17/2013) |
|---|---|---|
| 05/17/2013 | 350 | MEMORANDUM in Support re 349 MOTION in Limine *to Preclude Trial Evidence* filed by Vic Devita, McCray, Francine. (Brown, Stanley) (Entered: 05/17/2013) |
| 05/17/2013 | 351 | AFFIDAVIT/DECLARATION in Support re 349 MOTION in Limine *to Preclude Trial Evidence Declaration of Sarah Gregory* filed by Vic Devita, McCray, Francine. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7) (Brown, Stanley) (Entered: 05/17/2013) |
| 05/29/2013 | 352 | Consent MOTION for Extension of Time to File Response/Reply as to 349 MOTION in Limine *to Preclude Trial Evidence*, 351 Affidavit in Support of Motion, 350 Memorandum in Support, 347 Notice of MOTION in Limine *to Exclude Plaintiff's Experts*, 348 MOTION in Limine by McCray, Francine. (Sein, Andrew) (Entered: 05/29/2013) |
| 05/30/2013 | 353 | ORDER Re: 352 Motion/Stipulation to extend any opposition, by any party, to the motions in limine filed with the Court on 5/17/13. Opposition papers shall be filed on or before 6/3/13. Reply papers shall be filed on or before 6/10/13. Signed by Judge Arthur D. Spatt on 5/30/13. (Coleman, Laurie) (Entered: 05/30/2013) |
| 05/31/2013 | 354 | STIPULATION *Regarding Withdrawal of Plaintiff's Expert, Dr. Peter Marcuse and Defendants' Motion to Exclude Dr. Peter Marcuse* by MHANY Management, Inc., McCray, Francine, New York Communities For Change, Inc. (Brandriss, Chava) (Entered: 05/31/2013) |
| 06/01/2013 | 362 | ORDER Re: 354 STIPULATION Regarding Withdrawal of Plaintiff's Expert, Dr. Peter Marcuse and Defendants' Motion to Exclude Dr. Peter Marcus. Signed by Judge Arthur D. Spatt on 6/1/13. (Coleman, Laurie) (Entered: 06/06/2013) |
| 06/01/2013 | 363 | ORDER Re: 354 Stipulation Regarding Withdrawal of Plaintiff's Expert, Dr. Peter Marcuse and Defendants' Motion to Exclude Dr. Peter Marcuse. Signed by Judge Arthur D. Spatt on 6/1/13. (Coleman, Laurie) (Entered: 06/06/2013) |
| 06/03/2013 | 355 | MEMORANDUM in Opposition *to Plaintiffs' Motion In Limine to Preclude Evidence on Subjects as to Which Defendants Invoked Privilege During Discovery* filed by Garden City Board of Trustees, Incorporated Village of Garden City. (Ronneburger, Ariel) (Entered: 06/03/2013) |
| 06/03/2013 | 356 | MEMORANDUM in Opposition re 347 Notice of MOTION in Limine *to Exclude Plaintiff's Experts* filed by Vic Devita, McCray, Francine. (Brown, Stanley) (Entered: 06/03/2013) |
| 06/03/2013 | 357 | AFFIDAVIT/DECLARATION in Opposition re 347 Notice of MOTION in Limine *to Exclude Plaintiff's Experts* filed by Vic Devita, McCray, Francine. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (Gregory, Sarah) (Entered: 06/03/2013) |
| 06/03/2013 | 358 | MEMORANDUM in Opposition re 348 MOTION in Limine filed by Vic Devita, McCray, Francine. (Brown, Stanley) (Entered: 06/03/2013) |

JA 48

| | | |
|---|---|---|
| 06/03/2013 | 359 | AFFIDAVIT/DECLARATION in Opposition re 348 MOTION in Limine filed by Vic Devita, McCray, Francine. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9) (Sein, Andrew) (Entered: 06/03/2013) |
| 06/05/2013 | 360 | NOTICE of Appearance by Benjamin Andrew Fleming on behalf of McCray, Francine (aty to be noticed) (Fleming, Benjamin) (Entered: 06/05/2013) |
| 06/05/2013 | 361 | Letter *Application to Court Regarding Use of Electronic Devices in the Courtroom* by Vic Devita, MHANY Management, Inc., McCray, Francine (Sein, Andrew) (Entered: 06/05/2013) |
| 06/06/2013 | 364 | ORDER Re: 361 Letter Application to the Court Regarding Use of Electronic Devices in the Courtroom. Request granted. Signed by Judge Arthur D. Spatt on 6/6/13. C/F. (Coleman, Laurie) (Entered: 06/10/2013) |
| 06/10/2013 | 365 | AFFIDAVIT/DECLARATION in Support re 348 MOTION in Limine *Reply in Further Support* filed by Garden City Board of Trustees, Incorporated Village of Garden City. (Attachments: # 1 Exhibit A) (Ronneburger, Ariel) (Entered: 06/10/2013) |
| 06/10/2013 | 366 | MEMORANDUM in Support *of Motion In Limine to Exclude Evidence* filed by Garden City Board of Trustees, Incorporated Village of Garden City. (Ronneburger, Ariel) (Entered: 06/10/2013) |
| 06/10/2013 | 367 | MEMORANDUM in Support *of Motion In Limine to Exclude Expert Nancy McArdle* filed by Garden City Board of Trustees, Incorporated Village of Garden City. (Bohn, Douglas) (Entered: 06/10/2013) |
| 06/10/2013 | 368 | REPLY in Support re 349 MOTION in Limine *to Preclude Trial Evidence* filed by All Plaintiffs. (Attachments: # 1 Certificate of Service) (Brown, Stanley) (Entered: 06/10/2013) |
| 06/12/2013 | 369 | NOTICE of Appearance by Stanley Joseph Brown on behalf of MHANY Management, Inc. (aty to be noticed) (Attachments: # 1 Certificate of Service) (Brown, Stanley) (Entered: 06/12/2013) |
| 06/12/2013 | 370 | NOTICE of Appearance by Peter Joseph Dennin on behalf of MHANY Management, Inc. (aty to be noticed) (Attachments: # 1 Certificate of Service) (Dennin, Peter) (Entered: 06/12/2013) |
| 06/12/2013 | 371 | Letter *requesting leave to use electronic devices in the courtroom* by Incorporated Village of Garden City (Ronneburger, Ariel) (Entered: 06/12/2013) |
| 06/12/2013 | 372 | NOTICE of Appearance by Chava Brandriss on behalf of MHANY Management, Inc. (aty to be noticed) (Attachments: # 1 Certificate of Service) (Brandriss, Chava) (Entered: 06/12/2013) |
| 06/12/2013 | 373 | NOTICE of Appearance by Benjamin Andrew Fleming on behalf of MHANY Management, Inc. (aty to be noticed) (Attachments: # 1 Certificate of Service) (Fleming, Benjamin) (Entered: 06/12/2013) |
| 06/12/2013 | 374 | NOTICE of Appearance by Andrew Jaan Sein on behalf of MHANY |

| | | Management, Inc. (aty to be noticed) (Attachments: # 1 Certificate of Service) (Sein, Andrew) (Entered: 06/12/2013) |
|---|---|---|
| 06/12/2013 | 375 | NOTICE of Appearance by Sarah Joy Gregory on behalf of MHANY Management, Inc. (aty to be noticed) (Attachments: # 1 Certificate of Service) (Gregory, Sarah) (Entered: 06/12/2013) |
| 06/13/2013 | 376 | Letter MOTION to Amend/Correct/Supplement *the Joint Pretrial Order* by MHANY Management, Inc., McCray, Francine. (Attachments: # 1 Proposed Second Amended Joint Pretrial Order, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G) (Brown, Stanley) (Entered: 06/13/2013) |
| 06/13/2013 | 377 | ORDER Re: 371 Letter by Incorporated Village of Garden City requesting leave to use electronic devices in the courtroom. Request granted. Signed by Judge Arthur D. Spatt on 6/13/13. C/F. (Coleman, Laurie) (Entered: 06/13/2013) |
| 06/14/2013 | 378 | STIPULATION of Dismissal *with Prejudice of All Claims Brought by Plaintiff Francine McCray as to All Defendants* by Vic Devita, MHANY Management, Inc., McCray, Francine (Sein, Andrew) (Entered: 06/14/2013) |
| 06/14/2013 | 379 | PRETRIAL MEMORANDUM by MHANY Management, Inc. (Attachments: # 1 Certificate of Service) (Brown, Stanley) (Entered: 06/14/2013) |
| 06/15/2013 | 380 | TRIAL BRIEF *Pre-Trial Brief* by Garden City Board of Trustees, Incorporated Village of Garden City (Ronneburger, Ariel) (Entered: 06/15/2013) |
| 06/15/2013 | 384 | ORDER Re: 376 Motion for leave to file a Second Amended Joint Pretrial Order in this case. Request granted. Signed by Judge Arthur D. Spatt on 6/15/13. C/F. (Coleman, Laurie) (Entered: 06/18/2013) |
| 06/17/2013 | 387 | MINUTE ENTRY for proceedings held before Judge Arthur D. Spatt: Civil Cause on Trial (Non-Jury) held on 6/17/13 at 9:30 a.m. Court Reporter: Owen Wicker, Harry Rapaport. Case called. Counsel for all sides present. Non-Jury Trial ordered and begun. Plaintiffs open. Defendants open. Trial continued to 6/18/13 at 9:30 a.m. Other: Witness Nancy Anne McArdle sworn. (Coleman, Laurie) (Entered: 06/20/2013) |
| 06/18/2013 | 381 | Letter *Brief to Judge Spatt Regarding Expert Report* by MHANY Management, Inc. (Brown, Stanley) (Entered: 06/18/2013) |
| 06/18/2013 | 382 | MEMORANDUM in Opposition *Plaintiffs' Expert Report is Inadmissible Hearsay* filed by Garden City Board of Trustees, Incorporated Village of Garden City. (Ronneburger, Ariel) (Entered: 06/18/2013) |
| 06/18/2013 | 383 | NOTICE of Appearance by Sardar Mohammad Asadullah on behalf of Garden City Board of Trustees, Incorporated Village of Garden City (aty to be noticed) (Asadullah, Sardar) (Entered: 06/18/2013) |
| 06/18/2013 | 388 | MINUTE ENTRY for proceedings held before Judge Arthur D. Spatt: Civil Cause for Non Jury Trial held on 6/18/2013 from 9:30-11:15, 11:33-12:30, 1:33-3:00, 3:20-5:00 p.m. Court Reporter: Owen Wicker, Harry Rapaport. |

| | | Case called. Counsel for all sides present. Non-Jury Trial held-witnesses sworn. Trial will not go forward 6/24/13 in the a.m. Trial will commence at 1:00 p.m. Witness Nancy McCardle sworn, testimony heard. Trial to continue on 6/19/13 at 9:30 a.m. (Coleman, Laurie) (Entered: 06/20/2013) |
|---|---|---|
| 06/19/2013 | 389 | MINUTE ENTRY for proceedings held before Judge Arthur D. Spatt: Civil Cause for Non-Jury Trial held on 6/19/13 from 9:30-12:30 and 1:30-5:00. Court Reporter: Harry Rapaport. Case called. Counsel for all sides present. Non-Jury Trial held. Other: Witness Frank Fish & Robert L. Schoelle sworn. Witness Robert L. Schoelle testifies. Evidence entered. Non-Jury trial continued to 6/20/13 at 9:30 a.m. (Coleman, Laurie) (Entered: 06/21/2013) |
| 06/20/2013 | 385 | Letter *Application Regarding Plaintiffs' Exhibit 45* by MHANY Management, Inc. (Brandriss, Chava) (Entered: 06/20/2013) |
| 06/20/2013 | 386 | Letter *in Opposition to Plaintiffs' Letter Application* by Garden City Board of Trustees, Incorporated Village of Garden City (Ronneburger, Ariel) (Entered: 06/20/2013) |
| 06/20/2013 | 390 | MINUTE ENTRY for proceedings held before Judge Arthur D. Spatt: Civil Cause on Trial (Non-Jury) held on 6/20/13 from 9:30 a.m. - 12:30 p.m., 1:30 p.m. - 3:00 p.m., 3:20 p.m. - 5:00 p.m. Court Reporter: Harry Rapaport, Owen Wicker. Case called. Counsel for all sides present. Trial resumes. Trial continued to 6/24/13 at 1:30 p.m. Other: Witness Robert Schoelle, sworn and testifies. Evidence entered on the record. Witness Gerard P. Lundquist, sworn and testifies. Evidence entered on the record. (Coleman, Laurie) (Entered: 06/21/2013) |
| 06/24/2013 | 391 | MINUTE ENTRY for proceedings held before Judge Arthur D. Spatt: Civil Cause on Trial (Non-Jury) held on 6/24/13 at 1:30 p.m. Court Reporter: Mary Ann Steiger. Counsel for all sides present. Trial resumes. Trial continued to 6/25/13 at 9:30 a.m. Other: Witness Gerard P. Lundquist sworn and continues testimony. Witness Peter A. Bee sworn and testifies. Exhibits entered into evidence. Trial continued to 6/25/13 at 9:30 a.m. (Coleman, Laurie) (Entered: 06/27/2013) |
| 06/25/2013 | 393 | MINUTE ENTRY for proceedings held before Judge Arthur D. Spatt: Civil Cause on Trial (Non-Jury) on 6/25/13 at 9:30 a.m. Court Reporter: Mary Ann Steiger. Case called. Counsel for all sides present. Non-Jury Trial ordered and begun. Trial resumes. Other: Witness Gerard P. Lundquist sworn and continues testimony. Witness Peter A. Bee sworn and testifies. Exhibits entered into evidence. Trial continued to 6/26/13 at 9:30 a.m. Exhibits entered into evidence. (Coleman, Laurie) (Entered: 07/01/2013) |
| 06/26/2013 | 394 | MINUTE ENTRY for proceedings held before Judge Arthur D. Spatt: Civil Cause on Trial (Non-Jury) held on 6/26/13 at 9:30 a.m. Court Reporter: Mary Ann Steiger. Case called. Counsel for all sides present. Non-Jury Trial ordered and begun. Trial resumes. Other: Witness Gerard P. Lunquist sworn and continues testimony. Witness Peter A. Bee sworn and testifies. Exhibits entered into evidence. Trial continued to 6/27/13 at 9:30 a.m. Exhibits entered into evidence. (Coleman, Laurie) (Entered: 07/01/2013) |
| 06/27/2013 | 395 | MINUTE ENTRY for proceedings held before Judge Arthur D. Spatt: Civil |

| | | |
|---|---|---|
| | | Cause on Trial (Non-Jury) held on 6/27/2013 at 9:30 a.m. Court Reporter: Mary Ann Steiger. Case called. Counsel for all sides present. Non-jury trial ordered and begun. Trial resumes. Trial continued to 7/1/13 at 9:30 a.m. Other: Witnesses sworn/testify. ( Bench Trial set for 7/1/2013 09:30 AM in Courtroom 1020 before Judge Arthur D. Spatt.) (Coleman, Laurie) (Entered: 07/09/2013) |
| 06/29/2013 | 392 | Letter *Offer of Proof* by MHANY Management, Inc. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit) (Brandriss, Chava) (Entered: 06/29/2013) |
| 07/01/2013 | 396 | MINUTE ENTRY for proceedings held before Judge Arthur D. Spatt: Civil Cause on Trial (Non-Jury) held on 7/1/13 at 9:30 a.m. Court Reporter: Mary Ann Steiger. Case called. Counsel for all sides present. Non-Jury Trial ordered and begun. Trial resumes. Trial continued to 7/2/13 at 9:30 a.m. Other: Witness sworn/testify. Plaintiff rests. Defendant's oral motions on the record. Defendants case: Witness sworn/testify. ( Bench Trial set for 7/2/2013 09:30 AM in Courtroom 1020 before Judge Arthur D. Spatt.) (Coleman, Laurie) (Entered: 07/09/2013) |
| 07/02/2013 | 398 | MINUTE ENTRY for proceedings held before Judge Arthur D. Spatt: Civil Cause on Trial (Non-Jury) held on 7/2/13 at 9:30 a.m. Court Reporter: Mary Ann Steiger/Paul Lombardi. Case called. Counsel for all sides present. Trial resumes. Trial continued to 7/3/13 at 9:30. Other: Witnesses sworn/testify. (Coleman, Laurie) (Entered: 07/11/2013) |
| 07/03/2013 | 400 | MINUTE ENTRY for for proceedings held before Judge Arthur D. Spatt: Civil Cause on Trial (Non-Jury) held on 7/3/13 at 9:30 a.m. Court Reporter: Mary Ann Steiger/Paul Lombardi. Case called. Counsel for all sides present. Trial resumes. Trial concluded. Other: Witnesses sworn/testify. Both sides rest. Closing arguments heard on the record. Post-trial briefing schedule was set. Decision reserved. (Coleman, Laurie) (Entered: 07/31/2013) |
| 07/10/2013 | 397 | MOTION to Withdraw as Attorney *(Notice of Withdrawal of Appearance and Proposed Order)* by MHANY Management, Inc.. (Wasick, Joanna) (Entered: 07/10/2013) |
| 07/20/2013 | 399 | ORDER Re: 397 Motion to Withdraw Joanna F. Wasick as Attorney for Plaintiff MHANY Management, Inc.. Attorney Joanna F. Wasick terminated. So Ordered by Judge Arthur D. Spatt on 7/20/13. (Coleman, Laurie) (Entered: 07/26/2013) |
| 07/31/2013 | 401 | Letter MOTION for Leave to File Excess Pages by MHANY Management, Inc.. (Brown, Stanley) (Entered: 07/31/2013) |
| 08/01/2013 | 402 | ORDER Re: 401 Motion for Leave to File Excess Pages. Request granted. So Ordered by Judge Arthur D. Spatt on 8/1/13. C/F. (Coleman, Laurie) (Entered: 08/02/2013) |
| 08/05/2013 | 403 | TRIAL BRIEF by MHANY Management, Inc. (Brown, Stanley) (Entered: 08/05/2013) |
| 08/05/2013 | 404 | DECLARATION re 403 Trial Brief by MHANY Management, Inc. |

| | | (Attachments: # 1 Exhibit A) (Brown, Stanley) (Entered: 08/05/2013) |
|---|---|---|
| 08/20/2013 | 405 | Letter *Requesting Leave for a Ten (10) Page Extension to its Post-Trial Brief* by Garden City Board of Trustees, Incorporated Village of Garden City (Ronneburger, Ariel) (Entered: 08/20/2013) |
| 08/21/2013 | 406 | ORDER Re: 405 Letter requesting leave for a ten (10) page extension to its Post-Trial Brief by Garden City Board of Trustees, Incorporated Village of Garden City. Request granted. so Ordered by Judge Arthur D. Spatt on 8/21/13. (Coleman, Laurie) (Entered: 08/23/2013) |
| 09/05/2013 | 407 | NOTICE of Appearance by Thomas B. Wassel on behalf of Garden City Board of Trustees, Incorporated Village of Garden City (aty to be noticed) (Wassel, Thomas) (Entered: 09/05/2013) |
| 09/05/2013 | 408 | TRIAL BRIEF *Defendants' Post-Trial Memorandum* by Garden City Board of Trustees, Incorporated Village of Garden City (Ryan, James) (Entered: 09/05/2013) |
| 09/12/2013 | 409 | NOTICE of Appearance by Caroline H. Cheng on behalf of MHANY Management, Inc. (aty to be noticed) (Cheng, Caroline) (Entered: 09/12/2013) |
| 09/16/2013 | 410 | TRIAL BRIEF *Plaintiffs' Post-Trial Memorandum in Reply* by MHANY Management, Inc., New York Communities For Change, Inc. (Brown, Stanley) (Entered: 09/16/2013) |
| 09/17/2013 | 411 | Notice of MOTION to Withdraw as Attorney by Vic Devita, McCray, Francine. (Attachments: # 1 Declaration) (Henriquez, Luz) (Entered: 09/17/2013) |
| 09/18/2013 | 412 | ORDER granting 411 Motion to withdraw the appearance of Luz Maria Henriques for Plaintiff MHANY Management, Inc. So Ordered by Judge Arthur D. Spatt on 9/18/13. (Coleman, Laurie) (Entered: 09/19/2013) |
| 12/06/2013 | 413 | MEMORANDUM OF DECISION AND ORDER - For the foregoing reasons, the Court finds that the Plaintiffs have not established liability on the part of the Garden City Defendants under 42 U.S.C. § 1982 and the amended complaint is dismissed as to that cause of action. However, the Court finds that the Plaintiffs have established by, a preponderance of the evidence, the liability on the part of the Garden City Defendants under (1) the FHA, 42 U.S.C. § 3601 et seq., based on a theory of disparate treatment and disparate impact; (2) 42 U.S.C. § 1981; (3) 42 U.S.C. § 1983; and (4) the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. As noted above, the Court finds that the Garden City Defendants acted with discriminatory intent when they eliminated R-M zoning and endorsed R-T zoning after they received public opposition to the prospect of affordable housing in Garden City. The Court notes that R-T zoning banned the development of multi-family housing on all but a small portion of the Social Services site -- the 3.03 acres located on the western side of County Seat Drive and then only by special permit. The Court also notes the negative remarks by Garden City residents at public hearings and the flyer against multi-family housing on the Social Services Site. Set against the underlying sequence of events and the considerable impact that this zoning decision |

| | | would have had on minorities in that community, the Court concludes that some of the expressions by Garden City residents of disapproval for affordable housing reflected race-based animus or at least could have been construed as such by the Board. Furthermore, the Court finds that the adoption of R-T zoning instead of R-M zoning had a disparate impact on minorities in Garden City and tended to perpetuate segregation in that community. Accordingly, the Court directs the Plaintiffs to submit a proposed remedial plan to be incorporated in the final judgment in this case within thirty days of the date of this order. The Garden City Defendants shall then have thirty days to respond with objections. The Plaintiffs shall then have 15 days to reply to the Garden City Defendants objections. So Ordered by Judge Arthur D. Spatt on 12/6/2013. (Coleman, Laurie) (Entered: 12/06/2013) |
|---|---|---|
| 01/06/2014 | 414 | NOTICE by MHANY Management, Inc. *of Proposed Judgment Order* (Brown, Stanley) (Entered: 01/06/2014) |
| 01/06/2014 | 415 | MEMORANDUM in Support re 414 Notice(Other) *of Proposed Judgment Order* filed by MHANY Management, Inc.. (Brown, Stanley) (Entered: 01/06/2014) |
| 01/06/2014 | 416 | DECLARATION re 414 Notice(Other) *of Proposed Judgment Order* by MHANY Management, Inc. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E) (Brown, Stanley) (Entered: 01/06/2014) |
| 02/05/2014 | 417 | NOTICE of Appearance by Michael A. Carvin on behalf of Incorporated Village of Garden City (aty to be noticed) (Carvin, Michael) (Entered: 02/05/2014) |
| 02/05/2014 | 418 | NOTICE by Garden City Board of Trustees, Incorporated Village of Garden City *Alternative Proposed Judgment Order* (Ronneburger, Ariel) (Entered: 02/05/2014) |
| 02/05/2014 | 419 | MEMORANDUM in Opposition *to Plaintiff's Proposed Order* filed by Garden City Board of Trustees, Incorporated Village of Garden City. (Ronneburger, Ariel) (Entered: 02/05/2014) |
| 02/20/2014 | 420 | NOTICE by MHANY Management, Inc. *AMENDED PROPOSED JUDGMENT* (Brown, Stanley) (Entered: 02/20/2014) |
| 02/20/2014 | 421 | MEMORANDUM in Support re 420 Notice(Other) *AMENDED PROPOSED JUDGMENT* filed by MHANY Management, Inc.. (Brown, Stanley) (Entered: 02/20/2014) |
| 02/20/2014 | 422 | DECLARATION re 420 Notice(Other) *AMENDED PROPOSED JUDGMENT* by MHANY Management, Inc. (Attachments: # 1 Exhibit A) (Brown, Stanley) (Entered: 02/20/2014) |
| 03/17/2014 | 423 | MEMORANDUM OF DECISION AND ORDER - For the foregoing reasons, within ten days of the date of this order, the Plaintiffs are directed to submit a proposed final judgment in accordance with the terms set forth in this decision and order. The Defendants shall then have ten days to file objections or an alternative proposed judgment. The Court will subsequently enter a final |

| | | |
|---|---|---|
| | | judgment. So Ordered by Judge Arthur D. Spatt on 3/17/2014. (Coleman, Laurie) (Entered: 03/17/2014) |
| 03/27/2014 | 424 | NOTICE by MHANY Management, Inc. *PROPOSED FINAL JUDGMENT* (Brown, Stanley) (Entered: 03/27/2014) |
| 04/07/2014 | 425 | DECLARATION *of James G. Ryan* by Garden City Board of Trustees, Incorporated Village of Garden City (Attachments: # 1 Exhibit Redline Judgment, # 2 Exhibit Final Judgment) (Ronneburger, Ariel) (Entered: 04/07/2014) |
| 04/07/2014 | 426 | MEMORANDUM in Opposition *to Proposed Final Judgment* filed by Garden City Board of Trustees, Incorporated Village of Garden City. (Ronneburger, Ariel) (Entered: 04/07/2014) |
| 04/08/2014 | 427 | Letter MOTION for Leave to File *A Reply to the Objections Filed in Reponse to Plaintiffs' Proposed Judgment* by Acorn, Daphne Andrews, Vic Devita, Vernon Ghullkie, Natalie Guerrido, Lisbett Hunter, MHANY Management, Inc., McCray, Francine, New York Acorn Housing Company, Inc.. (Brown, Stanley) (Entered: 04/08/2014) |
| 04/08/2014 | 428 | Letter *in Opposition to Plaintiffs' Letter Motion for Leave to Reply* by Garden City Board of Trustees, Incorporated Village of Garden City (Ronneburger, Ariel) (Entered: 04/08/2014) |
| 04/09/2014 | 429 | ORDER Re: 427 Motion for Leave to File A Reply to the Objections Filed in Reponse to Plaintiffs' Proposed Judgment. Request granted. The reply shall not exceed three pages. No further briefing will be accepted. So Ordered by Judge Arthur D. Spatt on 4/9/14. Movant's counsel is directed to serve a copy of this Order on all parties upon receipt via facsimile. (Coleman, Laurie) (Entered: 04/10/2014) |
| 04/14/2014 | 430 | REPLY in Support re 424 Notice(Other) *Plaintiffs' Proposed Final Judgment Order* filed by MHANY Management, Inc., New York Communities For Change, Inc.. (Brown, Stanley) (Entered: 04/14/2014) |
| 04/22/2014 | 431 | FINAL JUDGMENT - The Clerk of the Court is directed to close this case. See Judgment for further details. So Ordered by Judge Arthur D. Spatt on 4/22/14. (Coleman, Laurie) (Entered: 04/22/2014) |
| 04/24/2014 | 432 | Letter MOTION for Extension of Time to File *Petition for Attorneys' Fees and Costs* by MHANY Management, Inc., New York Communities For Change, Inc.. (Brown, Stanley) (Entered: 04/24/2014) |
| 04/25/2014 | 433 | ORDER Re: 432 Motion requesting that the deadline for filing a petition for attorneys' fees and costs be extended by nine days, or until 5/15/14. Request granted. So Ordered by Judge Arthur D. Spatt on 4/25/2014. Movant's counsel is directed to serve a copy of this Order on all parties upon receipt via facsimile. (Coleman, Laurie) (Entered: 04/25/2014) |
| 04/25/2014 | 434 | Notice of MOTION to Withdraw as Attorney by MHANY Management, Inc.. (Sein, Andrew) (Entered: 04/25/2014) |
| 04/26/2014 | 435 | ORDER Re: 434 Motion for Andrew J. Sein to withdraw his appearance as |

| | | |
|---|---|---|
| | | counsel for Plaintiff MHANY Management, Inc.. Attorney Andrew Jaan Sein terminated for MHANY Management, Inc. So Ordered by Judge Arthur D. Spatt on 4/26/14. (Coleman, Laurie) (Entered: 04/28/2014) |
| 05/05/2014 | 436 | NOTICE OF APPEAL as to 431 Judgment by Garden City Board of Trustees, Incorporated Village of Garden City. Filing fee $ 505, receipt number 0207-6902771. (Carvin, Michael) (Entered: 05/05/2014) |
| 05/15/2014 | 437 | NOTICE of Appearance by Ira M. Feinberg on behalf of MHANY Management, Inc. (notification declined or already on case) (Feinberg, Ira) (Entered: 05/15/2014) |
| 05/15/2014 | 438 | MOTION for Attorney Fees *and Costs* by MHANY Management, Inc.. (Brown, Stanley) (Entered: 05/15/2014) |
| 05/15/2014 | 439 | MEMORANDUM in Support re 438 MOTION for Attorney Fees *and Costs* filed by MHANY Management, Inc.. (Brown, Stanley) (Entered: 05/15/2014) |
| 05/15/2014 | 440 | AFFIDAVIT/DECLARATION in Support re 438 MOTION for Attorney Fees *and Costs* filed by MHANY Management, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I) (Brown, Stanley) (Entered: 05/15/2014) |
| 05/15/2014 | 441 | AFFIDAVIT/DECLARATION in Support re 438 MOTION for Attorney Fees *and Costs* filed by MHANY Management, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3) (Brown, Stanley) (Entered: 05/15/2014) |
| 05/15/2014 | 442 | AFFIDAVIT/DECLARATION in Support re 438 MOTION for Attorney Fees *and Costs* filed by MHANY Management, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Brown, Stanley) (Entered: 05/15/2014) |
| 05/15/2014 | 443 | AFFIDAVIT/DECLARATION in Support re 438 MOTION for Attorney Fees *and Costs* filed by MHANY Management, Inc.. (Brown, Stanley) (Entered: 05/15/2014) |
| 05/15/2014 | 444 | AFFIDAVIT/DECLARATION in Support re 438 MOTION for Attorney Fees *and Costs* filed by MHANY Management, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C) (Brown, Stanley) (Entered: 05/15/2014) |
| 05/15/2014 | 445 | CERTIFICATE OF SERVICE by MHANY Management, Inc. re 440 Affidavit in Support of Motion, 438 MOTION for Attorney Fees *and Costs*, 439 Memorandum in Support, 443 Affidavit in Support of Motion, 444 Affidavit in Support of Motion, 441 Affidavit in Support of Motion, 442 Affidavit in Support of Motion (Brown, Stanley) (Entered: 05/15/2014) |
| 05/16/2014 | 446 | NOTICE OF APPEAL as to 431 Judgment by MHANY Management, Inc.. Filing fee $ 505, receipt number 0207-6930681. (Brown, Stanley) (Entered: 05/16/2014) |
| 05/16/2014 | | Electronic Index to Record on Appeal sent to US Court of Appeals. 446 Notice of Appeal Documents are available via Pacer. For docket entries without a hyperlink or for documents under seal, contact the court and we'll arrange for the document(s) to be made available to you. (Gledhill, Rosemary) |

| | | |
|---|---|---|
| | | (Entered: 05/16/2014) |
| 05/19/2014 | | Electronic Index to Record on Appeal sent to US Court of Appeals. 436 Notice of Appeal Documents are available via Pacer. For docket entries without a hyperlink or for documents under seal, contact the court and we'll arrange for the document(s) to be made available to you. (Cox, Dwayne) (Entered: 05/19/2014) |
| 05/22/2014 | 447 | Letter *Requesting Opposition to Motion for Attorneys' Fees* by Garden City Board of Trustees, Incorporated Village of Garden City (Ronneburger, Ariel) (Entered: 05/22/2014) |
| 05/22/2014 | 448 | ORDER Re: 447 Letter requesting the opportunity to file opposition papers to plaintiffs MHANY Management, Inc. and New York Communities for Change, Inc.'s ("Plaintiffs") motion for attorneys fees. We further request that the Village's opposition papers be file on or by 6/18/14, and that Plaintiff's reply papers be filed on or before 7/2/14. So Ordered by Judge Arthur D. Spatt on 5/22/14. Movant's counsel is directed to serve a copy of this Order on all parties upon receipt via facsimile. (Coleman, Laurie) (Entered: 05/23/2014) |
| 05/23/2014 | 449 | ORDER Re: 447 Letter requesting the opportunity to file opposition papers to plaintiffs motion for attorney's fees. We further request that the Village's opposition papers be filed on or by June 18, 2014, and that Plaintiffs' reply papers be filed on or before July 2, 2014. Request granted. So Ordered by Judge Arthur D. Spatt on 5/23/14. (Coleman, Laurie) (Entered: 05/28/2014) |
| 06/02/2014 | 450 | Letter *Requesting Extension of time to file Defendants' Opposition to Plaintiffs' Motion for Attorneys' Fees* by Garden City Board of Trustees, Incorporated Village of Garden City (Ronneburger, Ariel) (Entered: 06/02/2014) |
| 06/03/2014 | 451 | ORDER Re: 450 Letter requesting an extension of time for the Village to file its opposition to Plaintiffs' motion for attorneys' fees from 6/18/14 to 7/2/14. We additionally request that Plaintiffs' Reply papers be filed by or on 8/4/14. Request granted. So Ordered by Judge Arthur D. Spatt on 6/3/14. (Coleman, Laurie) (Entered: 06/04/2014) |
| 07/02/2014 | 452 | AFFIDAVIT/DECLARATION in Opposition re 438 MOTION for Attorney Fees *and Costs DECLARATION OF JUDITH BRONSTHER* filed by Garden City Board of Trustees, Incorporated Village of Garden City. (Attachments: # 1 Exhibit Exhibit A - Resume, # 2 Exhibit Exhibit B - Docs Reviewed, # 3 Exhibit Exhibit C - Full Report) (Ronneburger, Ariel) (Entered: 07/02/2014) |
| 07/02/2014 | 453 | MEMORANDUM in Opposition *to Plaintiffs' Motion for Attorneys' Fees* filed by Garden City Board of Trustees, Incorporated Village of Garden City. (Ronneburger, Ariel) (Entered: 07/02/2014) |
| 07/02/2014 | 454 | Notice of MOTION to Continue */Defer a Ruling on Plaintiffs' Motion for Attorneys' Fees* by Garden City Board of Trustees, Incorporated Village of Garden City. (Ronneburger, Ariel) (Entered: 07/02/2014) |
| 07/02/2014 | 455 | MEMORANDUM in Support *of Defendants' Motion to Defer a Ruling on Attorneys' Fees* filed by Garden City Board of Trustees, Incorporated Village |

| | | of Garden City. (Ronneburger, Ariel) (Entered: 07/02/2014) |
|---|---|---|
| 07/17/2014 | 456 | Letter MOTION for Extension of Time to File Response/Reply *in Support of Motion for Attorneys' Fees and Costs and in Opposition to Defendants' Motion to Defer* by MHANY Management, Inc.. (Fleming, Benjamin) (Entered: 07/17/2014) |
| 07/18/2014 | 457 | ORDER Re: Plaintiffs' 456 Motion for extension of time to file response/reply in support of motion for attorneys' fees and costs and in opposition to defendant's motion to defer. Request granted. So Ordered by Judge Arthur D. Spatt on 7/18/2014. (Coleman, Laurie) (Entered: 07/18/2014) |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ACORN (THE NEW YORK ASSOCIATION OF    :
COMMUNITY ORGANIZATIONS FOR REFORM    :
NOW), NEW YORK ACORN HOUSING COMPANY,    :
INC., VIC DEVITA, VERNON GHULLKIE, NATALIE   :   Case No. 05-CV-2301 (LDW)
GUERRIDO, LISBETT HUNTER AND FRANCINE    :   (WW)
MCCRAY,    :
   :   **AMENDED COMPLAINT**
               Plaintiffs,    :   **FOR DECLARATORY**
   :   **JUDGMENT AND**
        v.    :   **INJUNCTIVE RELIEF**
   :
COUNTY OF NASSAU, INCORPORATED VILLAGE   :
OF GARDEN CITY, AND GARDEN CITY BOARD OF  :   **JURY TRIAL REQUESTED**
TRUSTEES,    :
   :
             Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

     Plaintiffs, the New York Association of Community Organizations for Reform

Now, New York ACORN Housing Company, Inc., Vic DeVita, Vernon Ghullkie, Natalie

Guerrido, Lisbett Hunter, and Francine McCray, by and through their undersigned attorneys, as

and for their Complaint allege as follows:

## I.   NATURE OF ACTION

     1.     By this housing discrimination action, plaintiffs seek redress for ongoing

exclusionary housing practices by defendants Nassau County (the "County"), the incorporated

Village of Garden City ("the Village"), the Garden City Board of Trustees (the "Board of

Trustees") and others acting with, or on behalf of, the defendants Village and County

(collectively, "Defendants"). This action challenges defendant County's ongoing discriminatory

acts and long-standing pattern and practice of preventing African-American, other Black and

Hispanic persons from residing in predominantly white communities of Nassau County and,

specifically, the recent and imminent acts of the Defendants that effectively prevent affordable multi-family housing opportunities from being developed on a 25-acre parcel of County-owned property in Garden City, thereby perpetuating not only the exclusion of minorities from the overwhelmingly white enclave of Garden City, but also the pattern of racial and ethnic housing segregation in Nassau County generally, which is already one of the most segregated counties in the entire United States.  By these and other illegal and discriminatory acts, the defendants have violated plaintiffs' rights under the Fair Housing Act, as amended, 42 U.S.C. § 3601, *et seq.*; the Civil Rights Act of 1866, 42 U.S.C. §§ 1981, 1982 and 1983; the Equal Protection clause of the Fourteenth Amendment to the United States Constitution; the "affirmatively furthering" obligations of the Fair Housing Act, 42 U.S.C. § 3608; and the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq*.

## II.    JURISDICTION AND VENUE

2.      Jurisdiction is conferred on this Court by 42 U.S.C. § 3613 and by 28 U.S.C. §§ 1343 and 2201.

3.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b), (c).  Defendants all reside in this judicial district; the events or omissions giving rise to the claims herein occurred in this district; and the property at issue is situated in this judicial district.

## III.   PARTIES

4.      Plaintiff Vic DeVita is a white man who resides in Garden City, New York and desires to live in a more integrated community than currently exists in Garden City.  His residence is located less than two miles from the site that defendants, by their illegal action, are preventing from becoming a racially and ethnically integrated housing development.

2

JA 60

5.      Plaintiff Vernon Ghullkie is an African-American man who resides in Hempstead, New York.  Mr. Ghullkie has been seeking an affordable residence in a racially integrated and diverse area in Nassau County in general, including Garden City, for approximately two years. Mr. Ghullkie has been unable to find suitable affordable housing outside of Hempstead, a low-income, predominantly minority community.  He desires to live in Garden City because it is a safer community with more accessible public transportation than Hempstead.

6.      Plaintiff Lisbett Hunter is a Black woman of Panamanian descent who has lived in various parts of Nassau County, including the low-income, predominantly minority communities of Freeport and Long Beach, for the past nine years.  Ms. Hunter is currently in a temporary living arrangement and has been seeking a stable, affordable residence in a racially integrated and diverse area in Nassau County for the past several months.  Ms. Hunter desires to live in Garden City because it is a safe community with easy access to public transportation, which Ms. Hunter sometimes uses for travel to and from her job in Manhasset, New York.

7.      Plaintiff Francine McCray is an African-American woman who has been seeking an affordable residence in a racially integrated and diverse area in Nassau County, including Garden City, since February.  Ms. McCray is currently living with her sister and niece in Hempstead, a low-income, predominantly minority community.  Ms. McCray has lived in Nassau County all of her life and is very familiar with Garden City.  She desires to live in Garden City because it is a safe community in close proximity to public transportation, which she sometimes uses to commute to her job in Woodbury, New York.

8.      Plaintiff Natalie Guerrido is an African-American woman who resides in Roosevelt, New York with three of her children.  Ms. Guerrido has been seeking affordable housing in a racially integrated and diverse area in Nassau County in general, including Garden

3

City, since approximately 2001. Ms. Guerrido has been unable to find any suitable affordable housing outside of Roosevelt, a low-income, predominantly minority community. She desires to live in Garden City because of its proximity to several modes of public transportation and employment opportunities, as well as to better schools and parks for her children. (Mr. DeVita, Mr. Ghullkie, Ms. Guerrido, Ms. Hunter, and Ms. McCray are collectively referred to as the "Individual Plaintiffs".)

9.     Plaintiff New York Association of Community Organizations for Reform Now ("New York ACORN") is a local chapter of a nationwide nonprofit corporate entity called Association of Community Organizations for Reform Now organized and existing under the laws of the State of Arkansas. New York ACORN asserts the claims herein on behalf of its members.

10.     New York ACORN includes a Long Island chapter with a membership of approximately 2,000 families organized in Hempstead, Roosevelt, Uniondale and throughout Nassau and Suffolk Counties. Through its Long Island Chapter, New York ACORN endeavors to organize tenants, to advocate against discriminatory local and state government decisions, and to promote better housing conditions, more affordable housing, and racially integrated housing opportunities, for all residents of Long Island.

11.     New York ACORN has served as an advocate, working to eliminate unlawful racially discriminatory housing practices and housing segregation that affect every person who lives in or seeks to live in Nassau County. New York ACORN's mission is to improve the quality of life for low and moderate-income communities that are predominantly populated by minorities. The members of New York ACORN have been deprived of the opportunity to live in an integrated community by the housing segregation and racially discriminatory housing practices that are pervasive throughout Nassau County. Such housing segregation and racially

discriminatory housing practices further frustrate efforts of New York ACORN members to find affordable housing in communities other than those that are already predominately populated by minorities.

12. Plaintiff New York ACORN Housing Company, Inc. ("NYAHC") is an experienced not-for-profit community-based developer of affordable housing. NYAHC is incorporated in New York and was formed to develop, own, and manage affordable housing for families with low and moderate incomes.

13. NYAHC's professional staff is experienced in all aspects of the development, financing, management, marketing, and maintenance of affordable housing. NYAHC has developed and now manages approximately 700 affordable housing units, and has developed projects totaling over $80 million in the New York metropolitan area. NYAHC is currently constructing approximately 200 additional affordable housing units. For these newer units, NYAHC has either purchased and is renovating the buildings for tenant occupancy, is developing housing with a private co-developer, or has been awarded buildings for rehabilitation. NYAHC also has several other affordable housing projects in the pre-development stage with funding partners.

14. NYAHC has been actively seeking multi-family housing development opportunities in Nassau County over the past few years. NYAHC seeks to build mixed-income, multi-family affordable housing in Garden City.

15. Defendant County of Nassau (the "County" or "County Government") is a municipal corporation organized under the laws of the State of New York, having its principal offices located at 1 West Street, Mineola, New York, 11501. All references to defendant County include any individual or entity acting on behalf of, or under the authority derived from, the

5

County, including, but not limited to, the Nassau County Planning Commission ("County Planning Commission"), and the Nassau County Office of Real Estate Planning and Development (the "County REP&D").

16. Defendant Incorporated Village of Garden City, New York (the "Village") is a municipal corporation organized under the laws of the State of New York, having its principal offices located at 351 Stewart Avenue, Garden City, New York, 11530. All references to the Village include any individual or entity acting on behalf of, or under the authority derived from, the Village.

17. Defendant Garden City Board of Trustees (the "Board of Trustees") (together with the Village, the "Garden City Defendants") is an elected governing body in Garden City, having its principal offices located at 351 Stewart Avenue, Garden City, New York, 11530, from which the Garden City offices responsible for all development in Garden City derive their authority. All references to the Board of Trustees include any individual or entity acting on behalf of, or under authority derived from, the Board of Trustees.

## IV. FACTUAL BACKGROUND

**Nassau County's Historic Pattern
and Policy of Housing Segregation**

18. Housing in Nassau County is highly segregated by race and ethnicity, making Nassau County one of the most racially segregated counties in all of the United States.

19. Approximately 80% of the residents of Nassau County are white and approximately 17% of the residents of Nassau County are African-American, other Black, or Hispanic (hereinafter, "minority").

6

20.     Approximately 84% of white Nassau County residents live in non-integrated, virtually all white communities, whereas approximately 64% of the minority residents of Nassau County live in communities that contain predominantly minority residents.

21.     The foregoing custom, pattern, practice and usage of racially and ethnically segregated housing that exists in Nassau County has been caused, perpetuated and reinforced by the custom, pattern and practice of discriminatory actions, policies and practices of defendant County for many decades.

22.     Minorities residing in Nassau County have a disproportionate need for affordable multi-family housing that is not restricted to elderly persons (that is to say, "non-age restricted" housing).  The County Government is fully aware that such non-age restricted affordable housing is disproportionately needed by – and used by – minorities.  However, it is, and for many years has been, an express policy and practice of the County Government, as it recently expressed in its 2000-2004 Nassau County Consolidated Plan, to develop and promote the development of non-age restricted affordable housing only in predominantly minority and low-income areas of Nassau County and to exclude such affordable housing from areas that are predominantly populated by white people.

23.      The County Government has also adopted a policy of supporting, encouraging, facilitating, and acquiescing in the efforts by local zoning authorities in the towns and villages located within Nassau County to enact exclusionary zoning laws and ordinances that often, *inter alia*, prevent the development of non-age restricted affordable multi-family housing, and it has done so with the purpose, intent or foreseeable effect of perpetuating racial and ethnic housing segregation throughout Nassau County and creating identifiable enclaves of nearly all-white

7

**JA 65**

residential communities, such as Garden City. This express policy amounts to racial steering by the County Government.

24.    The County Government's own housing policies and practices also cause, perpetuate, and reinforce housing segregation on the basis of race, color and national origin. With full knowledge and awareness that the minorities in Nassau County have a disproportionate need for affordable housing in Nassau County, the County Government maintains, and for many years has persisted in maintaining, an express and deliberate policy and practice of causing and steering such affordable housing to be constructed only in a small number of lower income and predominantly minority communities such as Roosevelt, Inwood, Hempstead Village, New Cassel and Freeport, and it has done so with the purpose, intent or foreseeable effect of perpetuating racial and ethnic housing segregation throughout Nassau County.

25.    As a direct and foreseeable consequence of the aforementioned deliberate policy and practice, nearly all of the government subsidized, non-age restricted affordable housing developments in Nassau County are situated in predominantly minority census blocks.

26.    The County Government has received and continues to receive federal subsidized housing funds from the Community Development Block Grant ("CDBG") program and HOME program. The County Government's customs, patterns and practices with respect to its use of these funds cause, perpetuate and reinforce racial and ethnic housing segregation and constitute overt racial steering. The CDBG and HOME programs require, among other things, the County Government "affirmatively to further" fair housing. Specifically, the County Government must use the funds in a manner that promotes racial integration rather than perpetuating racial and ethnic segregation, must collect and consider data documenting, and must evaluate the impact of its CDBG and HOME expenditures on racial and ethnic housing segregation.

8

27.     In derogation of its affirmative obligations, the County Government maintains, and for many years has maintained, a policy and practice of directing HOME funds to local governments and non-profit entities to acquire sites for the development of non-age restricted affordable housing only in low and moderate income communities with a disproportionately minority population, but not in predominantly white communities and segregated white enclaves like Garden City.  The County Government has done so with the purpose, intent or foreseeable effect of perpetuating racial and ethnic housing segregation throughout Nassau County.

28.     In derogation of its affirmative obligations, the County Government has not used its CDBG funds in a manner that promotes racial integration, but instead the County Government maintains, and for many years has maintained, an express and deliberate discriminatory policy of using CDBG funds to support the development of non-age restricted affordable housing disproportionately in areas of Nassau County that it knows or should know are already predominated by minority residents and it has done so with the purpose, intent, or foreseeable effect of perpetuating racial and ethnic housing segregation throughout Nassau County.

29.     In derogation of its affirmative obligations, the County Government has persistently and knowingly failed and refused to develop an "Analysis of Impediments to Fair Housing" to analyze fair housing needs and residential segregation, which is a basic prerequisite to fulfill its "affirmative obligation" to promote fair housing.

30.     In derogation of its affirmative obligations, the County Government has persistently and knowingly failed and refused to track or document the effect of its CDBG and HOME expenditures on perpetuating segregation, so as to conceal and obscure the manifestly segregative effect of its CDBG and HOME programs on housing throughout Nassau County.

9

31.     In furtherance of its policy and practice of perpetuating and reinforcing segregated housing patterns in Nassau County, the County Government maintains, and for many years has maintained, an express and deliberate policy and practice of fostering the development of subsidized senior housing only or disproportionately on sites that are located in predominantly white areas of Nassau County, even though it knows that a disproportionate percentage of the residents of such housing are and will be white persons.  As a direct and foreseeable consequence of the aforementioned policies and practices of the County Government, most of the subsidized senior developments are located in census blocks where the vast majority of the population is white.

32.     The defendant County's policies and practices with respect to its use and development of County-owned real estate further cause, perpetuate and reinforce the racially and ethnically segregated housing patterns that persist in Nassau County.  The County Government maintains, and for many years has persisted in maintaining, a policy and practice of disallowing County-owned properties located in predominantly white communities of Nassau County to be sold to housing developers who it knows or believes will build affordable and integrated multi-family housing opportunities (and/or has reached agreements as to redevelopment plans to prevent such development).  By contrast, the County Government maintains a policy and practice of affirmatively promoting the sale of County-owned property in predominantly minority communities to developers of affordable multi-family housing, and it has done so with the purpose, intent or foreseeable effect of perpetuating racial and ethnic housing segregation throughout Nassau County.

33.     More than thirty-years ago in January 1974, the U.S. District Court in *Acevedo et al. v. Nassau County et al.*, expressly found that opposition to affordable and integrated housing in Nassau County is racially motivated:

> By far, however, the most objectionable form of housing has been low-income family housing. It is clear from all the evidence that community opposition to this form of housing has been racially motivated. In Nassau County low-income family housing is predominantly occupied by Blacks. Proposals for the construction of this form of housing have incurred immediate and vehement opposition. As can be expected such heated opposition has not been ignored by the elected officials of Nassau. There is evidence of more than one housing proposal being dropped because of vehement community opposition.

*Acevedo et al. v. Nassau County et al.*, 369 F. Supp. 1384, 1389 (E.D.N.Y. 1974).

34.     Notwithstanding, and with actual or constructive knowledge of, a judicial finding of this Court that community opposition to affordable multi-family housing is racially motivated, the County Government maintains, and for more than 30 years has maintained, the policy and practice of acquiescing in and impliedly consenting to neighborhood and community opposition to the development of affordable multi-family housing and other housing that provides integrated housing opportunities disproportionately needed by minorities or to proposed local laws or ordinances that would foster or permit such housing developments, and it has done so with the purpose, intent and foreseeable effect of perpetuating racial and ethnic housing segregation throughout Nassau County.

**Garden City's History of Housing Segregation**

35.     Defendant Village has cooperated with, facilitated and affirmatively acquiesced in the County Government's segregative policies and practices, including those that target the placement of non-age restricted affordable multi-family housing only in predominantly minority

communities of Nassau County but not in predominantly white communities or in white residential enclaves like Garden City.

36.     Garden City is, and has been for decades, a highly segregated, nearly all-white residential enclave, located near the center of Nassau County.

37.     The population of Garden City is approximately 95% white, with a total of only 23 African-American households (constituting approximately 1% of the Garden City population).

38.     The Village of Hempstead, which directly borders Garden City on the South, has a population of which approximately 84% are minority.  Uniondale, which is located Southeast of Garden City, has a population of which approximately 79% are minority.  The Village of Westbury, which is located Northwest of Garden City, has a population of which approximately 43% minority.

39.     Defendant Village has continuously acted to reject and obstruct the creation of any affordable and integrated multi-family housing opportunities by engaging in exclusionary zoning practices, and it has done so with the purpose, intent or foreseeable effect of excluding minorities from residing within the borders of Garden City and thereby perpetuating racial and ethnic housing segregation in Garden City itself and throughout Nassau County, generally.

40.     In or about April 1989, developers of a 18-acre parcel previously owned by Doubleday & Co., Inc. located at 501 Franklin Avenue in Garden City ("Doubleday Site") proposed a plan to redevelop the Doubleday Site that would have included 51 units of affordable housing under then-current zoning ("Proposed Doubleday Site Development").  Faced with objections from Garden City residents, defendant Village rejected the Proposed Doubleday Site

12

**JA 70**

Development and adopted a plan that eliminated the possibility of an affordable housing development on the Doubleday Site.

41.    Despite its opposition to the construction of affordable multi-family housing that would be likely to attract a significant proportion of minority residents, defendant Village has not blocked the development of other multi-family housing and apartment buildings that by their design are likely to be inhabited by predominantly white residents.  For example, the Wyndham, completed in 1989, is a two-building, 9-story complex consisting of 316 luxury condominiums and rental apartments on 12 acres of land.  The size and density of the Wyndham is significantly greater than the affordable, multi-family housing which faced staunch opposition in the present case.  *See, infra,* ¶¶ 53-59.  By its past actions, defendant Village has encouraged and permitted the building of luxury multi-family housing, like the Wyndham, in Garden City that it knew or should have known would be inhabited by only or virtually only white residents.

42.    Upon information and belief, with actual or constructive knowledge that government-subsidized, multi-family unit housing is likely to attract a significant proportion of minority residents and provide an opportunity for racially integrated housing for residents of Garden City and the surrounding communities, the defendant Village has not permitted the construction of even a single instance of such housing within the boundaries of Garden City.

43.    Consistent with and in furtherance of its policy of maintaining Garden City as, for all intents and purposes, an entirely white residential enclave within Nassau County, officials of defendant Village have engaged in open and notorious conduct to exclude minority persons from Garden City, its public parks, public streets and public schools.  Examples of such conduct include (1) in 1970, defendant Village denied, after receiving objections from Garden City residents, an application by the Unitarian Universalist Church to operate a daily day care center

13

**JA 71**

in Garden City to serve 35 children, most of whom would be African-American and from low-income households in neighboring towns; (2) as was recently found by the New York State Attorney General's Office, defendant Village discriminatorily excludes minorities from using its public parks by regularly asking non-white non-residents to leave the parks and permitting white non-residents to use its parks; and (3) numerous African-Americans have reported incidents of being harassed by Village police while walking, jogging, driving and shopping in Garden City.

**The Social Services Site: An Opportunity**
**for Affordable Racially Integrated and Diverse Housing**

44.     In or about May 2002, the County Government began drafting a Real Estate Consolidation Plan ("Consolidation Plan").  The purpose of the Consolidation Plan was to inventory the approximately 2500 County-owned properties, to consolidate County Government operations, and to sell certain County-owned properties that would no longer be necessary for County Government operations.

45.     Among the subjects of the Consolidation Plan was certain property located in Garden City known as the "Mineola Complex", which houses a courthouse, certain administration buildings, and parking facilities.  Within the Mineola Complex is a parcel of approximately 25 acres of land located at 101 County Seat Drive, Garden City, known as the "Social Services Site".

46.     The 25-acre Social Services Site consists chiefly of 21.44 acres located on the eastern side of County Seat Drive on which a social services building and a parking lot are situated, and an additional 3.03 acres located on the Western side of County Seat drive on which the Old Laboratory Building and County Garage are situated.

47. Throughout its preparation of the Consolidation Plan, defendant County consulted with defendant Garden City Board of Trustees to discuss the plans for the Mineola Complex and specifically for the Social Services Site.

48. The County Government issued its Consolidation Plan in December 2003 which called for, *inter alia,* the relocation of all the governmental operations then performed at the Social Services Site, and consolidating such operations with those performed at the County's facility in neighboring Uniondale. The Consolidation Plan further called for the sale of the Social Services Site to a private developer.

49. The defendant County requested the defendant Village's cooperation in rezoning the Mineola Complex, including the Social Services Site. At the time, the Social Services Site was zoned "P," that is to say, for public use. The County Government sought to rezone the Social Services Site to allow for non-governmental uses, which would facilitate the sale of the Social Services Site to a private developer. Throughout their planning of the rezoning and redevelopment of the Social Services Site, the County Government and the Garden City Defendants cooperated, facilitated, and coordinated their efforts.

50. The defendant County knew or reasonably should have known that the Social Services Site presented a uniquely attractive opportunity to address the County's need for affordable integrated housing opportunities, since it was centrally-located, publicly-owned, well-served by public transportation, situated nearby to uses compatible with affordable multi-family housing, including retail establishments and employment opportunities, and lacked barriers that the County has frequently identified as impediments to the development of affordable multi-family housing, such as land availability and willing developers.

15

**The Original Proposed Plan and Its**
**Significant Housing Opportunities for Minorities**

51.     In response to the County Government's request, the Board of Trustees appointed a "P Zone Committee" to address issues relating to the Mineola Complex and hired planning consultants, the firm of Buckhurst Fish & Jacquemart Inc. ("BFJ"), to assist the Garden City Defendants in drafting rezoning proposals in response to the County Government's plan to sell and redevelop the Social Services Site.

52.     During 2003, Garden City's P Zone Committee and BFJ held public workshops to discuss the development of the Social Services Site.

53.     During 2003 BFJ and the P Zone Committee also met with representatives of the County Defendants to discuss issues related to the County's proposed real estate consolidation, including among other things, the Village's future zoning of the Mineola Complex and the Social Services Site.

54.     In its final proposal, BFJ recommended that a new zoning designation of "CO-5b" be used for the Social Services Site ("Proposed Zoning"). Under the Proposed Zoning, the CO-5b zoning would use existing residential multi-family zoning controls (commonly referred to as "R-M" zoning) and would allow single-family homes, townhomes and multi-family apartments.

55.     Under the Proposed Zoning, and consistent with the existing R-M zoning, a multi-family dwelling would be subject, *inter alia,* to the following limitations: a maximum building height of 35 feet or two and a half stories; a restriction that the dwelling cover no more than 25% of the plot; a minimum of 25% of the plot must be open space; and the maximum number of multi-family housing units equal to one unit per 3000 square feet, or 14.5 units per acre. The

Proposed Zoning therefore allowed for a maximum of 355 affordable multi-family units to be constructed on the 25-acre Social Services Site.

56.     In its proposal, and in accordance with the Proposed Zoning, BFJ contemplated the construction of a 311-unit multi-family housing development on the Social Services Site ("Proposed Plan"), with each unit of sufficiently small size (approximately 1000 square feet per unit) and of sufficiently dense lot size as a whole so as to make it economically feasible for a developer of affordable multi-family housing to develop such housing.

57.     The Proposed Plan as developed by BFJ expressly stated that the Proposed Zoning permitted the development of housing that fit well with existing uses around the Social Services Site, which sits in a transitional area between single-family houses, retail/commercial areas, public/governmental offices and multi-story parking garages.

58.     Under the Proposed Plan, a developer could have constructed 311 affordable apartments and, therefore, could have created a substantial number of racially integrated housing opportunities disproportionately needed by minorities in Nassau County.  The Proposed Plan represented a meaningful step forward towards attenuating the persistent racial and ethnic housing segregation that existed in Garden City, its surrounding communities and Nassau County.

**Neighborhood Opposition to the
Possibility of Integrated Housing**

59.     On January 8 and February 5, 2004, the Garden City Defendants held hearings on the Proposed Zoning of the Mineola Complex and the Social Services Site.

60.     During those public hearings, Garden City residents vociferously objected to the construction of affordable multi-family housing on the Social Services Site, and sought repeated

17

assurances from Garden City Defendants and County officials present that no such affordable multi-family housing would be built on the Social Services Site.  Upon information and belief, the public opposition was racially motivated.

61.    In accordance with its long-standing policy and practice, the defendant County acquiesced in neighborhood and community opposition to the development of affordable housing on the Social Services Site and cooperated with, facilitated, and affirmatively supported in the Village's segregative zoning policies and practices by assuring Garden City residents, during the public hearings and at other times, that the County would not take any action antagonistic to Garden City's wishes and by agreeing to act in concert with the Garden City Defendants to reject the Proposed Plan and to permit only luxury housing to be built on the Social Services Site.

62.    In direct response to the aforementioned neighborhood and community opposition, the County Government, by its County Executive the Honorable Thomas R. Suozzi, acting consistent with and in furtherance of the County's long-standing policy and practice of acquiescing to neighborhood and community opposition of white residents to any housing developments likely to encourage or facilitate racially and ethnically integrated and diverse housing and acting, further, with conscious knowledge and awareness that affordable multi-family housing was actually needed in Nassau County and, in particular, those areas of Nassau County near to and around Garden City, gave express assurances that only luxury housing – that is to say, housing that defendant County knew or should have known was likely to attract predominantly white residents – would be allowed to be developed on the Social Services Site and gave as the reason therefore that given "the character of Garden City," only such housing "would be appropriate."

18

JA 76

63.     In June 2004, the defendant Village – with the express and deliberate support, encouragement, acquiescence and consent of the defendant County – rejected the Proposed Plan and Proposed Zoning, which had been recommended by its own planning consultants, and subsequently adopted an entirely new zoning classification for the Social Services Site, designated "R-T", which had not previously existed under the Village's proposed zoning ordinance ("Special Zoning").

64.     The new Special Zoning adopted by the Village was unique to, and expressly limited to the Social Services Site.  The Special Zoning imposed more severe restrictions on the construction of affordable multi-family housing than had theretofore existed under the "R-M" designation for residential multi-family zoning.  Most importantly, the new Special Zoning imposed stringent and unique limitations on multi-family housing unlike those found elsewhere in the Village's zoning regulations and, by design or foreseeable effect, prohibited the development of and integrated housing on the Social Services Site.

65.     The discriminatory Special Zoning permits multi-family dwellings only by special permission and only on a tiny sliver of the Social Services Site – namely, the 3.03 acre plot on which the Old Laboratory Building and County Garage were situated – constituting less than 15% of the Social Services Site's 25-acre area.  The discriminatory Special Zoning permits at the very most construction of only about 36 affordable multi-family housing units, as compared to the 311 units of affordable, multi-family housing that had been permitted under the Proposed Plan and Proposed Zoning.

66.     Even if special permission were to be obtained, the exclusionary Special Zoning adopted by the Village for the Social Services Site decreases the maximum number of multi-family units permitted on the 3.03 acre sliver of the Social Services Site, thereby making it

19

**JA 77**

economically unfeasible for any affordable racially integrated housing units to be developed on the Social Services Site.

67.     Under the exclusionary Special Zoning, even if special permission were obtained the maximum number of multi-family units permitted on the 3.03 acre sliver is only one unit per 4000 square feet, as compared to the Proposed Zoning and existing R-M zoning, which permitted one unit per 3000 feet.

68.     The discriminatory Special Zoning requires that single family homes and townhouses on the Social Services Site must be constructed of such a significant lot size and minimum square footage that the only economically feasible development on the Social Services Site will be of luxury single-family homes and townhouses, which are housing units likely to attract and to be inhabited by predominantly white residents.

69.     The Proposed Zoning was rejected and the Special Zoning was adopted by the Garden City Defendants with the purpose, intent or foreseeable effect of preventing and excluding minorities from moving into the Village and the housing units to be constructed on the Social Services Site and into Garden City generally.

70.     The reason asserted by defendants for rejecting the Proposed Zoning and adopting the Special Zoning was a concern with increased traffic and an increased burden on the school system from additional children that the Proposed Plan would cause.

71.     The purported concern with increased traffic and an increased burden on the school system from additional children that the Proposed Plan would cause was not the real reason that the defendants rejected Proposed Zoning and adopted the Special Zoning.

72.     Garden City's Defendants' own consultants projected that, assuming up to 355 apartments on the site, the impact on traffic would be negligible, or about a 5% increase in traffic during the evening and morning rush hour, given current traffic for the existing uses.  Further, assuming 355 apartments at an average of 1000 square feet each, BFJ projected only an additional 89 school children, for which the Garden City school district had sufficient capacity.

73.     The real reason for and foreseeable effect of the Garden City Defendants' decision to reject the Proposed Zoning and the Proposed Plan and to adopt the exclusionary Special Zoning was to prevent and curtail the availability of affordable, racially integrated housing in Garden City and to assure that the only housing allowed to be developed on the Social Services Site would be housing likely be inhabited by only or virtually only white residents.

**Nassau County's Promotion of and
Consent To the Discriminatory and
Exclusionary Special Zoning That Excludes
Housing Opportunities for Minorities**

74.     With knowledge of the Village's discriminatory conduct in adopting the exclusionary Special Zoning, the County Government failed and refused to – and indeed supported and acquiesced in – those provisions and conditions of the Special Zoning that eliminated the opportunity for affordable, racially integrated housing on the Social Services Site. In May 2004, the County Government affirmatively informed the Village of its objections to certain other provisions and conditions of the Special Zoning.  However, the County Government supported and acquiesced in Garden City Defendants' decision to block affordable and integrated housing opportunities on the Social Service Site.

75.     The defendant County failed and refused to object to – and indeed acquiesced in and supported – certain provisions and conditions of Special Zoning that prevented or curtailed the availability of integrated housing – namely those limiting the permitted density of the

21

**JA 79**

housing units and the availability of multi-family housing – notwithstanding its belief that such provisions and conditions of the Special Zoning reduced the potential revenue from its sale of the Social Services Site and negatively affected the County Government's overall Consolidation Plan.

76.     In or about July 2004, after the discriminatory Special Zoning was adopted, the County Government issued a Request for Proposals ("RFP") for the Social Services Site that set forth an asking price for the Social Services Site of $30 million.

77.     Developers of affordable housing, including plaintiff NYAHC, were unable to respond to the RFP with a proposal that complied with the Special Zoning because the discriminatory Special Zoning made it economically infeasible to develop affordable housing given its limitations on permitted density.  Immediately after Plaintiff NYAHC received the July 2004 RFP, NYAHC and a chapter of New York ACORN met with the County Government to present an alternative proposal for leasing the Social Services Site that would enable the County to meet its financial objectives while still providing affordable multi-family housing in Garden City.  Promptly after that meeting, NYAHC sent financial information with respect to the proposal to County Government.  During an August, 2004 meeting, County Government requested more information about the proposal, particularly with respect to the proposed lease payments.  NYAHC promptly provided the requested information.

78.     Under NYAHC's proposal, it would lease the Site from the County and develop multi-family housing containing both affordable and market-rate units.  The rents for the affordable units would be below market and based on the tenant's income and family size as compared to the Nassau County area median income ("AMI").  For example, rent on a two-bedroom apartment would be priced at $591 for families earning 30-40% of AMI, $760 for

families earning 41-50% of AMI, $928 for families earning 51-60% of AMI, $1,182 for families earning 61-80% of AMI, $1,519 for families earning 81-100% of AMI, $1,857 for families earning 101-120% of AMI, and $2,195 for families earning 121-140% of AMI. The market-rate rent on a two-bedroom unit in the proposed development would be $2,500. NYAHC planned to fund the proposed development through tax-exempt bonds, the low income housing tax credit, and other subsidies, such as federal HOME funds, each of which is commonly used in the industry and has been previously used by NYAHC.

79. NYAHC developed this proposal in consultation with architects and other developers. NYAHC's employees expended significant hours preparing the development proposal. Nonetheless, the County Government never responded to Plaintiff NYAHC's proposal.

80. After it submitted its proposal to County Government, NYAHC drafted an alternative development plan including multiple scenarios that would comply with the Proposed Zoning and under which NYAHC would purchase the Social Services Site from the County for no less than its $30 million asking price. These alternative development plans provide for the construction of a multi-family housing development containing approximately 300 units, some of which would be affordable units for families with low and moderate incomes and others which would be market-rate units. Under this alternative plan, the affordable housing units would include one, two, and three bedroom rental apartments with an average size of 1000 square feet and average rents substantially similar to those contained in NYAHC's original proposal to the County Government. Some of these affordable housing units would be available for families receiving Section 8 housing assistance. NYAHC intended to fund this alternative plan through tax-exempt bonds, the low income housing tax credit, and other subsidies, such as federal

HOME funds, each of which is commonly used in the industry and has been previously used by NYAHC.  NYAHC again expended numerous hours preparing this alternative proposal.

81.     Upon information and belief, other affordable housing developers in Nassau County are also interested in building multi-family affordable housing on the Social Services Site, but did not respond to the RFP because of the restrictive Special Zoning.

82.     Upon information and belief, the defendant County has selected developer Myron Nelkin to develop the Social Services Site and to construct only luxury single family dwellings and townhouses likely to attract only or virtually only white residents, and unlikely to provide racially integrated housing opportunities.

83.     The County Government and Mr. Nelkin do not propose to develop on the Social Services Site any affordable and integrated housing units in Garden City.

84.     The development of the Social Services Site as currently contemplated by the County Government perpetuates and reinforces racial and ethnic housing segregation in Garden City and Nassau County.

85.     Unless enjoined by this Court, the sale by the County of the Social Services Site will perpetuate and reinforce racial and ethnic housing segregation in Garden City and Nassau County.

**Injury To Plaintiffs As Resulting**
**from Defendants' Wrongful Conduct**

86.     Due to the pervasive pattern of racial and ethnic segregation in housing in the residential communities surrounding Garden City and throughout Nassau County, plaintiffs Ghullkie, Guerrido, Hunter and McCray have been unable to find any suitable affordable housing outside of predominantly minority communities.

24

**JA 82**

87.     Plaintiffs Ghullkie, Guerrido , Hunter, and McCray, desire to live in affordable housing in Garden City and likely have sufficient financial resources to afford an apartment in, and would seek to move into, affordable multi-family housing built on the Social Services Site were it not for defendants' discriminatory conduct and practices.  For instance, Plaintiffs Ghullkie, Guerrido, Hunter, and McCray desire to, are eligible to, and could afford to live in the affordable units available under the NYAHC proposals.

88.     By virtue of the defendants' discriminatory policies and actions, plaintiffs Ghullkie, Guerrido, Hunter, and McCray are being and, unless the relief herein requested is granted, will be, deprived of racially integrated housing opportunities outside predominantly minority communities of Nassau County and excluded from residing in predominantly white communities of Nassau County such as Garden City.

89.     As a result thereof, plaintiffs Ghullkie, Guerrido, Hunter, and McCray do not have access to basic public services that they desire and which are available in Garden City, but not available in predominately minority communities of Nassau County, such as adequate law enforcement and public schools, available public parks, convenient public transportation, and more expansive shopping areas such as those located near the Social Services Site in Garden City.

90.     By virtue of defendants' discriminatory policies and actions, plaintiffs Ghullkie, Guerrido, Hunter, and McCray are being and, unless the relief herein requested is granted, will be deprived of the ability to live in a racially integrated residential community, including the many benefits of interracial associations that would come with living in a racially integrated portion of Garden City and will be forced to experience the social stigma that results from living in highly segregated Nassau County.

25

91.     As a white resident of Garden City, plaintiff DeVita desires to live in an integrated residential community, and by virtue of defendants' discriminatory practices is being and, unless the relief herein requested is granted, will be, deprived of that opportunity of living in a more integrated community then currently exists in Garden City, and of the benefits that result from living in a racially integrated community, including the many benefits of interracial associations that would come with living in a racially integrated portion of Garden City.

92.     Due to the defendants' ongoing discriminatory conduct and practices that perpetuate and reinforce housing segregation generally and limit availability of affordable integrated housing developments to predominantly minority communities in particular, New York ACORN's members are being and, unless the relief herein requested is granted, will be, deprived of the opportunity to find suitable affordable housing located outside areas of minority concentration in the County.

93.     Due to the defendants' ongoing discriminatory conduct and practices, New York ACORN members are being and, unless the relief herein requested is granted, will be deprived of the opportunity to live in racially integrated communities and the associated benefits of interracial associations that come with such housing opportunities.

94.     Due to the defendants' ongoing discriminatory conduct and practices, New York ACORN members do not have and, unless the relief herein requested is granted, will be deprived of access to basic public services in Garden City such as adequate law enforcement and public schools, available public parks, convenient public transportation, educational facilities and more expansive shopping areas located near the Social Services Site in Garden City.

95.     Due to the defendants' ongoing discriminatory conduct and practices that perpetuate and reinforce housing segregation generally and limit availability of affordable

26

integrated housing developments to predominantly minority communities in particular, plaintiff NYAHC has been, and unless the relief requested herein is granted, will be deprived of its right to develop and make available affordable housing for low and moderate income families outside of areas of minority concentration in the County.

### FIRST CAUSE OF ACTION
**(Violation of the Fair Housing Act, 42 U.S.C. § 3601 *et seq*.)**

96.      Plaintiffs repeat and reallege paragraphs 1 through 95 as if fully set forth herein.

97.      Defendants' discriminatory practices, motivated by malice and/or callous disregard for the rights of Plaintiffs, deprive plaintiffs of their right of equal access to housing, otherwise make housing unavailable, deprive plaintiff NYAHC of its right to make housing available and perpetuate segregation on the basis of basis of race, color, and national origin in violation of the Fair Housing Act, 42 U.S.C. §§ 3604(a), both by intent and impact.

### SECOND CAUSE OF ACTION
**(Violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981)**

98.      Plaintiffs repeat and reallege paragraphs 1 through 97 as if fully set forth herein.

99.      Defendants' discriminatory practices, motivated by malice and/or callous disregard for the rights of plaintiffs, deprive plaintiffs of their right to make and enforce contracts to purchase, lease, or otherwise hold or convey property, on the basis of basis of race, color, and national origin (and thus deprive them of the same such rights as are enjoyed by white persons) in violation of the Civil Rights Act of 1866, 42 U.S.C. §1981.

### THIRD CAUSE OF ACTION
**(Violation of the Civil Rights Act of 1866, 42 U.S.C. § 1982)**

100.      Plaintiffs repeat and reallege paragraphs 1 through 99 as if fully set forth herein.

101.    Defendants' discriminatory practices, motivated by malice and/or callous disregard for the rights of plaintiffs, deprive plaintiffs of their right to purchase, lease, or otherwise hold or convey property on the basis of basis of race, color, and national origin (and thus deprive them of the same such rights as are enjoyed by white persons) in violation of the Civil Rights Act of 1866, 42 U.S.C. §1982.

**FOURTH CAUSE OF ACTION**
**(Violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States)**

102.    Plaintiffs repeat and reallege paragraphs 1 through 101 as if fully set forth herein.

103.    Defendants' discriminatory customs, patterns, practices, and usages in contravention of the Individual Plaintiffs' and NYAHC's constitutional and federal statutory rights motivated by malice and/or callous disregard for their rights, deprive the Individual Plaintiffs of their right of equal access to housing and deprive NYAHC of its right to make housing available under color of law in violation of the Federal Civil Rights Act of 1871, 42 U.S.C. §1983, and their rights under the Equal Protection Clause of the United States Constitution with regard to housing.

**FIFTH CAUSE OF ACTION**
**(Violation of the "Affirmatively Furthering" Obligations Under the Fair Housing Act, 42 U.S.C. § 3608)**

104.    Individual Plaintiffs and New York ACORN repeat and reallege paragraphs 1 through 103 as if fully set forth herein.

105.     In connection with their use of federal funds related to housing, including funds from the federal CDBG and HOME programs, the defendant County used the funds received in a discriminatory manner which promotes residential segregation and otherwise failed to meet the "affirmatively to further" obligations of the Fair Housing Act.

28

**SIXTH CAUSE OF ACTION**
**(Violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*)**

106.    Individual Plaintiffs and New York ACORN repeat and reallege paragraphs 1 through 105 as if fully set forth herein.

107.    The County Government's discriminatory practices with regard to the administration of federal programs, including the federal CDBG and HOME programs, motivated by malice and/or callous disregard for the rights of the Individual Plaintiffs and New York ACORN, violate the Civil Rights Act of 1964, 42 U.S.C. §2000d *et seq*.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs respectfully demand that this Court enter a judgment:

a)    Declaring that defendants' acts, practices, and policies complained of herein violated and violate plaintiffs' rights as secured by Fair Housing Act, as amended, 42 U.S.C. § 3601 *et seq.*; the Civil Rights Act of 1866, 42 U.S.C. § 1981; the Civil Rights Act of 1866, 42 U.S.C. § 1982; the Civil Rights Act of 1871, 42 U.S.C. § 1983; the Equal Protection clause of the Fourteenth Amendment to the U.S. Constitution; and the "affirmatively furthering" obligations of the Fair Housing Act, 42 U.S.C. § 3608, and the Civil Rights Act of 1964, 42 U.S.C. §2000d *et seq;*

b)    Enjoining defendants, their agents, employees, successors, assigns, and those acting in active concert, combination or participation with them, from engaging in any policies or practices that deprive plaintiffs of their rights secured by any and all of the statutes cited in sub-paragraph (a), above, including among other things:

29

(i)        Enjoining the Nassau County Defendants from proceeding with any sale of the Social Services Site, or continuing with any plans for redevelopment of the site, under the discriminatory Special Zoning;

(ii)        Enjoining the Garden City Defendants from enforcing or attempting to enforce in any way the discriminatory or exclusionary provisions of the Special Zoning;

(iii)        Ordering the Garden City Defendants to approve zoning ordinances for the Social Services Site that are substantially the same as the Proposed Zoning or that otherwise permit affordable housing;

(iv)        Ordering the Nassau County Defendants to issue a Request for Proposals consistent with the Proposed Zoning and Proposed Plan or consistent with zoning which otherwise permits affordable housing including provisions that will require the development of affordable and integrated housing units at the Social Services Site;

(v)        Enjoining the Nassau County Defendants from selling the Social Services Site to any person or developer that will not agree or commit to building  affordable and integrated housing units at the Social Services Site to the maximum extent permitted under the Proposed Zoning;

(vi)        Ordering all defendants to take all actions necessary to assure the redevelopment of the Social Services Site so as to maximize the availability of affordable and integrated housing at the site, including taking such

30

steps as the Court deems necessary and appropriate to support and/or subsidize such redevelopment;

(vii)     Enjoining the Garden City Defendants from granting, and ordering the Garden City Defendants to withdraw, any permits, letters of approval, or other consents allowing steps toward redevelopment of the Social Services Site to continue;

(viii)    Enjoining all Defendants and their agents, employees, successors and assigns, from engaging in any other discriminatory acts that perpetuate or contribute to segregation in the Garden City and Nassau County; and

(ix)     Ordering all Defendants to take and/or fund affirmative steps, supervised by this Court, to overcome the effects of past discriminatory practices, including the funding of remedial activities necessary to overcome the perpetuation of segregation in Nassau County and Garden City;

c)     Awarding such other relief as this Court deems reasonable, necessary and just; and

d)     Awarding Plaintiffs their costs and attorneys' fees in this action.

* * *

31

Dated: New York, New York
          November 30, 2005

                              By: s/ Paul B. Sweeney
                                    Paul B. Sweeney (PS 5254)
                                    Michael Starr (MS 6851)
                                    Jenny Rubin Robertson*
                                    Kim F. Bridges (KB 1306)

                              HOGAN & HARTSON LLP
                              875 Third Avenue
                              New York, New York 10022
                              (212) 918-3000

                              *Attorneys for the Individual Plaintiffs*

                                        - and -

                              Frederick K. Brewington (FB 5295)
                              Law Offices of Frederick K. Brewington
                              50 Clinton Street -- Suite 501
                              Hempstead, NY 11550
                              (516) 489-6959

                              Jonathan P. Hooks (admitted *pro hac vice*)
                              Nicole J. DeSario (admitted *pro hac vice*)
                              Lawyers' Committee for Civil Rights
                              Under Law
                              1401 New York Avenue, N.W. -- Suite 5000
                              Washington, D.C. 20005
                              (202) 662-8326

                              *Attorneys for Plaintiffs*
                              *New York Association of Community*
                              *Organizations for Reform Now, New York*
                              *ACORN Housing Company, Inc. and*
                              *the Individual Plaintiffs*

* *pro hac vice* admission to be sought

Case 2:05-cv-02301-ADS-WDW Document 110 Filed 08/02/2014 Page 128 of 134 PageID #: 6687

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                :

ACORN et al.,
                                :

        Plaintiffs,
                                :      ORDER
                                :      05-CV-2301 (JFB)(WDW)

        – against –
                                :

COUNTY OF NASSAU et al.,
                                :

        Defendants.
                                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

JOSEPH F. BIANCO, District Judge:

    For the reasons set forth on the record, I recuse myself pursuant to 28 U.S.C. § 455.

                                  SO ORDERED.

                                  JOSEPH F. BIANCO
                                  UNITED STATES DISTRICT JUDGE

Dated:      March 2, 2010
              Central Islip, NY

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
ACORN (The New York Association of
Community Organizations for Reform Now),
MHANY Management Inc., Vic DeVita, and
Francine McCray,                                              **ORDER**
                                                             05-CV-2301 (ADS) (WDW)

                              Plaintiffs,

               -against-

County of Nassau, Incorporated Village of
Garden City, and Garden City Board of Trustees,

                              Defendants.
--------------------------------------------------------X
**APPEARANCES:**

**Law Offices of Frederick K. Brewington**
*Attorneys for the former plaintiff ACORN and the proposed*
*intervenor New York Communities for Change, Inc.*
50 Clinton Street, Suite 501
Hempstead, NY 11550
          By:     Frederick K. Brewington, Esq., of Counsel


**Lawyers' Committee for Civil Rights Under Law**
*Attorneys for all plaintiffs and the proposed intervenor*
*New York Communities for Change, Inc.*
1401 New York Avenue, NW
Suite 400
Washington, DC 20005
          By:     Joseph D. Rich, Esq., of Counsel


**Hogan & Hartson LLP**
*Attorneys for plaintiffs Vic DeVita and Francine McCray*
875 Third Avenue
New York, NY 10022
          By:     Sabrina Helene Cochet, Esq.,
                  Jenny Rubin Robertson, Esq.,
                  Joanna F. Wasick, Esq.,
                  Stanley Joseph Brown, Esq.,
                  Toby William Smith, Esq.,
                  Peter Joseph Dennin, Esq., of Counsel

**Nassau County Attorney John Ciampoli**
*Attorney for the defendant County of Nassau*
Office of the Nassau County Attorney
1 West Street
Mineola, NY 11501
    By: Esther D. Miller, Assistant County Attorney
       Andrew Reginald Scott, Assistant County Attorney
       Ralph J. Reissman, Assistant County Attorney
       Bethany Bresnaider O'Neill, Assistant County Attorney
       David Bruce Goldin, Assistant County Attorney


**Heidell Pittoni Murphy & Bach LLP**
*Attorneys for the defendant County of Nassau*
1050 Franklin Avenue
Garden City, NY 11501
    By: Karen Schmidt, Esq., of Counsel

**Cullen and Dykman, LLP**
*Attorneys for the defendants Incorporated Village of Garden
City and Garden City Board of Trustees*
100 Quentin Roosevelt Boulevard
Garden City, NY 11530
    By: James G. Ryan, Esq.,
       Jennifer A. McLaughlin, Esq., of Counsel

**SPATT, District Judge.**

   This case arises out of a dispute concerning the proposed construction of low- and

middle-income housing on land owned by Nassau County and located in Garden City, New

York. Presently before the Court is a motion to intervene by proposed plaintiff New York

Communities for Change, Inc. ("NYCC"). For the reasons set forth below, the Court

grants this motion.

## I. INTRODUCTION

   In 2005, plaintiffs New York Association of Community Organizations for Reform

Now ("NY ACORN"), MHANY Management Inc. ("MHANY", formerly known as New

York ACORN Housing Company, Inc.), Vic DeVita, and Francine McCray brought the present case against defendants County of Nassau, the Incorporated Village of Garden City, and the Garden City Board of Trustees. The facts of the case are discussed in detail in a previous order issued in this case by United States District Judge Joseph F. Bianco, before whom this case was previously pending. See ACORN v. County of Nassau, No. 05-cv-2301(JFB)(WDW), 2006 WL 2053732, *1 (E.D.N.Y. Jul. 21, 2006) ("ACORN I"). Familiarity with that decision is assumed. Briefly, the plaintiffs allege that the defendants discriminatorily re-zoned two parcels of Nassau County-owned land that was located in Garden City to prevent plaintiff MHANY from building low- and middle-income housing on that site. The plaintiffs further allege that this decision was part of a long-standing racially discriminatory policy maintained by the defendants. Based on these allegations, the plaintiffs assert claims pursuant to the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*; 42 U.S.C. § 1981; 42 U.S.C. § 1982; and 42 U.S.C. § 2000d *et seq.* In response, the defendants deny any wrongdoing, and assert that they have no racially discriminatory policies. Discovery in the case is now concluded and closed.

The present motion arises from the recent dissolution of the plaintiff NY ACORN. Previously in this case, NY ACORN represented the interests of approximately 2,000 member families who lived on Long Island, and who claimed to seek racially integrated, affordable housing. See ACORN I, 2006 WL 2053732 at *10 ("ACORN does not assert claims on its behalf, but only on behalf of its members."). However, due to funding difficulties and a September 2009 incident unrelated to the present case, many of NY ACORN's national sister chapters disbanded. See, e.g., Times Topics: Acorn, March 23,

2010, available online at http://topics.nytimes.com/top/reference/timestopics/

organizations/a/acorn/index.html.  As of February 22, 2010, NY ACORN followed suit,

and likewise ceased to exist.  As such, no party is currently asserting claims on behalf of

NY ACORN's former members.

Presently, New York Communities for Change, Inc. ("NYCC") seeks to intervene

as the practical—though not the legal—successor to NY ACORN.  NYCC states that it has

purchased NY ACORN's membership list and has agreed to provide certain services to NY

ACORN's former members.  NYCC also asserts that most of its current Long Island-based

members are former members of NY ACORN, and that both of its co-executive directors

are former NY ACORN employees.  In addition, NYCC Co-Executive Director Ann

Sullivan was the only NY ACORN representative deposed during discovery in this case.

NYCC maintains that it should be permitted to intervene in this action so that, like NY

ACORN, it may assert claims against the defendants on behalf of its members—most of

whom previously had their claims asserted in this case by NY ACORN.  The claims NYCC

seeks to assert are substantially the same as those formerly alleged by NY ACORN.

The defendants oppose NYCC's intervention on the grounds that any claims by

NYCC are now barred by the relevant statutes of limitations.  The defendants also assert

that NYCC's intervention would require the parties to re-open discovery, causing unfair

expense and delay.

## II. DISCUSSION

NYCC seeks intervention by right pursuant to Fed. R. Civ. P. 24(a), as well as

permissive intervention pursuant to Fed. R. Civ. P. 24(b).  The defendants oppose

intervention on both grounds.  While the Court is doubtful that NYCC is entitled to

intervention by right under Rule 24(a), the Court will exercise its discretion to permit

NYCC to intervene pursuant to Rule 24(b).

Rule 24(b) provides in pertinent part:

(b) Permissive Intervention.

(1) In General. On timely motion, the court may permit anyone to intervene who: . . .

> (B) has a claim or defense that shares with the main action a common question of law or fact.

. . .

(3) Delay or Prejudice. In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.

Generally, a district court has broad discretion to grant or deny a request for

permissive intervention.  Catanzano by Catanzano v. Wing, 103 F.3d 223, 234 (2d Cir.

1996); Securities and Exchange Commission v. Everest Management Corp., 475 F.2d

1236, 1240 (2d Cir. 1973) ("Rule 24(b) necessarily vests broad discretion in the district

court to determine the fairest and most efficient method of handling a case with multiple

parties and claims.").  A court deciding a motion for permissive intervention under Rule

24(b) should consider (1) the relation of the proposed intervenor's claims to the pending

case, (2) the timeliness of the motion, and (3) the effect of intervention on the parties to the

case.  Catanzano, 103 F.3d at 234; New York News, Inc. v. Kheel, 972 F.2d 482, 487 (2d

Cir. 1992).

Here, there is no dispute that NYCC's claims are related to the pending suit, as NYCC seeks to assert claims that are substantially identical to those asserted by the current plaintiffs. However, the defendants contend that NYCC's intervention is untimely because its claims are barred by the relevant statutes of limitations. For its part, NYCC does not deny that the ordinary limitations periods on its claims have run, but maintains that its claims relate back to the original, timely complaint. The defendants dispute this contention, and further assert that NYCC's intervention would require additional discovery, and that this would cause them unfair burden and delay.

First, with respect to the timeliness issue, the Court finds that NYCC's claims do relate back to the timely original complaint. Unlike Fed. R. Civ. P. 15 and 17, which governs amendments to a complaint and substitution of parties, Rule 24 does not explicitly provide that an intervenor's claim may relate back to the case's original complaint for purposes of the statute of limitations. However, courts in this Circuit have generally interpreted Rule 24 to provide for relation back when: "(1) . . . there is a 'community of interest' between proposed intervenor's and plaintiff's claims; (2) intervenor's motion is timely within the meaning of Rule 24; and (3) no prejudice to defendants would result." New York v. Gutierrez, No. 08-cv-2503 (CPS)(RLM), 2008 WL 5000493, *13 (E.D.N.Y. Nov. 20, 2008) (Sifton, J.) (citing Ross v. Patrusky, Mintz & Semel, No. 90-cv-1356, 1997 WL 214957 (S.D.N.Y. Apr. 29, 1997) (collecting cases permitting intervenor's filing of complaint despite expiration of statute of limitations)). See also Red Rock Commodities Ltd. v. M/V KOPALNIA SZOMBIERKI, 92-cv-6016 (LMM), 1994 WL 440822, *2, (S.D.N.Y. Aug. 15, 1994); Cummings v. United States, 704 F.2d 437, 440 (9th Cir. 1983).

In the Court's view, these cases are persuasive, and the Court also finds that NYCC satisfies the requirements set forth by Judge Sifton in <u>Guitierrez</u> for an intervenor's claim to relate back to the original pleading. Namely, (1) there is a "community of interest" between NYCC's claims and those currently pending against the defendants, (2) NYCC moved to intervene shortly after the disbanding of NY ACORN, and therefore cannot be said to have unreasonably delayed in acting, and (3) it is the Court's opinion that no unfair prejudice to the defendants will result from NYCC's intervention.

Nevertheless, the defendants challenge this conclusion based on a case from the Southern District of New York that pre-dates <u>Gutierrez</u> and <u>Ross</u>. In that case, <u>Ceribelli v. Elghanayan</u>, No. 91-cv-3337(CSH), 1994 WL 529853 (S.D.N.Y. Sept. 28, 1994), the court held that a proposed intervenor's claims would not relate back to the original pleading, and were thus barred by the relevant statute of limitations. However, in <u>Ceribelli</u>, the proposed intervenors had previously timely filed federal claims against the defendants, and then abandoned those claims in favor of state court. <u>Id.</u> at *1. After being disappointed in state court, the proposed intervenors then returned to federal court and attempted to reassert their now time-barred federal claims by intervening into a similar action brought by others against the same defendants. <u>Id.</u> The court denied the plaintiffs' intervention, stating:

> Something akin to a rule of repose may be invoked when a party, having chosen a course of action and foregone a claim in the course of doing so, seeks to revive that claim after the statute of limitations has run by joining a suit timely filed by others.

<u>Id.</u>

In the Court's view, the holding of <u>Ceribelli</u> denying the relation back of a proposed intervenor's complaint is limited to its facts, and is distinguishable from the present case.

In Ceribelli, the plaintiffs sought to use the federal rules of procedure to gain an unfair advantage.  Here, NYCC seeks to intervene primarily to represent the interests of individuals who are presently unrepresented before the Court through no fault of their own. To the extent that Ceribelli contains additional dicta that is inconsistent with Gutierrez, Ross, and the Court's present holding, the Court finds that dicta to be unpersuasive.

Finally, the defendants also object to NYCC's intervention because it would require discovery to be re-opened, and this would be unfairly burdensome to the defendants. While this is an appropriate consideration for a Rule 24(b) motion, the Court is not persuaded by the defendants' assertions.  It is the Court's view that any supplementary discovery necessitated by the intervention of NYCC would be minimal, and that this will not cause unfair prejudice to the defendants.

The Court therefore grants NYCC's motion for permissive intervention pursuant to Rule 24(b).

### III. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that NYCC's motion to intervene pursuant to Rule 24(b) is granted; and it is further

**ORDERED** that, within twenty days of the date hereof, NYCC may file a complaint substantially similar to the proposed complaint by NYCC presently filed with the Court; and it is further

**ORDERED** that the parties are directed to appear before United States Magistrate Judge William D. Wall for a conference concerning any additional discovery in this case on June 25, 2010 at 11:00; and it is further

**ORDERED** that, pending the submission of NYCC's complaint, the Clerk of the Court is directed to amend the caption for this case to read as follows:

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
MHANY Management Inc., Vic DeVita, and
Francine McCray,

                        Plaintiffs,

          -against-

County of Nassau, Incorporated Village of
Garden City, and Garden City Board of Trustees,

                       Defendants.
-----------------------------------------------------------X

**SO ORDERED.**

Dated: Central Islip, New York
June 15, 2010

                                        _/s/ Arthur D. Spatt_____
                                      ARTHUR D. SPATT
                                United States District Judge

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
MHANY MANAGEMENT INC., et al.,

                         Plaintiff(s),                **ORDER**
                                            CV 05-2301  (ADS) (WDW)

      -against-

COUNTY OF NASSAU, et al.

                         Defendant(s).
--------------------------------------------------------X
**WALL, Magistrate Judge:**

     At Judge Spatt's request, I have reviewed plaintiffs' motion to reopen discovery.  *See*
Docket Entry ("DE") [273].  Upon review of the motion, defendant Nassau County's opposition,
*see* DE [274], and plaintiffs' reply, *see* DE [275], plaintiffs' motion is denied.

     Familiarity with this much-litigated case is assumed.  Plaintiffs seek to reopen discovery
for the second time, this time for further discovery on the "new development" of the County's
final decision to relocate the Nassau County Family Court to the Social Services site.
Specifically, they seek an opportunity to depose Chief Deputy County Executive Rob Walker and
an order compelling defendant to produce "all documents concerning its final decision."

     The affidavit of Walker makes clear that the decision to relocate the Nassau County
Family Court to the Social Services site is final.  Re-opening discovery to allow further
deposition of Walker is unnecessary and would serve no purpose other than to multiply theses
proceedings.  Defendant Nassau County is, of course, under a continuing duty to provide
documents responsive to prior demands and thus, to the extent any such demands exist,
defendant must supplement its responses.

Dated: Central Islip, New York           **SO ORDERED:**
       July 26, 2011

                               /s/ William D. Wall
                               WILLIAM D. WALL
                               United States Magistrate Judge

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
MHANY MANAGEMENT, INC., VIC DEVITA and
FRANCINE MCCRAY.

No. 05-CV-2301
(ADS)(WDW)

                                Plaintiffs,

            - and -

                                                        **NOTICE OF MOTION**

NEW YORK COMMUNITIES FOR CHANGE, INC.,

                                Plaintiff- Intervenor,

            - against -

COUNTY OF NASSAU, INCORPORATED
VILLAGE OF GARDEN CITY, AND
GARDEN CITY BOARD OF TRUSTEES,

                                Defendants.
-----------------------------------------------------------------------x

**PLEASE TAKE NOTICE** that, upon the Declaration of Ralph J. Reissman, Deputy

County Attorney in the Office of John Ciampoli, Nassau County Attorney, dated July 29, 2011

and the exhibits annexed thereto; upon defendant County of Nassau's Statement of Material

Facts pursuant to Local Rule 56.1, dated March 10, 2011; upon the Affidavit of Rob Walker,

Chief Deputy County Executive of defendant, County of Nassau, sworn to February 18, 2011;

upon the Affidavit of Kevin J. Crean, Deputy Director of the Nassau County Office of

Community Development, sworn to March 10, 2011; upon the Affidavit of Connie Lassandro,

former Director of the Nassau County Office of Housing & Homeless Services, sworn to March

1, 2011; upon the accompanying Memorandum of Law dated July 29, 2011; and upon all prior

pleadings and proceedings had herein, defendant, County of Nassau, will move this Court before

the Hon. Arthur D. Spatt, United States District Judge, at the United States Courthouse for the

Eastern District of New York located at 100 Federal Plaza, Central Islip, New York 11722, for

an Order pursuant to Rule 56 of the Federal Rules of Civil Procedure, granting summary

judgment in favor of defendant, County of Nassau, and (1) dismissing the Amended Complaint for Declaratory Judgment and Injunctive Relief of the plaintiffs, MHANY Management, Inc., Vic DeVita and Francine McCray, dated November 30, 2005, in its entirety, and (2) dismissing the Complaint in Intervention for Declaratory and Injunctive Relief of plaintiff, New York Communities for Change, Inc., dated June 30, 2010, in its entirety, on the ground that there is no genuine issue as to any material fact to be tried, and that defendant, County of Nassau, is entitled to judgment as a matter of law, together with all other and further relief as the Court deems just and proper.

Dated: Mineola, New York
      July 29, 2011

                      JOHN CIAMPOLI
                      Nassau County Attorney
                      Attorney for Defendant County of Nassau

By:  /s/ Ralph J. Reissman
      RALPH J. REISSMAN
      Deputy County Attorney
      1 West Street
      Mineola, N.Y. 11501
      (516) 571-3046

TO:
Stanley J. Brown, Esq.
Hogan Lovells US LLP
Attorneys for Plaintiffs
MHANY Management, Inc.,
Vic DeVita and Francine McCray
875 Third Avenue
New York, NY 10022

Joseph D. Rich, Esq.
Lawyers' Committee for Civil Rights
Attorneys for Plaintiff-Intervenor
New York Communities for Change, Inc.
1401 New York Avenue, NW - Suite 400
Washington, DC 20005

                      James G. Ryan, Esq.
                      Cullen & Dykman
                      Attorneys for Defendants
                      Incorporated Village of Garden City
                      and Garden City Board of Trustees
                      100 Quentin Roosevelt Boulevard
                      Garden City, NY 11530

2

# DECLARATION OF
# RALPH J. REISSMAN

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
MHANY MANAGEMENT, INC., VIC DEVITA and
FRANCINE MCCRAY.

No. 05-CV-2301
(ADS)(WDW)

Plaintiffs,

- and -

NEW YORK COMMUNITIES FOR CHANGE, INC.,

Plaintiff- Intervenor,

- against -

COUNTY OF NASSAU, INCORPORATED
VILLAGE OF GARDEN CITY, AND
GARDEN CITY BOARD OF TRUSTEES,

Defendants.
-----------------------------------------------------------------------x

## DECLARATION OF RALPH J. REISSMAN IN SUPPORT OF DEFENDANT NASSAU COUNTY'S MOTION FOR SUMMARY JUDGMENT

**RALPH J. REISSMAN**, an attorney duly admitted to the practice of law in the Courts of the State of New York and in the United States District Courts for the Eastern District of New York, declares as follows, under the penalties of perjury:

1.    I am a Deputy County Attorney in the office of John Ciampoli, County Attorney for defendant, the County of Nassau ("Nassau County" or the "County"), in the captioned action. As such, I am familiar with the facts and circumstances set forth herein, as a result of investigation, interviews with Nassau County officials and employees, and my review of the files maintained by the County Attorney and other Nassau County agencies and offices for the within matter.

2.    I submit this Declaration in support of defendant Nassau County's motion seeking an order granting summary judgment in favor of defendant, County of Nassau, dismissing (a) the

Amended Complaint of the plaintiffs, MHANY Management, Inc., formerly known as New York Acorn Housing Company ("NYAHC), Vic DeVita and Francine McCray in its entirety, and (b) the Complaint in Intervention of Plaintiff-Intervenor New York Communities for Change, Inc. ("NYCC"), in its entirety, on the ground that there is no genuine issue as to any material fact to be tried, and that defendant Nassau County is entitled to judgment as a matter of law dismissing both the Amended Complaint and the Complaint in Intervention, together with all other and further relief as the Court deems just and proper.

3.     The purpose of this Declaration is twofold.  The first purpose is to advise the Court of developments which definitively establish that the County no longer intends to sell the real property in Garden City which is the subject of this action (the "Site").  Instead, as established in the accompanying affidavit of Chief Deputy County Executive Rob Walker (the "Walker Aff."), and by the facts set forth below, the County has determined to retain ownership of the Site, and to construct a new Family and Matrimonial Court Complex on the Site, which project is well underway.

4.     The second purpose is to introduce the exhibits listed below to Part 1 of the County's Local Rule 56.1 Statement of Material Facts.  In addition, the County will submit exhibits to the accompanying affidavits of Chief Deputy County Executive Rob Walker, of Connie Lassandro, former Director of Nassau County's Office of Housing and Homeless Services, and also Kevin J. Crean, Deputy Director of Nassau County's Office of Community Development.

5.     In December 2009, Edward Mangano was declared winner of the November 2009 election between him and Thomas Suozzi for County Executive.  After taking office on January 1, 2010, the new Mangano Administration, faced with the problem of a seriously deteriorating

2

Family Court building in Westbury, and under severe pressure from the New York State Office of Court Administration to build a new Family Court, rescinded the Suozzi administration's plan to sell the Site. Instead, the Mangano administration determined that the best use of the Site for County purposes was to build on it a new combined Family and Matrimonial Court Complex.

6.      In his affidavit sworn to February 18, 2011, Mr. Walker unequivocally explains the reasons for the County's decision to build a new Family and Matrimonial Court on the Site site, and that this decision is indeed final

7.      Further recent developments evidencing the County's irrevocable commitment to the Family and Matrimonial Court project are the following:

a.      The Nassau County Legislature has authorized $112 million in funding sources to design and build the Family and Matrimonial Court on the Site. This is shown in the Nassau County Capital Improvement Plan for years 2011-2013. Page 63 of the Plan lists establishes that the County Legislature has authorized the amount of $112 million in funding sources for the project, including four ordinances to date approving bonds in the amount of $17,000,000. *See* Exhibit "BC."

b.      The County has executed a contract with a Construction Manager for the Family and Matrimonial Court project. This is evidenced in the "Contract Details" of the contract between the County and LiRo Program and Construction Management, P.C. ("LiRo") executed by County Executive Edward Mangano on January 21, 2011 in the amount of $4,975,797. LiRo was selected as the result of competitive bidding to serve as the Construction Manager for the project. *See* Exhibit "BD.".

8.      A full list of the exhibits annexed to the County's motion for summary judgment, exclusive of the exhibits annexed to the three affidavits, is set forth below.

3

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| Exhibit A | Amended Complaint for Declaratory Judgment and Injunctive Relief of ACORN (The New York Association of Community Organizations for Reform Now) [practical predecessor to plaintiff-intervenor New York Communities for Change, Inc.], New York Acorn Housing Company [name changed to MHANY Management, Inc.], Vic DeVita and Francine McCray, dated November 30, 2005 |
| Exhibit B | Answer by defendant County of Nassau to Amended Complaint, dated August 18, 2006 |
| Exhibit C | Complaint in Intervention of plaintiff-intervenor New York Communities for Change, Inc. [practical successor to ACORN], dated June 30, 2010 |
| Exhibit D | Answer by defendant County of Nassau to Complaint in Intervention of plaintiff-intervenor New York Communities for Change, Inc., dated September 16, 2010 |
| Exhibit E | Nassau County Charter, § 101 |
| Exhibit F | Deposition transcripts from depositions of Ann Sullivan, November 28, 2007, February 15, 2008 and November 3, 2010 |
| Exhibit G | Deposition transcript from deposition of Ismene Speliotis, November 29, 2007 |
| Exhibit H | Deposition transcript of Thomas R. Suozzi, April 24, 2008 |
| Exhibit I | Request for Proposal for Real Estate Services, May 15, 2002, ACORN 003755-003763 |
| Exhibit J | Deposition transcript of Sheldon Cohen, April 22, 2008 |
| Exhibit K | August 14, 2002 report to Board of Trustees from P-Zone committee, CNTY 03087-03093 |
| Exhibit L | Map of Mineola Complex by John G. Waite Associates and Architects, VGC 08071 |
| Exhibit M | April 30, 2003 memorandum from Buckhurst Fish & Jacquemart Inc. ("BFJ") to Garden City, VGC 677-688 |
| Exhibit N | October 8, 2002 memorandum from Robert Schoelle, Village Administrator for the Village of Garden City, to Garden City Property Owners Association, ACORN 002136-002138 |
| Exhibit O | Request for Proposal of +/- 25 Acre Development Site, CNTY 04927-05011 |

4

**JA 108**

| | |
|---|---|
| Exhibit P | Deposition transcript of Carl Schroeter, March 24, 2008 |
| Exhibit Q | Deposition transcript of Peter Bee, April 30, 2008 |
| Exhibit R | August 14, 2002 report to Board of Trustees from P-Zone committee, entry for May 16, 2002, CNTY 03087-03093 |
| Exhibit S | September 27, 2002 Progress Report from P-Zone Committee to Board of Trustees, entry for August 22, 2002, CNTY 03091-03093 |
| Exhibit T | September 18, 2002 letter from Robert Schoelle to County Executive Suozzi, CNTY 2709-2710 |
| Exhibit U | November 15, 2002 memorandum from BFJ to P-Zone Committee, VGC 752-757 |
| Exhibit V | Garden City Code, Chapter 200, Zoning |
| Exhibit W | December 19, 2002 memorandum from P-Zone Committee to Garden City Mayor Robert Lewis, CNTY 03099-03101 |
| Exhibit X | May 2, 2003 letter from Robert Schoelle to Sheldon Cohen, CNTY 00070-00083 |
| Exhibit Y | May 12, 2003 Zoning Study for the Public P District Containing the County Properties, with transmission letters dated May 14, 2003 and May 13, 2003 |
| Exhibit Z | May 19, 2003 BFJ memorandum to Robert Schoelle, VGC 104-105 |
| Exhibit AA | May 29, 2003 Zoning Study for the Public P District to the Village of Garden City with transmission letter dated May 30, 2003, VGC 66-83 |
| Exhibit AB | July 9, 2003 BFJ Zoning Study for the Public P District Containing the County Properties, BFJ 000202-000222. |
| Exhibit AC | BFJ memorandum dated August 19, 2003, VGC 211-212 |
| Exhibit AD | September 30, 2003 memorandum from BFJ to Village Administrator Schoelle, VGC 544-546 |
| Exhibit AE | A Zoning Study for the Public P District, Presentation to the Village, October 23, 2003, ACORN 002002-002022 |
| Exhibit AF | Notice in Garden City News, October 10, 2003, VGC 537-540 |
| Exhibit AG | BFJ memorandum of agenda for November 6, 2003 meeting with P-Zone Committee, VGC 612-618 |

5

| | |
|---|---|
| Exhibit AH | November 10, 2003 BJF memorandum to P-Zone Committee, VGC 528-530 |
| Exhibit AI | November 2003 Zoning Study for the Public P District Containing the County Properties, BFJ 000178000201 |
| Exhibit AJ | November 19, 2003 letter from Peter A. Bee to Garden City Mayor Barbara Miller, VGC 526 |
| Exhibit AK | December 5, 2003 letter from Robert Schoelle to Sheldon Cohen, CNTY 00319 |
| Exhibit AL | Transcript of public hearing held February 5, 2004, VGC 877-947 |
| Exhibit AM | April 1, 2004 BFJ document, "CO-5b Zoning Discussion," VGC 376-377 |
| Exhibit AN | April 22, 2004 BFJ Zoning Study for the Public P District, VGC 185-204 |
| Exhibit AO | May 4, 2004 memorandum from BFJ to Garden City Board of Trustees, VGC 344-348 |
| Exhibit AP | May 2004 BFJ Environmental Assessment Form, BFJ 000104-000147 |
| Exhibit AQ | May 24, 2004 letter from Sheldon Cohen to Barbara Miller, CNTY 03077-03086 |
| Exhibit AR | June 2, 2004 memorandum from BFJ to Board of Trustees, BFJ 000055-000062 |
| Exhibit AS | June 3, 2004 Notice of Adoption of Local Law No. 2-2004, with transmission letter dated June 7, 2004, CNTY 03067-03076 |
| Exhibit AT | August 10, 2004 Legal Notice of Request for Proposal for Sale of 25+/- Acre Redevelopment Site, CNTY 02137 |
| Exhibit AU | Transmission letter from CBRE to Sheldon Cohen, CNTY 005191-005192, with Proposal Summary, CNTY 05012-05096 |
| Exhibit AV | September 10, 2004 facsimile transmissions from NYAHC, NYAHC 000444-000449, with Proposal, NYAHC 000450-000464 |
| Exhibit AW | September 13, 2004 letter from Sheldon Cohen to Anthony Cancellieri and Arthur Giannelli, CNTY 05518-05520 |
| Exhibit AX | 101 County Seat Drive RFP Evaluation Process beginning with week of 9/27/04, CNTY 03234-03235 |
| Exhibit AY | October 28, 2004 Best And Final Offer Bid Matrix for 25-Acre Development Site in Garden City, CNTY 03238 |

Exhibit AZ    November 17, 2004 letter from CBRE to Fairhaven Properties, Inc., CNTY 02580

Exhibit BA    Deposition transcript of Vic DeVita, March 18, 2008

Exhibit BB    Deposition transcript of Francine McCray, March 19, 2008

Exhibit BC    Nassau County Capital Improvement Plan for years 2011-2013

Exhibit BD    Contract Details of the contract between the County and LiRo Program and
              Construction Management, P.C. executed by County Executive Edward Mangano
              on January 21, 2011 in the amount of $4,975,797.

Dated: Mineola, New York
       July 29, 2011

                                                /s/   Ralph J. Reissman
                                                RALPH J. REISSMAN

7

# EXHIBITS "A" – "BD"
# FILED AND SERVED
# BY HARD COPY

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
MHANY MANAGEMENT, INC., VIC DEVITA and
FRANCINE MCCRAY.                                        No. 05-CV-2301
                                                       (ADS)(WDW)
                              Plaintiffs,

            - and -

NEW YORK COMMUNITIES FOR CHANGE, INC.,

                              Plaintiff- Intervenor,
            - against -

COUNTY OF NASSAU, INCORPORATED
VILLAGE OF GARDEN CITY, AND
GARDEN CITY BOARD OF TRUSTEES,

                              Defendants.
------------------------------------------------------------------x
## AFFIDAVIT OF ROBERT WALKER IN SUPPORT OF DEFENDANT
## NASSAU COUNTY'S MOTION FOR SUMMARY JUDGMENT

STATE OF NEW YORK  )
                   ) ss.:
COUNTY OF NASSAU   )

    ROBERT WALKER, being duly sworn, deposes and says:

    1.    I have been Chief Deputy County Executive for the County of Nassau ("the

County") since January 2010. I serve directly under Nassau County Executive Edward P.

Mangano, who took office of January 1, 2010, succeeding former County Executive Thomas R.

Suozzi. The basis of my knowledge is review of County books, documents and records, and

interviews with County employees

    2.    My purpose in submitting this affidavit is to inform the Court of the reasons why

the present County administration has decided to relocate the Nassau County Family Court from

its present Westbury location, in an outdated, undersized and dilapidated building, to 101 County

Seat Drive in Garden City, the former site of the County's Department of Social Services (the

"Social Services Site"). The new Family Court will be part of a combined Family and Matrimonial Court Complex, for which the Schematic Design has already been accomplished.

3. In the New York Court State court system, local governments, including counties such as Nassau County, are responsible for providing, operating and maintaining suitable court facilities. *See* New York State Judiciary Law (L. 1976, c. 966), § 39(3)(a), which provides in relevant part:

> 3. (a) Notwithstanding any other provision of law, all goods, services and facilities presently furnished and paid for by any political subdivision to the courts and court-related agencies affected by this section not included in that portion of the budget of the political subdivision used in the computation of the amounts set forth in subdivision two of this section, shall continue to be furnished and paid for by the political subdivision. Each political subdivision shall also be responsible for supplying such additional facilities suitable and sufficient for the transaction of business as may become needed after the effective date of this subdivision.

4. In addition, the New York Court Facilities Act of 1987 (L. 1987, c. 825), New York Judiciary Law § 219, entitled "Capital Plans for Court Facilities," reaffirmed the principle that providing suitable court facilities is the responsibility of local governments:

> The chief executive officer of each political subdivision of the state specified in paragraph (a) of subdivision two of section thirty-nine of this chapter shall, not later than twenty-four months after the effective date of this section, prepare and submit to the chief administrator an assessment of the suitability and sufficiency for the transaction of business of the facilities it furnishes the courts, together with a plan for the acquisition, design, construction, reconstruction, rehabilitation, improvement and financing of such facilities and such additional facilities as may be needed by the unified court system as reasonably determined by the chief administrator after consultation with the chief executive officer. In making such determinations, the chief administrator may establish priorities among the facilities' needs within each political subdivision if he or she determines that it is practicable and in the best interests of the unified court system to do so. Each such assessment and plan shall be in the form prescribed by the chief administrator and prepared in compliance with such standards and

2

**JA 114**

administrative policies as may be promulgated pursuant to section twenty-eight of article six of the constitution and shall be subject to the approval of the court facilities capital review board. Following such approval, they shall constitute the capital plan for the political subdivision by which they were prepared.

5.    Under the above statutes and mandates, Nassau County is responsible for the construction, operation and maintenance of the County's Family Court.

6.    The current Family Court, built in 1960 and located at 1200 Old County Road in Westbury, was deemed inadequate as far back as 2004 by the New York State Office of Court Administration ("OCA"). In August 2004, Ronald Younkins, OCA's Chief of Operations, described the building as "inadequate to the needs of the court," adding, "the space is no longer adequate, the building is in bad condition. There is nothing we can do to make it long-term adequate. It simply needs to be replaced." In December 2009, Mr. Younkins called the Family Court "one of the worst court facilities in the state," and urged the County to provide "a proper facility . . . . as soon as possible for the families who come to this court." See Exhibit "A" annexed hereto, New York Law Journal articles dated August 3, 2004 and December 21, 2009.

7.    The current building, which was built with only two courtrooms, now contains twenty separate parts for nine sitting judges, six supporting magistrates, three court referees, eight hearing examiners, plus a Law Department with seven Law Secretaries. The courtrooms are a fraction of their original size, as space has been carved up into smaller, cubicle-sized offices. The court's case files, and the Deputy County Attorneys assigned to Family Court, are housed in trailers outside the building.

8.    Over 30,000 new cases are filed with the court each year, and more than 1,000 people come through the court each day. There are no attorney-client meeting rooms; instead, attorneys confer with clients in stairwells or hallways. When pretrial detainees in custody are

3

brought through the hallways, the public is directed to "hug the walls," even though there is barely enough space to walk through.

9. In September 2007, Nassau County Administrative Judge Anthony Marano ordered the building closed when eleven false fire alarms went off in ten days. Only one elevator was available to evacuate over five hundred people, including infants, the elderly, the handicapped and detainees in custody. Recently, a private engineering firm surveyed the building, finding poor air circulation due to significant wall partitions over the years, outdated fire protective systems and air handling units, failing temperature controls, and mildewed walls.

10. Since at least 2004, both OCA and Administrative Judge Marano, together with the Nassau County Bar Association, have strongly urged the County to relocate Family Court to the Mineola Court Complex, which presently contains Supreme Court, County Court and Matrimonial Court in separate buildings. The Social Services Site, while technically situated and zoned in Garden City, is immediately adjacent to the Mineola Court Complex, separated by a parking lot from the Supreme Court to the north.

11. Although the prior County administration planned to sell the Social Services Site to a private developer, the present administration recognizes the compelling need for a new Family Court in Mineola. Indeed, in early 2010, County Attorney John Ciampoli was advised by Administrative Judge Marano that, implicit in the need for a new Family Court is the impending threat that under the Judiciary Law, OCA could issue a mandate taking charge of the project, build a new Family Court wherever OCA deems best, and charge the entire cost to the County.

12. The County's reasons for relocating Family Court to a new Family and Matrimonial Court Complex in Mineola, rather than attempt to renovate the Westbury building, are manifold. Presently, Family Court litigants, who often have multiple court actions

proceeding in Family Court in Westbury, and also simultaneously in the Mineola-located County Court, Matrimonial Court and Supreme Court, are forced to travel the three-mile distance from Westbury to Mineola in the same day, losing valuable court time. Often, scheduled court hearings among the various courts have to be canceled, since litigants and their attorneys cannot manage to cover multiple appearances between the various court in Westbury and Mineola.

13.    By contrast, when the Family Court is moved to the former Social Services Site in Garden City to be included in the Mineola Court Complex, Family Court litigants and their attorneys will be concentrated in one geographic area. Compared to the present Westbury location, there is greater access to public transportation to the Mineola Court Complex via the Long Island Railroad and public busing. The closest railroad station to the Westbury Family Court is located in Hicksville, a distance of nearly two miles. By contrast, it is a five-minute walk from the Mineola train station to the Mineola Court Complex.

14.    In addition, combining the Family Court in Mineola will also further former Chief Judge Judith Kaye's "One Family-One Judge" initiative, seeking to reduce the need for domestic relations and Family Court litigants to maintain multiple actions in different courts.

15.    Another primary factor in the present administration's decision to build a new Family and Matrimonial Court Complex in Mineola, rather than attempt to renovate the current Family Court in Westbury facility, is cost. It would cost at least $100 million to build a new courthouse adjacent to the existing Family Court in Westbury, but even this would not remedy the many deficiencies in the existing building. OCA has determined that combining a new building with the existing facility in Westbury "barely meets the present needs of the Family Court and provides virtually no capacity for the inevitable future growth that will take place in the number of cases filed in the Family Court." *See* letter from OCA's Chief of Operations,

Ronald Younkins, dated December 26, 2007 (Exhibit "B"). In addition, the Westbury location would not have enough parking spaces to accommodate an expanded building.

16. By contrast, it will cost approximately the same $100 million to build a completely new Family and Matrimonial Court Complex in Mineola which, as explained above, is the more desirable, practical and efficient location. There is also an abundance of parking in the Mineola Court Complex, with over 1,500 parking spaces.

17. Plans for constructing the new Family and Matrimonial Court Complex are well underway. Annexed hereto as Exhibit "C" is the Schematic Design for the new building, issued in September 2010 by Perkins Eastman Architects, P.C. for the County.

18. I understand that plaintiffs in this action have charged Nassau County with engaging in racial discrimination by allegedly colluding with officials from Garden City to rezone the Social Services Site, so as to exclude the construction of affordable housing. I have three answers to refute this claim.

19. First, for all reasons explained above, the County's plan to construct a new Family and Matrimonial Court Complex on the Social Services Site in Garden City certainly constitutes a legitimate governmental purpose, which will benefit all residents of Nassau County for decades to come.

20. Second, the County has absolutely no zoning power in Garden City or, for that matter, anywhere in the County. Zoning power is reserved to the individual towns, villages and municipalities within Nassau County. The only – and narrow – exception to this limitation is that municipalities must refer proposed zoning amendments to the Nassau County Planning Commission, in accordance with General Municipal Law Section 239-m. In response, the Planning Commission issues resolutions to the referring municipality that are only advisory in

6

nature. Even in the event of disapproval from the Planning Commission, the referring municipality is still entitled to adopt its proposed zoning change, although a super-majority vote is required.

21.    Third, the County has engaged in proven, intensive efforts to promote affordable housing throughout the County, both in prior administrations and in the current Mangano administration. I respectfully refer the Court to the accompanying affidavits of Ray Thomas, Director of the Office of Community Development (formerly the Office of Housing and Intergovernmental Affairs), and of Connie Lassandro, Director of the Office of Housing and Homeless Services. These affidavits set forth in detail how the County has successfully promoted the construction of affordable housing and assisted the homeless throughout Nassau County, in full compliance with the Fair Housing Act and United States Department of Housing and Urban Development regulations.

ROBERT WALKER

Sworn to before me this

18th day of February, 2011.

RALPH J. REISSMAN
Notary Public of the State of New York
No. 02RE4951508
Qualified in Nassau County
Commission Expires July 24, 2013

# EXHIBITS "A" – "C"
# FILED AND SERVED
# BY HARD COPY

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MHANY MANAGEMENT INC., VIC DEVITA,   :
FRANCINE MCCRAY and NEW YORK   :
COMMUNITIES FOR CHANGE, INC.,   :
      :
    Plaintiffs,   :
      :
    v.   :  Case No. 05-cv-2301 (ADS) (WDW)
      :
COUNTY OF NASSAU, GARDEN CITY BOARD OF   :
TRUSTEES, AND INCORPORATED VILLAGE OF   :
GARDEN CITY,   :
      :
    Defendants.   :
      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF STANLEY J. BROWN IN OPPOSITION TO DEFENDANTS INCORPORATED VILLAGE OF GARDEN CITY'S, GARDEN CITY BOARD OF TRUSTEES' AND NASSAU COUNTY'S MOTIONS FOR SUMMARY JUDGMENT

STANLEY J. BROWN declares the following to be true under penalty of perjury:

1.     I am a member of the bar of this Court and a partner in the firm of Hogan Lovells US LLP, counsel for Plaintiffs Vic DeVita and Francine McCray. (The collective term "Plaintiffs" as used hereinafter refers to all Plaintiffs in this action.) I am fully familiar with the facts set forth herein. I affirm that I am not a party to the action. I respectfully submit this declaration in support of Plaintiffs' opposition to the motions for summary judgment of Defendants Incorporated Village of Garden City, Garden City Board of Trustees (collectively, "Garden City") and Nassau County ("Nassau County" or "the County").

**DEPOSITION TRANSCRIPTS**

1.     Attached hereto as **Exhibit 1** is a true and correct copy of excerpts of the deposition transcript of Peter Bee, dated April 30, 2008.

2.     Attached hereto as **Exhibit 2** is a true and correct copy of excerpts of the deposition transcript of Patrick Cleary, dated January 9, 2009.

3.      Attached hereto as **Exhibit 3** is a true and correct copy of excerpts of the deposition transcript of Sheldon Cohen, dated April 22, 2008.

4.      Attached hereto as **Exhibit 4** is a true and correct copy of excerpts of the deposition transcript of Vic De Vita, dated March 18, 2008.

5.      Attached hereto as **Exhibit 5** is a true and correct copy of excerpts of the deposition transcript of Patrick Duggan, dated April 10, 2008.

6.      Attached hereto as **Exhibit 6** is a true and correct copy of excerpts of the deposition transcript of Michael Filippon, dated January 30, 2008.

7.      Attached hereto as **Exhibit 7** is a true and correct copy of excerpts of the deposition transcript of Frank Fish, Volume I, dated November 9, 2006.

8.      Attached hereto as **Exhibit 8** is a true and correct copy of excerpts of the deposition transcript of Frank Fish, Volume II, dated December 17, 2007.

9.      Attached hereto as **Exhibit 9** is a true and correct copy of excerpts of the deposition transcript of Gerry Lundquist, dated April 23, 3008.

10.     Attached hereto as **Exhibit 10** is a true and correct copy of excerpts of the deposition transcript of Peter Marcuse, dated December 11, 2008.

11.     Attached hereto as **Exhibit 11** is a true and correct copy of excerpts of the deposition transcript of Francine McCray, dated March 19, 2008.

12.     Attached hereto as **Exhibit 12** is a true and correct copy of excerpts of the deposition transcript of Barbara Miller, dated April 18, 2008.

13.     Attached hereto as **Exhibit 13** is a true and correct copy of excerpts of the deposition transcript of Peter Negri, dated June 10, 2008.

14.     Attached hereto as **Exhibit 14** is a true and correct copy of excerpts of the deposition transcript of Rosemary Anne Olsen, dated February 13, 2008.

15.     Attached hereto as **Exhibit 15** is a true and correct copy of excerpts of the deposition transcript of Robert Schoelle, Volume I, dated January 16, 2008.

16.     Attached hereto as **Exhibit 16** is a true and correct copy of excerpts of the deposition transcript of Robert Schoelle, Volume II, dated January 17, 2008.

17.     Attached hereto as **Exhibit 17** is a true and correct copy of excerpts of the deposition transcript of Carl Schroeter, Volume I, dated March 24, 2008.

18.  Attached hereto as **Exhibit 18** is a true and correct copy of excerpts of the deposition transcript of Ismene Speliotis, dated November 29, 2007.

19.  Attached hereto as **Exhibit 19** is a true and correct copy of excerpts of the deposition transcript of Ann E. Sullivan, Volume I, dated November 28, 2007.

20.  Attached hereto as **Exhibit 20** is a true and correct copy of excerpts of the deposition transcript of Ann E. Sullivan, Volume II, February 15, 2008.

21.  Attached hereto as **Exhibit 21** is a true and correct copy of excerpts of the deposition transcript of Thomas Suozzi, dated April 24, 2008.

22.  Attached hereto as **Exhibit 99** is a true and correct copy of excerpts of the deposition transcript of Diane Goins, dated February 1, 2011.

23.  Attached hereto as **Exhibit 100** is a true and correct copy of excerpts of the deposition transcript of Carl Schroeter, Volume II, that took place on September 28, 2010.  (The transcript is incorrectly dated September 28, 200**9**.  The deposition actually took place on September 28, 20**10**.)

24.  Attached hereto as **Exhibit 123** is a true and correct copy of further excerpts of the deposition transcript of Carl Schroeter, Volume II, that took place on September 28, 2010.

25.  Attached hereto as **Exhibit 124** is a true and correct copy of further excerpts of the deposition transcript of Diane Goins, dated February 1, 2011.

26.  Attached hereto as **Exhibit 125** is a true and correct copy of further excerpts of the deposition transcript of Patrick Cleary, dated January 9, 2009.

**DEPOSITION EXHIBITS**

27.  Attached hereto as **Exhibit 22** is a true and correct copy of Plaintiffs' Exhibit 1, F. Fish Dep., September 13, 2002 facsimile from Buckhurst Fish & Jacquemart, Inc. ("BFJ") to Garden City, VGC778-79.

28.  Attached hereto as **Exhibit 23** is a true and correct copy of Plaintiffs' Exhibit 5, F. Fish Dep., November 15, 2002 memorandum from BFJ to "P" Zone Committee, VGC752-57.

29.  Attached hereto as **Exhibit 24** is a true and correct copy of Plaintiffs' Exhibit 6, F. Fish Dep., May 12, 2003 BFJ "Village of Garden City: A Zoning Study for the Public P District Containing the County Properties," with cover letters dated May 13, 2003 and May 14, 2003, VGC83a-103.

30.  Attached hereto as **Exhibit 25** is a true and correct copy of Plaintiffs' Exhibit 7, F. Fish Dep., May 29, 2003 Power Point presentation entitled "A Zoning Study for the Public P District," with a cover letter dated May 30, 2003, VGC66-83.

3

31.    Attached hereto as **Exhibit 26** is a true and correct copy of Plaintiffs' Exhibit 8, F. Fish Dep., May 19, 2003 memorandum from BFJ to Robert Schoelle, VGC104-05.

32.    Attached hereto as **Exhibit 27** is a true and correct copy of Plaintiffs' Exhibit 10, F. Fish Dep., July 9, 2003 BFJ "Village of Garden City: A Zoning Study for the Public P District Containing the County Properties," BFJ000202-22.

33.    Attached hereto as **Exhibit 28** is a true and correct copy of Plaintiffs' Exhibit 11, F. Fish Dep**.**, August 19, 2003 BJF Meeting Record, VGC211-12.

34.    Attached hereto as **Exhibit 29** is a true and correct copy of Plaintiffs' Exhibit 13, F. Fish Dep., September 2003 Draft Environmental Assessment Form with a cover letter dated September 8, 2003, VGC551-79.

35.    Attached hereto as **Exhibit 30** is a true and correct copy of Plaintiffs' Exhibit 14, F. Fish Dep., October 23, 2003 Power Point presentation entitled "A Zoning Study for the Public P District," ACORN002002-22.

36.    Attached hereto as **Exhibit 31** is a true and correct copy of Plaintiffs' Exhibit 15, F. Fish Dep., November 2003 BFJ "Village of Garden City: A Zoning Study for the Public P District Containing the County Properties," BFJ000178-201.

37.    Attached hereto as **Exhibit 32** is a true and correct copy of Plaintiffs' Exhibit 17, F. Fish Dep., flyer regarding 3/18 Trustees Meeting, VGC400-02.

38.    Attached hereto as **Exhibit 33** is a true and correct copy of Plaintiffs' Exhibit 18, F. Fish Dep., April 22, 2004 Power Point presentation entitled "A Zoning Study for the Public P District," VGC185-204.

39.    Attached hereto as **Exhibit 34** is a true and correct copy of Plaintiffs' Exhibit 19, F. Fish Dep., May 2004 Environmental Assessment Form, BFJ000104-147.

40.    Attached hereto as **Exhibit 35** is a true and correct copy of Plaintiffs' Exhibit 20, F. Fish Dep., June 3, 2004 Notice of Adoption of Local Law No. 2-2004, NYAHC000671-78.

41.    Attached hereto as **Exhibit 36** is a true and correct copy of Plaintiffs' Exhibit 24, R. Schoelle Dep., May 7, 1989 article "Garden City Scrutinizes Plan for a Plum," *The New York Times*, NYAHC000053-56.

42.    Attached hereto as **Exhibit 37** is a true and correct copy of Plaintiffs' Exhibit 25, R. Schoelle Dep., June 24, 1988 article "As Village Looks Ahead," *The Garden City News*, ACORN003376-77.

43.    Attached hereto as **Exhibit 38** is a true and correct copy of Plaintiffs' Exhibit 27, R. Schoelle Dep., May 26, 1989 article "Communications to Village Board," *The Garden City News,* ACORN003408-09.

4

44.     Attached hereto as **Exhibit 39** is a true and correct copy of Plaintiffs' Exhibit 33, R. Schoelle Dep., July 10, 2006 e-mail entitled "make a difference in town politics by email!".

45.     Attached hereto as **Exhibit 40** is a true and correct copy of Plaintiffs' Exhibit 37, R. Schoelle Dep., February 20, 2004 article "Mayor Lost Sight of Our Concerns," *Garden City Life*, *Online Edition*, ACORN001479-81.

46.     Attached hereto as **Exhibit 41** is a true and correct copy of Plaintiffs' Exhibit 50, R. Schoelle Dep., October 17, 2003 advertisement "Tell Them What You Think About The County's Plan for Garden City," *Garden City News*, VGC537-40.

47.     Attached hereto as **Exhibit 42** is a true and correct copy of Plaintiffs' Exhibit 53, M. Filippon Dep., May 4, 2004 BFJ memorandum to Garden City Village Trustees, VGC344-48.

48.     Attached hereto as **Exhibit 43** is a true and correct copy of Plaintiffs' Exhibit 54, M. Filippon Dep., May 19, 2005 press release from Attorney General Eliot Spitzer, ACORN05779-80.

49.     Attached hereto as **Exhibit 44** is a true and correct copy of Plaintiffs' Exhibit 58, M. Filippon Dep., April 29, 2003 BFJ memorandum to J. Kiernan, R. Schoelle, and M. Filippon with coversheet, VGC689-701.

50.     Attached hereto as **Exhibit 45** is a true and correct copy of Plaintiffs' Exhibit 69, R. Olsen Dep., July 1995 report "Nassau County Consolidated Strategy and Plan For Period Covering Federal Fiscal Years 1995-99," CNTY13335-783.

51.     Attached hereto as **Exhibit 46** is a true and correct copy of Plaintiffs' Exhibit 70, R. Olsen Dep., undated draft entitled "Housing for Nassau's Next Generation: New Initiatives for New Suburbia," ACORN0007740-60.

52.     Attached hereto as **Exhibit 47** is a true and correct copy of Plaintiffs' Exhibit 71, R. Olsen Dep., July 2000 report entitled "Nassau County Consolidated Strategy and Plan For Period Covering Federal Fiscal Years 2000-2004," CNTY13904-14175.

53.     Attached hereto as **Exhibit 48** is a true and correct copy of Plaintiffs' Exhibit 72, R. Olsen Dep., 2005 report entitled "Nassau Urban County Consortium Five Year (2005-2009) Consolidated Plan & Annual Action Plan," NYAHC001063-1597.

54.     Attached hereto as **Exhibit 49** is a true and correct copy of Plaintiffs' Exhibit 91, C. Schroeter Dep., June 4, 2003 memorandum from S. Cohen regarding Garden City Zoning Recommendations, CNTY016730-31.

55.     Attached hereto as **Exhibit 50** is a true and correct copy of Plaintiffs' Exhibit 92, C. Schroeter Dep., undated draft letter from C. Schroeter to S. Cohen and C. Senior, CNTY00345.

56.     Attached hereto as **Exhibit 51** is a true and correct copy of Plaintiffs' Exhibit 93, C. Schroeter Dep., December 23, 2003 e-mail from C. Friedman regarding "Garden City zoning letter," CNTY023345-48.

57.     Attached hereto as **Exhibit 52** is a true and correct copy of Plaintiffs' Exhibit 98, C. Schroeter Dep., July 22, 2004 e-mail from S. Cohen to W. Tripp Jr. et al. regarding "Thanks for all your help," attaching Real Estate Consolidation outline and chart, CNTY025218-20.

58.     Attached hereto as **Exhibit 53** is a true and correct copy of Plaintiffs' Exhibit 115, B. Miller Dep., January 8, 2004 minutes of Incorporated Village of Garden City Public Hearing, ACORN002319-62.

59.     Attached hereto as **Exhibit 54** is a true and correct copy of Plaintiffs' Exhibit 116, B. Miller Dep., February 5, 2004 minutes of Incorporated Village of Garden City Public Hearing, ACORN002363-434.

60.     Attached hereto as **Exhibit 55** is a true and correct copy of Plaintiffs' Exhibit 117, B. Miller Dep., May 20, 2004 minutes of Incorporated Village of Garden City Board of Trustees Meeting, ACORN002435-509.

61.     Attached hereto as **Exhibit 56** is a true and correct copy of Plaintiffs' Exhibit 120, B. Miller Dep., August 18, 2004 minutes of meeting with Mayor Miller and ACORN, VGC04813-17.

62.     Attached hereto as **Exhibit 57** is a true and correct copy of Plaintiffs' Exhibit 129, S. Cohen Dep., September 27, 2002 memorandum from the "P-Zone" Committee to Mayor Lewis, Subject "Progress to Date," CENTRALPOA000063-65.

63.     Attached hereto as **Exhibit 58** is a true and correct copy of Plaintiffs' Exhibit 155, S. Cohen Dep., October 28, 2004 letter from Fairview Properties, Inc. regarding Final Offer, CNTY00695-96.

64.     Attached hereto as **Exhibit 59** is a true and correct copy of Plaintiffs' Exhibit 175, T. Suozzi Dep., April 19, 2005 article "Long Island has Failed to Stem Segregation, a Group Charges," *The New York Times*.

65.     Attached hereto as **Exhibit 60** is a true and correct copy of Plaintiffs' Exhibit 177, T. Suozzi Dep., August 23, 2004, letter from T. Suozzi to J. Claffey, ACORN000119.

66.     Attached hereto as **Exhibit 61** is a true and correct copy of Plaintiffs' Exhibit 178, T. Suozzi Dep., May 8, 2006 E-mail from J. Calderone regarding Nassau County Press

6

Release "Suozzi Calls for Development of 'Next Generation' Housing in Garden City," CNTY022249-50.

67.    Attached hereto as **Exhibit 62** is a true and correct copy of Plaintiffs' Exhibit 179, T. Suozzi Dep., May 19, 2006 article "'Next Generation' Housing Proposed Near Roosevelt Field Mall," *Garden City Life*, *Online Edition*, ACORN000519-21.

68.    Attached hereto as **Exhibit 63** is a true and correct copy of Plaintiffs' Exhibit 180, T. Suozzi Dep., Web Messages and inter-departmental memoranda memorializing calls to the Office of the County Executive.

69.    Attached hereto as **Exhibit 64** is a true and correct copy of Plaintiffs' Exhibit 188, P. Bee Dep., May 19, 2006 letter to the editor "No to Housing," *Garden City News*, CNTY06003.

70.    Attached hereto as **Exhibit 65** is a true and correct copy of Plaintiffs' Exhibit 189, P. Bee Dep., June 20, 2006 web message to T. Suozzi, CNTY05951.

71.    Attached hereto as **Exhibit 66** is a true and correct copy of Plaintiffs' Exhibit 191, P. Negri Dep., January 20, 2004 minutes of the Eastern Property Owners' Association of Garden City General Meeting and Resident Electors' Meeting, EPOA0026-30.

72.    Attached hereto as **Exhibit 67** is a true and correct copy of Defendants' Exhibit A, A. Sullivan Dep., July 2004 Nassau County Request for Proposal +/- 25-Acre Development Site, Garden City, Long Island, New York, NYAHC000473-533.

73.    Attached hereto as **Exhibit 68** is a true and correct copy of Defendants' Exhibit E, A. Sullivan Dep., September 10, 2004 letter from NYAHC to T. Suozzi with fax coversheets, NYAHC000444-64.

74.    Attached hereto as **Exhibit 69** is a true and correct copy of Defendants' Exhibit H, I. Speliotis Dep., NYAHC spreadsheet, alternative development plan, NYAHC000739-837.

75.    Attached hereto as **Exhibit 70** is a true and correct copy of Defendants' Exhibit I, I. Speliotis Dep., July 22, 2004 memorandum from I. Speliotis to A. Sullivan regarding Garden City 25 acre development site, NYAHCE000209-10.

76.    Attached hereto as **Exhibit 71** is a true and correct copy of Defendants' Exhibit J, A. Sullivan Dep., May 26, 2004 letter from NYAHC to Nassau County Planning Commission, NYAHC000466-68.

77.    Attached hereto as **Exhibit 72** is a true and correct copy of Defendants' Exhibit K, I. Speliotis Dep., December 2004 ACORN report "Chronology of Affordable Housing Fight on Long Island" with fax coversheet dated January 4, 2005, ACORN004318-37.

78. Attached hereto as **Exhibit 73** is a true and correct copy of Expert Exhibit 3, P. Marcuse Dep., Peter Marcuse Expert Report: List of Sources Consulted, PM000557-63.

79. Attached hereto as **Exhibit 74** is a true and correct copy of Expert Exhibit 12, P. Cleary Dep., Code of the Village of Garden City, New York (Nassau County), Updated 08-15-2008 (Supp No. 53).

80. Attached hereto as **Exhibit 97** is a true and correct copy of Plaintiffs' Exhibit 167, G. Lundquist Dep., April 1, 2004 BFJ CO-5b Zoning Discussion Social Services Site, Notes for Discussion, VGC376-77.


## OTHER PRODUCED DOCUMENTS

81. Attached hereto as **Exhibit 75** is a true and correct copy of the December 11, 1969 article "A Day-Care Plan Stirs L.I. Wrath," *The New York Times*, PM000001.

82. Attached hereto as **Exhibit 76** is a true and correct copy of the May 16, 1971 article "Day-Care Center is Delayed on L.I.," *The New York Times*, PM000003.

83. Attached hereto as **Exhibit 77** is a true and correct copy of the March 27, 1970 article "Garden City is Sued Over Church Center," *The New York Times*, PM000004.

84. Attached hereto as **Exhibit 78** is a true and correct copy of the April 21, 1989 article "Moratorium Bars Action On New Doubleday Plan," *The Garden City News*, PM000005.

85. Attached hereto as **Exhibit 79** is a true and correct copy of the May 5, 1989 article "Residents Urge Village to Extend Moratorium," *The Garden City News,* PM000054-55.

86. Attached hereto as **Exhibit 80** is a true and correct copy of the September 1, 2006 article "L.I.'s Garden City Hotel changes to exclude night clubs, cabarets or discotheques," *Long Island Business News*, PM000145-46.

87. Attached hereto as **Exhibit 81** is a true and correct copy of the 2004 article "Results of Garden City Property Owners' Associations (POAs) Public Opinion Survey Regarding St. Paul's," Adelphi University, PM000215-20.

88. Attached hereto as **Exhibit 82** is a true and correct copy of the February 13, 1987 article "One Year Building Ban Imposed by Village," *The Garden City News*, PM000221.

89. Attached hereto as **Exhibit 83** is a true and correct copy of the April 14, 1989 article "Board Schedules Hearing on Master Plan Update," *The Garden City News*, PM000225.

90. Attached hereto as **Exhibit 84** is a true and correct copy of the November 7, 2003 article "Taking Another Look at Garden City's Public Use Zone," *The Garden City News*, ACORN000549-52.

91.     Attached hereto as **Exhibit 85** is a true and correct copy of the November 15, 2002 Nassau County Economic Development Plan, ACORN001763-1841.

92.     Attached hereto as **Exhibit 86** is a true and correct copy of the August 2004 draft Analysis of Impediments to Fair Housing Choice, 2004, CNTY025755-880.

93.     Attached hereto as **Exhibit 87** is a true and correct copy of a list of County-owned properties sold to non-profit housing organizations, CNTY026447.

94.     Attached hereto as **Exhibit 88** is a true and correct copy of an undated spreadsheet entitled "Office of Housing & Homeless Services Tracking," CNTY026535.

95.     Attached hereto as **Exhibit 89** is a true and correct copy of a June 2008 "DRAFT Existing Public/Assisted/Affordable Housing Resources," CNTY026952-60.

96.     Attached hereto as **Exhibit 90** is a true and correct copy of March 9, 2004 minutes of the Eastern Property Owners' Association of Garden City Board of Directors Meeting, EPOA0037-42.

97.     Attached hereto as **Exhibit 95** is a true and correct copy of November 11, 2003 minutes of the Eastern Property Owners' Association of Garden City Board of Directors Meeting, EPOA0008-12.

98.     Attached hereto as **Exhibit 96** is a true and correct copy of the April 9, 2004 article "Consultant Makes P-Zone Proposal," *The Garden City News*, ACORN000584-85.

99.     Attached hereto as **Exhibit 98** is a true and correct copy of the October 24, 2003 article "Letters to the Editor: Add St. Paul's School to 'Seven to Save' List," *Garden City Life*, *Online Edition*, ACORN000544-48.

100.    Attached hereto as **Exhibit 101** is a true and correct copy of Nassau County's Analysis of Impediments and Fair Housing Plan, Prepared by the Nassau County Office of Community Development on behalf of the County of Nassau and the Nassau County Urban County Consortium, dated July 21, 2010, with excerpted Appendices, produced by Nassau County in February 2011.

101.    Attached hereto as **Exhibit 102** is a true and correct copy of the November 19, 2003 letter from P. Bee to Mayor Miller, VGC526, attached as Exhibit AH to the Declaration of Ralph J. Reissman, dated March 31, 2009.

102.    Attached hereto as **Exhibit 103** is a true and correct copy of the October 8, 2002 memorandum from R. Schoelle to Garden City Property Owners' Associations, ACORN002136-38, attached as Exhibit L to the Declaration of Ralph J. Reissman, dated March 31, 2009.

9

103. Attached hereto as **Exhibit 104** is a true and correct copy of the Nassau Urban County Consortium Five Year (2010-2014) Consolidated Plan & Annual Action Plan, with excerpted Appendices, produced by Nassau County in February 2011.

104. Attached hereto as **Exhibit 105** is a true and correct copy of the October 31, 2008 Working Draft of the Economics Research Associates Nassau County Affordable Housing Study Prepared for the Nassau County Office of Housing and Intergovernmental Affairs (OHIA) and Office of Housing and Homeless Services (OHHS), attached as Exhibit J to the Affidavit of Kevin J. Crean in Support of Defendant Nassau County's Motion for Summary Judgment, dated March 10, 2011.

105. Attached hereto as **Exhibit 106** is a true and correct copy of a study entitled "Whites Only: Racial Discrimination in the Nassau County Real Estate Market and in the Public School System," published by New York ACORN Long Island, dated February 2004, ACORN006051-80.

106. Attached hereto as **Exhibit 107** is a true and correct copy of the Nassau Urban County Consortium End of the Year Reporting Narratives for IDIS for Fiscal Year 2009, produced by Nassau County in February 2011.

107. Attached hereto as **Exhibit 108** is a true and correct copy of the Nassau Urban County Consortium End of the Year Reporting Narratives for IDIS for Fiscal Year 2008, as included in the Nassau County Urban County Consortium Consolidated Annual Performance Evaluation Report (CAPER) for Program Year 2008, produced by Nassau County in February 2011.

**PUBLICLY AVAILABLE DOCUMENTS**

108. Attached hereto as **Exhibit 91** is a true and correct copy of a May 14, 2006 article, "The Forbidden Garden," *The New York Times*, available at http://www.nytimes.com/2006/05/14/opinion/LI_Housing.html, last accessed on August 30, 2011.

109. Attached hereto as **Exhibit 109** is a true and correct copy of The Racial Equity Report Card: Fair Housing on Long Island: A Report from ERASE Racism, released March 2009, available at http://www.eraseracismny.org/html/library/housing/resources/published_reports/ERASE _Housing_reportcard_final_2009.pdf, last accessed on August 30, 2011.

110. Attached hereto as **Exhibit 110** is a true and correct copy of the Nassau County Interim Finance Authority Resolution No. 11, dated January 26, 2011, available at http://www.nifa.state.ny.us/docs/ControlResolution.pdf, last accessed on August 30, 2011.

111. Attached hereto as **Exhibit 111** is a true and correct copy of *County of Nassau v. County Interim Finance Authority*, No. 001455-11, 2001 WL 1044556 (Sup. Ct. Nassau Cnty. March 11, 2001).

112.  Attached hereto as **Exhibit 112** is a true and correct copy of *Kenny v. the Board of Trustees of the Incorporated Village of Garden City*, 3/21/2001 N.Y.L.J. 21 (col. 2) (Sup. Ct. Nassau Cnty. March 21, 2001).

113.  Attached hereto as **Exhibit 113** is a true and correct copy of *Unitarian Universalist Church of Central Nassau v. Shorten*, 63 Misc.2d 978, 314 N.Y.S.2d 66 (Sup. Ct. Nassau Cnty. 1970).

114.  Attached hereto as **Exhibit 114** is a true and correct copy of *Unitarian Universalist Church of Central Nassau v. Shorten*, 316 N.Y.S.2d 837 (Sup. Ct. Nassau Cnty. 1970).

115.  Attached hereto as **Exhibit 115** is a true and correct copy of the Complaint filed in *Association of Community Organizations for Reform Now v. Anne Hagen Village Realty of Garden City* on January 11, 2005, Index No. 05-0151 (E.D.N.Y.) (Dkt. No. 1).

116.  Attached hereto as **Exhibit 116** is a true and correct copy of the So Ordered Stipulation of Dismissal filed in *Association of Community Organizations for Reform Now v. Anne Hagen Village Realty of Garden City* on January November 4, 2006, Index No. 05-0151 (E.D.N.Y.) (Dkt. No. 19).

117.  Attached hereto as **Exhibit 117** is a true and correct copy of the Complaint filed in *Association of Community Organizations for Reform Now v. Garden City Properties, Inc.* on January 11, 2005, Index No. 05-0153 (E.D.N.Y.) (Dkt. No. 1).

118.  Attached hereto as **Exhibit 118** is a true and correct copy of the So Ordered Stipulation of Discontinuance filed in *Association of Community Organizations for Reform Now v. Garden City Properties, Inc.* on August 25, 2005, Index No. 05-0153 (E.D.N.Y.) (Dkt. No. 10).

119.  Attached hereto as **Exhibit 119** is a true and correct copy of the Complaint filed in *Association of Community Organizations for Reform Now v. Silvana Bosco* on January 11, 2005, Index No. 05-0148 (E.D.N.Y.) (Dkt. No. 1).

120.  Attached hereto as **Exhibit 120** is a true and correct copy of the So Ordered Stipulation of Dismissal filed in *Association of Community Organizations for Reform now v. Silvana Bosco* on June 24, 2006, Index No. 05-0148 (E.D.N.Y.) (Dkt. No. 42).

121.  Attached hereto as **Exhibit 121** is a true and correct copy of the Complaint filed in *Association of Community Organizations for Reform Now v. Jimco Century 21* on January 11, 2005, Index No. 05-0149 (E.D.N.Y.) (Dkt. No. 1).

122.  Attached hereto as **Exhibit 122** is a true and correct copy of the Stipulation and Order of Final Dismissal with Prejudice filed in *Association of Community Organizations for Reform Now v. Jimco Century 21* on June 30, 2006, Index No. 05-0149 (E.D.N.Y.) (Dkt. No. 22).

11

**EXPERT REPORTS**

123.    Attached hereto as **Exhibit 92** is a true and correct copy of the Expert Report of Patrick Cleary, dated November 7, 2008.

124.    Attached hereto as **Exhibit 93** is a true and correct copy of the Expert Report of Peter Marcuse, dated September 12, 2008.

125.    Attached hereto as **Exhibit 94** is a true and correct copy of the Expert Report of Nancy McArdle, dated September 12, 2008.

**OTHER**

126.    Attached hereto as **Exhibit 126** are true and correct copies of letters from Stanley Brown to Ralph Reissman, dated August 18, 2010, August 25, 2010, August 30, 2010, September 2, 2010, September 15, 2010, September 22, 2010, December 1, 2010, January 4, 2011, August 18, 2011, and August 29, 2011.


New York, New York
August 31, 2011


/s/ Stanley J. Brown_____
Stanley J. Brown

12

**JA 132**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
MHANY MANAGEMENT INC., VIC DEVITA,
AND FRANCINE MCCRAY,

                    Plaintiffs,

and

NEW YORK COMMUNITIES FOR CHANGE,
INC.,
                    Plaintiff-Intervenor,

        -against-

COUNTY OF NASSAU, INCORPORATED
VILLAGE OF GARDEN CITY, AND GARDEN
CITY BOARD OF TRUSTEES,

                    Defendants.
------------------------------------------------------------X

**AMENDED COMPLAINT IN INTERVENTION FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

05-CV-2301 (ADS) (WDW)

## INTRODUCTION

On February 15, 2012, the Court granted Plaintiff-Intervenor New York

Communities for Change's (NYCC) motion to amend the Complaint in Intervention for

Declaratory Judgment and Injunctive Relief filed on June 30, 2010 to include an additional cause

of action for violations of the Civil Rights Act of 1871, 42 U.S.C. §1983 and the Equal Protection

Clause of the Fourteenth Amendment. In conformance with that and other parts of the February 15th

Memorandum of Decision and Order, the Court directed NYCC to file an amended complaint only as

against the Garden City Defendants within 20 days of the date of this Order. This Amended

Complaint in Intervention is filed by Plaintiff-Intervenor NYCC pursuant to this Order, and in

conformance with the Order, the Amended Complaint in Intervention is asserted only against the

Incorporated Village of Garden City and Garden City Board of Trustees.

## AMENDED COMPLAINT IN INTERVENTION FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Plaintiff-Intervenor New York Communities for Change, Inc., by and through its undersigned attorneys, as and for its Complaint alleges as follows:

### I.    NATURE OF ACTION

1.    Plaintiff-Intervenor New York Communities for Change, Inc. ("NYCC") is a nonprofit membership organization devoted to improving the quality of life for members of low and moderate income communities in New York.  Many members of NYCC live in Long Island and have been deprived of the opportunity to live in an integrated community by the housing segregation and racially discriminatory housing practices that are pervasive throughout Nassau County.  By this housing discrimination action, Plaintiff-Intervenor joins existing Plaintiffs in seeking redress for ongoing exclusionary housing practices by defendants Nassau County (the "County"), the incorporated Village of Garden City ("the Village"), the Garden City Board of Trustees (the "Board of Trustees") and others acting with, or on behalf of, the defendants Village and County (collectively, "Defendants").  This action challenges defendant County's ongoing discriminatory acts and long-standing pattern and practice of preventing African-American, other Black and Hispanic persons from residing in predominantly white communities of Nassau County and, specifically, the recent and imminent acts of the Defendants that effectively prevent affordable multi-family housing opportunities from being developed on a 25-acre parcel of County-owned property in Garden City, thereby perpetuating not only the exclusion of minorities from the overwhelmingly white enclave of Garden City, but also the pattern of racial and ethnic housing segregation in Nassau County generally, which is already one of the most segregated counties in the entire United States.  By these and other illegal and discriminatory

2

acts, the defendants have violated the rights of Plaintiff-Intervenor's members under the Fair Housing Act, as amended, 42 U.S.C. § 3601, *et seq.*; the Civil Rights Act of 1866, 42 U.S.C. §§ 1981, 1982 and 1983; the "affirmatively furthering" obligations of the Fair Housing Act, 42 U.S.C. § 3608; and the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.*

## II. JURISDICTION AND VENUE

2. Jurisdiction is conferred on this Court by 42 U.S.C. § 3613 and by 28 U.S.C. §§ 1343 and 2201.

3. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b), (c). Defendants all reside in this judicial district; the events or omissions giving rise to the claims herein occurred in this district; and the property at issue is situated in this judicial district.

## III. PARTIES

4. Plaintiff-Intervenor New York Communities for Change, Inc. ("NYCC") is a nonprofit corporate entity organized and existing under the laws of the State of New York. NYCC asserts the claims herein on behalf of its members.

5. NYCC filed its certificate of incorporation on December 31, 2009, and had a growing membership of between 200 and 300 New York residents as of March 31, 2010, with approximately 40 members in Nassau County in Long Island.

6. NYCC's mission is to improve the lives of members of low and moderate income communities in New York by promoting social and economic justice. It seeks to do so through advocating for affordable housing, working to eliminate racial and economic discrimination in housing and other areas, and organizing tenants.

7. The members of NYCC have been deprived of the opportunity to live in an integrated community by the housing segregation and racially discriminatory housing practices

3

that are pervasive throughout Nassau County. Such housing segregation and racially discriminatory housing practices further frustrate efforts of NYCC members to find affordable housing in communities other than those that are already predominately populated by minorities.

8.      Defendant County of Nassau (the "County" or "County Government") is a municipal corporation organized under the laws of the State of New York, having its principal offices located at 1 West Street, Mineola, New York, 11501. All references to defendant County include any individual or entity acting on behalf of, or under the authority derived from, the County, including, but not limited to, the Nassau County Planning Commission ("County Planning Commission"), and the Nassau County Office of Real Estate Planning and Development (the "County REP&D").

9.      Defendant Incorporated Village of Garden City, New York (the "Village") is a municipal corporation organized under the laws of the State of New York, having its principal offices located at 351 Stewart Avenue, Garden City, New York, 11530. All references to the Village include any individual or entity acting on behalf of, or under the authority derived from, the Village.

10.     Defendant Garden City Board of Trustees (the "Board of Trustees") (together with the Village, the "Garden City Defendants") is an elected governing body in Garden City, having its principal offices located at 351 Stewart Avenue, Garden City, New York, 11530, from which the Garden City offices responsible for all development in Garden City derive their authority. All references to the Board of Trustees include any individual or entity acting on behalf of, or under authority derived from, the Board of Trustees.

4

## IV.  FACTUAL BACKGROUND

**Nassau County's Historic Pattern**
**and Policy of Housing Segregation**

11.     Housing in Nassau County is highly segregated by race and ethnicity, making Nassau County one of the most racially segregated counties in all of the United States.

12.     Approximately 80% of the residents of Nassau County are white and approximately 17% of the residents of Nassau County are African-American, other Blacks, or Hispanics (hereinafter, "minority").

13.     Approximately 84% of white Nassau County residents live in non-integrated, virtually all white communities, whereas approximately 64% of the minority residents of Nassau County live in communities that contain predominantly minority residents.

14.     The foregoing custom, pattern, practice and usage of racially and ethnically segregated housing that exists in Nassau County has been caused, perpetuated and reinforced by the custom, pattern and practice of discriminatory actions, policies and practices of defendant County for many decades.

15.     Minorities residing in Nassau County have a disproportionate need for affordable multi-family housing that is not restricted to elderly persons (that is to say, "non-age restricted" housing).  The County Government is fully aware that such non-age restricted affordable housing is disproportionately needed by – and used by – minorities.  However, it is, and for many years has been, an express policy and practice of the County Government to develop and promote the development of non-age restricted affordable housing only in predominantly minority and low-income areas of Nassau County and to exclude such affordable housing from areas that are predominantly populated by white people.

5

16.     The County Government has also adopted a policy of supporting, encouraging, facilitating, and acquiescing in the efforts by local zoning authorities in the towns and villages located within Nassau County to enact exclusionary zoning laws and ordinances that often, *inter alia*, prevent the development of non-age restricted affordable multi-family housing, and it has done so with the purpose, intent or foreseeable effect of perpetuating racial and ethnic housing segregation throughout Nassau County and creating identifiable enclaves of nearly all-white residential communities, such as Garden City. This express policy amounts to racial steering by the County Government.

17.     The County Government's own housing policies and practices also cause, perpetuate, and reinforce housing segregation on the basis of race, color and national origin. With full knowledge and awareness that the minorities in Nassau County have a disproportionate need for affordable housing in Nassau County, the County Government maintains, and for many years has persisted in maintaining, an express and deliberate policy and practice of causing and steering such affordable housing to be constructed only in a small number of lower income and predominantly minority communities such as Roosevelt, Inwood, Hempstead Village, New Cassel and Freeport, and it has done so with the purpose, intent or foreseeable effect of perpetuating racial and ethnic housing segregation throughout Nassau County.

18.     As a direct and foreseeable consequence of the aforementioned deliberate policy and practice, nearly all of the government subsidized, non-age restricted affordable housing developments in Nassau County are situated in predominantly minority census blocks.

19.     The County Government has received, and continues to receive federal subsidized housing funds from the Community Development Block Grant ("CDBG") program and HOME

6

program. The County Government's customs, patterns and practices with respect to its use of these funds cause, perpetuate and reinforce racial and ethnic housing segregation and constitute overt racial steering. The CDBG and HOME programs require, among other things, the County Government "affirmatively to further" fair housing. Specifically, the County Government must use the funds in a manner that promotes racial integration rather than perpetuating racial and ethnic segregation, must collect and consider data documenting, and must evaluate the impact of its CDBG and HOME expenditures on racial and ethnic housing segregation.

20.     In derogation of its affirmative obligations, the County Government maintains, and for many years has maintained, a policy and practice of directing HOME funds to local governments and non-profit entities to acquire sites for the development of non-age restricted affordable housing only in low and moderate income communities with a disproportionately minority population, but not in predominantly white communities and segregated white enclaves like Garden City. The County Government has done so with the purpose, intent or foreseeable effect of perpetuating racial and ethnic housing segregation throughout Nassau County.

21.     In derogation of its affirmative obligations, the County Government has not used its CDBG funds in a manner that promotes racial integration, but instead the County Government maintains, and for many years has maintained, an express and deliberate discriminatory policy of using CDBG funds to support the development of non-age restricted affordable housing disproportionately in areas of Nassau County that it knows or should know are already predominated by minority residents and it as done so with the purpose, intent, or foreseeable effect of perpetuating racial and ethnic housing segregation throughout Nassau County.

7

22.     In derogation of its affirmative obligations, the County Government has persistently and knowingly failed and refused to develop an "Analysis of Impediments to Fair Housing" to analyze fair housing needs and residential segregation, which is a basic prerequisite to fulfill its "affirmative obligation" to promote fair housing.

23.     In derogation of its affirmative obligations, the County Government has persistently and knowingly failed and refused to track or document the effect of its CDBG and HOME expenditures on perpetuating segregation, so as to conceal and obscure the manifestly segregative effect of its CDBG and HOME programs on housing throughout Nassau County.

24.     In furtherance of its policy and practice of perpetuating and reinforcing segregated housing patterns in Nassau County, the County Government maintains, and for many years has maintained, an express and deliberate policy and practice of fostering the development of subsidized senior housing only or disproportionately on sites that are located in predominantly white areas of Nassau County, even though it knows that a disproportionate percentage of the residents of such housing are and will be white persons.  As a direct and foreseeable consequence of the aforementioned policies and practices of the County Government, most of the subsidized senior developments are located in census blocks where the vast majority of the population is white.

25.     The defendant County's policies and practices with respect to its use and development of County-owned real estate further cause, perpetuate and reinforce the racially and ethnically segregated housing patterns that persist in Nassau County.  The County Government maintains, and for many years has persisted in maintaining, a policy and practice of disallowing County-owned properties located in predominantly white communities of Nassau County to be

8

sold to housing developers who it knows or believes will build affordable and integrated multi-family housing opportunities (and/or has reached agreements as to redevelopment plans to prevent such development). By contrast, the County Government maintains a policy and practice of affirmatively promoting the sale of County-owned property in predominantly minority communities to developers of affordable multi-family housing, and it has done so with the purpose, intent or foreseeable effect of perpetuating racial and ethnic housing segregation throughout Nassau County.

26.     Thirty-six years ago in January 1974, the U.S. District Court in *Acevedo et al. v. Nassau County et al.*, expressly found that opposition to affordable and integrated housing in Nassau County is racially motivated:

> By far, however, the most objectionable form of housing has been low-income family housing. It is clear from all the evidence that community opposition to this form of housing has been racially motivated. In Nassau County low-income family housing is predominantly occupied by Blacks. Proposals for the construction of this form of housing have incurred immediate and vehement opposition. As can be expected such heated opposition has not been ignored by the elected officials of Nassau. There is evidence of more than one housing proposal being dropped because of vehement community opposition.

*Acevedo et al. v. Nassau County et al.*, 369 F. Supp. 1384, 1389 (E.D.N.Y. 1974).

27.     Notwithstanding, and with actual or constructive knowledge of, a judicial finding of this Court that community opposition to affordable multi-family housing is racially motivated, the County Government maintains, and for more than 36 years has maintained, the policy and practice of acquiescing in and impliedly consenting to neighborhood and community opposition to the development of affordable multi-family housing and other housing that provides integrated housing opportunities disproportionately needed by minorities or to proposed local laws or

9

ordinances that would foster or permit such housing developments, and it has done so with the purpose, intent and foreseeable effect of perpetuating racial and ethnic housing segregation throughout Nassau County.

## Garden City's History of Housing Segregation

28.     Defendant Village has cooperated with, facilitated and affirmatively acquiesced in the County Government's segregative policies and practices, including those that target the placement of non-age restricted affordable multi-family housing only in predominantly minority communities of Nassau County but not in predominantly white communities or in white residential enclaves like Garden City.

29.     Garden City is, and has been for decades, a highly segregated, nearly all-white residential enclave, located near the center of Nassau County.

30.     The population of Garden City is approximately 95% white; approximately 1% of the Garden City population is African-American.

31.     The Village of Hempstead, which directly borders Garden City on the South, has a population of which approximately 84% are minority.  Uniondale, which is located Southeast of Garden City, has a population of which approximately 79% are minority.  The Village of Westbury, which is located Northwest of Garden City, has a population of which approximately 43% minority.

32.     Defendant Village has continuously acted to reject and obstruct the creation of any affordable and integrated multi-family housing opportunities by engaging in exclusionary zoning practices, and it has done so with the purpose, intent or foreseeable effect of excluding

10

minorities from residing within the borders of Garden City and thereby perpetuating racial and ethnic housing segregation in Garden City itself and throughout Nassau County, generally.

33.     In or about April 1989, developers of a 18-acre parcel previously owned by Doubleday & Co., Inc. located at 501 Franklin Avenue in Garden City ("Doubleday Site") proposed a plan to redevelop the Doubleday Site that would have included 51 units of affordable housing under then-current zoning ("Proposed Doubleday Site Development"). Faced with objections from Garden City residents, defendant Village rejected the Proposed Doubleday Site Development and adopted a plan that eliminated the possibility of an affordable housing development on the Doubleday Site.

34.     Despite its opposition to the construction of affordable multi-family housing that would be likely to attract a significant proportion of minority residents, defendant Village has not blocked the development of other multi-family housing and apartment buildings that by their design are likely to be inhabited by predominantly white residents. For example, the Wyndham, completed in 1989, is a two building, 9-story complex consisting of 316 luxury condominiums and rental apartments on 12 acres of land. The size and density of the Wyndham is significantly greater than the affordable, multi-family housing which faced staunch opposition in the present case. By its past actions, defendant Village has encouraged and permitted the building of luxury multi-family housing, like the Wyndham, in Garden City that it knew or should have known would be inhabited by only or virtually only white residents.

35.     Upon information and belief, with actual or constructive knowledge that government-subsidized, multi-family unit housing is likely to attract a significant proportion of minority residents and provide an opportunity for racially integrated housing for residents of

11

Garden City and the surrounding communities, the defendant Village has not permitted the construction of even a single instance of such housing within the boundaries of Garden City.

36.     Consistent with and in furtherance of its policy of maintaining Garden City as, for all intents and purposes, an entirely white residential enclave within Nassau County, officials of defendant Village have engaged in open and notorious conduct to exclude minority persons from Garden City, its public parks, public streets and public schools.  Examples of such conduct includes (1) in 1970, defendant Village denied, after receiving objections from Garden City residents, an application by the Unitarian Universalist Church to operate a daily day care center in Garden City to serve 35 children, most of whom would be African-American and from low-income households in neighboring towns; (2) as was recently found by the New York State Attorney General's Office, defendant Village discriminatorily excludes minorities from using its public parks by regularly asking non-white, non-residents to leave the parks and permitting white non-residents to use its parks; and (3) numerous African-Americans have reported incidents of being harassed by Village police while walking, jogging, driving and shopping in Garden City.

**The Social Services Site: An Opportunity**
**for Affordable Racially Integrated and Diverse Housing**

37.     In or about May 2002, the County Government began drafting a Real Estate Consolidation Plan ("Consolidation Plan").  The purpose of the Consolidation Plan was to inventory the approximately 2500 County-owned properties, to consolidate County Government operations, and to sell certain County-owned properties that would no longer be necessary for County Government operations.

38.     Among the subjects of the Consolidation Plan was certain property located in Garden City known as the "Mineola Complex", which houses a courthouse, certain

12

**JA 144**

administration buildings, and parking facilities. Within the Mineola Complex is a parcel of approximately 25 acres of land located at 101 County Seat Drive, Garden City, known as the "Social Services Site".

39.     The 25-acre Social Services Site consists chiefly of 21.44 acres located on the eastern side of County Seat Drive on which a social services building and a parking lot are situated, and an additional 3.03 acres located on the Western side of County Seat drive on which the Old Laboratory Building and County Garage are situated.

40.     Throughout its preparation of the Consolidation Plan, the Nassau County defendants consulted with the Garden City Board of Trustees to discuss the plans for the Mineola Complex and specifically for the Social Services Site.

41.     The County Government issued its Consolidation Plan in December 2003 which called for, *inter alia*, the relocation of all the governmental operations then performed at the Social Services Site, and consolidating such operations with those performed at the County's facility in neighboring Uniondale. The Consolidation Plan further called for the sale of the Social Services Site to a private developer.

42.     The defendant County requested the defendant Village's cooperation in rezoning the Mineola Complex, including the Social Services Site. At the time, the Social Services Site was zoned "P," that is to say, for public use. The County Government sought to rezone the Social Services Site to allow for non-governmental uses, which would facilitate the sale of the Social Services Site to a private developer. Throughout their planning of the rezoning and redevelopment of the Social Services Site, the County Government and the Garden City Defendants cooperated, facilitated, and coordinated their efforts.

13

43.     The defendant County knew or reasonably should have known that the Social
Services Site presented a uniquely attractive opportunity to address the County's need for
affordable integrated housing opportunities, since it was centrally-located, publicly-owned, well-
served by public transportation, situated nearby to uses compatible with affordable multi-family
housing, including retail establishments and employment opportunities, and lacked barriers that
the County has frequently identified as impediments to the development of affordable multi-
family housing, such as land availability and willing developers.

**The Original Proposed Plan and Its**
**Significant Housing Opportunities for Minorities**

44.     In response to the County Government's request, the Board of Trustees appointed
a "P Zone Committee" to address issues relating to the Mineola Complex and hired planning
consultants, the firm of Buckhurst Fish & Jacquemart Inc. ("BFJ"), to assist the Garden City
Defendants in drafting rezoning proposals in response to the County Government's plan to sell
and redevelop the Social Services Site.

45.     During 2003, Garden City's P Zone Committee and BFJ held public workshops to
discuss the development of the Social Services Site.

46.     During 2003 BFJ and the P Zone Committee also met with representatives of the
County Defendants to discuss issues related to the County's proposed real estate consolidation,
including among other things, the Village's future zoning of the Mineola Complex and the Social
Services Site.

47.     In its final proposal, BFJ recommended that a new zoning designation of "CO-5b"
be used for the Social Services Site ("Proposed Zoning").  Under the Proposed Zoning, the CO-

14

5b zoning would use existing residential multi-family zoning controls (commonly referred to as "R-M" zoning) and would allow single-family homes, townhomes and multi-family apartments.

48.     Under the Proposed Zoning, and consistent with the existing R-M zoning, a multi-family dwelling would be subject, *inter alia,* to the following limitations: a maximum building height of 35 feet or two and a half stories; a restriction that the dwelling cover no more than 25% of the plot; a minimum of 25% of the plot must be open space; and the maximum number of multi-family housing units equal to one unit per 3000 square feet, or 14.5 units per acre. The Proposed Zoning therefore allowed for a maximum of 355 affordable multi-family units to be constructed on the 25-acre Social Services Site.

49.     In its proposal, and in accordance with the Proposed Zoning, BFJ contemplated the construction of a 311-unit multi-family housing development on the Social Services Site ("Proposed Plan"), with each unit of sufficiently small size (approximately 1000 square feet per unit) and of sufficiently dense lot size as a whole so as to make it economically feasible for a developer of affordable multi-family housing to develop such housing.

50.     The Proposed Plan as developed by BFJ expressly stated that the Proposed Zoning permitted the development of housing that fit well with existing uses around the Social Services Site, which sits in a transitional area between single-family houses, retail/commercial areas, public/governmental offices and multi-story parking garages.

51.     Under the Proposed Plan, a developer could have constructed 311 affordable apartments and, therefore, could have created a substantial number of racially integrated housing opportunities disproportionately needed by minorities in Nassau County. The Proposed Plan represented a meaningful step forward towards attenuating the persistent racial and ethnic

15

housing segregation that existed in Garden City, its surrounding communities and Nassau County.

**Neighborhood Opposition to the**
**Possibility of Integrated Housing**

52.    On January 8 and February 5, 2004, the Garden City Defendants held hearings on the Proposed Zoning of the Mineola Complex and the Social Services Site.

53.    During those public hearings, Garden City residents vociferously objected to the construction of affordable multi-family housing on the Social Services Site, and sought repeated assurances from Garden City Defendants and County officials present that no such affordable multi-family housing would be built on the Social Services Site. Upon information and belief, the public opposition was racially-motivated.

54.    In accordance with its long-standing policy and practice, the defendant County acquiesced in neighborhood and community opposition to the development of affordable housing on the Social Services Site and cooperated with, facilitated, and affirmatively supported in the Village's segregative zoning policies and practices by assuring Garden City residents, during the public hearings and at other times, that the County would not take any action antagonistic to Garden City's wishes and by agreeing to act in concert with the Garden City Defendants to reject the Proposed Plan and to permit only luxury housing to be built on the Social Services Site.

55.    In direct response to the aforementioned neighborhood and community opposition, the County Government, by its County Executive the Honorable Thomas R. Suozzi, acting consistent with and in furtherance of the County's long-standing policy and practice of acquiescing to neighborhood and community opposition of white residents to any housing developments likely to encourage or facilitate racially and ethnically integrated and diverse

16

housing and acting, further, with conscious knowledge and awareness that affordable multi-family housing was actually needed in Nassau County and, in particular, those areas of Nassau County near to and around Garden City, gave express assurances that only luxury housing -- that is to say, housing that defendant County knew or should have known was likely to attract predominantly white residents -- would be allowed to be developed on the Social Services Site and gave as the reason therefor that given "the character of Garden City," only such housing "would be appropriate."

56.     In June 2004, the defendant Village -- with the express and deliberate support, encouragement, acquiescence and consent of the defendant County -- rejected the Proposed Plan and Proposed Zoning, which had been recommended by its own planning consultants, and subsequently adopted an entirely new zoning classification for the Social Service Site, designated "R-T," which had not previously existed under the Village's proposed zoning ordinance ("Special Zoning").

57.     The new Special Zoning adopted by the Village was unique to, and expressly limited to the Social Services Site.  The Special Zoning imposed more severe restrictions on the construction of affordable multi-family housing than had theretofore existed under the "R-M" designation for residential multi-family zoning.  Most importantly, the new Special Zoning imposed stringent and unique limitations on multi-family housing unlike those found elsewhere in the Village's zoning regulations and, by design or foreseeable effect, prohibited the development of and integrated housing on the Social Services Site.

58.     The discriminatory Special Zoning permits multi-family dwellings only by special permission and only on a tiny sliver of the Social Services Site – namely, the 3.03 acre plot on

17

which the Old Laboratory Building and County Garage were situated -- constituting less than 15% of the Social Services Site's 25-acre area. The discriminatory Special Zoning permits at the very most construction of only about 36 affordable multi-family housing units, as compared to the 311 units of affordable, multi-family housing that had been permitted under the Proposed Plan and Proposed Zoning.

59.     Even if special permission were to be obtained, the exclusionary Special Zoning adopted by the Village for the Social Services Site decreases the maximum number of multi-family units permitted on the 3.03 acre sliver of the Social Services Site, thereby making it economically unfeasible for any affordable racially integrated housing units to be developed on the Social Services Site.

60.     Under the exclusionary Special Zoning, even if special permission were obtained the maximum number of multi-family units permitted on the 3.03 acre sliver is only one unit per 4000 square feet, as compared to the Proposed Zoning and existing R-M zoning, which permitted one unit per 3000 feet.

61.     The discriminatory Special Zoning requires that single family homes and townhouses on the Social Services Site must be constructed of such a significant lot size and minimum square footage that the only economically feasible development on the Social Services Site will be of luxury single-family homes and townhouses, which are housing units likely to attract and to be inhabited by predominantly white residents.

62.     The Proposed Zoning was rejected and the Special Zoning was adopted by Garden City Defendants with the purpose, intent or foreseeable effect of preventing and

18

excluding minorities from moving into the Village and the housing units to be constructed on the Social Services Site and into Garden City generally.

63.     The reason asserted by defendants for rejecting the Proposed Zoning and adopting the Special Zoning was a concern with increased traffic and an increased burden on the school system from additional children that the Proposed Plan would cause.

64.     The purported concern with increased traffic and an increased burden on the school system from additional children that the Proposed Plan would cause was not the real reason that the defendants rejected Proposed Zoning and adopted the Special Zoning.

65.     Garden City's Defendants' own consultants projected that, assuming up to 355 apartments on the site, the impact on traffic would be negligible, or about a 5% increase in traffic during the evening and morning rush hour, given current traffic for the existing uses.  Further, assuming 355 apartments at an average of 1000 square feet each, BFJ projected only an additional 89 school children.

66.     The real reason for and foreseeable effect of the Garden City Defendants' decision to reject the Proposed Zoning and the Proposed Plan and to adopt the exclusionary Special Zoning was to prevent and curtail the availability of affordable, racially integrated housing in Garden City and to assure that the only housing allowed to be developed on the Social Services Site would be housing likely be inhabited by only or virtually only white residents.

19

**Nassau County's Promotion of and**
**Consent To the Discriminatory and**
**Exclusionary Special Zoning That Excludes**
**Housing Opportunities for Minorities**

67.    With knowledge of the Village's discriminatory conduct in adopting the exclusionary Special Zoning, the County Government failed and refused to – and indeed supported and acquiesced in – those provisions and conditions of the Special Zoning that eliminated the opportunity for affordable, racially integrated housing on the Social Services Site. In May 2004, the County Government affirmatively informed the Village of its objections to certain other provisions and conditions of the Special Zoning.  However, the County Government supported and acquiesced in Garden City Defendants' decision to block affordable and integrated housing opportunities on the Social Service Site.

68.    The defendant County failed and refused to object to – and indeed acquiesced in and supported – certain provisions and conditions of Special Zoning that prevented or curtailed the availability of integrated housing – namely those limiting the permitted density of the housing units and the availability of multi-family housing – notwithstanding its belief that such provisions and conditions of the Special Zoning reduced the potential revenue from its sale of the Social Services Site and negatively affected the County Government's overall Consolidation Plan.

69.    In or about July 2004, after the discriminatory Special Zoning was adopted, the County Government issued a Request for Proposals ("RFP") for the Social Services Site that set forth an asking price for the Social Services Site was $30 million.

70.    Developers of affordable housing, including plaintiff NYAHC, were unable to respond to the RFP with a proposal that complied with the Special Zoning because the

20

discriminatory Special Zoning made it economically infeasible to develop affordable housing given its limitations on permitted density. Immediately after Plaintiff NYAHC received the July 2004 RFP, NYAHC and a chapter of New York ACORN met with the County Government to present an alternative proposal for leasing the Social Services Site that would enable the County to meet its financial objectives while still providing affordable multi-family housing in Garden City. Promptly after that meeting, NYAHC sent financial information with respect to the proposal to County Government. During an August, 2004 meeting, County Government requested more information about the proposal, particularly with respect to the proposed lease payments. NYAHC promptly provided the requested information.

71.     Under NYAHC's proposal, it would lease the Site from the County and develop multi-family housing containing both affordable and market-rate units. The rents for the affordable units would be below market and based on the tenant's income and family size as compared to the Nassau County area median income ("AMI"). For example, rent on a two-bedroom apartment would be priced at $591 for families earning 30-40% of AMI, $760 for families earning 41-50% of AMI, $928 for families earning 51-60% of AMI, $1,182 for families earning 61-80% of AMI, $1,519 for families earning 81-100% of AMI, $1,857 for families earning 101-120% of AMI, and $2,195 for families earning 121-140% of AMI. The market-rate rent on a two-bedroom unit in the proposed development would be $2,500. NYAHC planned to fund the proposed development through tax-exempt bonds, the low income housing tax credit, and other subsidies, such as federal HOME funds, each of which is commonly used in the industry and has been previously used by NYAHC.

21

72.     NYAHC developed this proposal in consultation with architects and other developers. NYAHC's employees expended significant hours preparing the development proposal. Nonetheless, the County Government never responded to Plaintiff NYAHC's proposal.

73.     After it submitted its proposal to County Government, NYAHC drafted an alternative development plan including multiple scenarios that would comply with the Proposed Zoning and under which NYAHC would purchase the Social Services Site from the County for no less than its $30 million dollars asking price. These alternative development plans provide for the construction of a multi-family housing development containing approximately 300 units, some of which would be affordable units for families with low and moderate incomes and others which would be market-rate units. Under this alternative plan, the affordable housing units would include one, two, and three bedroom rental apartments with an average size of 1000 square feet and average rents substantially similar to those contained in NYAHC's original proposal to the County Government. Some of these affordable housing units would be available for families receiving Section 8 housing assistance. NYAHC intended to fund this alternative plan through tax-exempt bonds, the low income housing tax credit, and other subsidies, such as federal HOME funds, each of which is commonly used in the industry and has been previously used by NYAHC. NYAHC again expended numerous hours preparing this alternative proposal.

74.     Upon information and belief, other affordable housing developers in Nassau County are also interested in building multi-family affordable housing on the Social Services Site, but did not respond to the RFP because of the restrictive Special Zoning.

22

75. Upon information and belief, the County has selected developer Myron Nelkin to develop the Social Services Site and to construct only luxury single family dwellings and townhouses likely to attract only or virtually only white residents, and unlikely to provide racially integrated housing opportunities.

76. The County Government and Mr. Nelkin do not propose to develop on the Social Services Site any affordable and integrated housing units in Garden City.

77. The development of the Social Services Site as currently contemplated by the County Government perpetuates and reinforces racial and ethnic housing segregation in Garden City and Nassau County.

78. Unless enjoined by this Court, the sale by the County of the Social Services Site will perpetuate and reinforce racial and ethnic housing segregation in Garden City and Nassau County.

**Injury To Plaintiff-Intervenor As Resulting
from Defendants' Wrongful Conduct**

79. Due to the defendants' ongoing discriminatory conduct and practices that perpetuate and reinforce housing segregation generally and limit availability of affordable integrated housing developments to predominantly minority communities in particular, Plaintiff-Intervenor NYCC's members are being and, unless the relief herein requested is granted, will be, deprived of the opportunity to find suitable affordable housing located outside areas of minority concentration in the County.

80. Due to the defendants' ongoing discriminatory conduct and practices, NYCC members are being and, unless the relief herein requested is granted, will be deprived of the

23

opportunity to live in racially integrated communities and the associated benefits of interracial associations that come with such housing opportunities.

81.     Due to the defendants' ongoing discriminatory conduct and practices, NYCC members do not have and, unless the relief herein requested is granted, will be deprived, access to basic public services in Garden City such as adequate law enforcement and public schools, available public parks, convenient public transportation, educational facilities and more expansive shopping areas located near the Social Services Site in Garden City.

## FIRST CAUSE OF ACTION
### (Violation of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*)

82.     Plaintiff-Intervenor repeats and realleges the paragraphs 1 through 81 as if fully set forth herein.

83.     Defendants' discriminatory practices, motivated by malice and/or callous disregard for the rights of NYCC members, deprive Plaintiff-Intervenor's members of their right of equal access to housing, otherwise make housing unavailable, deprive plaintiff NYAHC of its right to make housing available and perpetuate segregation on the basis of basis of race, color, and national origin in violation of the Fair Housing Act, 42 U.S.C. §§ 3604(a), both by intent and impact.

## SECOND CAUSE OF ACTION
### (Violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981)

84.     Plaintiff-Intervenor repeats and realleges paragraphs 1 through 83 as if fully set forth herein.

85.     Defendants' discriminatory practices, motivated by malice and/or callous disregard for the rights of NYCC members, deprive Plaintiff-Intervenor's members of their right

24

to make and enforce contracts to purchase, lease, or otherwise hold or convey property, on the basis of basis of race, color, and national origin (and thus deprive them of the same such rights as are enjoyed by white persons) in violation of the Civil Rights Act of 1866, 42 U.S.C. §1981.

### THIRD CAUSE OF ACTION
### (Violation of the Civil Rights Act of 1866, 42 U.S.C. § 1982)

86.     Plaintiff-Intervenor repeats and realleges paragraphs 1 through 85 as if fully set forth herein.

87.     Defendants' discriminatory practices, motivated by malice and/or callous disregard for the rights of NYCC members, deprive Plaintiff-Intervenor's members of their right to purchase, lease, or otherwise hold or convey property on the basis of basis of race, color, and national origin (and thus deprive them of the same such rights as are enjoyed by white persons) in violation of the Civil Rights Act of 1866, 42 U.S.C. §1982.

### FOURTH CAUSE OF ACTION
### (Violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States)

88.     Plaintiff-Intervenor repeats and realleges paragraphs 1 through 87 as if fully set forth herein.

89.     Defendants' discriminatory customs, patterns, practices, and usage in contravention of the Individual Plaintiffs' and NYCC's constitutional and federal statutory rights motivated by malice and/or callous disregard for their rights, deprive the Individual Plaintiffs of their right of equal access to housing and deprive NYCC of its right to make housing available under color of law in violation of the Federal Civil Rights Act of 1871, 42 U.S.C. § 1983, and its

25

rights under the Equal Protection Clause of the United States Constitution with regard to housing.

### FIFTH CAUSE OF ACTION
### (Violation of the "Affirmatively Furthering" Obligations Under the Fair Housing Act, 42 U.S.C. § 3608)

90.     Plaintiff-Intervenor repeats and realleges paragraphs 1 through 89 as if fully set forth herein.

91.     In connection with their use of federal funds related to housing, including funds from the federal CDBG and HOME programs, the defendant County, used the funds received in a discriminatory manner which promotes residential segregation and otherwise failed to meet the "affirmatively to further" obligations of the Fair Housing Act.

### SIXTH CAUSE OF ACTION
### (Violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*)

92.     Plaintiff-Intervenor NYCC repeats and realleges paragraphs 1 through 91 as if fully set forth herein.

93.     The County Government's discriminatory practices with regard to the administration of federal programs, including the federal CDBG and HOME programs, motivated by malice and/or callous disregard for the rights of Plaintiff-Intervenor, violate the Civil Rights Act of 1964, 42 U.S.C. §2000d *et seq.*

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff-Intervenor respectfully demands that this Court enter a judgment:

  a)      Declaring that defendants' acts, practices, and policies complained of herein violated and violate the rights of Plaintif-Intervenor's members as secured by Fair

26

**JA 158**

Housing Act, as amended, 42 U.S.C. § 3601 *et seq.*; the Civil Rights Act of 1866, 42 U.S.C. §

1981; the Civil Rights Act of 1866, 42 U.S.C. § 1982; and the "affirmatively furthering"

obligations of the Fair Housing Act, 42 U.S.C. § 3608, and the Civil Rights Act of 1964, 42

U.S.C. §2000d *et seq;*

        b)      Enjoining defendants, their agents, employees, successors, assigns, and

those acting in active concert, combination or participation with them, from engaging in any

policies or practices that deprive plaintiffs of their rights secured by any and all of the statutes

cited in sub-paragraph (a), above, including among other things:

        (i)      Enjoining the Nassau County Defendants from

proceeding with any sale of the Social Services Site, or continuing with any plans

for redevelopment of the site, under the discriminatory Special Zoning;

        (ii)      Enjoining the Garden City Defendants from enforcing

or attempting to enforce in any way the discriminatory or exclusionary provisions

of the Special Zoning;

        (iii)      Ordering the Garden City Defendants to approve

zoning ordinances for the Social Services Site that are substantially the same as

the Proposed Zoning or that otherwise permit affordable housing;

        (iv)      Ordering the Nassau County Defendants to issue a

Request for Proposals consistent with the Proposed Zoning and Proposed Plan or

consistent with zoning which otherwise permits affordable housing including

27

provisions that will require the development of affordable and integrated housing units at the Social Services Site;

        (v)      Enjoining the Nassau County Defendants from selling the Social Services Site to any person or developer that will not agree or commit to building affordable and integrated housing units at the Social Services Site to the maximum extent permitted under the Proposed Zoning;

        (vi)      Ordering all defendants to take all actions necessary to assure the redevelopment of the Social Services Site so as to maximize the availability of affordable and integrated housing at the site, including taking such steps as the Court deems necessary and appropriate to support and/or subsidize such redevelopment;

        (vii)      Enjoining the Garden City Defendants from granting, and ordering the Garden City Defendants to withdraw, any permits, letters of approval, or other consents allowing steps toward redevelopment of the Social Services Site to continue;

        (viii)      Enjoining all Defendants and their agents, employees, successors and assigns, from engaging in any other discriminatory acts that perpetuate or contribute to segregation in the Garden City and Nassau County; and

        (ix)      Ordering all Defendants to take and/or fund affirmative steps, supervised by this Court, to overcome the effects of past discriminatory

28

practices, including the funding of remedial activities necessary to overcome the

perpetuation of segregation in Nassau County and Garden City;

        c)      Awarding such other relief as this Court deems reasonable, necessary

and just; and

        d)      Awarding Plaintiff-Intervenor its costs and attorneys' fees in this

action.

* * *

Dated: Washington, D.C.
      February 29, 2012

                         By: _Joseph D. Rich_
                         Joseph D. Rich (admitted *pro hac vice*)
                         Linda Mullenbach (admitted *pro hac vice*)
                         LAWYERS' COMMITTEE FOR CIVIL
                         RIGHTS UNDER LAW
                         1401 New York Avenue, NW
                         Suite 400
                         Washington, DC 20005
                         (202) 662-8600

                             &&

                         Frederick K. Brewington (FB 5295)
                         Law Offices of Frederick K. Brewington
                         50 Clinton Street -- Suite 501
                         Hempstead, NY 11550
                         (516) 489-6959

                         *Attorneys for Plaintiff-Intervenor New*
                         *York Communities for Change and for*
                         *All Plaintiffs*

29

**JA 161**

1

1                   UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK
2

3       -------------------------------X
        MHANY MANAGEMENT, INC.,
4                                       :  05-CV-02301

5             Plaintiff,
                                        :  United States Courthouse
6          -and-                           Central Islip, New York

7       NEW YORK COMMUNITIES FOR CHANGE,
        INC.,
8
              Intervenor-Plaintiff,
9
                   -against-
10
        INCORPORATED VILLAGE OF GARDEN
11      CITY, and GARDEN CITY BOARD
        OF TRUSTEES,                       June 17, 2013
12
              Defendants.                  9:30 a.m.
13      -------------------------------X

14                   TRANSCRIPT OF TRIAL
             BEFORE THE HONORABLE ARTHUR D. SPATT
15           UNITED STATES DISTRICT COURT JUDGE

16

17      APPEARANCES:

        For the Individual
18      Plaintiffs:             HOGAN LOVELLS
                                875 Third Avenue
19                              New York, NY 10022
                                By:  STANLEY J. BROWN, ESQ.
20                                   PETER J. DENNIN, ESQ.
                                     CHAVA BRANDRISS, ESQ.
21                                   ANDREW J. SEIN, ESQ.
                                     SARAH J. GREGORY, ESQ.
22
        Counsel for all Plaintiffs:
23                              LAWYERS' COMMITTEE FOR CIVIL
                                RIGHTS UNDER LAW
24                              1401 New York Avenue, N.W.
                                Suite 400
25                              Washington, D.C. 20005
                                By: JOSEPH D. RICH, ESQ.

**Proceedings**

2

```
1        FREDERICK K. BREWINGTON, ESQ
         556 Peninsula Blvd.
2        Hempstead, NY 11550
.

3

4   For the Defendants Garden City
    Board of Trustees and
5   Incorporated Village of Garden City:

6        CULLEN AND DYKMAN, LLP
         100 Quentin Roosevelt Blvd
7        Garden City, NY 11530-4850
         By: JAMES G. RYAN, ESQ.
8            JENNIFER A. McLAUGHLIN, ESQ.
             DOUGLAS J. BOHN, ESQ.
9            CYNTHIA A. AUGELLO, ESQ.
             ARIEL E. RONNEBURGER, ESQ.
10           SEAN R. GAJEWSKI, ESQ.

11

12  Court Reporter:      OWEN WICKER, RPR
                         100 Federal Plaza - Suite 1180
13                       Central Islip, New York 11722
                         (631) 712-6102

14

15

16  Proceedings recorded by mechanical stenography;
    transcript produced by computer aided transcription
17        THE COURT:  Appearances, please.
18  Let's start with the plaintiff.
19        MR. BROWN:  My name is Stan Brown --
20        THE COURT:  Not Stanley?
21        MR. BROWN:  I like to use Stan, your Honor.
22  -- representing the plaintiffs.
23        MR. BREWINGTON:  Frederick K. Brewington.
24  Good morning, your Honor.
25        MR. RICH:  Attorney for the plaintiffs, Joseph
```

**Proceedings**

3

```
1   Rich.
2         MR. DENNIN:  Peter Dennin, D-E-N-N-I-N, with
3   Hogan Lovells US, LLP, for the plaintiffs.
4         MS. BRANDRISS:  Chava Brandriss, also for
5   plaintiffs.
6         THE COURT:  I'm sorry, what is your name?
7         MS. BRANDRISS:  Chava, C-H-A-V-A, last name
8   Brandriss, B-R-A-N-D-R-I-S-S.
9         MS. GREGORY:  Good morning.  My name is Sarah
10  Gregory, S-A-R-A-H, G-R-E-G-O-R-Y, from Hogan Lovells US,
11  LLP.
12        MR. SEIN:  Good morning.  First name Andrew,
13  last name is Sein, S-E-I-N, also from Hogan Lovells, on
14  behalf of plaintiffs.
15        MR. FLEMING:  Benjamin Fleming, your Honor,
16  F-L-E-M-I-N-G, from Hogan Lovells, on behalf of plaintiff.
17        MR. LUGO:  Figuel, F-I-G-U-E-L, last name Lugo,
18  L-U-G-O.
19        THE COURT:  That's all?
20        MR. BROWN:  Yes, your Honor.
21        THE COURT:  Who will do the actual trial work?
22        MR. BROWN:  Well, a number of us will be doing
23  the actual trial work, including the people that have been
24  introduced to you, your Honor.
25        THE COURT:  Defense?
```

**Proceedings**

4

```
1         MR. RYAN:  Good morning, your Honor.
2         James Ryan for Cullen and Dykman LLP for the
3   Garden City defendants.
4         MR. BOHN:  Good morning.  Douglas Bohn on behalf
5   of the Garden City defendants as well.
6         MS. MCLAUGHLIN:  Good morning.  Jennifer
7   McLaughlin for the Garden City defendants.
8         MR. GAJEWSKI:  Good morning, your Honor.  Sean
9   Gajewski, G-A-J-E-W-S-K-I.
10        THE COURT:  Sean is S-E-A-N?
11        MR. GAJEWSKI:  Yes, your Honor.
12        MS. AUGELLO:  Good morning, your Honor.  Cynthia
13  Augello, A-U-G-E-L-L-O, from Cullen and Dykman on behalf
14  of the Garden City defendants.
15        MS. RONNEBURGER:  Good morning, your Honor.
16  Ariel Ronneburger.  A-R-I-E-L, last name is
17  R-O-N-N-E-B-U-R-G-E-R.
18        THE COURT:  Sorry, didn't get your last name.
19        MS. RONNEBURGER:  R-O-N-N-E-B-U-R-G-E-R.
20        THE COURT:  First, the rules of the road in
21  trying a case in this part.
22        The audibility in this beautiful courtroom is
23  limited, so please speak into the microphones and keep
24  your voices up.
25        When you read, please do so slowly so the Court
```

**Proceedings**

5

```
1   and the court reporters can hear and understand every
2   word.
3         When you use a name which would be unfamiliar to
4   the court reporters, please spell those names.
5         Please remain seated when witnesses are sworn.
6   I consider that a formal moment.
7         I don't have to tell experienced lawyers to rise
8   when making objections.
9         On Fridays I have sentencings and things of that
10  nature on Fridays.
11        Also, please don't trip over the electrical
12  cords.
13        And as to each witness, one lawyer on each side.
14  Not more than that.  One lawyer on each side.
15        Before we get started, let's get what the
16  correct title is.
17        We have MHANY Management, Inc., and Vic DeVita
18  is no longer a plaintiff.
19        MR. BROWN:  That is correct.
20        THE COURT:  And also Francine McCray.
21        MR. BROWN:  That is also correct.
22        THE COURT:  So it is MHANY Management and New
23  York Communities for Change, Inc., intervenor-plaintiff
24  against -- is County of Nassau out?
25        MR. BROWN:  Yes, County of Nassau is out, your
```

1  Honor.

2       THE COURT:  So it is against Incorporated

3  Village of Garden City and Garden City Board of Trustees.

4       MR. BROWN:  Correct, your Honor.

5       THE COURT:  So it is MHANY Management, Inc.,

6  plaintiff, and New York Communities for Change, Inc.,

7  intervenor-plaintiff, against Incorporated Village of

8  Garden City and Garden City Board of Trustees.

9       Now, in this joint pretrial order there are a

10  large number of stipulated facts, correct?

11       MR. BROWN:  That is correct, your Honor.

12       THE COURT:  69 stipulated facts, right?

13       MR. BROWN:  Yes, your Honor.  That is correct.

14       THE COURT:  Let's take the motions in limine.

15       MR. BROWN:  Do you want to have them in any

16  particular order.

17       THE COURT:  Pardon?

18       MR. BROWN:  Do you want to have them in any

19  particular order?

20       MS. GREGORY:  No.

21       MS. GREGORY:  Good morning, your Honor.  My name

22  is Sarah Gregory from Hogan Lovells LLP, and I'll be

23  presenting a motion to preclude evidence to which

24  plaintiffs seek to offer.

25       Your Honor, from the very beginning of this

1  case, defendants have asserted the legislative privilege

2  to block plaintiffs from inquiring into all nonpublic

3  evidence of the board of trustees' reasons for rezoning

4  the social services site and asserted the privilege not

5  only as to Garden City's legislative body but also as to

6  nonlegislative employees and a third-party outside

7  consulting firm, Buckhurst, B-U-C-K-H-U-R-S-T, Fish,

8  F-I-S-H, & Jacquemart, J-A-C-Q-U-E-M-A-R-T.  And I'll

9  referring to them as BFJ.

10       Garden City, or the defendants, asserted the

11  privilege, particularly during the deposition of Frank

12  Fish, F-I-S-H.  And he's the principal at BFJ and the

13  outside consultant with which Garden City had primary

14  contact.

15       In this motion in limine, plaintiffs do not seek

16  to relitigate the legislative privilege.  What we're

17  seeking here is simply a ruling instructing the parties to

18  continue operating within that nonprivileged universe of

19  evidence to which plaintiffs were confined during

20  discovery.

21       Plaintiffs -- let me back up.

22       Every one of the witnesses as to Garden City who

23  asserted privilege during discovery will be testifying

24  during this trial.  Garden City has listed a number of

25  defenses remaining to be tried, which referenced the board

1  of trustees' reasoning for the board of zoning and

2  particularly the way public comments were incorporated

3  into the rezoning process and the decision-making process.

4       Because plaintiffs do not know what questions

5  defendants plan to ask these witnesses, we thought it

6  would be prudent to bring those issues to the Court's

7  attention before trial and to seek a ruling setting a

8  clear ground rule for questioning during trial.

9       THE COURT:  What ruling?

10       MS. GREGORY:  Plaintiffs would seek a ruling

11  ordering the parties to restrain the universe of

12  nonprivileged information, meaning neither side may

13  inquire into nonpublic deliberations or evidence of the

14  board of trustees' intent or reasoning for rezoning.  That

15  is because, as I said, plaintiffs were blocked from asking

16  those questions during discovery.

17       THE COURT:  I don't understand.  What do you

18  want?

19       MS. GREGORY:  Your Honor, we're seeking to set

20  the ground rules for questioning during trial.  Therefore,

21  if defendants want to start asking questions of the board

22  of trustees, who will be testifying, you know, why did the

23  board of trustees do this, how were public comments taken

24  into consideration, we would object to those kinds of

25  questions on the grounds we were prevented from asking

1  those questions during discovery.

2       THE COURT:  No, I'll allow it.  If they want to

3  waive privilege, let them waive it.

4       MS. GREGORY:  Your Honor, we respectfully

5  disagree.  We would be severely prejudiced by such

6  questions.

7       THE COURT:  Well, if you are prejudiced, you

8  will tell me about it and I'll see.  But otherwise, if

9  they want to waive their privilege, I'll let them.

10       MS. GREGORY:  Your Honor, we're firmly grounded

11  in Second Circuit case law which provides that a party may

12  not use the privilege as a shield during discovery and

13  then later waive that privilege or selectively disclose

14  such information at trial.

15       THE COURT:  If the waiver of the privilege would

16  result in prejudice to the plaintiff, which you could have

17  overcome during the deposition, yes, but otherwise, no.

18       MS. GREGORY:  Okay.  So --

19       THE COURT:  It depends.  If it's something that

20  you could have refuted in your deposition period but were

21  not given the opportunity to do so, yes, I would prohibit

22  that.

23       MS. GREGORY:  Okay.

24       THE COURT:  Otherwise, if they want to waive on

25  something that wouldn't matter about, I'll let it.

Proceedings
10

1    MS. GREGORY: So we'll object to it if it
2  arises.
3        THE COURT: That's right.
4        MS. GREGORY: Thank you, your Honor.
5        MR. BREWINGTON: Judge, may I confer with
6  counsel for one second, please?
7        THE COURT: Sure.
8        MS. GREGORY: Just one more thing, your Honor.
9        If and when those questions start being asked
10 and plaintiffs feel the need to object, we would just ask
11 for an immediate conference in order to resolve the issue
12 right away before we get too far down that road.
13       THE COURT: Surely.
14       MS. GREGORY: Great. Thank you.
15       THE COURT: Is that the plaintiffs' motions in
16 limine?
17       MS. GREGORY: Yes, your Honor, that's it for us.
18       THE COURT: Okay. Defendants' motions in
19 limine.
20       MR. BOHN: Good morning, your Honor. Douglas
21 Bohn.
22       The defendants have filed two motions in limine
23 in this case. I will address the first, which is the
24 motion to exclude or limit the proffered experts by the
25 plaintiffs.

Proceedings
11

1        Now a big chunk, as the Court knows, is already
2  resolved after the filing of the motion. The plaintiffs
3  withdrew Dr. Marcuse, their planning expert in this case,
4  so that is resolved.
5        The only remaining aspect of this motion is the
6  defendants' motion against Nancy McArdle, who is the
7  proper demographer on behalf of the plaintiffs.
8        Now in response to the defendants' motion, the
9  plaintiffs responded with a large discussion about census
10 data and statistics and how census data and statistics can
11 be utilized in cases such as this. Up to a point,
12 defendants do not agree.
13       Under Daubert and 702, as the Court is aware, it
14 is the use of that data, and here the absence of a
15 reliable and proper methodology to reach the conclusions
16 that Ms. McArdle.
17       If Ms. McArdle would like to come in and testify
18 about statistics for Nassau County or the Village of
19 Garden City, then we understand that.
20       However, Ms. McArdle has taken an additional
21 step, really, in opining who she predicts or claims is
22 going to be an actual resident of hypothetical, somewhat
23 theoretical, housing developments under different
24 scenarios. That inferential jump is where the defendants
25 have a problem. As the Second Circuit has held in the

Proceedings
12

1  Amtrak case, every case --
2        THE COURT: What case?
3        Excuse me. You want an accurate record, do you
4  not?
5        MR. BOHN: Of course, your Honor.
6        THE COURT: Well --
7        MR. BOHN: Amorgianos, A-M-O-R-G-I-A-N-O-S,
8  versus Amtrak.
9        Now, where Ms. McArdle goes off the rails, no
10 pun intended, is when she predicts who will reside in the
11 houses. To the extent she's not saying that, we
12 understand. So that is one issue with Ms. McArdle.
13       The other issue has to do with the reliability
14 of her opinions. And it's not the work she did, your
15 Honor; it's the work she did not do, that work, with any
16 certificate of analysis under the subject zoning in this
17 case.
18       As the Court is aware, the Village of Garden
19 City passed R-T zoning. The main issue here is the
20 passage of that R-T zoning district.
21       One of the claims, and really the claim that
22 Ms. McArdle, the only claim, is the FHA disparate impact
23 claim.
24       Now, Ms. McArdle, however, did not --
25       THE COURT: FHA?

Proceedings
13

1        MR. BOHN: Yes.
2        THE COURT: Federal Housing Act.
3        MR. BOHN: Federal Housing Act, your Honor.
4        Now, Ms. McArdle did not do an analysis under
5  that R-T Zone. It is the impact of the R-T zoning which
6  is the case here. That's why we're here on this disparity
7  impact side of the case. Without that, as a matter of
8  law, she cannot offer an opinion as to impact. She cannot
9  tell you that impact -- excuse me, that R-T has a
10 disproportionate impact on anybody because it is not
11 there.
12       She was fed statistics, or fed parameters, by
13 the plaintiffs for a hypothetical 311-unit development,
14 but it is the R-T zone -- what would map under R-T or what
15 could happen under R-T which is the issue here. And there
16 is the comparison. She doesn't do it. She doesn't have a
17 comparison group.
18       So her underlying conclusions, any conclusions
19 she could offer on this, is going to be unreliable. She
20 hasn't analyzed what you can build under R-T. She only
21 looks at a theoretical development proposed by plaintiffs
22 here.
23       And it is that delta, your Honor, it is that
24 difference, where an impact opinion would necessarily come
25 to. That is why underlying such opinions that she

Proceedings

14

1  reaches, she can't do it here.

2  That's the point of Daubert. That's the point

3  of 702. That is the point of the Court having to perform

4  a gate-keeping function before the trial starts: to rule

5  on the admissibility. That is why we're asking for

6  Ms. McArdle to be excluded from offering that testimony.

7  At most, your Honor, she should be permitted to

8  testify, if plaintiffs so choose, as to underlying

9  statistics and demographic analysis. Anything more than

10  that is speculative and well outside what she could offer

11  that is reliable.

12  MR. FLEMING: Good morning, your Honor.

13  Benjamin Fleming for the plaintiffs to address a few

14  points that were raised in counsel's argument.

15  Dr. Marcuse, as counsel noted, that portion of

16  this motion is now moot. But I just wanted to be clear

17  that Dr. Marcuse has been drawn per stipulation of the

18  parties.

19  The second thing, counsel referred to the FHA,

20  the laws of the Fair Housing Act of 1968. It has amended

21  the Civil Rights Act of 1964. Present in the law now is

22  Title 8, and that is the law under which the plaintiffs

23  are bringing their claims.

24  I want to bring up, first, the relevant standard

25  for a motion at this time.

Proceedings

15

1  Defendants have not referenced the relevance

2  standard either in their papers or in argument today.

3  This is a bench trial. There will be no jury

4  seated, and the Court will be the finder of fact. In that

5  context, there is a much higher threshold for excluding

6  expert evidence and expert testimony. That is because for

7  a number of reasons.

8  It goes to the thrust of the federal rule, the

9  liberal thrust of admitting evidence. It goes to judicial

10  economy. When the judge is the trier of fact, he can, as

11  the jury cannot, separate out evidence and only rely upon

12  that which is properly considered.

13  The federal circuit has referred to this

14  phenomenon as making the Daubert issue of "lesser import,"

15  and that is from the Seaboard Lumber case we addressed in

16  our briefs.

17  The second thing that the defendants addressed

18  is this consideration that comparison between the four

19  proposals by the New York ACORN Housing Company, which is

20  to be used as an acronym, NYAHC, and the Fairhaven bid

21  that was accepted under the R-T Zoning, is not sufficient

22  to show disparity impact under the law.

23  But an expert's testimony may not prove the

24  entire case. The case law is extremely clear on this.

25  The expert's testimony must be probative of disparate

Proceedings

16

1  impact, helpful to the trier of fact, and especially so in

2  a bench trial where the Court can hear the testimony and

3  evaluate it in context and give it proper weight.

4  The general law is that disputes over the legal

5  significance of an expert opinion go to the weight and not

6  the admissibility of the testimony.

7  Here, the Garden City defendants are claiming

8  that Ms. McArdle has not performed the proper disparate

9  impact analysis.

10  I would submit to the Court there is no one

11  single way for disparate analysis. This is true under the

12  FHA, where the Court recognizes there is two separate ways

13  to show disparate impact. You can show it through the

14  showing of an adverse effect on one or more protected

15  grounds, and use statistics has done so, as Ms. McArdle

16  has done in her report and her testimony.

17  You can show disparate impact under the FHA by

18  showing of segregation generally. The Court found it

19  irrelevant and probative on both of those issues, the

20  Court has found.

21  Finally, just two more points, your Honor.

22  One is this issue that Ms. McArdle was fed

23  information from the plaintiffs. Ms. McArdle was

24  presented with four alternatives from NYAHC, four

25  proposals from housing under the R-M housing -- and that

Proceedings

17

1  term will also be used quite a bit.

2  Under the R-M zoning not enacted by Garden City,

3  there was no potential to ever build housing in the site

4  under that zoning. Anything that she did by necessity

5  could never be permitted.

6  The parameters of those proposals -- and with

7  them she applied her expertise and knowledge of

8  demographics to come to the conclusion about the

9  affordability of that development.

10  That is an eminently proper thing for an expert

11  to do in this context. It goes to the affordability of

12  the development, and it is a proxy for what could have

13  been built under the R-M zoning, just as the Fairhaven

14  zoning with a proxy, what could have been built under the

15  enacted R-T zoning.

16  My final point, your Honor, is about the use of

17  statistics at Ms. McArdle's testimony.

18  In its opposition, Garden City has contended

19  these statistics are somehow flawed because Ms. McArdle

20  did not testify as to what the underlying causation of

21  those statistics were. For example, she did not offer an

22  opinion as to why Nassau County is so heavily segregated

23  or why the demographics of Garden City are the way they

24  are. This is not a proper subject for demographic

25  analysis.

Proceedings

18

1    Demographic analysis is descriptive, to describe
2 the state of the world.  It is not meant to show
3 causation.
4    Defendants cited several cases from the
5 employment or constitutional context where statistics are
6 used to show discriminatory intent.  But that is not
7 needed under a disparity impact analysis and especially
8 not required under the FHA, which permits a plaintiff to
9 show disparate impact through the perpetuation of
10 segregation.
11    Unless your Honor has any other questions --
12    THE COURT:  I do not.
13    MR. BOHN:  Douglas Bohn.
14    Counsel just said it.  They are unable to prove
15 causation, or not proving causation through Ms. McArdle.
16    Causation is an element under the disparity
17 impact theory.  It is an element pursuant to the Second
18 Circuit in the Quad Enterprises cases, and that is a
19 significant issue and a significant point by counsel.
20    Lastly, the idea that goes to weight only.
21 There is no doubt the defendants can look and weigh
22 testimony appropriately.  However, since this is a bench
23 trial, it only goes to weight is not true.
24    We have several cases, three, Biofluid, Meade,
25 as well as WFX Holdings Corp. which said, I still perform

Proceedings

19

1 Daubert in a bench trial.
2    That is the point of the gate-keeping function,
3 and it is still adequate here.
4    Thank you.
5    THE COURT:  Under the Daubert case, an expert
6 has to be R and R, relevant and reliable.  The defendant
7 does not challenge the qualifications of the expert, Nancy
8 McArdle.
9    Ms. McArdle apparently will testify and offer
10 opinions on the racial and ethnic composition of Garden
11 City and Nassau County; the connections between income,
12 race and housing problems in the county; the likely
13 composition of the pool of renters who could afford to
14 rent under the four scenarios utilizing R-M, Roger Mike,
15 zoning, which was the previous zoning; the likely racial
16 composition of homeowners who could afford to purchase
17 certain units.
18    In my previous decision on summary judgment, I
19 already found her report to be relevant, quote, that
20 minorities comprised a disproportionate share of renter
21 versus owner households in the county, so that the
22 proposed 36 rental units, rather than the 311 housing
23 units contemplated in the original zoning proposal -- she
24 will comment on that using her expert qualifications and
25 that it would have a greater impact on minority residents.

Proceedings

20

1    The defendants oppose Ms. McArdle on a number of
2 grounds, but I find that the objections really go to the
3 weight of her testimony and to her credibility, not to the
4 admissibility.
5    Accordingly, I'm denying the motion in limine to
6 curtail the testimony of Nancy McArdle.
7    What is the next motion?
8    MS. RONNEBURGER:  Good morning, your Honor.
9 Ariel Ronneburg from Cullen and Dykman LLC for the
10 Garden City defendants.  That is R-O-N-N-E-B-U-R-G-E-R.
11    And I will be arguing Garden City's motion in
12 limine to exclude certain evidence to be offered by
13 plaintiffs during trial, expectedly.
14    Plaintiffs seek to admit in excess of 350
15 exhibits at trial.  Almost 50 of these are newspaper
16 articles.  Most of these newspaper articles were written
17 in the past 20 years.
18    It is respectfully submitted --
19    THE COURT:  Most of them are within 20 years?
20    MS. RONNEBURGER:  Yes.
21    THE COURT:  How can they be admissible?
22    MS. RONNEBURGER:  That's our argument.
23    These are inadmissible hearsay within the
24 Federal Rules of Evidence.
25    THE COURT:  If they are within 20 years, they

Proceedings

21

1 are out.  They are hearsay.
2    MS. RONNEBURGER:  Yes, thank you.
3    THE COURT:  Simple hearsay and not admissible.
4    MS. RONNEBURGER:  Yes.
5    THE COURT:  What about the ones more than
6 20 years old?
7    MS. RONNEBURGER:  Plaintiffs do seek to admit a
8 number of articles more than 20 years old.  While under
9 the ancient documents exception these would come in, they
10 are entirely irrelevant.
11    Many of the articles have to do with the
12 proposed day-care center in Garden City in 1969.  These
13 articles contains quotes which are in and of themselves
14 hearsay.  Regardless whether the article comes in and is
15 no longer hearsay under the ancient document exception,
16 these quotes are still hearsay.  They are still the same
17 chance that the author may have misquoted an individual in
18 an article written in 1969 that an author misquoted in an
19 article written today.
20    We would respectfully submit that if these
21 articles are not excluded because they are entirely
22 irrelevant, at least these quotes which are hearsay within
23 hearsay would not be admissible.
24    Plaintiffs also seek to admit a number of
25 articles about a completely uncorroborated allegation of

Proceedings

22

1 an affordable housing proposal at a site called Doubleday.
2 THE COURT: What is that?
3 MS. RONNEBURGER: D-O-U-B-L-E-D-A-Y, in 1989.
4 THE COURT: Right outside Franklin Avenue. I
5 pass it all the time, or I used to. Is it out of business
6 now?
7 MS. RONNEBURGER: The site is still there, but
8 they are not there now.
9 These articles are entirely irrelevant, and if
10 you read them, they do not support the allegations that
11 plaintiffs are contending they do.
12 Plaintiffs say there was an affordable housing
13 proposal. There never was. They have never been able to
14 produce any other evidence of this so-called affordable
15 housing proposal other than these articles.
16 Our witnesses have testified that Garden City
17 never received such a proposal.
18 If you read the articles, they say that -- they
19 make reference to work force housing, or housing that is
20 affordable to the people that work at the Doubleday site.
21 One of them says, we're not talking about affordable
22 housing per se.
23 Plaintiffs are skewing the words in these
24 articles and trying to make them out to be something they
25 are not, and therefore they are entirely irrelevant and

Proceedings

23

1 therefore should not be used as evidence in this matter.
2 Plaintiffs also seek to admit a number of
3 e-mails --
4 THE COURT: Let's do one thing at a time. Let's
5 talk about the newspapers, the ancient documents.
6 MS. RONNEBURGER: Yes, your Honor.
7 THE COURT: What about that?
8 MR. SEIN: Good morning. Andrew Sein, S-E-I-N,
9 for plaintiffs.
10 Your Honor, may I first address your ruling on
11 the other newspaper articles that were from the last
12 20 years?
13 THE COURT: Sure.
14 MR. SEIN: 19 of these newspapers are to be
15 offered for a nonhearsay purpose, offered to show what
16 would be reported in the media at the time, what
17 information the public was learning, digesting, part of
18 the public consciousness, and what they were learning
19 about the proposed zoning at the social services site. So
20 we would ask that your Honor defer a decision as to
21 particular newspaper articles until they are actually
22 sought to be admitted and we have an opportunity to place
23 them in their appropriate factual context to explain why
24 we plan to admit them, for what purpose, and to extend our
25 hearsay exception they fall into to deal with --

Proceedings

24

1 THE COURT: What hearsay exception would fit a
2 newspaper?
3 MR. SEIN: Your Honor, the major hearsay
4 exception for the newspaper articles would be the ones
5 from 20 years or older, and that would be the ancient
6 documents.
7 THE COURT: I didn't ask about the 20 years or
8 older. How about the ones less than 20 years? 20-year
9 old articles may be admissible under the ancient document
10 exception to the hearsay rule, but the ones less than
11 20 years, what about them?
12 MR. SEIN: There may be individual statements,
13 present impression, utterances, and have to cite specific
14 passages in the articles at the time. We would have to
15 consider them on a case-by-case basis, which we're asking
16 the Court to do.
17 THE COURT: What are you asking for?
18 MR. SEIN: Your Honor, respectfully, there are
19 over 50 exhibits that defendants have moved to have
20 excluded at this point. And -- your Honor, generally we
21 believe that your Honor should consider these in their
22 appropriate factual context when there is a specific
23 objection raised so we can discuss and raise the merits of
24 each particular article that are presented.
25 THE COURT: There are 15 or 50 newspaper

Proceedings

25

1 articles?
2 MR. SEIN: Certain newspaper articles will be
3 offered at one time for one issue and others for other
4 issues, and other issues that they seek to have excluded
5 in their motion in limine, and they should be ruled on
6 specifically when they are presented.
7 THE COURT: You certainly can offer the
8 newspaper article in the trial, but I'm telling you now,
9 they are certainly not going to be admitted for the truth
10 of what is in the newspaper article. That's for sure.
11 Whether a particular article may be admissible
12 not for the truth but simply because it was printed, that
13 is another matter.
14 MR. SEIN: I think that is precisely right, your
15 Honor.
16 THE COURT: I would give you the opportunity to
17 show that.
18 MR. SEIN: Thank you, your Honor.
19 Would you like me to address the ancient
20 documents issue as well?
21 THE COURT: Sure.
22 MR. SEIN: I believe, as your Honor just said, I
23 believe your Honor just said the ancient documents
24 exception would apply to any articles that are 20 years or
25 older. This would include some articles that we plan to

Proceedings

26

1  submit from the 1960s and 1970s and the 1980s.
2      As to relevance, your Honor, we would submit you
3  should wait to actually see what the documents say, how
4  they might be relevant to the issues that unfold at trial,
5  rather than making a blanket, categorical judgment before
6  seeing them individually.
7      THE COURT:  Well, I said Rule 803(16) says:  The
8  following are not excluded by the rule against hearsay,
9  regardless whether the declarant is available as a
10 witness.
11     And 16 says:  Statements in ancient documents:
12 A statement in a document that is at least 20 years old
13 and whose authenticity is established.
14     Now, further, with regard to the ancient
15 documents and authenticity, you have to look at Rule 901,
16 subdivision 8, evidence about ancient documents or data
17 compilations.
18     For a document or data compilation, evidence
19 that is, A, in a condition that creates no suspicion about
20 its authenticity, B, was in a place where, if authentic,
21 it would likely be -- likely be in that place, and, C, is
22 at least 20 years old when offered.
23     So there has to be some authenticity also.
24     MR. SEIN:  I'd like to point out in Rule 902,
25 section 6, newspapers or periodically

Proceedings

27

1  self-authenticating --
2      THE COURT:  902?
3      MR. SEIN:  902, section 6, your Honor.
4      THE COURT:  Yes, that's true.  902 says evidence
5  that is self-authenticating.  You're right.  The following
6  items of evidence are self-authenticating.  They require
7  no extrinsic evidence of authenticity in order to be
8  admitted.  6:  Newspapers and periodicals, printed
9  materials purporting to be a newspaper or periodical -- it
10 seems these two rules are somewhat in conflict, but I
11 think you are correct about that.
12     MR. SEIN:  Thank you, your Honor.
13     So as to the newspaper article, generally we
14 would ask your Honor -- as you just said, you would give
15 us the opportunity to present them to you and offer them
16 for nonhearsay purposes when they are offered for
17 nonhearsay purposes.  When they do fall into a hearsay
18 exception, be able to explain them to you.
19     THE COURT:  What about the defense's contention
20 that there is double hearsay; in other words, the article
21 has statements made by third parties?  What about that?
22     MR. SEIN:  Your Honor, once again we would say
23 that the documents have to be considered individually.
24 Some of these quotations within the article, again, would
25 be offered for a nonhearsay proof, not for the truth of

Proceedings

28

1  the matter; only to show that the statement was made.
2      Your Honor, for the reasons we rely on in our
3  brief, we believe there is a good legal basis for
4  admitting all contents of this.
5      THE COURT:  You have to slow down and speak up.
6      MR. SEIN:  Your Honor, taken by the -- all
7  statements within ancient documents are admissible,
8  regardless whether or not they are double hearsay.
9      More importantly, your Honor, we believe to the
10 extent the ancient document newspaper articles are
11 offered, invocations within the articles for the most part
12 will be offered for a nonhearsay purpose.
13     But even if they were offered for a hearsay
14 purpose, that is, to prove the truth of the matter, there
15 is authority that your Honor should find even under the
16 ancient document exception.
17     THE COURT:  Where are we now?
18     MR. SEIN:  Your Honor, one last point.
19     This debate --
20     THE COURT:  You will have to sit down in the
21 back or leave.  One or the other.  I will not have people
22 standing up.
23     (Pause in proceedings.)
24     MR. SEIN:  Your Honor, I would like to make one
25 last point which is a factor in something in this debate

Proceedings

29

1  which underscores the fact it is important to consider
2  each one of these documents individually and to wait for a
3  specific objection on the record at trial.
4      THE COURT:  Very well.
5      Where are we now on the defendants' motions in
6  limine?
7      MS. RONNEBURGER:  If I may, I would like to
8  address Mr. Sein's comments.
9      THE COURT:  Pardon?
10     MS. RONNEBURGER:  I would like to address
11 Mr. Sein's comments before we go on.
12     THE COURT:  Sure.
13     MS. RONNEBURGER:  We refer to the Federal Rule
14 of Evidence which says newspapers are self-authenticating,
15 refers to the entire newspaper.
16     Plaintiffs have given us as evidence,
17 newspapers, although they've rectified it in some cases
18 are missing the page which says the article is continued
19 on, has handwritten notations on for date.  And recently
20 they provided us one, an article -- it is Plaintiffs' 359,
21 "An Affordable Housing Plan in Garden City" is the name of
22 it, purportedly from April 14, 1989, in Newsday.  It says
23 absolutely nothing on it.  In fact, the copy I received
24 looks like it was pasted together.
25     That is not self-authenticating.  That wouldn't

Proceedings

30

1  pass muster for a Law Review citation.
2        THE COURT:  I think you are right about that.
3  Even though 902 says it is self-authenticating, if there
4  is evidence it is not accurate or we have no knowledge
5  where it came from or there is writing on it that
6  shouldn't belong, I have to take that into consideration.
7        MS. RONNEBURGER:  Yes.
8        THE COURT:  And I will.
9        MS. RONNEBURGER:  Thank you.
10       To the extent that plaintiffs argue that the
11  double hearsay rule does not apply to articles, the only
12  support for that contention is a treatise and case law
13  that follows that treatise.  A footnote in a treatise does
14  not override cases from a number of circuits.
15       THE COURT:  Well, we'll see.  For me to get into
16  double hearsay on each particular newspaper, we would have
17  to extend this trial until Christmastime, and I don't
18  intend to do that.
19       MS. RONNEBURGER:  Yes, your Honor.
20       THE COURT:  So generally, newspaper articles do
21  contain double hearsay.  They contain triple hearsay.  But
22  if they are more than 20 years old, generally are
23  admissible with the double hearsay.
24       MS. RONNEBURGER:  Thank you, your Honor.
25       THE COURT:  Okay.

Proceedings

31

1        MS. RONNEBURGER:  The next topic is that
2  plaintiffs are trying to admit a number of e-mails sent to
3  count -- former county executive Thomas Suozzi and also
4  phone logs kept by Nassau County.  These e-mails and phone
5  logs are from 2005 to 2006, most of them, and deal with a
6  property called Ring Road, which is not the property in
7  issue in this case.
8        Therefore, these e-mails and phone logs are
9  entirely irrelevant to this case.  Moreover, the phone
10  logs are hearsay in and of themselves.  They are not even
11  direct quotes.
12       THE COURT:  Who are they from?
13       MS. RONNEBURGER:  Who are they from?  They are
14  from alleged Garden City residents, although it is
15  possible in today's day and age that anyone could make a
16  free Gmail or Hotmail address, say they are someone from
17  Garden City, and send a letter to Tom Suozzi.
18       THE COURT:  The e-mails were sent to whom?
19       MS. RONNEBURGER:  To Thomas Suozzi.
20       THE COURT:  What does that have to do with the
21  Village of Garden City?
22       MS. RONNEBURGER:  Nothing.  It cannot support
23  plaintiffs' claim that the village responded to the
24  response of respondent's concern.  They were stated to
25  Thomas Suozzi, not the village, who is the Nas -- if

Proceedings

32

1  Nassau County is no longer involved in this case and noted
2  in your summary judgment decision, Nassau County was not a
3  decision-maker in the zoning.  So these e-mails should not
4  be considered because they are entirely irrelevant --
5        THE COURT:  Let's hear from your opponent.
6        Why would these e-mails be admissible?
7        MR. SEIN:  Your Honor, respectfully, this issue
8  also was dealt with in your summary judgment decision.
9  You made specific reference to these e-mails in your
10  summary judgment --
11       THE COURT:  Where in my summary judgment?
12       MR. SEIN:  Your Honor, give me one moment, and
13  I'll refer you to the page.
14       THE COURT:  I knew I talked too much in that
15  summary judgment motion.  It was much too long.
16       MR. SEIN:  Your Honor, pages 50 and 51.
17       THE COURT:  Pardon?
18       MR. SEIN:  Pages 50 and 51, I'm told.
19       THE COURT:  Oh, yes, I see it.
20       MR. SEIN:  Your Honor, actually, that is not the
21  correct page.
22       THE COURT:  No, it's in there.  I said the
23  e-mails are admissible not for the truth of the matter
24  asserted but instead to demonstrate that complaints in
25  opposition to Ring, R-I-N-G, Road, were made and received,

Proceedings

33

1  some of which indicate racial animus.
2        MR. SEIN:  So as to the claim that these
3  documents are hearsay, your Honor correctly points out in
4  your summary judgment decision they are not hearsay
5  because they will not be offered to prove the truth of the
6  matter but to prove -- purely to show these statements
7  were made and that they were received by the County of
8  Nassau.
9        THE COURT:  I still don't understand how they
10  are admissible against the Village of Garden City.
11       If the Village of Garden City didn't receive
12  them, didn't know anything about them, why would they be
13  admissible against the Village of Garden City?
14       MR. SEIN:  That would lead me to give you a
15  little bit of background of the Ring Road proposal.
16       It was a proposal to build affordable housing
17  warned Garden City, and this was part of a backlash and
18  response that came out of the Ring Road proposal.
19       Some of these documents are in fact e-mails.
20  They are web messages sent to County Executive Suozzi's
21  office, former county executive, and some of them are
22  interdepartmental memos which summarize these
23  communications.  They are documents created by Nassau
24  County summarizing letters and phone calls they received
25  from people in Garden City opposed to the Ring Road

1  affordable housing proposal, and they show public
2  attitudes towards affordable housing and racial attitude
3  in Garden City.
4      That's why --
5      THE COURT:  They show public attitude and racial
6  attitude but no evidence that it went to the Village of
7  Garden City Board of Trustees or anybody in the village.
8  Right?
9      MR. SEIN:  Your Honor, these were sent --
10     THE COURT:  No, my question is:  Did it go to
11  the village trustees or anybody in the village?
12     MR. SEIN:  The particular messages were sent to
13  Nassau County, but they were sent by people in Garden City
14  and --
15     THE COURT:  Mr. Sein, I ask questions from time
16  to time.  I want a responsive answer.
17     MR. SEIN:  Yes, your Honor.
18     THE COURT:  Did they go to the Village of Garden
19  City trustees or any official of the Village of Garden
20  City.
21     MR. SEIN:  These particular messages were sent
22  not to the Village of Garden City but to Nassau County.
23  And, your Honor, they are nevertheless relevant because
24  they are sent by Garden City residents, many of them,
25  related to another affordable housing proposal in Garden

1  City.  They are directly relevant to the background prong
2  laid out in the Village of Arlington Heights' decision.
3      And your Honor should first, again, consider
4  them when they are actually offered at trial, read them
5  for what they are worth, and decide whether or not they
6  are relevant to the issues presented at trial.
7      THE COURT:  I said in my opinion, quote, in any
8  event, even in these e-mails are inadmissible hearsay,
9  there remains sufficient evidence for this Court to find a
10  question of fact with regard to Garden City's historical
11  background as contributing to the plaintiffs' allegations
12  of disparate treatment.
13     MR. SEIN:  That is precisely the point, your
14  Honor.
15     THE COURT:  I'll have to reserve decision on
16  this subject.
17     MS. RONNEBURGER:  Your Honor, if I may, I just
18  want to note that while Mr. Sein argues these are part of
19  the historical background of the zoning decisions, these
20  are from Garden City residents, purportedly, sent to
21  Nassau County after the zoning was enacted, some of them
22  as many as two years after the zoning was enacted, some of
23  them after this case was commenced.  They cannot be part
24  of the historical background of the zoning decision in
25  this matter.

1      And it is also respectfully submitted that
2  Arlington Heights does not say the entire background of an
3  incorporated village can be considered in determining
4  whether a zoning decision could be made with any kind of
5  discriminatory intent.
6      What Arlington Heights says, historical
7  background may be considered if it showed official action
8  was taken with nefarious purpose.  There is absolutely no
9  evidence that any actions were taken with nefarious
10  purpose in this case.
11     And moreover, again, these cannot be part of
12  historical background because they are from after the
13  zoning decision.
14     THE COURT:  I'll take that into consideration.
15     MS. RONNEBURGER:  Thank you, your Honor.
16     THE COURT:  What else?
17     MS. RONNEBURGER:  Plaintiffs also seek to admit
18  two flyers, actually, that cannot be authenticated.  These
19  flyers were purportedly handed out by unnamed residents --
20  not even residents -- citizens prior to public hearings on
21  the zoning.
22     Plaintiffs will argue that at a deposition, a
23  resident admitted to -- or essentially admitted, as they
24  said in their opposition for motion in limine, she was the
25  one that handed this flyer out with another resident.

1      In actuality, this resident testified she handed
2  out a flyer.  She wasn't sure if it was the one they
3  showed her during this deposition --
4      THE COURT:  Where is this in your motion?
5      MS. RONNEBURGER:  It is in our reply.
6      THE COURT:  In your reply?
7      MS. RONNEBURGER:  Yes.
8      THE COURT:  Are you objecting to these flyers
9  because they are not authenticated?
10     MS. RONNEBURGER:  Correct.  And they contain
11  hearsay.  There is no evidence who created them.  They are
12  being offered for the truth of the matter asserted,
13  essentially, and no one has actually said they created
14  them or that they knew anything about the residents that
15  plaintiffs argued handed them out.
16     Didn't actually say they handed them out.  They
17  said they handed a flyer out, and they didn't know if it
18  was this particular flyer.
19     THE COURT:  What about that?
20     MR. SEIN:  Your Honor, there are two documents
21  here that defendants are referring to as the "flyers."
22     The first one, in fact, is not a flyer; it is
23  the newspaper advertisement.  And as such, it would be
24  self-authenticating under Rule 902.  So there wouldn't be
25  any authentication issue.

Proceedings

38

1    Nothing from the advertisement from the
2  newspaper would be offered for the truth of the matter, so
3  there is no hearsay issue presented.
4    Respectfully, as to the first of the two flyers,
5  the newspaper ads, we would argue there is no
6  authentication issue because it is self-authenticating.
7    As to the second document they refer to as a
8  flyer, the document attached to a fax cover page sent by
9  Village Administrator Robert Shelly, who will testify here
10  in court to various individuals, including Frank Fish,
11  F-I-S-H, and former village trustee Rothschild,
12  R-O-T-H-S-C-H-I-L-D -- so, your Honor, the flyer is
13  attached to a facsimile cover page sent from Robert Shelly
14  to these other individuals.
15    We respectfully submit your Honor should wait to
16  hear Mr. Shelly's testimony and decide for yourself
17  whether these can be self-authenticated.  We believe they
18  can.  They were produced from the village's own files to
19  us, and they are part of a document that Mr. Shelly sent
20  to other individuals in the town.
21    THE COURT:  I have problems with these flyers,
22  even though one of them may be in the nature of a
23  newspaper.  Apparently nobody identifies who made these
24  flyers.
25    MR. SEIN:  There was testimony very recently

Proceedings

39

1  when we had depositions of several residents in the
2  Village of Garden City.  There was testimony related to
3  these flyers.
4    So we would ask your Honor to wait for this
5  testimony --
6    THE COURT:  I will wait to hear --
7    MR. SEIN:  -- and defer decision until that
8  time.
9    THE COURT:  I will wait to hear.
10    MR. SEIN:  Thank you, your Honor.
11    THE COURT:  What else?
12    MS. RONNEBURGER:  Plaintiffs seek to admit a
13  press release by the attorney general regarding park
14  access in Garden City.  We would respectfully submit that
15  the press release contains hearsay in that it, the press
16  release, says ACORN filed a complaint that park access was
17  being admitted in a discriminatory manner.
18    Additionally, this press release is entirely
19  irrelevant to this case.  It involves park access from
20  park attendants.  It does not involve the board of
21  trustees; does not involve any official.
22    THE COURT:  Okay.  Let me hear from your
23  opponent.
24    Why is this admissible?
25    MR. SEIN:  Your Honor, it is admissible for the

Proceedings

40

1  same reason that the internet messages and communications
2  with the County by its constituents is admissible.  It
3  reflects the attitude of the community members with
4  respect to making decisions, with respect to the
5  background prong of Arlington Heights, as your Honor
6  refers to.  Because it reflects the attitude of the
7  community, your Honor, it would be admissible for that
8  reason.
9    The press release was an announcement from the
10  attorney general's office announcing the results of an
11  investigation it conducted into discrimination in the
12  Garden City parks.  As the attorney general's
13  investigation found, there were allegations that the
14  park's entry requirements in Garden City were being
15  enforced in a discriminatory manner.  Racial minorities
16  were asked to present identification, whereas
17  nonminorities weren't asked to prove that they lived in
18  Garden City.
19    And for that reason, your Honor, and because it
20  reflects the attitude of the community, the attorney
21  general's investigation and finding of the investigation
22  would be relevant to the issues presented at trial.
23    As to whether or not it is hearsay, for reasons
24  set forth in our brief, says it falls squarely in a
25  hearsay exception.  The exception is laid out in Rule 803,

Proceedings

41

1  section 8, public records, the press release, an
2  announcement of the civil investigation by the New York
3  State Attorney General's Office.
4    There is case law directly on point finding that
5  press releases that announce findings of a civil
6  investigation are not hearsay -- fall within the hearsay
7  exception, rather.  So it is not hearsay, and it is
8  relevant for this reason.
9    THE COURT:  Anything else?
10    Do you want to tell me about this?
11    MS. RONNEBURGER:  Yes, your Honor.
12    Again, plaintiffs have cited to Arlington
13  Heights and say this press release is evidence of a
14  historical background of this case.
15    This press release was issued after the zoning
16  decision.  Plaintiffs continue to bring up Arlington
17  Heights, where the court in Arlington Heights did not look
18  at any other history, other than the actual background of
19  the zone decision.  And moreover, they noted the
20  historical background has to show some kind of nefarious
21  actions taken by individuals.
22    This press release, plaintiffs have
23  misrepresented this.  Garden City was never charged with
24  discrimination.  They never did anything wrong.  There is
25  no proof of that, your Honor.

42

1      THE COURT: I will grant your application. I
2  will decline to allow it in. And also under 403, I think
3  it is unduly prejudicial.
4      MS. RONNEBURGER: Thank you, your Honor.
5      THE COURT: Sustained.
6      MS. RONNEBURGER: Thank you, your Honor.
7      THE COURT: Next.
8      MS. RONNEBURGER: Plaintiffs also listed on
9  their exhibit list a number of expert material. We would
10  respectfully submit these are inadmissible under Federal
11  Rule of Evidence 803 (18), which says that treatises,
12  articles and similar items used by experts cannot be used
13  as exhibits. They can be used on cross, but they may not
14  be offered as exhibits.
15      THE COURT: I think that the plaintiff agreed
16  with that, didn't they?
17      MR. SEIN: Many of these documents, your
18  Honor -- and I'm not sure which documents are being
19  referred to, but we believe -- your Honor, I'm not
20  entirely sure which documents are being referred to. We
21  believe we do know which documents are being referred to,
22  and they are merely marked for ease of identification
23  during trial. We do not actually intend to move their
24  admission during trial.
25      THE COURT: That's what I thought.

43

1      Anything else?
2      MS. RONNEBURGER: Plaintiffs have asked the
3  Court to take judicial notice of a number of cases and
4  statutes. Many of these cases are ACORN filed against
5  individual real estate agencies in Garden City.
6      The Court -- while the Court can take judicial
7  notice of the existence of cases, typically that would be
8  in a matter related to this case.
9      ACORN has been disbanded, and the defendants in
10  those cases are private real estate agencies. To use
11  those cases as evidence in this matter, they are
12  irrelevant, and it would be almost -- would not make
13  sense.
14      You can't hold a municipality liable for what
15  private real estate agencies that happen to be located in
16  a town have allegedly done.
17      While the Court should take judicial notice of
18  these matters, we would ask because they are entirely
19  irrelevant and do not involve any parties in this case,
20  that the Court do not take judicial notice of them.
21      MR. SEIN: Your Honor, there are exhibits
22  attached to our plaintiffs' trial exhibit list that relate
23  to other actions that are relevant to the attitudes in the
24  community. Some of these are actions that are relevant to
25  incidents that happened some years ago. Some of them are

44

1  relevant to actions that are much more recent.
2      And, your Honor, we would submit that you can
3  take judicial notice of the fact that these actions exist,
4  and that your Honor again wait to decide the matter until
5  we've actually presented particular exhibits, or ask the
6  Court to take judicial notice at a particular stage at the
7  trial.
8      THE COURT: Well, as I said, as you commented in
9  your memorandum in the case of Hill against Goord,
10  G-O-O-R-D, 63 Fed.Supp 2d 254, which I decided in 1999. I
11  said, quote, it is entirely proper for this Court to take
12  judicial notice of the actions taken in these related
13  proceedings to establish the fact of such litigation and
14  related filings.
15      And I also stated -- I also see that you said,
16  properly, that courts routinely take judicial notice of
17  documents filed in other courts, again, not for the truth
18  of the matters asserted in the other litigation but rather
19  to establish the fact of such litigation and related
20  filings.
21      So I'll have to see what comes in when you do.
22  I'll reserve decision on that.
23      MS. RONNEBURGER: Thank you, your Honor.
24      MR. SEIN: Thank you, your Honor.
25      THE COURT: Anything else?

45

1      MS. RONNEBURGER: I have nothing further, no.
2      THE COURT: Anything else in motions in limine?
3      MR. BROWN: No, your Honor. No other motions in
4  limine are pending before the Court.
5      We do have -- I don't know if this is the
6  appropriate time, but we do have some logistical issues we
7  want to take up with the Court.
8      THE COURT: Go ahead.
9      MR. BROWN: Okay. I would say many of these,
10  your Honor, are simply to help these proceedings proceed
11  in the most expeditious and efficient way possible.
12      First, your Honor, the parties have agreed to a
13  number of joint exhibits and would like to move them into
14  evidence now so we don't have to go through that process
15  later on and slow up the proceedings. And we can list
16  those for you if you would like.
17      THE COURT: Yes.
18      MR. BROWN: I'm going to turn that over to my
19  colleague, Ms. Brandriss, to do that.
20      THE COURT: Whose exhibits are they?
21      MR. BROWN: These will be joint exhibits.
22      THE COURT: Joint exhibits?
23      MR. BROWN: That is correct.
24      MS. BRANDRISS: Your Honor, I'm Chava Brandriss
25  for the plaintiffs, and with the consent of our

Proceedings

46

1 adversaries, I'll read for the Court the contents of
2 Exhibit G to the joint pretrial order, which are the
3 parties' joint exhibits to which both parties have
4 stipulated to the admission at trial.
5     Joint Exhibit No. 1 -- would it be helpful if I
6 read the descriptions as well as the exhibit numbers?
7     THE COURT: Pardon?
8     MS. BRANDRISS: Would it be helpful if I read
9 the descriptions as well as the numbers?
10     THE COURT: Very quick, short.
11     MS. BRANDRISS: Joint Exhibit 1, Fish and
12 Yardley to Shelly --
13     THE COURT: I didn't hear a thing you said.
14     MS. BRANDRISS: There are very many names of
15 people in this list.
16     THE COURT: What is Exhibit 1? Is it what? Is
17 it a deed? Is it a will? Is it a contract? Is it a
18 ticket to the Jets game? What is it?
19     MS. BRANDRISS: I'll read it without people's
20 names in the process.
21     Joint Exhibit 1 is a fax.
22     THE COURT: A fax.
23     MS. BRANDRISS: A fax.
24     THE COURT: What date?
25     MS. BRANDRISS: December 13, 2002.

Proceedings

47

1     THE COURT: Fine.
2     MS. BRANDRISS: Joint Exhibit 2, a memo,
3 November 15, 2002.
4     Joint Exhibit 3, a draft of a zoning study.
5     THE COURT: A draft of what?
6     MS. BRANDRISS: Draft of a zoning study dated
7 May 13, 2003.
8     Joint Exhibit 4 is a letter enclosing PowerPoint
9 slides.
10     THE COURT: What is the date of the letter?
11     MS. BRANDRISS: The date is May 29 -- the
12 letter, I'm sorry, is May 30, 2003, and the slides are
13 dated May 29, 2003.
14     Joint Exhibit 5 is a memo dated May 19, 2003.
15     Joint Exhibit 6 are a board of trustees meeting
16 minutes with attendance sheet, June 24, 2003.
17     Joint Exhibit 7 is another draft zoning study
18 dated July 9, 2003.
19     Joint Exhibit 8 --
20     THE COURT: Just one minute. What date is that,
21 No. 7?
22     MS. BRANDRISS: 7 is July 9, 2003.
23     THE COURT: Okay.
24     MS. BRANDRISS: Joint Exhibit 8 is a BJF meeting
25 record dated August 19, 2003.

Proceedings

48

1     Joint Exhibit 9 is an environmental assessment
2 form, September 8, 2003.
3     Joint Exhibit 10 are slides, PowerPoint slides,
4 dated October 23, 2003.
5     Joint Exhibit 11 is a draft zoning study dated
6 November of 2003.
7     Joint Exhibit 12 is a transcript of public
8 hearing dated February 5, 2004.
9     Joint Exhibit 13 is a PowerPoint presentation
10 dated April 22, 2004.
11     THE COURT: Just one minute. What date is it?
12     MS. BRANDRISS: April 22, 2004.
13     THE COURT: Okay.
14     MS. BRANDRISS: Joint Exhibit 14 is an
15 environmental assessment form dated May of 2004.
16     Joint Exhibit 15 is a notice of adoption of
17 local law dated June 3, 2004.
18     Joint Exhibit 16 is a memo dated September 30,
19 2003.
20     Joint Exhibit 17 is a memo dated November 10,
21 2003.
22     Joint Exhibit 18 are notes for discussion dated
23 April 1st --
24     THE COURT: Are what?
25     MS. BRANDRISS: Notes, N-O-T-E-S, for discussion

Proceedings

49

1 dated April 1, 2004.
2     Joint Exhibit 19 is a memo dated May 4, 2004.
3     Joint Exhibit 20 is a memo dated August 14,
4 2002.
5     Joint Exhibit 21 is a memo dated April 17, 2003.
6     Joint Exhibit 22 is a memo dated April 29, 2003.
7     Joint Exhibit 23 is a memo dated November 19,
8 2003.
9     Joint Exhibit 24 is a public hearing transcript
10 dated January 8, 2004.
11     THE COURT: Just hold it.
12     Okay.
13     MS. BRANDRISS: Joint Exhibit 25 is a transcript
14 dated May 20, 2004.
15     Joint Exhibit 26 is a letter dated September 18,
16 2002.
17     Joint Exhibit 27 is a resolution dated May --
18     THE COURT: Is a what?
19     MS. BRANDRISS: Resolution dated May 28, 2004.
20     Joint Exhibit 28 is a letter dated October 28,
21 2004.
22     Joint Exhibit 29 is a fax dated September 10,
23 2004.
24     And Joint Exhibit 30 is a compilation, undated,
25 of spreadsheet.

Proceedings

50

As I stated at the start of this list, all of these joint exhibits are listed by exhibit number date, description, and production number on Exhibit G to the parties' joint pretrial order.

And we'd like to have these exhibits admitted at this time.

THE COURT: Pardon me?

MS. BRANDRISS: The parties would like to have these admitted at this time.

THE COURT: Any objection?

MS. MCLAUGHLIN: No objection.

THE COURT: Joint exhibits 1 through 30, admitted.

(Whereupon, Joint Exhibits 1 through 30 were received in evidence.)

MR. BROWN: Thank you, your Honor.

Towards that end, we will have binders of exhibits we'll hand up for both you, for your convenience, and to the court reporter.

A couple of other issues we want to bring to your attention. Again, most of them are logistical.

The parties have agreed the rule on witnesses under Rule 615 is appropriate in this case, and they've agreed who will be the designated representatives of the parties.

Proceedings

51

And do you want me to tell you exactly who they are?

THE COURT: Yes. I don't know what that means.

MR. BROWN: For the plaintiffs, the representative for New York Communities for Change will be Ann Sullivan, who will be the director of that organization.

THE COURT: Did someone stand up?

MR. BROWN: That is Ann Sullivan.

THE COURT: Hello, Ann Sullivan.

MR. BROWN: The representative for MHANY Management, the nonprofit, will be I-S-M-I -- I'm sorry, I-S-M-E-N-E, S-P-E-L-I-O-T-I-S, who I don't think is in the courtroom with us today, but she will be our representative.

For Garden City, I will turn it over to Ms. McLaughlin.

MS. MCLAUGHLIN: Good morning.

For the Village we have Mr. Robert Shelly. He's the village administrator. From time to time, a board of trustee member may also attend.

As you know, our board is volunteer members, so they'll be rotating their attendance here.

We have Mr. Andrew Cavanaugh here today.

THE COURT: Okay.

Proceedings

52

MR. BROWN: Your Honor, the next issue is simply one that we would inquire of you in terms of the timing of the case.

I think it was discussed that we have 12 trial dates set. Obviously, this morning has been given up to preliminaries and motions, so we have about 11 and a half days left.

Would you expect each side will approximately have five and three-quarters days for their presentation in their case? Is there any particular sequence you want to follow?

THE COURT: No. You put the plaintiffs' case in, and they follow with the defendants' case. That is the sequence.

MR. BROWN: Very good.

THE COURT: No different than any other case.

MS. MCLAUGHLIN: Your Honor, we talked to counsel about a possible strategy that most of our witnesses are being called on the plaintiffs' direct case. We think it would be efficient and make sense if that witness is here, available and present, that we continue with our case after plaintiff is done with that witness.

THE COURT: No. It is not unusual for a plaintiff to put defendant's witnesses on. It's done all the time.

Proceedings

53

When the plaintiff concludes their case, then you can put your case in.

MS. MCLAUGHLIN: Thank you.

THE COURT: I will not interrupt in the middle of your case.

MR. BROWN: Very good, your Honor. We appreciate that.

I have one other issue. This is again with the agreement of the parties.

With regard to experts, the parties have agreed that when Ms. McArdle testifies, that their expert, Mr. Salzburg can be present, and vice versa.

THE COURT: Surely.

MR. BROWN: And with that, your Honor, I think we have taken care of all the preliminaries.

THE COURT: Okay. We'll take a ten-minute recess. Ten minutes.

MR. BROWN: Very good.

(Whereupon, a recess was taken.)

THE COURT: The schedule for this week will be 9:30 a.m. to 12:30 p.m., when we take lunch from 12:30 to 1:30, and then we work until 5:00. That will be for the rest of the week except Friday.

MR. BROWN: Very well.

THE COURT: If it continues after that, I'll

Proceedings

54

1   have to let you know.

2       I think that before we go any further, I think I

3   ought to put on the record the stipulated facts.  I think

4   it is very important that the following facts have been

5   stipulated, agreed to, by both parties.

6       1.  Plaintiff Vic DeVita was a white man who

7   resided in Garden City, New York, and desired to live in a

8   more integrated Garden City.  He resided less than two

9   miles from the site that was at issue in this litigation.

10  Mr. DeVita passed away in February of 2012.

11      2.  Plaintiff Francine McCray is an

12  African-American woman who has been seeking an affordable

13  residence in Nassau County.

14      MR. RYAN:  Your Honor, Ms. McCray is no longer a

15  plaintiff.

16      MR. BROWN:  Yes, your Honor.

17      MR. RYAN:  And obviously Mr. DeVita is no longer

18  a plaintiff either.

19      THE COURT:  So they are both former plaintiffs.

20      MR. RYAN:  Correct, your Honor.

21      THE COURT:  3.  Former plaintiffs Natalie

22  Guerrido, G-U-E-R-R-I-D-O, Vernon Ghullkie and Lisbett

23  Hunter dismissed all claims against the defendants

24  pursuant to Federal Rule 41.

25      4.  Plaintiff MHANY -- how do you pronounce it?

Proceedings

55

1       MR. BROWN:  We called it MANNY [phonetic]

2   Management.

3       THE COURT:  That's good.

4       MR. BROWN:  Try to make it easy as possible.

5       THE COURT:  Good.  I'll go with that.

6       Plaintiff MHANY Management, Inc., is a

7   not-for-profit community-based developer of affordable

8   housing incorporated in New York, and at all times

9   relevant to the allegations in the amended complaint was

10  known as New York ACORN, in caps, A-C-O-R-N, Housing

11  Company, Inc.

12      5.  Former plaintiff New York Association of

13  Community Organizations for Reform Now, New York ACORN, is

14  a former local chapter of a nationwide not-for-profit

15  corporate entity that was called the Association of

16  Community Organizations For Reform Now, organized and

17  existing under the State of Arkansas and which disbanded

18  in or about December of 2009.

19      6.  Plaintiff New York Communities for Change,

20  Inc., is a nonprofit entity formed in December of 2009 and

21  intervened in this action on or about June 30, 2009.

22      7.  Defendant Incorporated Village of Garden

23  City is a municipal corporation organized in New York

24  state.  It is located in New York state in the County of

25  Nassau.

Proceedings

56

1       8.  Defendant Garden City Board of Trustees is

2   an elected governing body in Garden City.

3       9.  In or about May 2002, Nassau County, New

4   York, under the leadership of Thomas Suozzi, the then

5   County Executive of Nassau County, began drafting a real

6   estate consolidation plan.  The purpose of the plan was to

7   identify what properties the county needed to operate its

8   government.

9       The balance of the other properties that the

10  county owned would be sold in order to maximize revenue to

11  fund renovations for the county's existing operations.

12      10.  One of the properties considered under the

13  plan was a parcel of land located within the boundaries of

14  the Village of Garden City in its public, or "P" zone,

15  which incorporates numerous county buildings, including

16  but not limited to Nassau County police headquarters, the

17  county executive building, the Nassau County Supreme Court

18  and the Social Services building.

19      The entire parcel encompasses 84.76 acres.

20      The portion of the "P" zone site at issue is an

21  approximately 25-acre site which currently and at all

22  times relevant to the allegations in the amended complaint

23  houses the parking lot for the Supreme Court of Nassau

24  County, the former Social Services building, a garage, an

25  ancillary building and additional parking facilities,

Proceedings

57

1   hereinafter called "Social Services site."

2       11.  The Social Services site consists of

3   21.44 acres located on the eastern side of County Seat

4   Drive on which the Social Services building and a parking

5   lot are located, an additional 3.03 acres located on the

6   western side of County Seat Drive on which a county-owned

7   building and parking garage sit.

8       12.  The County intended to sell the Social

9   Services site to a private developer.

10      13.  Nassau County's goal was to maximize the

11  value of the Social Services site.

12      14.  The County hoped to receive at least

13  $30 million for the property.

14      15.  At the time the County was devising the

15  plan, the zoning of the Social Services site was

16  designated by the Code of the Village of Garden City as

17  "P," for Peter, which permitted government and court

18  buildings, hereinafter "P" zone.

19      The "P" zone did not have any other area or bulk

20  controls, nor did it permit residential housing.

21      16.  The County requested that the Village

22  rezone the Social Services site for residential

23  development.

24      The next series of stipulated facts are under

25  the title "The Rezoning Process, Reports Prepared By

1 Buckhurst, B-U-C-K-H-U-R-S-T, Fish, F-I-S-H, and
2 Jacquemart, J-A-Q-U-E-M-A-R-T.
3 　　17. In or about June 2002, upon the County's
4 request to rezone the Social Services site, the Village
5 created a subcommittee charged with retaining a planner,
6 reviewing zoning options for the Social Service's site,
7 and reviewing zoning options for the entire 84.76-acre "P"
8 zone, including the Social Services site. The "P" zone
9 committee consisted of village trustees Peter Bee, B-E-E,
10 Peter Negri, N-E-G-R-I, and Gerard Lundquist,
11 L-U-N-D-Q-U-I-S-T.
12 　　18. Bee was the chairman of the "P" zone
13 committee.
14 　　19. The County retained the firm of Buckhurst
15 Fish and Jacquemart.
16 　　20. On September 13, 2002, BFJ sent a facsimile
17 to Garden City outlining the general planning principles
18 for redevelopment of county properties in Garden City.
19 These principles included that: Any rezoning associated
20 with the proposed development should be in accordance with
21 the goals and parameters set forth in the zoning code.
22 　　21. BFJ presented a memorandum to the Village
23 dated November 15, 2002, titled "Potential Approach to 'P'
24 Zone Changes."
25 　　22. In or about March of 2003, a meeting was

1 held by the "P" zone committee with various village
2 property owners' associations at which the "P" zone
3 committee give an overview of the plan.
4 　　23. Similarly, in or about March of 2003, a
5 public meeting was held for Garden City residents at which
6 the plan was described by the former county executive.
7 　　24. On April 29, 2003, BFJ issued a memorandum
8 to the "P" zone committee proposing a zone designated CO,
9 Charlie, oboe, 5(b), for baker, CO-5(b), for the Social
10 Services site, and CO-5(a), for able, for the remaining
11 63.32 acres of the "P" zone.
12 　　On the April 29, 2003, memorandum, BFJ proposed
13 applying existing R-M, Roger Mike, zoning controls to the
14 residential component of the proposed CO-5(b) zone. This
15 would have allowed for up to 311 residential units to be
16 built at the Social Services site.
17 　　The proposed R-M, Roger Mike, zoning controls
18 permitted the construction of multifamily housing as well
19 as townhouses and single-family dwellings.
20 　　25. In or about May 2003, BFJ presented its
21 first report titled "Village of Garden City - a Zoning
22 Study for Public "P" Zone Committee by BFJ."
23 　　Under the proposed R-M zoning contemplated by
24 the May 2000 report for the residential component of the
25 Social Services site, single-family homes, townhouses or

1 apartments would be permitted.
2 　　26. Specifically, the May 2003 report states:
3 We propose using the existing R-M zoning controls for the
4 residential component of the CO-5(b) zone...R-M allows
5 14.5 units per acre. At the Social Services site, this
6 would allow a total of 311 units.
7 　　The CO-5(b) zone would also allow single-family
8 homes at an R6 density, which would apply approximately
9 75 units.
10 　　27. The May 2003 report also states that BFJ's
11 zoning proposal would, quote, be likely to generate a net
12 tax benefit to the village.
13 　　28. On or about May 29, 2003, BFJ made a
14 PowerPoint presentation of the May 2003 report to the
15 Village.
16 　　29. Under the proposed zoning contemplated by
17 the May 2003, presentation, single-family homes,
18 townhouses or apartments would be permitted at the Social
19 Services site.
20 　　30. In or about July 2003, BFJ presented its
21 second report titled "Village of Garden City - A Zoning
22 Study for Public 'P' District Containing the County
23 Properties."
24 　　31. Under the proposed R-M zoning contemplated
25 by the July 2003 report, single-family homes, townhouses

1 or apartments would be permitted at the Social Services
2 site.
3 　　32. Specifically, the July 2003 report states:
4 We propose using the existing R-M zoning controls for the
5 residential component of the CO-5(b) zone...R-M allows
6 14.5 units per acre. At the Social Services site, this
7 would allow a total of 311 units.
8 　　The CO-5(b) zone would also allow single-family
9 homes at an R6 density, which would allow a total of
10 approximately 75 units.
11 　　33. The July 2003 report also states that there
12 would be smaller number of school children generated by
13 the new development than with the development of
14 single-family homes.
15 　　34. The July 2003 report further states that
16 BFJ's zoning proposal would, quote, be likely to generate
17 a net tax benefit to the Village.
18 　　35. In September 2003, BFJ issued a draft
19 environmental assessment form. The September 2003 EAF
20 also proposed R-F district zoning proposed be used for the
21 residential component of the Social Services site.
22 　　36. On or about October 23, 2003, BFJ made
23 another PowerPoint presentation to the Village,
24 summarizing the CO-5(b) zoning, including the R-M zone for
25 the residential component.

Proceedings

62

37. Under the proposed zoning contemplated by the October 23, 2003, presentation, single-family homes, townhouses or apartments would be permitted at the Social Services site.

38. In or about November of 2003, BFJ presented its third report titled "Village of Garden City - A Zoning Study For public 'P' District Containing the County Properties."

39. Under the proposed R-M zoning contemplated by the November 2003 report, single-family homes, townhouses or apartments would be permitted at the Social Services site.

40. Specifically, the November 2003 report states, quote: We propose using the existing R-M zoning controls for the residential component of the CO-5(b) zone. R-M allows 14.5 units per acre. At the Social Services site, this would allow a total of 311 units.

The CO-5(b) zone would also allow single-family homes at an R8 density, which would allow approximately 90 units.

41. The November 2003 report states that there would be a smaller number of school children generated by the new development than with the development of single-family homes.

42. The November 2003 report also states that

Proceedings

63

BFJ zoning proposal would, quote, be likely to generate a net benefit to the Village.

The next section is entitled the January and February 2004 public hearings.

43. On or about January 8, 2004, a public hearing was held for the purposes of considering a proposed Local Law that would effectively rezone the "P" zone.

44. At the January 8, 2004, hearing, public comment on the proposed Local Law was heard.

45. The proposed Local Law considered at this meeting would create a new CO-5(b) zone which would include the Social Services site, allowing residential use as well as office and courtroom use.

46. The residential use in the new CO-5(b) zone would allow both single-family as well as multifamily units at the Social Services site.

47. On or about February 5, 2004, a second public hearing was held for the purposes of further considering the proposed Local Law presented at the January 8, 2004, public hearing.

48. At the February 5, 2004, hearing, further public comment on the proposed Local Law was heard.

The next subdivision is entitled "The April 2004 Public Meeting."

Proceedings

64

49. On or about April 22, 2004, BFJ made a PowerPoint presentation to the village residents.

50. Under the proposed zoning contemplated by the April 22, 2004, presentation, single-family homes, townhouses or apartments would be permitted at the Social Services site. The proposed zoning defined the term "townhomes."

51. Under the proposed zoning contemplated by the April 22, 2004, presentation, 90 single-family homes, 150 townhouses or 215 apartments would be permitted at the Social Services site.

The next section is entitled "The R-T," Roger, tiger, "Zone."

52. In May 2004, BFJ issued its final environmental assessment form.

53. BFJ's May 2004 environmental assessment form proposed a "residential townhouse, `R-T' district" to replace the previously proposed CO-5(b) district. The R-T zone.

54. The R-T zone permits the construction of townhouses and single-family dwellings.

55. The R-T zone allowed multifamily dwellings on 3.3 acres of the Social Services site west of County Seat Drive, with a special permit.

56. The May 2004 EAF referenced the proposed

Proceedings

65

Local Law 2-2004.

Next section, Adoption of Local Law 2-2004.

57. On May 20, 2004, proposed Local Law 2004 was considered at a public hearing.

58. Local Law 2004 amended the code to delete the "P" zone and replace it with a CO-5 and R-T district.

59. On June 3, 2004, the new R-T zoning was adopted by Garden City, and the Social Services site was rezoned R-T.

60. The R-T district encompasses the Social Services site.

The next and last subdivision is NYAHC's Response to Nassau County's RFP for the Social Services Site.

61. On July 2004, the County issued a Request for Proposals, the County's RFP, Roger, fox, Peter, concerning the Social Services site under the R-T zoning designation.

62. The County's RFP required that each proposal contain a fixed purchase price of not less than $30 million.

63. The County RFP required that all proposals be received before 12 noon on September 10, 2004.

64. On September 10, 2004, NYAHC submitted a proposal to the County to develop the Social Services

Proceedings

66

1  site.

2      65.  The September 10, 2004, proposal
3  contemplated the plaintiff NYAHC leasing the Social
4  Services site from the County.

5      66.  The September 10, 2004, proposal did not
6  utilize the R-T zoning.  The proposal contemplated a
7  development of 2,000 apartment units, which about
8  two-thirds would be below market rents for families making
9  between 40 percent and 120 percent of the Nassau County
10  median income, and 30 percent would be at market rents.

11      67.  The County awarded the contract to develop
12  the Social Services site to Fairhaven, F-A-I-R-H-A-V-E-N,
13  Properties for $56,500,000.

14      68.  That transaction with Fairhaven Properties
15  never closed.

16      69.  The final agreed-upon, stipulated facts.

17      The Social Services site is no longer for sale
18  by the County.

19      Do you wish to make an opening statement?

20      MR. BROWN:  Yes, your Honor, I do.  But before I
21  do that, there are actually a few other stipulations that
22  the parties have agreed to.

23      THE COURT:  Okay.  Where are they?

24      MR. BROWN:  If it is convenient for the Court,
25  we would read them into the record at this point.

Proceedings

67

1      THE COURT:  What are they?

2      MS. BRANDRISS:  Three additional stipulated
3  facts:

4      That the population of the incorporated Village
5  of Garden City in 2000 was 21,672 people.

6      THE COURT:  That is the population of the
7  Village?

8      MS. BRANDRISS:  Yes.

9      THE COURT:  How much?

10      MS. BRANDRISS:  21,672 people in the year 2000.

11      An additional stipulated fact in that the area
12  of Garden City is 5.3 square miles.

13      And the last stipulated fact is that in
14  2011-2012, Garden City contained the following type of
15  residential dwelling places in the following quantities:

16      Single-family homes, 6,485.

17      Condominiums, 410.

18      Apartments or co-ops, 691.

19      THE COURT:  Okay.  Any additional stipulated
20  facts?

21      MR. BROWN:  I think that is all as far as the
22  parties are concerned, your Honor.

23      Your Honor, as I said, we do wish to make an
24  opening statement.

25      THE COURT:  Go ahead.

Opening Statement by Mr. Brown

68

1      MR. BROWN:  But given the nearness to lunch,
2  would it be possible to take an early lunch and start --

3      THE COURT:  No, it's not possible.  You will do
4  it now, and if you have to take it over, you'll take it
5  over.

6      MR. BROWN:  Very well, your Honor.

7      THE COURT:  There is no jury here.  I'll listen
8  to it.

9      MR. BROWN:  Thank you, your Honor.

10      THE COURT:  Go ahead.

11              - - -

12      MR. BROWN:  Your Honor, I open for both
13  plaintiffs today.

14      The two parties, as you know, are the New York
15  Communities For Change, or NYCC.  They are a nonprofit
16  membership organization dedicated to improving the life of
17  low income individuals in New York.

18      Many of their members, your Honor, are
19  desperately in need of affordable housing and have
20  suffered the result of segregation in Nassau County,
21  including crime and inferior schools.

22      The second plaintiff is Mutual Housing
23  Association, or MHANY Management, which is a
24  not-for-profit developer of affordable housing.

25      I would like to take note, your Honor, of Vic

Opening Statement by Mr. Brown

69

1  DeVita, a former plaintiff no longer in this case because
2  he passed last year.  Mr. DeVita was a white resident of
3  Garden City who very much wanted to see an integrated
4  village, and he was shunned by his neighbors because he
5  spoke up for racial justice.

6      This case involves one of the most persistent
7  obstacles of integrated housing in the United States:  the
8  use of exclusionary zoning to block affordable housing
9  likely to be occupied by minority residents.

10      We are before the Court today because Garden
11  City, in response to racially animated pressure from its
12  residents, enacted a new zone never before used in Garden
13  City to preclude any realistic possibility of affordable
14  housing in that zone.

15      In doing so, they ignored the recommendation of
16  the zoning advisor that they hired to assist.  They
17  ignored the recommendation of a group of trustees that
18  were tasked to recommend zoning to the so-called "P" zone
19  site, and they turned from their own decision to recommend
20  zoning that would have allowed the development of 311
21  multifamily homes on the so-called Social Services site.

22      If they had allowed that multifamily zoning to
23  go forward, it would have been possible to build
24  affordable housing on this site.  But in the face of an
25  outcry from village residents, they zoned the possibility

70

1  of affordable housing out of existence.
2        It is unfortunate, no surprise.  Garden City has
3  a history of racial animus.  That history has led to a
4  lily white enclave surrounded by a number of predominantly
5  minority areas.  After all of these years, Garden City
6  still doesn't seem to understand our arguments.  They have
7  instead created arguments that we don't make and show why
8  they should be rejected.
9        So we don't claim there is an obligation to
10  building affordable housing or to zone at maximum density.
11  The fundamental proposition we're making, you can't use
12  zoning as a tool to block the possibility of constructing
13  affordable housing that would likely be occupied largely
14  by minorities.
15        Now let me start with some important background
16  facts.
17        It is undisputed that as of the 2000 census,
18  Nassau County was one of the most segregated counties in
19  the U.S.  Affluent Garden City was 97.4 percent white, in
20  stark contrast to predominantly minority communities like
21  Hempstead and Roosevelt that were nearby.
22        We've put up here, your Honor, a map that shows
23  the percentage of black or Hispanic residents in various
24  towns.  I think the important thing here is --
25        MR. RYAN:  Objection, your Honor.  The map is

71

1  not in evidence.
2        THE COURT:  Sustained.
3        MR. BROWN:  Your Honor, the map is simply to
4  show what the racial composition is of this area.
5        In any event, it is clear, and you will have
6  testimony to the effect, that Garden City is, as I said, a
7  white enclave surrounded by many minority communities.  It
8  is not a rural village.  There are some 21,000 residents
9  in an urbanized area of Long Island.  If Garden City had
10  the same percentage of minorities as Nassau County, it
11  would have had 1,333 minority households in 2000 rather
12  than 157 minority households that actually live there.
13        There is not a single unit of affordable housing
14  in Garden City, and there never has been.
15        Garden City has been resistant to the
16  development of affordable housing, and that resistance has
17  helped perpetuate segregation in Nassau County.
18        And while some municipalities in Nassau County
19  have realized the need for affordable housing and
20  diversity and joined an organization called the Long
21  Island Consortium, a coalition of Long Island
22  municipalities willing to receive federal funds to assist
23  in the development of affordable housing, to this day, to
24  this day, Garden City has refused to join.
25        Garden City residents do not use the ugly words

72

1  of the past, but what they do and what they say carry the
2  same messages and results.
3        Now as to the background of this group.
4        In 2002, at a time of fiscal crises, the then
5  Nassau County executive adopted a consolidation plan.
6  Mr. Suozzi needed money.  He had more real estate owned by
7  Nassau County than was needed and determined to sell some
8  of that real estate, including holdings in Garden City.
9        A key piece of land in the case is a 25-acre
10  site in Garden City called the Social Services site.
11        I'm sure --
12        MR. RYAN:  Objection, your Honor.
13        MR. BROWN:  Your Honor --
14        MR. RYAN:  This is an exhibit not in evidence.
15  There are joint exhibits in this.
16        Are you representing this is from a joint
17  exhibit?
18        MR. BROWN:  No, I'm not representing this is
19  from a joint exhibit.
20        What I am saying, your Honor, this is a
21  satellite view, a map of the site that is at issue here.
22  We think it will be --
23        THE COURT:  There is no question it will go in,
24  is there?
25        MR. RYAN:  No, your Honor.

73

1        THE COURT:  So I'll allow it.
2        MR. BROWN:  Thank you, your Honor.
3        THE COURT:  The Social Services site, is that
4  where the state supreme courthouse is?
5        MR. BROWN:  Actually south of that, your Honor.
6        THE COURT:  First of all, the county court faces
7  Old Country Road, right?
8        MR. BROWN:  That is right.
9        THE COURT:  And then south of that is the
10  supreme court -- well, south is a parking area and then
11  the supreme court, right?
12        MR. BROWN:  That is correct.
13        THE COURT:  And then a parking area, again, for
14  the supreme court, and then the Social Services building.
15        MR. BROWN:  The social -- yes.  The Social
16  Services site.
17        THE COURT:  I tried many cases in those courts,
18  so I'm very familiar.
19        MR. BROWN:  I suspect you've passed the site
20  many, many times.
21        But since we'll be talking about it at length, I
22  thought it would be valuable for you to see where it is.
23        Below the court, the Social Services building is
24  to the south.  To the north of that is a huge ground-level
25  parking lot.  And we don't have a map that might actually

**74**

1  be helpful in terms of showing this site, but it is bound
2  by South Drive to the north, 11th Street to the south,
3  Washington Avenue to the east, and County Seat Drive to
4  the west.
5         In this image, it shows the site clearly.
6         There is one piece, though, that I want to
7  particularly point out, because that piece is going to
8  be -- you'll hear about it a lot during the course of this
9  trial.
10        There is about three acres of that site that is
11 on the west side of County Seat Drive and houses several
12 small county buildings.
13        Let's go back to the satellite image.
14        So west of County Seat Drive, you will see there
15 are a bunch of buildings there.  Those are Nassau County
16 buildings.  And of course further west of that is Franklin
17 Avenue, Sears Roebuck, and Sears Roebuck parking lot backs
18 up to that area.
19        You'll be hearing what we call a three-acre
20 sliver during the course of this trial, more than one
21 time.
22        In any event, the County decided and desired to
23 sell that Social Services site for multifamily housing
24 which would allow maximum revenue from the sale.
25        Now, because the Village, the Village of Garden

**75**

1  City, of course, had zoning authority for that
2  municipality, Nassau County asked the Garden City village
3  board of trustees to rezone the "P" zone site, because "P"
4  zone stands for governmental use.  And if it rezones to
5  allow residential uses, this site could then be sold for
6  residential development.
7         So what happened was the mayor of Garden City
8  and its village trustees appointed three trustees that
9  they called the "P" zone committee to make recommendation
10 in connection with rezoning the "P" zone site, including
11 the Social Services site.  The three members of the city
12 were Peter Bee, its chairman -- that is B-E-E, Peter
13 Negri, N-E-G-R-I, and Gerard, G-E-R-A-R-D, Lundquist,
14 L-U-N-D-Q-U-I-S-T.
15        They immediately went about hiring a planning
16 and zoning consultant, a firm that we've already talked
17 about, Buckhurst, Fish and Jacquemart -- do you want me to
18 spell that out again for you?
19        THE COURT:  I think that is all right.
20        MR. BROWN:  It is already in the record.
21        In any event, they hired them to advise them.
22 We'll call them BFJ for the purposes of this trial.
23        BFJ had worked on many projects in Garden City
24 before and Frank Fish, whose name you heard earlier, was
25 the lead BFJ consultant for this project, and he was a

**76**

1  principal at BFJ.
2         BFJ met with the "P" zone committee and came up
3  with planning principles or assumptions used in the zoning
4  process.  Those assumptions appeared in BFJ's first report
5  in November of 2002 and are repeated in virtually every
6  report issued for the next year and a half.
7         I put those assumptions on the screen.  They
8  are, by the way, part of a joint exhibit.
9         I want to point out a couple of them I think are
10 of particular importance.
11        First of all, it says respect for existing
12 neighborhood, and they would be sensitive particularly the
13 residential neighborhood that surrounded the Social
14 Services silent.
15        Maximize -- that is number C.
16        Maximize the use of existing zoning tools.  The
17 assumption is to borrow, where possible, from existing
18 regulations that are currently contained in the Garden
19 City zoning code.  In other words, if we were to rezone
20 this site from a public use to a residential use, let's
21 use something that already exists in the Garden City code.
22        Finally, I want to point out and emphasize
23 environmental impact.  This assumes we would be careful of
24 not overwhelming the neighborhoods with any significant
25 adverse environmental impacts, particularly traffic,

**77**

1  visual effects, or burdens on public facilities, including
2  public schools.
3         I would ask your Honor to keep those principles
4  in mind because they are repeated by BFJ again and again
5  in its recommendations to allow residential multifamily
6  housing containing 311 multifamily units on the site.
7         In any event, in this same report, BFJ made the
8  following recommendation -- and again, I will put that up
9  on the screen.  And again, this is part of a joint
10 exhibit.
11        They said -- and I read it because of its
12 importance:  We propose using the existing R-M zoning
13 controls for the residential component of the CO-5 zone.
14 And the CO-5 zone is a Social Services site.  An R-M zone
15 is currently mapped north of 15th Street on Old Country
16 Road, the Cherry Valley apartments.
17        In other words, what he's saying, it is already
18 used in another location, the Cherry Valley apartments.
19        R-M allows 14.5 units per acre.  At the Social
20 Services site, this would allow a total of 311 units.  The
21 CO-5 zone would also allow single-family homes at an R 6
22 density, which would allow a total of approximately
23 75 units.
24        Then he says:  Under the proposed zoning,
25 single-family, town homes or apartments would be allowed.

**78**

1    Now, as BFJ noted in another report, this R-M,
2 or residential multifamily, zoning was the lowest density
3 permitted under the Garden City city code.  In other
4 words, you can build two-and-a-half-story garden
5 apartments under this R-M zoning, but you would not be
6 able to build, for example, a high-rise building.
7    This proposal which I read to you just now
8 remained in every BFJ report until April of 2004, a total
9 of six reports.  It is disingenuous to say that
10 residential multifamily zoning permitting 311 multifamily
11 units was one of numerous options contemplated over the --
12 over a two-year period, because again and again, that is
13 exactly what BFJ recommends.
14    Every proposal, every proposal, until what I
15 will call the citizens' revolt in early 2004, when the
16 prospect of affordable housing arose, proposed residential
17 multifamily zoning allowing 311 units.  You will see it,
18 your Honor, in report after report.
19    This was not a consultant who was on a frolic of
20 some kind, acting without authorization.
21    We'll introduce evidence that in November of
22 2003, the "P" zone committee wrote to the mayor and the
23 full board saying they endorsed BFJ's recommendation.
24 That same month, the board, the entire village board,
25 unanimously accepted the report and, pursuant to Garden

**79**

1 City zone law, moved it to the formal public hearing
2 stage.
3    Then something happened that changed the whole
4 tenor of this process.
5    Garden City has four property owners
6 associations, your Honor.  They are call the Central,
7 East, West and Estates.  The trustees of the village, the
8 village trustees, look to that as representative of the
9 residents that are within the geographic areas covered by
10 those associations, so they align to their views, attend
11 their meetings and provide updates on various town
12 business.
13    The EPOA, the Eastern Property Owners
14 Association, was particularly interested in the "P" zone
15 since it was in their area of the Village.
16    In any event, the "P" zone committee briefed the
17 POA's progress of the "P" zone and, at a meeting of this
18 Eastern POA on January 20, 2004, Trustee Bee, who you may
19 recall was the chair of the "P" zone committee, the group
20 that was to recommend zoning, new zoning for Garden City,
21 was asked a question.  And in answer -- about affordable
22 housing.
23    In answer to that question, he said that
24 although he believed that a developer who --
25    MR. RYAN:  Objection, your Honor.  That document

**80**

1 is not in evidence.
2    THE COURT:  Well, he intends to prove that.
3 That's all right.
4    MR. BROWN:  I absolutely do, your Honor.  That
5 will be in evidence, and Mr. Bee will be asked about this
6 conversation.
7    In any event, he was asked about whether there
8 would be affordable housing, and he said, it is likely the
9 developers could build high-end housing, but under this
10 R-M zoning it would be possible to build affordable
11 housing.
12    Well, that statement spread like wildfire.  Like
13 many rumors, it evolved, so that at least some people
14 began to understand there would actually be a plan to
15 build affordable housing.
16    Now, I mentioned to you earlier that after the
17 village trustees decided to take this to the step of
18 formal public hearing, there were two hearings.  I think I
19 mentioned that, but if I didn't, let me state:  There were
20 two hearings.  The first was in January, and the second
21 public hearing was on February 5, 2004.  That was the
22 first public hearing after Bee made this statement.
23    At that hearing, the issue of affordable housing
24 became front and center.
25    You will see the transcript of this hearing, a

**81**

1 transcript made by Garden City.  And in this transcript,
2 Tom Yardley, who is another BFJ consultant.
3    THE COURT:  This is -
4    MR. BROWN:  Tom Yardley, Y-A-R-D-L-E-Y.
5    In any event, he's there as well as Mr. Suozzi,
6 and they made a detailed presentation on the plan for the
7 Social Services site.  Neither, by the way, mentions
8 affordable housing.
9    After they make this first presentation, the
10 first question they get is:  Is this going to be upscale?
11    Suozzi says yes.
12    The second question is:  But you said it will be
13 upscale, but I understand from what Peter Bee said it will
14 be affordable housing.
15    Well, at that meeting, residents then raised
16 numerous and strident objections to multifamily housing.
17    The impact of that possibility, of affordable
18 housing, struck like a lighted match.  They asked for
19 guarantees that only upscale housing would be built.  They
20 raised traffic and school children issues that both the
21 BFJ consultant and Suozzi said was not logical.  In fact,
22 Suozzi called them irrational.
23    There was another issue that added to residents'
24 fears at this time.  There was a bill introduced by
25 Senator Balboni that would have required that whenever

1  developments are built in Nassau County, ten percent of
2  the units would have to be affordable housing.
3        We will introduce evidence, your Honor, that
4  Garden City residents were up in arms about the
5  possibility of affordable housing on the Social Services
6  site and that their fear only increased because of this
7  pending Balboni affordable housing bill.
8        The opposition only got louder after this
9  meeting.  It came in the questions in meetings, including
10  at the property owners association meeting, with the
11  Balboni meetings, flyers, letters to the editor, events.
12        After 18 months, a residential, multifamily
13  recommendation that would allow 311 units at the site, at
14  the Social Services site, 311 units of multifamily
15  housing, a recommendation that had been made by BFJ, a
16  recommendation that had been adopted by the "P" zone
17  committee, a recommendation that had been adopted by the
18  board of trustees, and faced with what evidence will show
19  was vocal opposition to the possibility of affordable
20  housing, whose occupants would most likely be minority,
21  Garden City did an about face.  They developed a new
22  zoning classification never used before.
23        Remember, your Honor, one of the planned
24  principles that I put up on the screen was to use zone
25  classifications already in place.  This was new.  They

1  called it R-T, for residential townhouses, which under the
2  zone were required to be single-family residences.
3        Here's what they did with respect to multifamily
4  housing.
5        First, they restricted it to that tiny,
6  three-acre, unattractive sliver of land that you saw
7  earlier on the screen.  And it was described as
8  unattractive by their own zoning control.
9        So multifamily was limited to only that type,
10  and then only if a permit was granted.  A permit had to be
11  granted by the village trustees, the same people that came
12  up with this discriminatory zoning in the first place.
13        The amount of the --
14        THE COURT:  When you say this
15  three-and-a-half-acre site, you mean the area west of
16  County Seat Drive?
17        MR. BROWN:  Exactly, your Honor.
18        THE COURT:  Where there is a garage there?
19        MR. BROWN:  There is some government buildings
20  there.  That's the area.  So it is limited there to that
21  site.
22        Moreover, and -- by permit only.  And moreover,
23  the lot sizes had to be 4,000 square feet.  What that
24  meant was a maximum of 36 multifamily units could be
25  developed on the unattractive sliver, and if the permit

1  were contracted.
2        Now let's contract it.  R-M permitted 311 units.
3  Moreover, they could be on 3,000 -- there would be
4  3,000 square feet of lots rather than 4,000, and of course
5  they could be built with no special permit to be required.
6  They now, as to this R-T zoning, had to be built on 6,000
7  square-foot lots.
8        You will hear from Ismene Speliotis, the
9  executive director of MHANY Management.  Ms. Speliotis has
10  a BA in urban planning from Barnard, and she has been an
11  affordable housing developer since 1985.  She'll testify
12  that under the residential multifamily proposal, the
13  proposal that allowed 311 units, she could have purchased
14  that land at Nassau County's $30 million asking price and
15  developed a project that would have contained from 45 to
16  78 affordable units.
17        She submitted no proposals under the R-T zoning
18  because, as she will testify, R-T made affordable housing
19  not feasible.  Garden City had zoned the possibility of
20  affordable housing out of existence.  All she could do was
21  submit what might be characterized as a nonconforming,
22  non-RT-conforming, protest proposal.
23        Now, as your Honor knows, we are bringing this
24  case under two basic theories.  The first is --
25        THE COURT:  You can tell me the two basic

1  theories after lunch.
2        MR. BROWN:  Okay.  Very good, your Honor.  Glad
3  to do that.
4        THE COURT:  I'll be more fortified to hear the
5  two theories.
6        MR. BROWN:  I could use a little fortification
7  myself.
8        THE COURT:  We'll recess until 1:30.
9        (Whereupon, a recess was taken.)
10        (Continued on the following page.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

86

88

1    We submit, your Honor, that we will show
2    compelling evidence of discriminatory intent in this case.
3        The Courts will look at the sequence of events
4    leading up to the challenged decision in evaluating an
5    intent case.  That is one of the factors they take into
6    account.
7        What we will show is that Garden City was ready
8    to follow the recommendation of BFJ and its B zone
9    committee and only did an abrupt about face as a result of
10   community opposition to the prospect of affordable
11   housing, opposition laced with code words indicating
12   racial animus.
13       The Courts also have directed to see if there is
14   a departure from subsequent criteria.
15       BFJ stated that residential multifamily zoning,
16   zoning that would permit 311 units, comported with the
17   planning principles that you saw earlier and that I put on
18   the board.  And those include respect for existing
19   neighborhoods, any proposed modifications would be
20   sensitive to the surrounding land use, particularly in
21   residential neighborhoods; maximize the use of existing
22   zoning tools; environmental impact.  This assumes we will
23   be careful of not overwhelming the neighborhood with any
24   significant environmental impact, particularly traffic,
25   visual effects or burdens on public facilities, such as

---

87

1    A F T E R N O O N   S E S S I O N
2
3        MR. BROWN:  Your Honor.
4        I'm Stanley Brown, representing the plaintiffs
5    in this case.
6        Your Honor, I was beginning to discuss the
7    theories that we have brought this case under.  And as the
8    Court knows, we have two essentially theories that the
9    claim is brought under.
10       The first is one of intent.  The question in
11   intent cases is a very simple one, was race a motivating
12   factor in the defendant's decision.
13       Once the plaintiff shows a zoning decision that
14   is partly motivated by race, the burden then shifts to the
15   defendant to establish legitimate non-discriminatory
16   reasons for the decision.
17       And the justification, of course, must be
18   scrutinized to determine if it is pretextual.
19       As the Supreme Court said in the Arlington
20   Heights case, that the Village of Arlington Heights versus
21   Metropolitan Housing Development Corporation, 429 US 252,
22   1977, as the Court said there, an intent case -- an
23   intentional discrimination case requires a sensitive
24   inquiry into such circumstances, circumstantial and direct
25   evidence as may be available.

---

89

1    schools.
2        There was total agreement, your Honor, on those
3    principles, and agreement that the RM residential
4    multifamily zoning was consistent with those principles,
5    met those principles.
6        Then the public rose in fear of public housing
7    and the kind of people that affordable housing brings.
8    Residents asked for a guarantee that only upscale housing
9    would be built.  Residents raised concerns about the
10   impact of the character of multifamily building on the
11   neighborhood.  Residents repeatedly raised concerns about
12   the impact of this Balboni affordable housing bill.
13       Now, Garden City has said the character of the
14   neighborhood is a legitimate government concern.  But the
15   concern was that minorities who had occupied the housing,
16   and that is not only not legitimate but illegal under the
17   FHA.
18       Garden City will make all kinds of arguments
19   about changing the zoning from RM to residential, to --
20   let me start again.
21       Garden City will make all kinds of arguments
22   about changing the zoning from residential multifamily to
23   RT, or residential townhouses, for aesthetic reasons
24   because of concern about school children and traffic.
25       In fact, their own consultant and the fee zone

---

1  committee members all told residents that any alleged
2  concerns were not that, in fact were contrary to studies
3  undertaken to evaluate the impact of RM or residential
4  multifamily zoning on these very issues.
5         Again, I would take the Court back to the
6  principles that Mr. Fish articulated, and then everyone
7  agreed that this RM zoning followed, including respect for
8  existing neighborhoods, no negative impacts as far as
9  traffic, visual effects or burdens on public facilities
10 like the schools.
11        In short, Garden City offers up as a defense the
12 same arguments that its experts and trustees publicly
13 rejected.
14        Concerns about traffic, about RM being -- not
15 being a proper transition zone only arose after residents
16 raised fears about the housing that would be built.
17 BFJ, the T zone committee and the village board
18 all considers these issues were properly addressed for a
19 year and a half in the residential multifamily zoning that
20 had been proposed and would have permitted 311 units of
21 housing.
22        Garden City will try to paint this as a picture
23 of economics, not race.  Garden City will claim, perhaps
24 not as prudently as its residents in the information to
25 Mr. Suozzi, that we are not against the affordable

1  housing, if Garden City can afford the live there it is
2  affordable.
3         As demographic evidence will show, race and
4  income are inextricably intertwined in Nassau County.  In
5  Nassau County the concern about an influx of people who
6  don't earn Garden City income cannot be -- about concerns
7  against the race of those who don't earn Garden City
8  incomes.
9         Garden City's actions in adopting the RT zoning
10 to block affordable housing is enough to prove a violation
11 of the Fair Housing Act.  But evidence both before and
12 after the switch to RT shows the community's long-standing
13 resistance to people of color.
14        Now, let me touch on the next theory that we
15 have discussed, which is dispirit impact.
16        A violation of the Fair Housing Act can also be
17 proved by a dispirit impact analysis, indeed, since
18 shortly after the FHA was passed Courts have recognized
19 this standard in exclusionary zoning cases.
20        The plaintiff need only show that an outwardly
21 neutral practice actually or predictably has a
22 discriminatory effect.
23        A case of discriminatory effect prima facie
24 consideration can be met by showing the decision either
25 disproportionally support minority, or -- that is the

1  challenge practice tends to reinforce patterns of
2  segregation.
3         Once a prima facie case is made, the defendant
4  must show its actions furthered a legitimate governmental
5  interest and that there were no less discriminatory
6  alternatives available.
7         It is important that if there is evidence of
8  dispirit intent or discriminatory intent, as there is
9  here, this actually weighs heavily in favor of the
10 plaintiff in any dispirit impact analysis.
11        Now, Garden City argues that dispirit impact
12 claims are not cognizable under the Fair Housing Act.
13        The Second Circuit and every other Circuit that
14 has dealt with this issue fully -- unless and until the
15 Supreme Court rules otherwise, that is the governing law
16 in this Circuit.
17        As I mentioned earlier, your Honor, MHANY
18 management could have purchased the Social Services site
19 and developed the site containing affordable house.
20        They had four alternative scenarios for doing
21 so.  Two of which involved Section 8 funds.
22        Nancy McArdle, plaintiff's expert whom you will
23 hear from today, stated that under these proposals the
24 pool of renters who could have afforded to live at the
25 Social Services site ranged from 56, or 18 percent of the

1  pool of renters, to 101, or 32 percent minority
2  households.
3         McArdle also analyzed the RT zoning compliant
4  luxury housing that was opposed by the winning bidder,
5  Fairhaven Properties, a proposal that Nassau County
6  approved.
7         Assuming the average purchase price of the homes
8  under that proposal, the $700,000, which is actually a
9  conservative assumption, and based upon the racial
10 composition of the home buyers in Nassau County, she
11 concluded that such a project would be almost exclusively
12 white and that Garden City would continue as a segregated
13 community.
14        As I said, we will hear from Ms. McArdle today,
15 and she will explain why blocking affordable housing
16 disproportionately harms minorities.
17        Indeed, the proposition that minorities are
18 disproportionately hurt by the elimination of the
19 possibility of affordable housing at Social Services site
20 is really irrefutable.
21        But Garden City argues that there is no
22 violation because the county's price demand for the Social
23 Services site excludes individuals of protected groups.
24 But you will hear from Ms. Speliotis, the expert and
25 developer of affordable housing, that the restrictions of

1 the RT 17, not the land cost, that made affordable housing
2 infeasible.
3 So while it cannot be denied that cost of land
4 has an impact on affordable housing, in this case it is
5 the zoning which restricted what you could put on the land
6 that made affordable housing possible.
7 Garden City is also arguing that even if the RT
8 zone made affordable housing possible, and even if it
9 continued the pattern of discrimination, it is okay
10 because it promoted townhouses, a new type of housing not
11 previously constructed in Garden City.
12 First, RM, in fact, as you saw, permitted
13 townhouses.
14 Second, the townhouses permitted by RT required
15 a minimum 6,000 foot -- 6,000 square foot lot size, and
16 that the single-family homes, thus precluding affordable
17 housing.
18 In any event, there is no exemption in the Fair
19 Housing Act for the encouragement of townhouses. You
20 can't block affordable housing, thus hurting minority
21 households, and then say that that is okay because we are
22 promoting townhouses.
23 The most polite way to describe that argument is
24 that it is simply irrelevant.
25 Finally, Garden City cannot show a legitimate

1 government interest in enacting RT, and Garden City has
2 never even tried to show that there is no less
3 discriminatory alternative.
4 The irony here, your Honor, is that the
5 residential multifamily zoning, the zoning that would have
6 permitted 311 units, which had been proposed by BFJ, and
7 then recommended by the P zone committee, met the concerns
8 that Garden City has raised in its defense. It met
9 concerns, it met concerns of transitions from single
10 family to others, it met concerns of school children in
11 traffic. RN is the less discriminatory alternative.
12 It worked with the aesthetics of the surrounding
13 community. It reduced traffic, and multifamily, the RM
14 zoning produced less school children than the single
15 family housing that residents of Garden City wanted.
16 Garden City's own zoning consultant concluded
17 that there were not issues of aesthetics, traffic, or
18 school children under the proposed residential multifamily
19 zoning that would have permitted the development of 311
20 units.
21 Counsel for Garden City said in answer to Judge
22 Bianco's question related to citizens expressing concerns
23 about these issues, but those concerns being contrary to
24 the facts that you listen to your constituents.
25 With all due respect, your Honor, you don't

1 listen to your constituents when their concerns are driven
2 by racial animus or stereotypical attitudes about the
3 minorities that would inhabit the affordable housing that
4 these people feared.
5 Yes, these constituents didn't use the ugly
6 words of the past. Instead we heard about the character
7 of the community, people who didn't have Garden City
8 income, people who didn't work hard to get into Garden
9 City. But that kind of stereotyping cannot drive a
10 municipality's decision.
11 In conclusion, your Honor, the plaintiffs will
12 submit evidence that proved that under either analysis,
13 whether it is a dispirit intent or discriminatory intent,
14 or dispirit impact analysis, Garden City's actions in
15 enacting the RT zoning ordinance, an ordinance that was
16 manifestly exclusionary, violates the Fair Housing Act,
17 violates the Constitution's Equal Protection Clause, and
18 violates Sections 1981, 1982 and 1983 of the Civil Rights
19 Act.
20 We ask the Court to find violations of these
21 statutes and a remedy tailored to those violations.
22 Garden City must stop blocking affordable
23 housing and at least use its zoning powers to encourage
24 its construction.
25 In denying summary judgment, this Court

1 recognized its broad power to fashion relief. And that is
2 consistent with the law in this circuit.
3 As Judge Kaufman recognized in the Huntington
4 Branch NAACP versus Town of Huntington case, and that cite
5 is 844 F.2d 926, Second Circuit, 1988, affirmed per
6 curiam, 488 US 15. And as Judge Kaufman said in that case
7 20 years ago, widespread segregation threatened to lift
8 civil society asunder.
9 In response Congress adopted broad municipal
10 decisions to promote integration.
11 Senator Mondale said the proposed law was
12 designed to replace ghettos by truly integrated and
13 balanced living patterns.
14 We are far from that goal today. But this Court
15 is in a position to help us achieve that goal.
16 With that, your Honor, I thank you for
17 listening, and our opening statement is concluded.
18 THE COURT: Very well.
19 You may proceed.
20 MR. RYAN: Good afternoon, your Honor.
21 As you know, I am James Ryan for the Garden City
22 defendants.
23 The rumors spread like wildfire.
24 There was a citizen's revolt. Affordable
25 housing was discussed throughout the February 2004

1  meeting.
2      I hold the transcript of that February 4, 2000
3  meeting in my hand, your Honor.  I believe that the word
4  "affordable" was used not a hundred times, not fifty
5  times, not even ten times.  I believe it was used six
6  times throughout this entire transcript.
7      That is the citizen's revolt about affordable
8  housing.
9      The Balboni bill was not mentioned once at this
10  hearing.  It is not in the transcript.
11      Your Honor, this case arises because the
12  citizens of Garden City exercised their First Amendment
13  rights to both participate in the governmental process and
14  to express their opinions and comments to their elected
15  officials.
16      Both of those rights are constitutionally
17  protected.  Plaintiffs are mischaracterizing, turning and
18  twisting fairly innocuous statements, questions, new ideas
19  and other types of comments from the Garden City
20  residents.
21      Those comments concern traffic, additional
22  school children, additional costs, density, how big would
23  the project be?  Transition from single family housing
24  that surrounded the courts, and your Honor is fully aware
25  of that area having served in the state court system as

1  well.  The single-family homes on Washington, and the
2  single-family homes on 11, across from what is now Sears,
3  and used to be Bloomingdale's, and a host of other issues.
4  Those are the issues raised by the citizens.
5      Plaintiffs claim while those statements may be
6  neutral on their face, and now without any expert to
7  support this proposition, they are claiming that those
8  bland neutral statements are actually euphemisms for the
9  citizens' racist intent.
10      Well, let's look at some of those comments.
11      Those are the comments, your Honor.  These are
12  what we will hear about.
13      I would be opposed to any rezoning other --
14      THE COURT:  You have to slow down when you read.
15      MR. RYAN:  Yes, your Honor.
16      THE COURT:  People have a tendency to read
17  faster when they speak.  You know why, don't you?
18      MR. RYAN:  Nerves.
19      THE COURT:  No.  Grade 1-A, when you learn how
20  to read.  If you read slowly, why did the chicken cross
21  the street, no good.
22      It has to be faster, why did the chicken cross
23  the street.  And you get an A immediately.
24      We take that with us all the way through our
25  lives, so people who speak in a very modulated tone, when

1  they read, off to the races, they are back in elementary
2  school.
3      I have to break this up every once in a while.
4      MR. RYAN:  Yes, your Honor, I will now read
5  first grade.
6      THE COURT:  Okay.
7      MR. RYAN:  I would be opposed to any rezoning
8  other than RA in the Social Services area for a few
9  reasons.  One of them is that traffic in the area is
10  horrendous.
11      That is from a Joint Exhibit 24, at the public
12  hearing on January 8th.
13      And would everyone like to see Wyndham in their
14  neighborhood.  I don't think so.  Wyndham had a nine story
15  luxury apartment building in the village already, 316 unit
16  apartments.  That is from Joint Exhibit 12.
17      I moved here from Brooklyn so that when I walked
18  out of my house, I did not turn left and see apartment
19  buildings.
20      That is from this Court's decision quoting a
21  comment made at a public hearing.
22      It should remain R 8, it should remain in the
23  flavor and character of what Garden City is now.
24      You will hear a lot about the word character.
25  And that is a term of art in planning and zoning.

1      Let's look at this case.  This is not about one
2  development versus another.  This case is not a case where
3  the village was presented with two actual proposals and
4  shows one developer that did not provide for affordable
5  housing.
6      It is not the case about lowering the density,
7  such as making it two acres so that housing could not be
8  built.
9      No housing could ever have been built on this
10  lot without the village.  The village provided housing.
11  The RT zone provided from up to 186 units of housing.
12      Plaintiffs ignore that.  186 units of housing.
13  Plaintiffs argue in this case that 186 is not enough.
14      As you just heard from Mr. Brown, this is not a
15  case where plaintiffs participated in the process, applied
16  for a building permit, applied for a zone change.
17  Plaintiffs were entirely involved in the entire zone
18  change process in Garden City from beginning to end.  The
19  village never knew about it.  The first time they knew
20  about ACORN was when we got sued.
21      I want to modify that.  The first time was after
22  this case -- after the zoning was enacted.  We did know of
23  ACORN after the zoning was enacted.  I want to correct
24  that for the record.
25      Nonetheless, based on the cold written record,

1  plaintiffs contend that racism is the explanation for the
2  enactment of the RT 17 and it permeated every person in
3  every issue.
4       All of these Garden City individuals are racist,
5  at the very least they condone racism.
6       A few unrelated and other irrelevant events that
7  occurred over 45 years ago somehow continued to impact
8  this decision.  That is what they claim.
9       They do not understand the zoning process.  It
10 is very simple.  You hire municipal planners that come to
11 you with suggestions.
12      In this case there were three members of the
13 board working with the planner to work with suggestions.
14 It goes to the full board.  The full board looks at it and
15 says let's have public hearings.  It is a new local law so
16 they need public hearings, it is in the village code.
17 They have the public hearings and they accept the comments
18 and they change and modify and move and mold and come up
19 with a plan, and that is the RT zone.  That is the zoning
20 process.
21      Plaintiffs refer you to several Second Circuit
22 cases in their papers, as well as today, Huntington
23 Branch, fair housing in Huntington, cite of Saratoga,
24 LeBlanc.  All those cases concern segregation within,
25 within the borders of a community.

1       A specific municipality.  None of those cases,
2  none of those precedents do what is trying to be done here
3  today.  None of those concerned charges a specific
4  community was being liable legally responsible for
5  segregation that occurred outside of its borders, that is
6  what plaintiff and its demographer, Ms. McArdle, intend to
7  do.
8       Finally you will be hearing and you heard from
9  Mr. Brown that plaintiffs have tainted -- have claims that
10 the citizens' concerns during the public hearing process
11 were tainted with racism.
12      Let's look at those citizens' concerns.
13      You will hear that Garden City residents are
14 very active in their community.  You heard Mr. Brown, he
15 talked about their four community groups for each section
16 of the Villager.  And then appoint the legislators.  It is
17 an active community.
18      They go to board meetings and they are not
19 afraid to express their opinions while exercising their
20 First Amendment rights.
21      Plaintiffs contend the issues raised by them,
22 and in the questions they ask about traffic, school
23 children and other issues, were pretext for their racism.
24      Look at the issues.
25      School children.

1       The fact, according to plaintiff, the fact that
2  issues concerning the resources necessary and the cost of
3  educating additional school children was even raised.  In
4  actuality, according to plaintiffs it has nothing to do
5  with the cost and resources necessary to educate those
6  kids.  It was all borne out of racism.
7       Just because residents understandably could not
8  wrap their heads around the fact that hundreds of
9  multifamily housing actually produce less children than 90
10 single-family homes doesn't make them racist.  What it
11 makes them is they are not demographers, not
12 statisticians.
13      As to the issue of school children and the
14 impacts, plaintiffs pointed out to these comments and
15 claimed they were racists, even raising it as an impact.
16      However, impact on schools is a required
17 analysis under state law.  You will see the May 2000 EAF
18 report mandated by SEQRA, the New York State Environmental
19 Control Act.  SEQRA specifically requires an assessment on
20 the surrounding infrastructure, including schools.
21      Regardless of state law, plaintiffs say looking
22 into that impact is a racist act.
23      Character of the neighborhood.
24      Character of the neighborhood, in quotes, is a
25 term of art.  It is a planning principle, it is a zoning

1  principle, it is mandated by state law.  Plaintiffs do not
2  understand.  It is not code for anything.  It means what
3  it says.  You look at the surrounding neighborhood.
4       According to plaintiffs it is racist for the
5  single-family homeowners in the neighborhood south of 11th
6  Street, and the single-family homeowners east of
7  Washington Avenue, to want other single family homes
8  across the street from them.
9       Plaintiffs argue this, that despite the fact
10 that New York law, despite the fact the state village
11 law, despite the fact the Garden City code, despite
12 the fact that SEQRA all compel and mandate that the board
13 shall and must consider the character of the existing
14 neighborhood in their deliberations.
15      Plaintiffs contend that that consideration is
16 borne out of racism.
17      The New York Court of Appeals last year
18 emphasized that consideration of the character of the
19 neighborhood is appropriate for a municipal agency when
20 rezoning, and that is Chinese Staff and Workers
21 Association versus Bordon, 19 New York 2d 922.
22      Transition.
23      How to change from the surrounding residential
24 area and move toward the commercial buildings along
25 Franklin Avenue.

1         Come across Washington over towards Franklin.

2         Plaintiff would have you believe that despite

3 the fact that virtually every other multifamily

4 development in the village, all 16 of them, act as a

5 transition from and to the commercial and public districts

6 in the village, the creation of a transition using

7 multifamily housing on this site was not in keeping with

8 prior planning practice but was borne out of racism.

9         Listen to Garden City's professional planner,

10 Mr. Fish, concerning the concept of transition.

11         Plaintiffs have called him as their witness.

12 The flow, if you will, from single to multifamily, to

13 commercial and into the public uses is transition.  The

14 concept was not pulled out of thin air, this is a

15 professional planning principle.  It was used in the

16 village for 50 or more years and it is still used in the

17 village.

18         Plaintiff had a municipal expert, Peter Marcuse.

19 He was a municipal planning expert, and he was their

20 expert witness and provided testimony which you relied on

21 in your summary judgment decision, your Honor.

22         They have chosen not to call him.  So there will

23 be no expert testimony by a municipal planner for the

24 plaintiffs.

25         Conversely they have chosen to call our planner

1 as a fact witness, but what he did as to the planning

2 process.

3         You will also hear from an expert planner,

4 Mr. Patrick Cleary, for us, who will affirm what Mr. Fish

5 did.

6         But plaintiffs argue without the benefit of a

7 planning exit -- expert that that basic planning concept

8 of transition was borne out of racism.

9        MR. BROWN:  Your Honor, I would object, we used

10 the term discrimination.  Racism is not the same as

11 discrimination.  We are not tasked with saying or proving

12 Garden City is racist.  We are not required to prove what

13 is in the hearts of Garden City residents.  We are asked

14 to prove actions that exclude affordable housing.

15 Therefore I object to the use of the term in describing

16 our case.

17        THE COURT:  Overruled.

18        MR. RYAN:  Another issue, your Honor, was

19 traffic.

20         Plaintiffs contend that the horrific traffic

21 that existed in 2004 around that area, which includes the

22 Nassau County Supreme Court, as you are well aware, and

23 the Social Services site when it was operational, was not

24 a reason for plaintiffs -- for defendant citizens to be

25 concerned, that traffic was not a legitimate concern of

1 the surrounding neighborhoods.

2         As the Court is well aware, that parking lot

3 will be completely full at 9:15 in the morning and you

4 will have to park across the street.

5         The fact that those cars in that parking lot

6 created those significant traffic impacts on the

7 surrounding neighborhood before this complex was even

8 discussed is not a genuine issue according to plaintiffs.

9         Mr. Brown talked about the sequence of events

10 and the history of the decision.

11        Your Honor, look at the 25 -- at least 25

12 separate memos, reports, letters, PowerPoints and other

13 documents created by Mr. Fish.

14        Mr. Fish, by the way, is an NYU professor of

15 planning.  You will hear that he had worked in the Yonkers

16 case with Judge Sands as a consultant after the special

17 master was appointed.  He is also working in the

18 Westchester case to put in affordable houses there.  He is

19 also working in the Hempstead redevelopment of the

20 downtown.

21        Mr. Fish knows what he is doing and you will be

22 able to hear that.

23        Look at how many times Mr. Fish over the course

24 of this project changed his mind.  Look at how many times

25 over the course of this project Mr. Fish says, I spoke to

1 so and so, a citizen at a public workshop, or I did this,

2 or I looked at that.  I will change my mind.

3        What he started with in 2002 was an evolutionary

4 process until he came to the RT in 2004.  Look at those

5 documents.  Look at those pieces of paper that document

6 Mr. Fish's reasons for the zoning change, as well as the

7 evolving process leading to its enactment.

8        Ironically, plaintiff objected to many of those

9 documents before you, yet they contend that the village

10 had no reason to do what they did other than to be against

11 affordable housing.

12        Those documents which are business records of

13 Mr. Fish form the history of the zone change and provide

14 the history why Mr. Fish chose the final version of the

15 zone change, the RT zone.

16        The documents are buttressed by the public

17 statements at the public workshops and meetings at which

18 plaintiff have the minutes.  Yet plaintiffs argue that

19 Mr. Fish, the NYU professor, the professional planner and

20 consultant in the Yonkers case, as well as consultant in

21 Westchester, and working to revitalize downtown Hempstead,

22 put his professional reputation and integrity to the side

23 to support the racist whims of his clients, the Village of

24 Garden City.

25        Maybe, just maybe, plaintiffs claim those

1 reasons found in discrimination and racism are wrong.
2           The evidence will show that the reasons for
3 enacting the RT were actually traffic, school children
4 impacts, character of the neighborhood, and transition,
5 and maybe in combination, those factors in combination, as
6 was decided by the board of the community at issue, that
7 was the only vehicle to accomplish all of those legitimate
8 concerns.
9           As you found in the summary judgment motion,
10 defendants satisfy their burden of offering a
11 non-discriminatory reason for the zoning change.
12 Plaintiff cannot prove that those reasons are anything but
13 legitimate and true.
14           Let's look at the transition, the number of
15 multifamilies.
16           You will hear that a significant concern about
17 the physical nature, the bulk, the density, the size of
18 the multifamily housing was born out of an experience with
19 an ultra-luxury multifamily complex in the Town known as
20 the Wyndham. It is those two towers by the Garden City
21 Hotel.
22           Plaintiffs own expert called those towers, the
23 316 unit towers, obtrusive.
24           It bears repeating, plaintiffs own expert called
25 the development obtrusive.

1           In response to the county's RFP to purchase the
2 Social Services site, plaintiffs wanted to put up 2,000
3 units on that site, 2,000 units across from the Court,
4 2,000 units in that residential area.
5           In any event, maybe the citizens' concerns about
6 planning another obtrusive apartment complex at the Social
7 Services site was just that, legitimate concerns.
8           Plaintiff based their case on a November 2003
9 report by Frank Fish. That is the one, they said that
10 Mr. Fish wrote it; the P zone committee forwarded it to
11 the board trustees. As they are required to do, the board
12 held public hearings. And that should have been it.
13           Plaintiffs contend that the board rejected the
14 RM zoning controls. This is very important.
15           Plaintiffs contend that the board of trustees
16 rejected the RM zoning controls.
17           It did not. It never was put before the board.
18 It never was put before the board. There was never a vote
19 on the RM zoning controls.
20           What was in that report was an entirely new
21 zone, the C, Charley, O, Oscar, 5B, Bravo, CO 5B zone.
22           From day one, day one of 2002, when this all
23 started, that zone was going to be brand new.
24           So whether you call it CO 5B, CO 5, RT, those
25 are new terms. RM was never on the table.

1           By the way, RM, Roger Mike, stands for
2 residential multifamily, and it governs some of the
3 multifamilies in the building. And you heard there are
4 about 1,100 units of multifamily housing already existing
5 in the village, in the form of condos, co-ops and
6 apartments. They make up 15 percent of the village.
7           You will hear that Uniondale, which is a town
8 they point to as being segregated, Uniondale has no way
9 near 15 percent multifamily buildings.
10           Garden City has a substantial amount of
11 multifamily apartments in Nassau County.
12           But the village cannot and does not, and legally
13 should not, and cannot control the economics or model of
14 ownership of any residences within the village. It can't
15 make something luxury. It can't make something
16 affordable. It can't make something middle income. All
17 it can do is zone.
18           Plaintiffs contend that in 2003, once Peter Bee,
19 B-E-E, as chairman of the P zone committee, forwarded
20 Mr. Fish's recommendation to the board of trustees for
21 consideration of the CO 5 zone, no further modifications
22 could be made to that recommendation.
23           This is a very important and critical aspect of
24 the case.
25           In November 2003, three members of the voluntary

1 board of trustees, who comprised of P zone committee,
2 forwarded the professional planner's recommendation to the
3 five other members of the volunteer board for its
4 consideration.
5           Plaintiffs would have you believe that that
6 should have ended the discussion; that those five other
7 members of the board were compelled to accept those
8 recommendations of Mr. Fish in total. In other words,
9 plaintiffs would have you believe that the elected
10 officials of Garden City were compelled to rubber stamp
11 the recommendations of Mr. Fish and simply enact his
12 suggestions.
13           This is not how democracy works.
14           Furthermore, the zone change in whatever form it
15 would take would be a new local law as I mentioned.
16           Consequently, as a matter of law you will hear
17 that the board was required to have public hearings.
18 However, the plaintiffs will also have this board believe
19 that the eight members of the board of trustees, once they
20 were in possession of the November 2003 recommendations
21 from Mr. Fish, and since it is true, an elected body can
22 ignore the ideas, comments, concerns, suggestions of its
23 constituents, the board members were obligated and
24 compelled to ignore, and indeed dismiss, any concerns,
25 comments, questions, new ideas, new proposal, or indeed

**114**

1   new recommendations from its own citizens.

2   In other words, plaintiffs contend the board

3   members could not consider citizen input.

4   That is not how a democracy works.

5   Therefore, plaintiffs case compels this Court to

6   accept their proposition that once Mr. Fish made his

7   initial recommendations, they were set in stone, and the

8   board of trustees, as well as the citizens of Garden City,

9   lost their collective right to question, reason, comment,

10  challenge or modify Mr. Fish's recommendations.

11  Indeed, Mr. Fish himself lost his own right to

12  change his mind and state his reasons for doing so.

13  That is not how a democracy works.

14  Finally, you will hear during the course of this

15  trial from four members of the board at the time.  The

16  other four members of the board were never deposed.

17  So as far as those other four members of the

18  board, their reasons, intent, understanding, beliefs,

19  desires, or any thoughts they may have had concerning the

20  zone change are and will not -- will be unknown to this

21  Court.

22  So, in fact, plaintiffs are asking for a finding

23  that those four members, those other four members of the

24  board, half the board, were also racist, without ever

25  speaking to them.

**115**

1   It is their burden to show intent, and they are

2   trying to do it without half the board.

3   Let's talk about dispirit impact.

4   Putting aside for the moment the allegations

5   that everyone in this case acted out of racism or

6   capitulated to the racism of others, let's look at the

7   dispirit impact claims.

8   The neutral decision in this case, the issue to

9   be tried, is the enactment of the RT zone and its impacts.

10  It is not the enactment of the CO 5B, the RM, the BH, the

11  RA, the CO4, the CO3, or any of other zones in Garden

12  City, it is the enactment of the RT.

13  What plaintiffs could or wanted to do with 311

14  multifamily units is entirely irrelevant.  It is not the

15  neutral decision.

16  Plaintiffs are making an apples to oranges

17  comparison.  The RT permitted 90 single-family homes, 150

18  or so town homes, and 36 multifamily homes.

19  For example, plaintiff's expert is not going to

20  tell you how many minorities would live on the Social

21  Services site under the RT zone.  If you had 150 rental

22  townhouses and 36 multi-rental units.

23  She is not going to tell you about 160 rental

24  units and its impacts.  She will tell you about 311 units

25  and its impacts, but not the 186 that are allowed.

**116**

1   She is not going to do that because there is no

2   analysis of rental housing on the RT zone.  There isn't an

3   analysis of affordable rental housing on the RT zone.

4   The only proposition that plaintiff will purport

5   is the rental development it suggests that would be

6   appropriate at that site if RM was the zoning control.

7   Plaintiffs won't tell you what they could have

8   done with the rentals at the RT.  All they would say is it

9   was infeasible.

10  Where is the calculation?  Where is the analysis

11  of the 186 possible rental units to show you that it was

12  infeasible?  You can't throw up your hands and say it is

13  infeasible, I will not do anything.  I will go home.

14  The evidence will demonstrate that plaintiffs

15  deliberately does not conduct a dispirit impact analysis

16  under RT, and not under the combination of 36 multifamily

17  and 150 town homes at the RT.  Once these glaring

18  omissions are crystalized, the central issue is simply

19  this:  Does the available housing opportunities, rental or

20  equity, multifamily, town homes or single families, or any

21  combination thereof available under the neutral zoning at

22  issue, the RT zone, disproportionately protect a protected

23  class.

24  As noted in the permutations I just went

25  through, plaintiffs offered no evidence on this issue.

**117**

1   Plaintiffs contend they do not have to explore every

2   permutation of any affordable housing mixes at the RT.

3   They didn't do any, not one.

4   The representatives of plaintiffs will simply

5   testify that building affordable housing at any density

6   level, the 186 units allowed, other than the density level

7   they contend is feasible under a different zone structure

8   that is not at issue in this case, is not acceptable.

9   That is what this dispute is about.

10  I do know when Ms. Speliotis takes the stand,

11  she will tell you that in all these years since the

12  rezoning in 2004, not once has she done a feasibility

13  study of rentals in the RT zone.

14  NYCC didn't do it and MHANY didn't do it.  Not

15  once did they sit down and do a budget as to how much it

16  would cost to do the rental development of the 186 units

17  at the RT zone to provide affordable housing.  Not once

18  did they engage a consultant or design professional to do

19  those calculations.  Not once in nine and a half years.

20  The only proposition that has been and will be

21  presented through this trial is very clearly that

22  plaintiffs wanted 25 acres of land zoned the way they

23  wanted it.  They wanted the development built by someone

24  their way, at their preferred level of density.

25  Critically they only told us about their way after they

1  sued us.

2        But the question for today is:  If you put

3  affordable housing at the Social Services site, using the

4  RT zone, the neutral policy at issue, how many minorities

5  would avail themselves of those units?  The answer is, we

6  don't know.

7        Mr. Brown said you can't use zoning to block

8  construction of affordable housing likely to be inhabited

9  by minorities.

10        I ask, under RT how many minorities will inhabit

11  a rental development at the RT zone using the RT zoning

12  structure?  They don't do that.

13        So in conclusion, your Honor, Peter Bee, Peter

14  Negri, Jerry Lundquist, Barbara Miller, Bob Schoelle, Mike

15  Filippon, F-I-L-I-P-P-O-N, and Frank Fish, the

16  representative of Garden City who plaintiffs claim are

17  racist or condoned racism, they aren't corporations.  They

18  are human beings who will appear before you and let you

19  judge and tell them whether or not plaintiffs' claims are

20  true, whether or not they are racist.

21        It has been said if you believe that

22  discrimination exists it will.  If you believe that

23  decisions are borne out of racism, they will be.  If you

24  paint all white people involved in the decision making

25  process regarding the enactment of the RT zone with the

1  broad and sweeping brush of racism, aren't the accusers

2  doing exactly what they allege of the accused.

3        The folks I just listed as well as the villagers

4  of Garden City as a whole have been branded as racist

5  without evidence or basis.  And to be so branded leaves a

6  mark on one's reputation that can rarely be erased.

7  Consequently, to be branded a racist unfairly or unjustly

8  is unforgivable.

9        So the village volunteers look to this Court to

10  tell the world that the RT zone was enacted lawfully,

11  without malice, and without the stain or taint of racial

12  animus.

13        Thank you, your Honor.

14        THE COURT:  You may commence the plaintiff's

15  case:

16        MR. DENNIN:  Your Honor, I am Peter Dennin,

17  D-E-N-N-I-N, for the plaintiffs.

18

19        (Whereupon, at this time there was a pause in

20  the proceedings.)

21        MR. DENNIN:  Before I begin with the first

22  witness, to help the court reporter, there are a number of

23  us.  We are moving around.  We will endeavor to inform the

24  court reporter who is who and who is sitting where when we

25  do anything

1        I will be the only lawyer on behalf of the

2  plaintiffs directing and working on this next witness, if

3  that is helpful to you, Mr. court reporter

4        The plaintiffs call Nancy McArdle to the stand.

5        THE COURT:  Please be standing and raise your

6  right hand:

7

8  N A N C Y   A N N E   M c A R D L E,

9        called as a witness, having been first

10        duly sworn, was examined and testified

11        as follows:

12        THE COURT:  Please be seated.

13        Please state your full name and spell your last

14  name slowly for the record.

15        THE WITNESS:  My name is Nancy Anne, A-N-N-E,

16  McArdle, M-C, A-R-D-L-E.

17        THE COURT:  You may proceed.

18

19  DIRECT EXAMINATION

20  BY MR. DENNIN:

21  Q      Good afternoon, Ms. McArdle, how are you?

22  A      **I'm fine.  Thank you.**

23  Q      A few quick things.

24        One, if I can ask you and everyone else to speak

25  slowly, loudly and clearly, and take your time.

1        If you use words which are a little unusual,

2  take the time to spell it for the court reporter, and any

3  acronyms you may use, you can spell it out and spell it

4  for the court reporter and the judge, and I will

5  appreciate that.

6        Are you ready?

7  A      **I'm ready.**

8  Q      Again, would you state your name?

9  A      **Nancy Anne McArdle.**

10  Q      And did you reach any expert opinions in this case?

11  A      **I did.**

12  Q      And --

13  A      **I reached opinions about the relative racial**

14  **composition and racial change in Garden City and in Nassau**

15  **County, about the minority representation about all**

16  **households, rental households, low income households and**

17  **households with rental problems in Nassau County.  About**

18  **the estimated minority share of households that would**

19  **likely be able to afford to rent or buy homes in Garden**

20  **City under a series of development proposals.**

21  Q      Before we get to your opinions in this case, we need

22  you to provide background for the Court.  Where do you

23  live presently?

24  A      **Somverville, Massachusetts.**

25  Q      And what is your occupation

1   A    I am a researcher, consultant and author.

2        THE COURT:  Sorry, researcher, author --

3        THE WITNESS:  Consultant and author.

4   Q    And what areas do you specialize in?

5   A    I specialize in areas of residential racial

6   segregation, racial change and housing demography.

7   Q    And generally speaking, what tools or sources do you

8   generally utilize in doing your work?

9   A    I generally use statistical software, including

10  geographic information systems software and large

11  quantitative databases.

12  Q    And, Ms. McArdle, would you please describe generally

13  your educational background post high school.

14  A    I received a bachelor's of science degree in public

15  policy and management, summa cum laude, from Carnegie

16  Mellon University in 1985.  And a master's of public

17  policy from Harvard University's Kennedy School of

18  Government in 1987.

19  Q    Briefly and generally, would you describe the type of

20  classes you took in college?

21  A    I took several statistic classes as well as classes

22  in probability, economics, policy analysis, research

23  methods and accounting.

24  Q    And, again, briefly and generally, would you describe

25  the type of classes you took in graduate school?

1   A    I took further classes in statistics, economics, cost

2   benefit analysis, economics and also housing policy.

3   Q    And would you please describe generally your

4   professional experience after earning your master's

5   degree?

6   A    For 14 years I was a research associate and project

7   director at Harvard University's Joint Center For Housing

8   Studies.

9   Q    And what did you do in that role?

10  A    I performed a wide range of housing policy analysis,

11  particularly around areas of housing demographics, but

12  also concerning home ownership, low income housing, some

13  aspects of housing finance and reservation and repair

14  markets.  I also did public speaking, writing and project

15  management.

16  Q    And what sources of data did you generally utilize

17  for your research and writing?

18  A    I generally used large quantitative databases,

19  including the decennial census, the American housing

20  survey, the current population survey, the Home Mortgage

21  Disclosure Act database, and the comprehensive housing

22  assistant strategy database.

23  Q    And what, if anything, works did you author while at

24  Harvard University's Joint Center For Housing Studies?

25  A    I authored and co-authored many papers and reports

1   including book charters.  I was co-author of the center's

2   signature report, the State of the Nation's Housing.

3   Q    And after your time at the Harvard University's Joint

4   Center For Housing Studies, what did you do next?

5   A    I worked as a consultant basis with the Harvard

6   University civil rights project, performing analysis and

7   writing reports, major reports on residential racial

8   segregation in Chicago, San Diego and metropolitan Boston.

9   I then became research director for the civil rights

10  projects, metropolitan Boston equity initiative, examining

11  causes and results of segregation in metropolitan Boston,

12  including issues of employment, education, segregation

13  patterns, racial attitudes.

14       I also performed various public speaking roles.

15  I worked as a consultant for a public television station

16  on a program about school segregation.  And I did housing

17  market analysis for a neighborhood housing services for

18  Rochester, New York, and for Neighbor Works America.

19  Q    And generally what time period did these activities

20  cover?

21  A    That was approximately until -- between 2002 and

22  2006.

23  Q    What did you do starting in 2006?

24  A    I became the principal data analyst for a project

25  called Diversitydata.org, so it is

1   D-I-V-E-R-S-I-T-Y-D-A-T-A dot O-R-G, which is a project of

2   the Harvard Graduate School of Public Health and the

3   Center For Advancement of Health.  We designed and created

4   a website with the company's analysis for every

5   metropolitan area in the country, looking at areas of

6   racial equity and opportunity in areas such as housing,

7   education, health, employment, neighborhoods, etcetera.

8        That project has now grown to be a larger

9   project called the Diversitydatakids.org.

10       THE COURT:  Called what?

11       THE WITNESS:  Diversitydatakids, K-I-D-S, as in

12  children, Diversitydatakids.org, which in addition to

13  looking at metropolitan areas looks at six other areas of

14  geography from the nation down to the neighborhood level,

15  particularly looking at indicators as they affect

16  children.

17  Q    And have you ever testified before any government

18  body, Ms. McArdle?

19  A    I have.

20       I have testified before the US Commission on

21  Civil Rights; the Massachusetts Governor's Fair Housing

22  Advisory Panel, and the Massachusetts Department of

23  Housing and Community Development.

24  Q    And what if any teaching have you done in the fields

25  of demographics in housing?

126

1    A    I developed and for several years taught a top rated
2    class for Neighbor Works America, teaching community
3    development professionals how to use the census and other
4    databases to analyze how their communities were changing
5    and adapt their housing policy accordingly.
6         I have also been a guest lecturer in many
7    graduate level classes, including those at Harvard
8    University, Massachusetts Institute of Technology,
9    Brandeis University, B-R-A-N -- sorry, and Northeastern
10   University.
11   Q    And Ms. McArdle, how many other times have you served
12   as an expert witness in litigation?
13   A    I have prepared expert reports in five cases, and
14   testified at trial in two cases.
15   Q    And to your knowledge, was your report or testimony
16   ever rejected by any Court in those cases?
17   A    No, not to my knowledge.
18   Q    And, Ms. McArdle, have plaintiffs compensated you for
19   your time in this case?
20   A    They have.
21   Q    And how much do you charge per hour?
22   A    $65 an hour.
23   Q    And approximately how many hours do you spend
24   preparing your report, including research and writing?
25   A    Approximately 330 hours.

127

1         MR. DENNIN:  Your Honor, at this time I would
2    like to ask the Court to recognize Ms. McArdle as an
3    expert in the area of racial segregation and change,
4    demographics, including housing demographics and racial
5    demographics.
6         MR. BOHN:  Your Honor, I am Douglas Bohn.
7         The defendants do not object to Ms. McArdle as
8    an expert in demographics.  However, she is also
9    apparently being asked to be an expert in racial
10   segregation and racial change.
11        We would object to the extent that I don't think
12   that is a category or a learned area where expert
13   testimony is necessary or really even can be qualified.
14        Again, as your Honor pointed out before, we did
15   not challenge her and do not challenge her expertise on
16   demographics.  However, offering an expert on racial
17   change is not appropriate.
18        THE COURT:  First of all, I don't know where
19   this situation arose in cases where the lawyer asks the
20   judge to mark the witness as qualified.  I never do that.
21   If there is an objection to the witness, I will rule on
22   the objection.  But I don't ever say the witness is
23   qualified.  I don't do that.  I know some judges do, but I
24   don't.
25        However, I'm overruling the objection made by

128

1    counsel.
2         MR. DENNIN:  Thank you, your Honor.
3    Q    Ms. McArdle, will you please describe in summary the
4    conclusions you reached in this case.
5    A    In summary, I found that the minority share of the
6    population in Garden City was much lower than that in
7    Nassau County.  That the rate of growth of the minority
8    population in Garden City was much slower than it was in
9    Nassau County between 1980 and 2000.  That minority
10   households are disproportionately represented among rental
11   households, very low income rental households, very low
12   income non-elderly rental households, and households with
13   housing problems in Nassau County.
14        I further found the estimated minority share of
15   households that were likely be able to afford to rent
16   homes under the four NYAHC proposals, I don't know if the
17   aggregate was introduced yet, the New York ACORN Housing
18   Company, that the minority share of households likely to
19   be able to afford to rent homes under the four NYAHC
20   proposals, under the proposed RM zoning, would likely be
21   between 156 and 101 minority households.
22        THE COURT:  156 and what --
23        THE WITNESS:  Between 56 and 101 minority
24   households.
25        THE COURT:  56?

129

1         THE WITNESS:  Yes.  Likely able to rent those
2    homes under the NYAHC proposals.
3         Lastly, that the --
4         THE COURT:  That is under RM, Roger Mike?
5         THE WITNESS:  Yes, under the proposed RM zoning.
6         And lastly, that the estimated minority share of
7    households likely to be able to afford to buy under the
8    Fairhaven proposal, under the adoptive RT zoning, would
9    likely be between three and six minority households.
10        MR. DENNIN:  Fairhaven is one word.
11   Q    Did you produce an expert report in this case?
12   A    I did not.
13        MR. DENNIN:  Your Honor, I have what is marked
14   as PTX 175 for identification purposes only.
15        THE COURT:  Defendant's exhibit?
16        MR. DENNIN:  Plaintiff's Exhibit 175, PTX.
17        THE COURT:  Plaintiff's have to be by numbers.
18        MR. DENNIN:  The number of the exhibit is 175,
19   175.  There is a prefix to make it easier, we thought of
20   PTX.
21        THE COURT:  I don't know what that means.  What
22   does that mean?
23        MR. DENNIN:  It is just the designation for
24   plaintiff's exhibit.  But 175 is the number, your Honor.
25        MR. BOHN:  We object if this is being offered as

1   evidence.  The report itself is hearsay and can
2   obviously -- she can obviously testify as to her opinion
3   and be shown it.  But to the extent counsel is moving it
4   into evidence, we object.
5          THE COURT:  Sustained.
6          MR. DENNIN:  May I address that point?
7          THE COURT:  Yes.
8          MR. DENNIN:  First of all, I haven't moved it
9   yet.
10         Given that your Honor is the finder of fact in
11  this case, Courts have found when there is a bench trial,
12  the danger or risk of hearsay testimony does not have to
13  be as strenuously guarded against.  Your Honor has the
14  ability to sort out hearsay from non-hearsay before making
15  your final determination.
16         One of the concerns with an expert report being
17  admitted in evidence is the redundancy factor that the
18  Courts have discussed.
19         And Judge Weinstein of the Eastern District of
20  New York has allowed in an expert's report into evidence
21  because he filed that, having available an expert's
22  comprehensive written report, he said jury, but in this
23  case your Honor, would help the Court to more fully
24  understand and evaluate that expert's testimony and
25  conclusions and their impact on the case.

1          The witness' report in this matter is a 23 page
2   single spaced detailed report with much analysis and stats
3   and data.  And I would ask your Honor to consider the
4   inherent unfairness of requiring Ms. McArdle to have
5   memorized the 23 page report.  And I would ask the Court
6   to take into consideration at this time for further
7   decision by your Honor of her report.  And we are prepared
8   to proceed with her report being excluded.
9          But I would ask your Honor to take it under
10  advisement.
11         THE COURT:  What is the date of the report?
12         THE WITNESS:  I believe it is November of 2008.
13  But I don't remember the exact day.
14         MR. DENNIN:  Close.  September 17th, 2008.
15         MR. BOHN:  Your Honor, if I may, in addition to
16  our objection before, which your Honor initially
17  sustained, we know of this 23 page report, a real large
18  bulk of it concerns the county.  The county is no longer
19  the party, and the allegations and conclusions of the
20  party.
21         So admission of the expert report itself is
22  hearsay.  And there is additional prejudice and problems
23  here since much has to do with the county and not the
24  village.
25         MR. DENNIN:  That is easily solved because your

1   Honor would have the ability to ignore the portions of the
2   report --
3          THE COURT:  I'm not concerned about the county.
4   I'm concerned about the admissibility of the report.
5          You say Judge Weinstein has admitted these
6   reports.
7          Has any Second Circuit decision ruled on these
8   reports?
9          MR. DENNIN:  Not to my knowledge, your Honor.
10         THE COURT:  Well, I will give you an opportunity
11  overnight to give me some law on that.  Because in many
12  cases there is no objection to the report.  And I would
13  like to see whether there is any Second Circuit opinions
14  on this subject.
15         It does contain on the one hand a lot of hearsay
16  and statements that would not be admissible.
17         On the other hand, it is a record made by her in
18  the regular course of her business.  Let me see if you can
19  get authority on that.
20         MR. DENNIN:  Thank you.
21         Would you like me to proceed without the report
22  in evidence?
23         THE COURT:  Yes, proceed.
24  Q   Ms. McArdle, you just listed off the summary of your
25  various opinions reached in this case.

1          Would you repeat for us the first issue that
2   plaintiffs asked you to opine on.
3   A   **The extent of minority composition and minority**
4   **change in Garden City and Nassau County.**
5          THE COURT:  The extent of minority --
6   A   **Minority composition -- excuse me.**
7          **Say racial change and racial composition in**
8   **Nassau County and Garden City.**
9   Q   Again, what was your expert opinion for that
10  proposition?
11  A   **I concluded that minority share of the population in**
12  **Garden City was much less than that in Nassau County.  And**
13  **at the rate of growth of the minority population in Garden**
14  **City was much slower than that in Nassau County from 1980**
15  **to 2000.**
16  Q   And what other conclusions did you reach about the
17  racial composition of Nassau County and related pattern of
18  change in summary?
19  A   **I also concluded that Nassau County had a high degree**
20  **of segregation between blacks and whites, and that level**
21  **of segregation has moved very slowly between 1980 and**
22  **2000.**
23         **Further, that the level of segregation between**
24  **Hispanics and whites was at the moderate level, but**
25  **increasing steadily between 1980 and 2000.**

**134**

1    Q    And what other conclusions did you reach about the
2    racial composition of Garden City in summary?
3    A    I found also not only looking at population, I also
4    looked at household characteristics, households are the
5    unit of analysis most commonly used in studying housing
6    policy.
7          So I further concluded that the share of
8    minority head of households in Garden City was much lower
9    than that in Nassau County.
10   Q    Ms. McArdle, what was the minority population share
11   of Nassau County in 2000?
12   A    20.3 percent minority.
13         MR. DENNIN:  Your Honor, at this point we would
14   like to start to use some demonstratives or testimonial
15   aids by the way of slides.
16         THE COURT:  Sure.
17         MR. DENNIN:  They are not being offered in
18   evidence at this time.  They are to help the witness.
19         THE COURT:  Yes.
20         MR. DENNIN:  PTX 1.
21         THE COURT:  Would you like me to dim the lights
22   somewhat to see it better?
23         MR. DENNIN:  Up to you.
24   Q    Can you see it fine?
25   A    Yes.

**135**

1          MR. DENNIN:  Ms. McArdle has brought a laser
2    pointer with her, is it okay if she uses that to point it
3    out on the map?
4          THE COURT:  Yes.
5          MR. DENNIN:  If it works.
6    Q    How is generally the 20 percent minority share
7    dispersed throughout Nassau County?
8    A    There is a large degree of variation of disparity in
9    the minority area across the municipalities in Nassau
10   County as of 2000.  With some communities being majority
11   minority at that time.
12   Q    What is a majority minority area?
13   A    An area in which over 50 percent of the population is
14   minority.
15   Q    And looking at the map in Nassau County -- first of
16   all, Ms. McArdle, who prepared this map?
17   A    I did.
18   Q    And what was the source of the information you used
19   to prepare this map?
20   A    The 2000 census.
21   Q    And getting back to the majority/minority areas, can
22   you point out those areas on the map?
23   A    Yes.
24         The areas in the darkest color.
25         Here are one, two, three, four, five, six,

**136**

1    seven, eight, and nine.
2    Q    What, if any, were the other conclusions you reached
3    about the demographics of Nassau County as a result of
4    your work?
5    A    As I mentioned, I found the minority share of the
6    population in households was greater in -- greater in
7    Nassau County than in Garden City.
8    Q    You describe the term majority minority area.
9          What type of area is Garden City?
10   A    Yes, I'm sorry.  I understand your previous question
11   now.
12         As I had said, a number of communities are
13   majority minority.  But a number of other communities have
14   very small minority shares in the population.  In fact,
15   less than five percent minority.  And those are the
16   municipalities that are in the lightest yellow color.
17         Garden City, which is located right here, is one
18   of those with the population of minority actually being
19   4.1 percent, and in that lowest category, five percent or
20   low -- five percent or lower minority share of the
21   population.
22   Q    Ms. McArdle, I would like you to turn back to your
23   analysis of the racial composition of Nassau County and
24   Garden City.
25         MR. DENNIN:  Please put up PTX 2.

**137**

1    Q    Ms. McArdle, I would ask you to take a minute to
2    review the slide and let me know when you are ready to
3    discuss it.
4          THE COURT:  I will dim the lights a little bit
5    so it can be seen better.
6    A    I'm ready.
7    Q    Who prepared this slide?
8    A    I did.
9    Q    What is the source of your information?
10   A    The 1980 and 2000 census.
11   Q    And what did you conclude about the minority share of
12   Nassau County in 1980 and 2000?
13         MR. BOHN:  Objection, your Honor.
14         Before Ms. McArdle testifies as to her opinion
15   as to minority share, I believe it is necessary as well as
16   helpful for her to define what she used in what she
17   identified as minority.
18         THE COURT:  Very well.
19         MR. DENNIN:  We were going to get to that.  We
20   can jump ahead.
21   Q    What did you use as definition of minority in
22   performing your work in this case?
23   A    For work in this case I defined minority as all
24   persons identifying their ethnicity as Hispanic and all
25   people who defined their race as black.

McArdle-Direct/Dennin

138

1  Q   Why just those races or ethnicities?

2  A   In Nassau County the only other what is considered

3  minority group of significant size are Asian.  And Asians

4  are quite differently situated in terms of their

5  socioeconomic status as compared to blacks and Hispanics

6  in Nassau County.

7       For example, in 2000, the median housing income

8  for Asians is actually $10,000 higher than it is for

9  non-Hispanic whites.

10      Furthermore, they are much more integrated with

11  the white population and have a much lower level of

12  segregation than do blacks and Hispanics.

13      In a case where a number of issues deal with

14  housing, affordable, and accessibility, to mix Asians into

15  that minority population with their much higher

16  socioeconomic status and level of integration I believe

17  would obscure the situations or the challenges faced by

18  Hispanics and blacks.  For that purpose I defined

19  minorities as blacks and Hispanics:

20  Q   And you used the term minority share impact.

21      Before we go into the question, can you explain

22  what that means, minority share?

23  A   The number of minority population divided by the

24  total population.  It is a percent.

25  Q   Returning to my question, what did you conclude about

McArdle-Direct/Dennin

139

1  the minority share of Nassau County in 1980 and 2000?

2  A   I concluded that the minority share or percentage of

3  the population increased from ten percent in 1983, 20.3

4  percent in 2000 for Nassau County.

5  Q   And what did you conclude about the minority share of

6  Garden City in 1980 to 2000?

7  A   I concluded that the minority share of the population in

8  Garden City increased from 2.9 percent in 1980 to 4.1

9  percent in 2000.  However, in calculating those

10  statistics, I discovered that a large share, 61 percent of

11  the black population living in Garden City in 2000, were

12  living in dormitories.

13      If you exclude those people and look only at

14  people living in households, which as I mentioned is the

15  most common unit of analysis in looking at housing issues,

16  you can only look at people living in households, the

17  minority share of the population in Garden City in 2000

18  was 2.6 percent.

19  Q   Why did you exclude in that third set of bars the

20  students living in dorms in Garden City?

21  A   I believe that the question of whether to include or

22  not include students in dormitories depends on the

23  question that one is considering.

24      In this particular case, which I believe the

25  question deals with housing affordability and

McArdle-Direct/Dennin

140

1  accessibility, the fact that a private university provides

2  dorms which are not part of the wider housing market that

3  are located in the very centralized area, and as for

4  transient population of students, that the population

5  living in those dormitories is not relevant to the larger

6  question at hand dealing with housing accessibility in the

7  community at large.

8       THE COURT:  We are going to take a 15 minute

9  recess.

10

11      (Whereupon, a recess was taken.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

McArdle-Direct/Dennin

141

1       THE COURT:  You may proceed.

2       MR. DENNIN:  Thank you, your Honor.

3  Q   I believe we just finished up with PTX 2, and we put

4  up PTX 3.

5       Please take a moment to review the slide and let

6  me know when you are ready.

7  A   I'm ready.

8  Q   Who prepared this slide?

9  A   I did.

10  Q   And what was the source of the information or data

11  that you used?

12  A   In 1980 and 2000, the censuses.

13  Q   And what was the rate of growth for minorities in

14  Garden City from 1980 to 2000?

15  A   31.4 percent.

16  Q   Is that represented by the red bar?

17  A   Yes.

18  Q   And what was the rate of growth for minorities in

19  Nassau County from 1980 to 2000?

20  A   As represented in the blue bar, it is 105 percent

21  Q   To be clear, what numbers are you comparing?

22  A   Based on the total population.

23      As I mentioned relative to the previous slide,

24  ideally it would be best to look at the population

25  residing in households, excluding those in group quarters

142

1  such as dormitories. In this particular case I was unable
2  to obtain either publicly available data or by special
3  request from the Census Bureau data about the population
4  living in households by race for 1980. So this data on
5  racial change relates to total population.
6  Q   If we can now go back to PTX 2.
7      The comparison in the slide we were just looking
8  at, which numbers is it comparing?
9  A   This is -- the timeframe is 1980 to the 2000
10 timeframe, and it deals with the total population. It
11 states the underlying population numbers in calculating a
12 percentage change.
13 Q   Go back to 36789 PTX 3 now.
14     Two questions ago you described which numbers
15 you used in this comparison. Would you please explain why
16 you used those numbers?
17 A   With respect to the total population?
18 Q   Yes.
19 A   As mentioned, ideally I like to use the population
20 living in households, but that was unavailable to me from
21 either publicly available sources or by special request
22 from the Census Bureau. Instead of using population of
23 household I used total population.
24 Q   Thank you.
25     I would like to now return to your analysis of

143

1  certain household demographics in Nassau County and in
2  Garden City.
3      I believe you already explained what a household
4  is. Would you explain what a minority head of household
5  is?
6  A   I'm not sure I did explain what a household is.
7      Just for the record, a household are all people
8  living together in the same housing unit.
9      A minority head of the household is one in which
10 the head, sometimes called a householder, which is the
11 person or one of the people in whose name the house is
12 rented, owned or being purchased, in which that head is a
13 minority.
14     MR. DENNIN: Miguel, please put up PTX 4.
15 Q   Ms. McArdle, lease take a moment to review the slide
16 and let me know when you are ready.
17 A   All right.
18 Q   Who prepared this slide?
19 A   I did.
20 Q   What was the source of information or data you used?
21 A   The 2000 decennial census.
22 Q   What was your conclusion about the racial composition
23 of Garden City in terms of household as of 2000?
24 A   Minorities made up 2.3 percent of households in
25 Garden City.

144

1  Q   And what was your conclusion about the racial
2  composition of Nassau County in terms of the household as
3  of 2000?
4  A   Minorities made up 15.3 percent of households in
5  Nassau County in 2000.
6      MR. DENNIN: PTX 5, please.
7      THE COURT: What was the percentage in Nassau
8  County, sorry?
9      THE WITNESS: 15.3 percent.
10 Q   Ms. McArdle, please take a moment to review this
11 slide and let me know when you are ready.
12 A   I'm ready.
13 Q   Who prepared this slide?
14 A   I did.
15 Q   And what was your source of information or data in
16 preparing this slide?
17 A   The 2000 decennial census.
18 Q   And would you please describe what analysis you
19 performed that represented -- is represented by this
20 slide?
21 A   In this slide the bar in red represents the number of
22 minority households actually in Garden City in 2000, 167
23 households, representing 2.3 percent of all households.
24     The bar in blue, 1,133 households, would be the
25 number of minority households if Garden City's minority

145

1  composition equalled that of Nassau County, which is 15.3
2  percent. That is calculated by taking the total number of
3  households in Garden City and multiplying it by the
4  minority share of households in Nassau County, or 15.3
5  percent, resulting in 1,133 households, which shows that
6  if the minority share of households in Garden City
7  equalled that of Nassau County, it is not -- the number of
8  minority households would increase over six-fold.
9      MR. BOHN: Your Honor, we will object to this
10 demonstrative for the sake that that number on the blue
11 line, the 1,133, appears to be inconsistent with
12 Ms. McArdle's report, which I believe was setting forth
13 the same analysis, but the number was significantly lower
14 in the report.
15     THE COURT: So bring it up on cross-examination.
16 Overruled.
17     MR. DENNIN: You can take that down. Thank you.
18 Q   Ms. McArdle, I would like to now turn to how you went
19 about performing your analysis in reaching the conclusions
20 you just described to us.
21     Generally speaking, what was the source of data
22 and information that you used?
23 A   For this particular analysis which I just discussed,
24 the sources were the 1980 and 2000 decennial census.
25 Q   Was there any specific databases that you used for

1   your analysis?

2   A    These were taken from the summary files, one and two,

3   of the decennial census.

4   Q    Would you please describe generally how you performed

5   your analysis that you described over the last half an

6   hour or so about the racial composition in Nassau County

7   and Garden City.

8   A    Generally, first I identified the geographic areas of

9   interest, the most appropriate data sets, and when looking

10  at racial change the best data you have to use is the

11  census, the decennial census.

12          After identifying the appropriate census

13  databases, I extracted the raw data from either historical

14  paper documents in the case of the 1980 census, or more

15  recent electronic documents for the 2000 census;

16  information on the populations using the most consistent

17  racial definitions.

18          I then used various software, including

19  Geographic Information System software for the mapping I

20  showed, in order to calculate various indicators commonly

21  used in evaluating or analyzing racial change.

22  Q    I would like to move on to the next area the

23  plaintiffs asked you to opine on.  And would you for the

24  Court describe the second opinion that you reached in this

25  case, in summary.

1   A    Minority households are disproportionately

2   represented among renter households, very low income

3   renter households, very low income elderly renter

4   households, and households with housing problems in Nassau

5   County.

6   Q    Take a moment to review PTX 6, and let me know when

7   you are ready.

8   A    I'm ready.

9           THE COURT:  Excuse me for one minute.

10          (Whereupon, at this time there was a pause in

11  the proceedings.)

12          THE COURT:  All right.

13  Q    Did you have a chance to review the slide?

14  A    Yes.

15  Q    You prepared it?

16  A    Yes.

17          This is the Comprehensive Housing Assistance

18  Strategy database, as of 2000, commonly known as the CHAS,

19  C-H-A-S.

20  Q    Ms. McArdle, what were your conclusions about the

21  connection between rental or renting and racial

22  composition as expressed by this slide?

23  A    I concluded that minority households in Nassau County

24  were disproportionately renters relative to their

25  representation among all households.

1           In Nassau County in 2000 14.8 percent of all

2   households were minority.  But renter households, 31.81

3   percent of all renter households were minority.  41.4

4   percent of very low income renter households were

5   minority.  And 53.1 percent of very low income non-elderly

6   renter households were minority.

7   Q    And what is a very low income household?

8   A    Generally when people think about low income

9   populations, they think in terms of the poverty level, the

10  federal level.

11          The poverty level is the same across the

12  country.  It does not differ in the cost of living in a

13  particular area.

14          So the Department of Urban Development, HUD,

15  creates these other categories relative to the

16  metropolitan area's median income, adjusting for the cost

17  of living.

18          Very little households are defined with family

19  income less than 50 percent of the median family income

20  for that particular metropolitan area.

21  Q    And according to your analysis, what was the relevant

22  metropolitan area?

23  A    The Nassau, Suffolk primary metropolitan statistical

24  area.

25  Q    What is a primary statistical metropolitan area?

1   A    In general, metropolitan areas are geographic

2   entities defined by the Office of Management and Budget.

3   They are areas of a population and urban core of at least

4   50,000 people, along with the county in which that core is

5   located, and other adjoining counties that have a strong

6   socioeconomic tie to the urban core, as noted by commuting

7   patterns.  That metropolitan statistical area is so

8   defined.  In certain areas where metropolitan areas are

9   very large, they are designated as CMSA, Consolidated

10  Metropolitan Statistical Areas.

11          In the northern New Jersey and Long Island area

12  is one of those large CMSAs, and they are further

13  subdivided into smaller PMSAs, or Primary Metropolitan

14  Statistic Areas, of which Nassau Suffolk is one of those

15  PMSAs, in the larger New York, Consolidated Metropolitan

16  Statistical Area.

17  Q    Turning back to your analysis, what other conclusions

18  did you reach about the relationship between race and very

19  low income renters in Nassau County?

20  A    Minority households are always four times as likely

21  to be very low income renter households as are

22  non-minority households.

23  Q    And where did this data come from?

24  A    This is from the CHAS, the Comprehensive Housing

25  Assistance housing database.

150

1   Q    What is the CHAS database?

2   A    The CHAS database are special tabulations created by

3   the census bureau for HUD, according to HUD's

4   specifications, designed specifically to get information

5   about housing problems, housing affordability, and housing

6   need, specifically for lower income households.

7   Q    Generally speaking, who uses the CHAS database?

8   A    The CHAS database is most commonly used by local

9   governments in order to create strategies about how to use

10  housing funds, and also reporting of how they use housing

11  funds.  It is also used by HUD in terms of determining the

12  allocation of funds.  And it is used by researchers in

13  both academic and policy researchers.

14  Q    How did you use this data in forming your analysis?

15  A    I created tabulations from the CHAS on the minority

16  share of all households, renter households, very low

17  income renter households, and very low income renter

18  non-elderly households, as well as households with housing

19  problems.

20  Q    And what was the actual very low income level that

21  you used or calculated in this matter?

22  A    As I mentioned, this is data that is tabulated

23  especially by the Census Bureau from the decennial census.

24  Therefore, it is based on incomes collected through the

25  census as part of, in this case, as part of the decennial

151

1   census of 2000.

2        When the census bureau asks people about their

3   incomes as part of the decennial census, it asks about the

4   incomes for the previous year.  So that would be 1999.

5        In 1999, which the CHAS reflects, the very low

6   income level where a family of four in this metropolitan

7   area of Nassau/Suffolk, PMSA, was $36,650.

8   Q    What if any conclusions did you reach about housing

9   problems faced by minorities in Nassau County?

10  A    I felt that minorities were more likely to experience

11  housing problems than non-minorities, and approximately 52

12  percent of minority households had housing problems

13  compared to approximately 31 percent of non-minority

14  households.

15  Q    And what are housing problems?

16  A    Housing problems as defined by HUD include those of

17  paying more than 30 percent of your income for your

18  housing costs, and/or living in urban crowded housing,

19  and/or lacking complete kitchen or plumbing facilities.

20  Q    And what was the source of your data information for

21  this conclusion?

22  A    That data all came from the CHAS, the Comprehensive

23  Housing Assistance Strategy base.

24  Q    Ms. McArdle, I would like you to turn to the next

25  area, the four NYAHC proposal.

152

1        What were you asked to do regarding the four

2   NYAHC proposals?

3        THE COURT:  The four what?

4        MR. DENNIN:  NYAHC proposals.

5   A    I was asked to estimate the minority share of

6   households that would likely be able to rent based on

7   affordability, rent new rental housing developed under

8   NYAHC proposals under the proposed RM zoning.

9   Q    And what was the total number of units for each of

10  the four proposals?

11  A    311 for each of the proposals.

12       MR. DENNIN:  Please put up PX 7 and blow it up a

13  little.

14  Q    Do you see PTX 7 on your screen, Ms. McArdle?

15  A    Yes.

16  Q    Please take a moment to review it and let me know

17  when you are ready to discuss.

18  A    I'm ready.

19  Q    Who prepared PTX 7?

20  A    It was prepared by plaintiff's counsel and drawn

21  entirely from data I had prepared and reported in my

22  report in Exhibit 2.

23  Q    And let's start with this proposal.

24       What was the parameters of this proposal?

25  A    This proposal included out of the 311 total units, 80

153

1   percent of the market rate units, and 20 percent being

2   other affordable units, which is the term I'm using to

3   describe the subsidized units other than those subsidized

4   through Section 8.

5   Q    And what were your conclusions with regard to the

6   first proposal?

7   A    It is a little hard to see.

8        My conclusions under the first proposal was that

9   for the market rate units, 13 percent of households that

10  were likely to be able to afford this market rate unit

11  would be minority.

12       Apply that to the 249 total units that were to

13  be developed under the market rate section, revealed an

14  estimated 33 minority head of households likely to occupy

15  the market rate units.

16       The other affordable units, 52 percent of the

17  households that would be income eligible and likely able

18  to afford the other affordable units would be minority.

19  52 percent would be minority, and applied to the 62 units

20  to be developed under 52 minority households.  Combining

21  those two, the market rate units and the other affordable

22  units yields a combined number of 65 minority households

23  of the total 311, for 21 percent of the households that

24  were likely to be able to afford those units, would be

25  minority.

1  Q   Do you have a hard copy of the slide in front of you,

2  would that help?

3  A   It would.  I don't know if that is possible.

4      MR. DENNIN:  Your Honor, can I put before

5  Ms. McArdle what is Exhibit 2 to her expert report, which

6  she just testified to was the exclusive source for this

7  slide, not to be put in evidence but to aid her in reading

8  the numbers?

9      THE COURT:  Yes.

10     MR. DENNIN:  May I approach the witness?

11     THE COURT:  Yes, at any time.

12     THE WITNESS:  Thank you very much.

13     (Handed to the witness.)

14     MR. DENNIN:  Highlight the second portion,

15 please.

16 Q   Ms. McArdle, what were the parameters of this

17 proposal?

18 A   Under this proposal, once again, 311 units, 85

19 percent would be market rate units and 15 percent would be

20 the other affordable units.

21 Q   And what were your conclusions with regard to this

22 proposal?

23 A   For the market rate units, 12 percent of the

24 household would likely be able to afford these units would

25 be minority.  Applying that to the 265 units to be

1  developed yields a total of 32 minority households.

2      For the other affordable units, 52 percent of

3  the households that would become income eligible and likely be

4  able to afford the units would be minority.  Applying that

5  to the 46 units to be developed yields 24 minority

6  households.

7      Combining the market rate in other affordable

8  units would be a total of 56 minority households of the

9  311, or 18 percent.

10     MR. DENNIN:  Now, highlight the third one,

11 please.

12 Q   Ms. McArdle, what are the parameters of this

13 proposal?

14 A   75 percent of the total 311 units would be market

15 rate.  25 percent would be Section 8 subsidized.

16 Q   And what conclusions did you reach regarding this

17 proposal?

18 A   14 percent of the households is likely to be able to

19 afford the market rate units would be minority, applied to

20 the 233 total units to be developed, would yield 32

21 minority households.

22     88 percent of households likely to be -- likely

23 to occupy the Section 8 units would be minority, applied

24 to the 78 total Section 8 units would yield 69 minority

25 households.

1      Combined with those would be 101 minority

2  households of the 311, or 32 percent.

3      MR. DENNIN:  Miguel, highlight the fourth one,

4  please.

5  Q   Ms. McArdle, what were the parameters of this

6  proposal?

7  A   75 percent would be market rate, 12 and a half

8  Section 8, and 12 and a half percent other affordable.

9  Q   And what were your conclusions?

10 A   The market rate units, 14 percent of the households

11 likely to be able to afford the market rate units would be

12 minority.  Applied to the 233 total market rate units

13 yields 32 minority households.  For the Section 8 units,

14 88 percent of those likely to occupy the Section 8 units

15 would be minority, applied to the 40 Section 8 units would

16 yield 35 minority households.  For the other affordable

17 units, 53 percent of the households income eligible and

18 likely to be able to afford those units would be minority.

19 Applied to the 38 other affordable units to be developed

20 yields 20 minority households.  Adding all of those

21 together yields 88 minority households, of the 311 total,

22 or 28 percent.

23     MR. DENNIN:  Leave it up, unhighlight it though.

24 Q   In summary, what were your conclusions how the

25 development of these proposals would likely affect the

1  racial composition of Garden City as a whole?

2  A   The development of these proposals would yield likely

3  based on the ability to afford these units an additional

4  56 to 101 minority households.

5  Q   And looking at the third proposal, the 75 percent

6  market, 25 percent Section 8, how is that with the 101

7  households likely affect the share of minority head of

8  households in Garden City?

9  A   It would likely increase to 3.6 percent of households

10 in Garden City.

11 Q   Again, with this 75 percent market, 25 percent

12 Section 8 proposal, how would that likely affect the

13 overall minority population in Garden City?

14 A   In terms of people living in households, there would

15 likely be an increase of 4.2 percent.

16 Q   And Ms. McArdle, in your expert opinion, what, if

17 any, is the connection between housing developments with

18 affordable and/or Section 8 components and minority

19 residents?

20 A   In my opinion, because of the lower income

21 distribution of minority households, increasing the number

22 of affordable and especially Section 8 units would

23 increase the affordability to minorities and increase the

24 number of minority households likely to reside in those

25 units.

1  Q   I would like to now turn to the details of how you
2  performed your analysis.
3      Ms. McArdle, who or what was the source of these
4  four proposals?
5  A   The plaintiffs.
6  Q   And what were your inputs into the very parameters we
7  discussed for these four proposals?
8  A   In terms of the parameters of the proposals, I had no
9  input into them.
10 Q   Specifically what information from these four
11 proposals did you use to perform your analysis?
12 A   For the market rate units, I used the information on
13 the number of units to be developed by bedroom size and
14 the corresponding rents for those units.
15     For the Section 8 units I used the number of
16 units to be developed for the Section 8 subsidies.
17     For the other affordable units, I used
18 information on the number of units to be developed by
19 bedroom size for households within specified income
20 eligibility ranges.
21 Q   And why was this information useful in performing
22 your analysis?
23 A   That type of detailed information allowed me to more
24 accurately tailor my methodology in my estimates to the
25 proposals and would accurately reflect the minority share

1  of households likely to be able to afford those units.
2  Q   I will ask you to briefly describe, what is
3  Section 8?
4  A   In terms of its rental components, it is a subsidy
5  program, federal subsidy program, administered by HUD,
6  designed to allow renters to rent in a private market.
7      One component of the program allows tenants to
8  use and take those certificates or vouchers to -- along
9  with them when they moved to various units.  They are
10 called portable vouchers.
11     Another component attaches some of that subsidy
12 to particular projects.
13     In any case, these units are qualified according
14 to -- they must pass HUD quality inspections and rent at
15 levels that HUD deems to be fair.  Under the subsidy
16 households generally pay 30 percent of their income for
17 rent and the rest of the rent is paid through the subsidy
18 directly to the landlord.
19     MR. BOHN:  Your Honor, objection and move to
20 strike that response.
21     The description of what Section 8 household or
22 what the program is is well outside the parameter of this
23 expert's report.  She did an estimate of who may afford,
24 but not a description of what Section 8 is.  It is outside
25 her reporting and outside her proffered expertise as a

1  demographer.
2      THE COURT:  Overruled.
3  Q   Let's turn to the market rate category.
4      Generally speaking, what is a market rate unit?
5  A   A market rate unit is one in which the owner would
6  set the rent according to what they believe the market
7  would bear, and the tenant would pay the full amount of
8  the rent without subsidy.
9      MR. DENNIN:  Miguel, would you highlight the
10 three columns under the market rate unit.
11     Thank you.
12 Q   Ms. McArdle, would you please describe the first step
13 of your analysis that you performed regarding the market
14 rate units.
15 A   For the market rate units, I received information by
16 bedroom size on the proposed rents that they would rent
17 for.  That information was for rents as of 2004.
18     My goal was to be able to calculate the minority
19 share of households with incomes that could afford those
20 rents.
21     The best source of information I had on incomes
22 for Nassau County was from the 2000 decennial census.
23     As I mentioned, the census reports incomes as of
24 the previous year.
25     The 2000 census reports incomes as of 1999.

1      So I had 2004 rents, rents as of 2004, and
2  incomes to compare them to as of 1999.
3      So in order to adjust for inflation between
4  those two years, I deflated the 2004 rents back to 1999,
5  using the Bureau of Labor Statistics, Consumer Price Index
6  for residential rents for the New York, northern
7  New Jersey and Long Island area.
8      I used that deflator, that CPI, to deflate the
9  rents back to 1999 and made them comparable with the
10 incomes I had from the census.
11 Q   Now that you had this information, what did you do
12 next?
13 A   There was another step before I got to that point.
14     What I had was the contract rents.  They did not
15 include utilities.  So then I obtained information from
16 the plaintiffs about estimated utility amounts.  I
17 similarly had to deflate those back to 1999 using a
18 different Consumer Price Index, the Consumer Price Index
19 for household energy for New York, northern New Jersey,
20 and Long Island.
21     After I deflated those back to 1999, I had the
22 contract rents plus the utilities which I could combine to
23 create what they call the gross rent, which is what is
24 commonly used in doing affordability analysis, now in 1999
25 dollars.

1    Since I now had the rents in 1999 dollars, and
2 the income in 1999 dollars, I can calculate what income
3 would a household need to afford those particular rents.
4 And I did that by dividing the monthly rents by .3, which
5 yielded the monthly income necessary to afford those rents
6 without paying more than 30 percent of their income for
7 rent, which is the common affordability standard.  And
8 that gave me the monthly incomes that households would
9 need to afford those rents.  I then multiplied that by 12
10 to get the yearly annual income for household needs to
11 afford those rents.
12    With that income cut up now in 1999 dollars, I
13 can compare that with the incomes for renters in Nassau
14 County and calculate which renters had incomes above that
15 cutoff, how many in total, and how many of them were
16 minority.
17    I could then create a share in the minority
18 households that could afford those rents, divided by the
19 total that could afford those rents, to come up with the
20 minority share of households that could afford those rents
21 without paying more than 30 percent of those incomes for
22 rent.
23 Q    And are your conclusions represented in the three
24 highlighted columns for slide 7?
25 A    That information would be done by bedroom size.  And

1 then the sum, this data here shows the summation across
2 different bedroom sizes.
3    So the columns under set minority would be that
4 percent I calculated from the census, the percentage of
5 household minority that could rent those units.  Applying
6 that to the total number of units available would then
7 yield the total number of households likely to be minority
8 that could afford to rent those units.
9 Q    Why were you using Nassau County information for this
10 calculation?
11 A    For several reasons.
12    One is the relative central location of Garden
13 City in Nassau County.  Also the fact that I had
14 calculated from the decennial census that in 2000, 70
15 percent of the population that moved into Garden City
16 moved from Nassau County.  And that in combination with my
17 previous experience in dealing or thinking about housing
18 markets and mobility led me to make the decision that
19 Nassau County was an appropriate housing market for
20 analyzing.
21 Q    And what was your source for the income levels of
22 renters in Nassau County?
23 A    The 2000 decennial census.
24 Q    I would like to move on to the Section 8 category.
25    MR. DENNIN:  Miguel, would you highlight the

1 middle section, please.
2 Q    In summary, what was the goals on part of your
3 analysis?
4 A    To estimate the minority share of households likely
5 to rent Section 8 units.
6 Q    Would you please describe the first step you took in
7 performing this analysis?
8 A    From the -- I obtained the Section 8 waiting list
9 from the plaintiffs.
10 Q    What is that list?
11 A    As with many subsidized programs, when there is a
12 number of eligible households more than available, the
13 administrative agency would have a waiting list to
14 basically keep track who is next in line with that
15 subsidy.
16 Q    And how long was the waiting list for Nassau County?
17 A    I believe it was approximately 3,600.
18 Q    And is that individuals or households?
19 A    Households.
20 Q    After obtaining the Section 8 waiting list, what did
21 you do next in performing your analysis?
22 A    I calculated the minority share of the waiting list.
23 Q    And how did you do that?
24 A    On the waiting list it provided information for the
25 ethnic categorization of the household and the racial

1 categorization.  They were reported separately.  So I
2 added together the share of the waiting list households
3 that reported their ethnicity as Hispanic, plus those
4 that reported their race as black.  But because they were
5 reported separately, they -- there could conceivably be an
6 overlap between the two, people who were both black and
7 Hispanic.
8    In order to try to eliminate that overlap, I
9 used information from the 2006 American Community Survey
10 to get the estimate of the share of blacks that were also
11 Hispanic.  And I applied that share to the total number of
12 minorities and subtracted out those that would likely be
13 estimated to be the small overlap between blacks and
14 Hispanics.
15 Q    And what if any information was not available on the
16 Section 8 waiting list that would have been relevant to
17 your analysis?
18 A    I can tell you my conclusion was 88 percent of the
19 waiting list was minority.
20    In terms of what I would have liked to have on
21 the waiting list that was not there, I would have
22 preferred to have information on the racial and ethnic
23 composition of households on the waiting list by either
24 unit size or household size.  So that was not available.
25 Q    So with that information not available, how did you

1    account for that in performing your analysis?
2    A    Well, it is my belief based on the demographics of
3    Nassau County that a higher minority share would be found
4    among the larger households, which are more likely to be
5    family households.  They are more likely to be minority.
6    And the smaller households which would tend to be more
7    elderly households would be more commonly white.
8          Because I used the 88 percent consistently
9    across the different household sizes, and because of the
10   NYACH proposal, they intended to build more of the larger
11   housing units.
12         The fact that those larger housing units, the 88
13   percent would be somewhat an under-estimate for a minority
14   share, would be my results to possibly slightly
15   underestimate the number of minorities likely to live in
16   the Section 8 units.
17   Q    From what you had determined that the Section 8
18   waiting list was 88 percent minority share, once you did
19   that, what did you do next?
20   A    I applied the 88 percent share to the number of units
21   to be developed under Section 8 to get an estimated
22   minority number of households.
23   Q    And is that represented --
24   A    Represented by the middle column of the shaded area.
25   Q    I would like to move to the third category, the other

1    affordable units.
2          How is the category of other affordable units
3    different from Section 8 housing?
4    A    My understanding was that the developments NYACH
5    planned to use another type of subsidy in addition to
6    replace the Section 8 subsidy.  It was subsidies such as
7    low income housing tax credits.  These were the other
8    affordable units in addition to or besides the Section 8
9    units, they also provided information of other affordable
10   units on the income eligibility ranges for those
11   households.
12   Q    And, again, what other data information did you use
13   from the NYACH proposals to perform an analysis on the
14   other affordable units?
15         MR. BOHN:  Objection to leading.
16         THE COURT:  Overruled.
17   A    For the other affordable units, the proposals include
18   information by bedroom size on the number of units to be
19   developed within specified income eligibility ranges.
20         So once again those income eligibility ranges
21   were given as of 2004, in 2004 dollars.
22         In order to compare them with census incomes as
23   of 1999, I deflated them, in this case using the CPI, for
24   Consumer Price Index, for all urban consumers for the New
25   York, northern New Jersey, Long Island region or area, to

1    deflate those incomes back to 1999.
2          I now have income eligibility ranges for 1999
3    and income information under the decennial census as of
4    1999.  And I could calculate the number of households that
5    fell into those income ranges, the total number, and also
6    the number that were minority, and then compute a share,
7    the minority number that fell in those ranges of the
8    appropriate household size compared to the total number of
9    households in that income range to create the minority
10   share that would be likely to be income eligible.
11   Q    Is that represented by the highlighted column?
12   A    Yes.  This is once again the summary across all the
13   different bedroom sizes.  But the highlighted data do
14   show the likely to be minority in the far right column
15   applied to the total number of units to be developed in
16   the total left column, yielding the total likely to be
17   minority in the center column.
18   Q    And Ms. McArdle, you are using the term, income
19   eligibility range.  What does that mean, income eligible
20   range?
21   A    For these other affordable units, the proposal would
22   detonate the income ranges in which households would have
23   to fall to be eligible for these affordable units.
24   Generally they were between 41 percent and 60 percent of
25   area median income for the Nassau/Suffolk area.

1          Usually they were a number of units estimated,
2    certain number designated between 41 and 50 percent of
3    area median income, between 41 and 50 percent of area
4    median income, and between 51 and 60 percent of area
5    median income.
6    Q    Ms. McArdle, I would like to turn to the last area
7    plaintiffs asked you to opine on.
8          Would you again remind everyone what that last
9    area was.
10   A    The estimated share of minority households likely to
11   be able to purchase homes under the Fairhaven proposal,
12   under the adoptive RT zoning.
13   Q    And what was your conclusion that you reached in that
14   area?
15   A    I concluded the likely minority share of households
16   able to afford to purchase households under the Fairhaven
17   proposal, when applied to the 156 proposed units, would
18   likely yield three to six minority households based on the
19   ability to afford those units.
20   Q    Generally speaking, what caused that range from three
21   to six, in your results?
22   A    In order to report my analysis, I needed information
23   on home prices, what people were buying homes for in
24   Nassau County.  And that data is not generally available.
25   Instead I used information on mortgage amounts for home

McArdle-Direct/Dennin

**170**

1  borrowers.  And I needed to adjust that information on
2  mortgage amounts to estimate home prices.
3        I made a series of different assumptions to test
4  the sensitivity of basically the down payment that a
5  purchaser would use to make -- to buy the home.
6        Another way of thinking of the down payment is
7  what I term or what is termed the LTV, or loan to value
8  ratio.  And that accounts for the variation, a series of
9  different assumptions about the value ratio in adjusting
10  data from mortgage amounts to get purchase price.
11  Q    And what was the series of assumptions or estimates
12  in the LTV that you used that resulted in the low end, the
13  three households?
14  A    95 percent LTV, or a five percent down payment from
15  minority households, combined with a 80 percent LTV, or 20
16  percent down payment for non-minority households.
17  Q    Why did you use a mixed LTV rate there?
18  A    I wanted at least one of my tests or analyses to try
19  to account for the very different wealth holdings between
20  minorities and whites.  And that is why I did that, to at
21  least in one case use a situation in which minorities
22  would only put down five percent down payment,
23  non-minorities would put down 20 percent down payment, to
24  try to account for the entirely different wealth holdings.
25        In 2004 it was estimated by the census bureau

McArdle-Direct/Dennin

**171**

1  that whites had 11 dollars in wealth for every one dollar
2  that black households had, and seven dollars in wealth for
3  every one dollar in wealth that Hispanics had.
4        At least in some cases I wanted to try to show
5  what would be the effect, taking into account different
6  amounts of wealth.
7  Q    And why is different amounts of wealth relevant to
8  your analysis?
9  A    Because for the same amount of mortgage, households
10  with larger wealth are able to put down a higher down
11  payment and are able to afford a higher price.
12  Q    And what other LTVs did -- loan valuation ratios did
13  you use in your -- what was the other ranges or other
14  estimates that you used in performing your analysis,
15  besides what you have already described?
16        MR. BOHN:  Leading again.
17        THE COURT:  It is not phrased the way it was
18  leading.  It could be, if he said, isn't that right?  But
19  he didn't say that.  So it is not leading.
20  Q    The question is:  What was the other ranges or other
21  estimates that you used in performing your analysis,
22  besides what you have already described?
23  A    I used the range estimates, and 80 percent LTV, which
24  corresponds to a 20 percent down payment, 90 percent LTV,
25  corresponding to a 10 percent down payment, and 95 percent

McArdle-Direct/Dennin

**172**

1  LTV, corresponding to a five percent down payment, and 100
2  percent LTV corresponding to a zero percent down payment.
3  Q    And what was the source of information regarding --
4  withdrawn.
5        What was your source of information for your
6  analysis for the Fairhaven proposal?
7  A    The plaintiffs.
8  Q    What information were you provided?
9  A    I was provided with a bid sheet and project
10  description that provided information on the total number
11  of units for two different housing types and the fact that
12  these were going to be homes for sale.
13  Q    Now, what information was not contained in the
14  Fairhaven proposal that you would have liked to have had
15  to perform your analysis?
16  A    In order to perform analysis on the minority share of
17  households that can afford these homes, I would have liked
18  information on the actual prices of these homes.
19        However, amongst the various proposals that I
20  saw from Fairhaven, and I saw a few, none of them
21  contained information on the actual sales price.
22  Additionally, information that I read in the Long Island
23  Business News in December, December 3rd, I believe, of
24  2004, which reported on the sale of the property, or the
25  awarding of the property to Fairhaven for 56 million

McArdle-Direct/Dennin

**173**

1  dollars, reported that the purchase prices had not been
2  finalized, although it noted that the average sales price
3  in Garden City through the third quarter of 2004 was over
4  $836,000.
5  So I did not have actual purchase prices which I would
6  have liked to have.  Not having that, my second preference
7  would have been to have some detailed characteristics of
8  the homes that would allow someone with a lot of
9  development experience to price out those homes.  That
10  would be my second preference.
11  Originally I had received a bid -- a copy of the bid and
12  the project description from Fairhaven, which did include
13  some information about relative home sizes in terms of
14  square footage.
15  However, that particular description was thoroughly a
16  preliminary bid, as attached to it on the bid sheet was an
17  amount of 42 million dollars.  And that clearly was much
18  lower than what I learned to be the final bid which was
19  reported in the newspaper as 56 million.
20  So that initial bid did have some information about sizes.
21  However, I subsequently received what I believe to be the
22  final description.  It had attached to it a bid price of
23  56 million dollars which corresponded to be the final
24  amount.  However, in its description of the units, the
25  size of the units were quite different than the initial

174

1  description that I saw.  And in several cases had missing
2  data in terms of the size of the units.
3  Because of that I felt that I did not have conclusive
4  information on the size of the units and important
5  characteristics.  And I did not feel it was wise to rely
6  on that missing and conflicting information in order to
7  try to have someone price out those units.
8  So those would have been my two primary pieces of
9  information I would have liked to have, with the actual
10  prices not available.  So definitive characteristics of
11  the units, which were conflicting or missing based on the
12  bids and the descriptions that I saw.
13  Q    So not having that information available to you, what
14  did you use instead?
15  A    I used information on the average sales price in
16  Garden City in 2004 of $700,000.
17  Q    And what was the source of that information?
18  A    The plaintiffs.
19  Q    And what was your understanding as to the underlying
20  source of that information?
21  A    My understanding was it came from the Multiple
22  Listing Service.
23  Q    What is the Multiple Listing Service?
24  A    The Multiple Listing Service is a list, now a
25  computerized list that is created and maintained by real

175

1  estate professionals and their associations.  I believe
2  its primary purpose is to share information between
3  listing and cooperating brokers.  It also contains
4  information on housing characteristics and prices, prices
5  for sale, and then after the property is sold what it
6  actually sold for.
7  Q    Generally how reliable are the prices in the Multiple
8  Listing Services?
9  A    They are very reliable.  They are the actual sales
10  prices.
11  Q    What concerns, if any, did you have about using this
12  $700,000 figure?
13  A    I had some concerns that the $700,000 number was too
14  high.  One concern really.  Because that number reflected
15  the range of the different housing types found in Garden
16  City, it likely included single family detached housing,
17  as well as single family other housing types.  And all
18  things being equal, it seems at least possible that
19  including those single family detached homes would
20  overestimate the likely price.
21  On the other hand, I had a number of concerns
22  that the 700,000 was too low, very conservative.  And one
23  being that other prices I had seen describing Garden City
24  in sales prices all were higher than that number.  As I
25  mentioned, the number in the Long Island Business News

176

1  article said that the average home price in Garden City as
2  of the third quarter of 2004 was over $836,000.  I also
3  had seen information in Long Island Newsday reporting the
4  median price in 2004 in Garden City was $725,000,
5  increasing in 2005 to where I believe it was $799,500.
6  So these other pieces of information were all
7  higher in terms of what the prices seemed to be.
8  Secondly, there were a number of instances which
9  I saw describing the housing to be developed in terms of
10  it being luxury housing, for example, the article in Long
11  Island Business Week described them to be luxury
12  condominiums in a townhouse style.
13  The bids I saw describing the amenities of the
14  project described it as being in keeping with exclusive
15  communities.
16  So these seemed to be more top end, high end
17  units.
18  Also, these were new units.  And the data
19  reported in the Multiple Listing Service for the average
20  sales price would largely include existing units,
21  especially in an older community like Garden City.  And
22  typically new units such as developed by Fairhaven demands
23  a price premium, a higher premium, a higher amount than
24  along the lines of the existing units.
25  And the data that I had collected from the

177

1  National Association of Realtors and the US Census Bureau
2  reported that in 2004 the median price of a new unit was
3  24 percent higher than the price of the existing unit.
4  So all of these considerations together led me
5  to believe that -- you know, led me to conclude that the
6  700,000 estimate was a conservative estimate.
7  Q    Would you like some water?
8  A    Yes, thank you.
9  (Whereupon, at this time there was a pause in
10  the proceedings.)
11  Q    Ms. McArdle, now that you have the data that you
12  needed and you were comfortable with the reasonableness of
13  the estimates, can you describe the steps you took in
14  calculating, the first steps you took in calculating the
15  likely racial composition of those who could afford to buy
16  homes under the Fairhaven proposal?
17  A    I used data from the Home Mortgages Disclosure Act
18  database, also called HMDA, the Home Mortgage Disclosure
19  Act database, to examine data on new mortgages for homes
20  purchased in Nassau County, along with the rates of the
21  borrower of that home.
22  I used that data on mortgage amounts in
23  combination with the series of assumptions of loan to
24  value ratios to estimate the purchase prices of homes
25  purchased in Nassau County overall and for minority

1  households.
2  Q    And just taking a step back, what is the HMDA, or
3  HMDA database?
4  A    The HMDA database, or the Home Mortgage Disclosure
5  Act database, was enacted by Congress in 1975, and one of
6  its components mandated the collection of certain data
7  about mortgages.
8  Q    What types of data?
9  A    The data collection acts started at the application
10  process.  So people apply for a mortgage, certain data is
11  collected, including information about the prospective
12  borrower, their race, gender, information about the
13  property that the mortgage would be applied to, including
14  where it is located, information about the lender.  There
15  is also information about whether it is first mortgage or
16  second mortgage, a for purchase loan or a refinance loan
17  or a home improvement loan.  There is information about if
18  the home -- if the application is denied, there is
19  information on why it is denied.
20        If the application is originated, the mortgage
21  is originated, there is information on the mortgage
22  amount.
23        There is also more recently information on
24  whether it is a high cost or essentially a sub prime loan.
25  Although I don't believe that that data was available in

1  2004 from which this analysis is applicable.
2  Q    And how is this data maintained?
3  A    It is maintained by the Federal Financial
4  Institutions Examination Council, the FFIEC, which is an
5  interagency, one of those whose responsibility is to
6  provide for public access in the HMDA data.
7  Q    How acceptable is this database?
8  A    It is widely used and accepted, used by both academic
9  and policy researchers.
10  Q    And turning back to your calculation, what data did
11  you collect from the HMDA database?
12  A    I collected information on the mortgage amounts and
13  the race of the borrower.
14  Q    And why would you collect that information?
15  A    Ideally I would like to have information on the
16  purchase price for sales in Nassau County and the race of
17  the purchaser.  But insofar as I know there is no publicly
18  available database for all purchases that include
19  information on the actual sales price and the race of the
20  purchaser.
21        So in lieu of that, I used HMDA data to estimate
22  purchase prices.
23  Q    And how did you form that estimation?
24  A    As I mentioned, I used a series of assumptions taking
25  the information on the loan amounts and the assumed down

1  payment amount based on the loan to value ratio.
2        The loan to value ratio is the proportion of the
3  loan amount to the purchase price.
4        So, for example, if you have $100,000 home, and
5  someone takes out an $80,000 mortgage, the loan to value
6  ratio is 80,000, divided by 100,000, or 80 percent.  80
7  percent to loan to value.
8        The difference is that 20 percent, $20,000,
9  which is the amount to be given as a down payment.  So
10  there is a relationship between the loan to value ratio
11  and the down payment.
12        I used a series of different assumptions for
13  loan to value ratio on the mortgage estimated purchase
14  price to look at a range, a sensitivity of the possibility
15  of the amount of a mortgage that I had yielding different
16  purchase amounts.
17  Q    Once you had this information, what did you do next?
18  A    For each of the different scenarios with the purchase
19  prices calculated based on the mortgage amount, and then
20  adjusted by the loan to value ratio, I looked at, using
21  the HMDA data, the people that all the borrowers who could
22  afford homes at $700,000 or more, based on the people who
23  actually purchased homes at that amount, estimated at that
24  amount.
25        So I looked and collected information on the

1  racial categorization of the people who purchased those
2  homes; took the number that were minority divided by the
3  total number, and created a calculation of the minority
4  share of households that could afford purchase of those
5  homes.
6  Q    And then what was the result of that calculation?
7  A    The result based on people able to afford those homes
8  was three to six minority households.
9        THE COURT:  Was what?
10        THE WITNESS:  Between three and six minority
11  households.
12        MR. DENNIN:  Please put up PTX 8.
13  Q    Ms. McArdle, please review this slide and let me know
14  when you are ready.
15  A    I'm ready.
16  Q    Who prepared this slide?
17  A    I did.
18  Q    And what was the source of the data information you
19  used to prepare this slide?
20  A    The underlying analysis that I prepared for my
21  report.
22  Q    And what does the four blue bars represent?
23  A    They represent the number of minority households
24  likely to be able to afford to rent homes under the four
25  NYACH proposals.

1  **Q**  What is the one red bar representing?

2  **A**  **It estimates the number of minority households likely**

3  **to be able to afford to purchase a home under the**

4  **Fairhaven proposal.**

5  **Q**  And in your expert opinion, how would the Fairhaven

6  proposal likely affect the racial composition of Garden

7  City?

8  **A**  **In my opinion it would likely leave it unchanged,**

9  **leave the racial composition unchanged.**

10  **Q**  And why is that?

11  **A**  **Because the number of households that would likely be**

12  **able to afford purchases under Fairhaven was not large**

13  **enough to affect the underlying racial composition, to**

14  **shift it.**

15  **Q**  And Ms. McArdle, in your expert opinion, how would

16  the four NYACH proposals likely affect the racial

17  compositions of Garden City?

18  **A**  **In my opinion the four NYACH proposals would likely**

19  **increase racial diversity in Garden City and make it more**

20  **reflective of Nassau County overall.**

21  **Q**  And why is that?

22  **A**  **Because of the situation of affordable housing,**

23  **specifically Section 8 housing, in combination with the**

24  **lower income distribution of minority households in Nassau**

25  **County, would mean that a higher share, a higher number of**

1  **minority households would be able to afford those units**

2  **and, therefore, increasing their representation in Garden**

3  **City.**

4       MR. DENNIN:  Thank you, Ms. McArdle.

5       I have no further questions at this time, and I

6  reserve the right to redirect.

7       Thank you, your Honor.

8       THE COURT:  Cross-examination.

9

10  CROSS-EXAMINATION

11  BY MR. BOHN:

12  **Q**  Good afternoon, Ms. McArdle.

13  **A**  **Good afternoon.**

14  **Q**  Now, Ms. McArdle, you offered your opinions in this

15  case as a demographer; is that correct?

16  **A**  **As an expert in the issues of household demography --**

17  **housing demography, racial change and residential**

18  **segregation, yes, that's correct.**

19  **Q**  And you are not an expert in zoning law; is that

20  correct?

21  **A**  **I'm not.**

22  **Q**  And you are not an expert in real estate development;

23  is that correct?

24  **A**  **No, I'm not.**

25  **Q**  You are not an expert in construction; is that

1  correct?

2  **A**  **No, I'm not.**

3  **Q**  And you are an expert in planning, correct?

4       MR. DENNIN:  Vagueness as to planning.

5  Objection.

6       THE COURT:  Overruled.

7  **A**  **That's correct.**

8  **Q**  Ms. McArdle, we have been talking a bit for the last

9  few minutes about the Fairhaven proposal.  That was the

10  term used.

11       Did you view this Fairhaven proposal?

12  **A**  **I viewed several versions of the profit description**

13  **and bid, if that is what you mean by proposal.**

14  **Q**  Do you know, the Fairhaven proposal, it was never

15  submitted to the Village of Garden City; is that correct?

16  **A**  **I do not know.**

17  **Q**  Was it ever submitted, if you know, to the County of

18  Nassau?

19  **A**  **Based on the newspaper article which I read and cited**

20  **in the Long Island Business News of December 3rd, 2004,**

21  **which said that the project had been awarded to**

22  **Fairhaven --**

23       THE COURT:  Ms. McArdle, you are going to be

24  asked questions on cross-examination which are mostly

25  going to call for a yes or no answer.  Please try to

1  answer yes or no.

2       THE WITNESS:  Okay.

3       THE COURT:  There may be some questions that you

4  cannot answer yes or no.  And in that event say so.  But

5  don't offer an explanation if no explanation is called

6  for.  That is our procedure.

7       THE WITNESS:  Okay.

8  **A**  **Thank you very much.**

9       **Could you repeat the question?**

10  **Q**  Certainly.

11       Are you aware whether or not the Fairhaven

12  proposal was submitted to Nassau County?

13  **A**  **No.**

14  **Q**  But it wasn't submitted to Garden City; is that

15  correct?

16  **A**  **I don't know.**

17  **Q**  And did you ever look at any other proposals

18  concerning the Social Services site?

19  **A**  **Yes.**

20  **Q**  What other ones?

21  **A**  **In my interpretation of the proposal, the**

22  **descriptions of the four NYACH proposals would fall in**

23  **that category.**

24  **Q**  Were the four NYACH proposals, to use your

25  terminology, submitted to Nassau County?

1    A    I do not know.

2    Q    Were they submitted to Garden City?

3    A    I do not know.

4    Q    Other than those NYACH proposals you are talking

5    about, did you ever see any other proposals concerning the

6    site other than Fairhaven?

7    A    No.

8    Q    Did you look at any responses to the request for

9    proposals that the county sent out?

10    A    No.

11    Q    Were you ever told that there were any other bids

12    concerning the site?

13    A    Can I clarify what you mean by told?

14    Q    You would like that clarification from me?

15    A    Yes.

16    Q    Let me withdraw that for a second.

17            Were you ever informed by plaintiffs if there

18    were any other proposals other than Fairhaven submitted to

19    Nassau County?

20    A    I want to do this correctly.

21    Q    So do I.

22    A    The Long Island Business News article reported 19

23    bids were submitted.  That is what I understand.

24    Q    Fine.

25            Did you review any of those 19 other bids?

1    A    No.

2    Q    Did you ask any information from plaintiff about

3    those other 19 bids?

4    A    No.

5    Q    Do you know what was proposed as a build-out under

6    those other 19 bids?

7    A    No.

8    Q    Do you know how many multifamily units were proposed?

9    A    Under those 19 bids?

10    Q    Any of them.

11    A    No.

12    Q    Do you know how many townhouses were proposed to be

13    built?

14    A    Only under the Fairhaven bid.

15    Q    So no, then?

16    A    No, under those other bids.

17    Q    And the same, I assume, in regard to single-family

18    homes, you have no information as to what number single

19    head of family homes were proposed to be built other --

20    excuse me, in any of those other bids; is that correct?

21    A    Correct.

22    Q    Do you know whether any of those other bids had an

23    affordable housing component to it?

24    A    I do not know.

25    Q    Do you know if any of the other bids had a

1    configuration that would have a mix of a market and

2    affordable housing to it?

3    A    I do not know.

4    Q    Did you do any other analysis of RT, other than

5    looking at the Fairhaven bid?

6    A    No.

7    Q    Does the Fairhaven bid represent all development

8    possibilities under RT?

9    A    I don't know.

10    Q    Now, isn't it true that under the county's RFP,

11    request for proposals, up to 150 townhouses could be built

12    on the site?  Do you know?

13    A    I don't know.

14    Q    Do you know -- strike that.

15            Is it true under the county RFP, up to 90

16    single-family homes could be built on the site?  Do you

17    know that?

18    A    That is consistent with what I read in the article in

19    the Long Island Business News.

20    Q    Anything other than article --

21    A    No.

22    Q    Please allow me to finish.

23            Anything other than that article did you review

24    regarding those possible developments?

25    A    No.

1    Q    Were you aware in addition to 150 townhouses or up to

2    90 single-family homes or in combination, in addition to

3    that the county RFP allowed for up to 36 multifamily

4    units?

5    A    Outside of that article, no.

6    Q    Was that in the article?

7    A    Yes.

8    Q    Did you ever ask to see a copy of the county RFP?

9    A    No.

10    Q    Did you ever review the zoning parameters law for the

11    RFP to determine how many units can be built?

12    A    No.

13    Q    Did you ever do any analysis concerning the

14    development of potential affordable or market housing

15    using 150 town homes and 36 multifamily units?

16    A    No.

17    Q    Isn't it true that the difference between your

18    conclusion regarding the ACORN proposals and Fairhaven is

19    based solely on price and number of units?

20    A    I view the provision -- I believe the provision of

21    rental housing also had an effect.

22    Q    You mean whether or not the housing would be rental

23    or equity?

24    A    Yes.

25    Q    And did you do an analysis on any equity development

1  other than Fairhaven for RT?

2  A  No.

3  Q  Did you do an analysis of equity of 150 town homes

4  and 36 multifamilies?

5  A  No.

6  Q  Did you do an analysis of affordability on 90

7  single-family homes and 36 multifamily units as to equity?

8  A  No.

9  Q  Now, you testified earlier regarding the sales price

10  for Fairhaven, and that number that you used, that was

11  $700,000; is that correct?

12  A  Yes.

13  Q  And that information was given to you by

14  Ms. Speliotis; is that correct?

15  A  It was given to me -- I don't recall precisely if it

16  came directly to me from Ms. Speliotis or through the

17  plaintiffs' attorneys through Ms. Speliotis.  But I

18  understand her to be the source of that information, yes.

19  Q  Earlier for counsel you identified a few concerns you

20  had with respect to that $700,000; is that correct?

21  A  Yes.

22  Q  And are you familiar with the type or the structure

23  of the housing that Fairhaven put in their proposal?

24  A  Yes, to some extent.

25  Q  And it was attached single-family homes, right?

1  A  Attached single-family homes and townhouses, correct.

2  Q  Are you aware of any other comparable in Garden City

3  with single-family homes?

4  A  No.

5  Q  So that didn't enter into your equation as to

6  verifying whether or not that 700,000 was an accurate

7  price?

8  A  Correct.

9  Q  Now, we heard a fair amount today about the 311 --

10  strike that.

11     The NYACH proposal for 311 multifamily units; is

12  that right?

13  A  Yes.

14  Q  And those -- that number was presented in pro formas

15  provided by Ms. Speliotis; is that correct?

16  A  Yes.

17  Q  And you testified earlier you did not create any of

18  the parameters of those pro formas; is that right?

19  A  Yes.

20  Q  You were confirming that those parameters were

21  provided to you by Ms. Speliotis; is that right?

22  A  Once again, I believe the ultimate or the original

23  producer of those was Ms. Speliotis, and they were

24  provided to me through plaintiff's counsel, yes.

25  Q  Now, when did you first receive the pro formas?

1  A  I can't recall precisely.  I believe it was sometime

2  in 2005.

3  Q  Do you remember testifying in your deposition that it

4  was within the last year of when you gave your deposition

5  in 2008?

6  A  I don't recall.  I know the information identifying

7  which pro formas were the ones to analyze was finalized

8  during that last year before my deposition.  However, I

9  don't recall precisely when I received the group of pro

10  formas.

11  Q  Based on your prior testimony, it was no earlier than

12  2005 though, right?

13  A  That's correct.

14  Q  All right.

15     The RFT zone here was passed in 2004; is that

16  correct?

17  A  I don't know.

18  Q  I submit that that is part of the stipulated facts

19  that we have already entered into evidence.

20     Do you know when the pro formas were created?

21  A  I do not know.

22  Q  Do you know if they were created before or after the

23  zoning was passed?

24  A  I do not know.

25  Q  By the way, did you ever see a pro forma for a 2,000

1  unit development suggested by ACORN for the Social

2  Services site?

3  A  Yes.

4  Q  Did you do any analysis of that one?

5  A  No.

6  Q  Why not?

7  A  It was not one of the four proposals I was asked to

8  evaluate.

9  Q  So you limited your analysis just to the ones you

10  were asked to evaluate?

11  A  Correct.

12     MR. BOHN:  Your Honor, I'm probably about to go

13  into a different area.  It being two minutes to 5:00, I

14  don't know if you wish me to go or stop.

15     THE COURT:  It is a good time to stop.

16  I was going to say members of the jury just now.

17     MR. BOHN:  I can go sit there if you like.

18     THE COURT:  I don't see any.

19  We are going to recess until 9:30 tomorrow

20  morning.

21     (Case on trial adjourned until 9:30 o'clock

22  a.m., Tuesday, June 18, 2013.)

23

24

25

194

### I-N-D-E-X

**W-I-T-N-E-S-S-E-S**

N A N C Y   A N N E   M c A R D L E          120

DIRECT EXAMINATION          120

BY MR. DENNIN

CROSS-EXAMINATION          183

BY MR. BOHN

### E-X-H-I-B-I-T-S

Joint Exhibits 1 through 30 were received in    50

evidence

1

**$**

**$10,000** [1] - 138:8
**$100,000** [1] - 180:4
**$20,000** [1] - 180:8
**$30** [3] - 57:13; 65:21; 84:14
**$36,650** [1] - 151:7
**$56,500,000** [1] - 66:13
**$65** [1] - 126:22
**$700,000** [7] - 93:8; 174:16; 175:12; 180:22; 190:11, 20
**$725,000** [1] - 176:4
**$799,500** [1] - 176:5
**$80,000** [1] - 180:5
**$836,000** [2] - 173:4; 176:2

**'**

**'P'** [3] - 58:23; 60:22; 62:7

**0**

**05-CV-02301** [1] - 1:4

**1**

**1** [10] - 46:5, 11, 16, 21; 49:1; 50:12, 14; 54:6; 134:20; 194:15
**1,100** [1] - 112:4
**1,133** [3] - 144:24; 145:5, 11
**1,333** [1] - 71:11
**1-A** [1] - 99:19
**10** [9] - 48:3, 20; 49:22; 56:12; 65:23; 66:2, 5; 171:25
**100** [3] - 2:6, 12; 172:1
**100,000** [1] - 180:6
**10022** [1] - 1:19
**101** [6] - 93:1; 128:21, 23; 156:1; 157:4, 6
**105** [1] - 141:20
**11** [5] - 48:5; 52:6; 57:2; 99:2; 171:1
**11530-4850** [1] - 2:7
**11550** [1] - 2:2
**11722** [1] - 2:13
**1180** [1] - 2:12
**11th** [2] - 74:2; 105:5
**12** [9] - 48:7; 52:4;

57:8; 65:23; 100:16; 154:23; 156:7; 162:9
**120** [3] - 66:9; 194:4
**12:30** [2] - 53:21
**13** [6] - 46:25; 47:7; 48:9; 57:10; 58:16; 153:9
**14** [7] - 29:22; 48:14; 49:3; 57:12; 123:6; 155:18; 156:10
**14.5** [4] - 60:5; 61:6; 62:16; 77:19
**14.8** [1] - 148:1
**1401** [1] - 1:24
**15** [10] - 24:25; 47:3; 48:16; 57:14; 58:23; 97:6; 112:6, 9; 140:8; 154:19
**15.3** [4] - 144:4, 9; 145:1, 4
**150** [8] - 64:10; 115:17, 21; 116:17; 188:11; 189:1, 15; 190:3
**156** [3] - 128:21; 169:17
**157** [1] - 71:12
**15th** [1] - 77:15
**16** [4] - 26:11; 48:18; 57:21; 106:4
**160** [1] - 115:23
**167** [1] - 144:22
**17** [6] - 1:11; 48:20; 49:5; 58:3; 94:1; 102:2
**175** [5] - 129:14, 16, 18-19, 24
**17th** [1] - 131:14
**18** [8] - 42:11; 48:22; 49:15; 58:12; 82:12; 92:25; 155:9; 193:22
**183** [1] - 194:7
**186** [7] - 101:11-13; 115:25; 116:11; 117:6, 16
**19** [12] - 23:14; 47:14, 25; 49:2, 7; 58:14; 105:21; 186:22, 25; 187:3, 6, 9
**1960s** [1] - 26:1
**1964** [1] - 14:21
**1968** [1] - 14:20
**1969** [2] - 21:12, 18
**1970s** [1] - 26:1
**1975** [1] - 178:5
**1977** [1] - 87:22
**1980** [16] - 128:9;

133:14, 21, 25; 137:10, 12; 139:1, 6, 8; 141:12, 14, 19; 142:4, 9; 145:24; 146:14
**1980s** [1] - 26:1
**1981** [1] - 96:18
**1982** [1] - 96:18
**1983** [2] - 96:18; 139:3
**1985** [2] - 84:11; 122:16
**1987** [1] - 122:18
**1988** [1] - 97:5
**1989** [2] - 22:3; 29:22
**1999** [17] - 44:10; 151:4; 160:25; 161:2, 4, 9, 17, 21, 24; 162:1, 12; 167:23; 168:1, 4
**1:30** [2] - 53:22; 85:8
**1st** [1] - 48:23

**2**

**2** [7] - 47:2; 54:11; 136:25; 141:3; 142:6; 152:22; 154:5
**2,000** [5] - 66:7; 111:2-4; 192:25
**2-2004** [2] - 65:1
**2.3** [2] - 143:24; 144:23
**2.6** [1] - 139:18
**2.9** [1] - 139:8
**20** [27] - 20:17, 19, 25; 21:6, 8; 23:12; 24:5, 7-8, 11; 25:24; 26:12, 22; 30:22; 49:3, 14; 58:16; 65:3; 79:18; 97:7; 135:6; 153:1; 156:20; 170:15, 23; 171:24; 180:8
**20-year** [1] - 24:8
**20.3** [2] - 134:12; 139:3
**2000** [42] - 59:24; 67:5, 10; 70:17; 71:11; 98:2; 104:17; 128:9; 133:15, 22, 25; 134:11; 135:10, 20; 137:10, 12; 138:7; 139:1, 4, 6, 9, 11, 17; 141:12, 14, 19; 142:9; 143:21, 23; 144:3, 5, 17, 22; 145:24; 146:15; 147:18; 148:1; 151:1; 160:22, 25; 163:14, 23
**20005** [1] - 1:25
**2002** [13] - 46:25;

47:3; 49:4, 16; 56:3; 58:3, 16, 23; 72:4; 76:5; 109:3; 111:22; 124:21
**2003** [45] - 47:7, 12-14, 16, 18, 22, 25; 48:2, 4, 6, 19, 21; 49:5, 8; 58:25; 59:4, 7, 12, 20; 60:2, 10, 13-14, 17, 20, 25; 61:3, 11, 15, 18-19, 22; 62:2, 5, 10, 13, 21, 25; 78:22; 111:8; 112:18, 25; 113:20
**2004** [58] - 48:8, 10, 12, 15, 17; 49:1, 10, 14, 19, 21, 23; 63:4, 9, 18, 21-22, 24; 64:1, 4, 9, 14, 16, 25; 65:3, 5, 7, 15, 23-24; 66:2, 5; 78:8, 15; 79:18; 80:21; 97:25; 107:21; 109:4; 117:12; 160:17; 161:1, 4; 167:21; 170:25; 172:24; 173:3; 174:16; 176:2, 4; 177:2; 179:1; 184:20; 192:15
**2005** [4] - 31:5; 176:5; 192:2, 12
**2006** [4] - 31:5; 124:22; 165:9
**2008** [3] - 131:12, 14; 192:5
**2009** [3] - 55:18, 20
**2011-2012** [1] - 67:14
**2012** [1] - 54:10
**2013** [2] - 1:11; 193:22
**21** [3] - 49:5; 58:22; 153:23
**21,000** [1] - 71:8
**21,672** [2] - 67:5, 10
**21.44** [1] - 57:3
**215** [1] - 64:10
**22** [7] - 48:10, 12; 49:6; 58:25; 64:1, 4, 9
**23** [8] - 48:4; 49:7; 59:4; 61:22; 62:2; 131:1, 5, 17
**233** [2] - 155:20; 156:12
**24** [6] - 47:16; 49:9; 59:7; 100:11; 155:5; 177:3
**249** [1] - 153:12
**25** [8] - 49:13; 59:20; 108:11; 117:22; 155:15; 157:6, 11

**25-acre** [2] - 56:21;
72:9

**252** [1] - 87:21

**254** [1] - 44:10

**26** [2] - 49:15; 60:2

**265** [1] - 154:25

**27** [2] - 49:17; 60:10

**28** [5] - 49:19; 60:13;
156:22

**29** [3] - 47:11, 13;
49:6, 22; 59:7, 12;
60:13, 16

**2d** [2] - 44:10; 105:21

---

**3**

**3** [7] - 47:4; 48:17;
54:21; 65:7; 141:4;
142:13; 162:4

**3,000** [2] - 84:3

**3,600** [1] - 164:17

**3.03** [1] - 57:5

**3.3** [1] - 64:23

**3.6** [1] - 157:9

**30** [13] - 47:12; 48:18;
49:24; 50:12, 14;
55:21; 60:20; 66:10;
151:17; 159:16; 162:6,
21; 194:15

**31** [2] - 60:24; 151:13

**31.4** [1] - 141:15

**31.81** [1] - 148:2

**311** [30] - 19:22;
59:15; 60:6; 61:7;
62:17; 69:20; 77:6, 20;
78:10, 17; 82:13; 84:2,
13; 88:16; 90:20; 95:6,
19; 115:13, 24; 152:11,
25; 153:23; 154:18;
155:9, 14; 156:2, 21;
191:9, 11

**311-unit** [1] - 13:13

**316** [2] - 100:15;
110:23

**32** [7] - 61:3; 93:1;
153:20; 155:1, 20;
156:2, 13

**33** [2] - 61:11; 153:14

**330** [1] - 126:25

**34** [1] - 61:15

**35** [2] - 61:18; 156:16

**350** [1] - 20:14

**359** [1] - 29:20

**36** [10] - 19:22; 61:22;
83:24; 115:18, 22;
116:16; 189:3, 15;
190:4, 7

**36789** [1] - 142:13

**37** [1] - 62:1

**38** [2] - 62:5; 156:19

**39** [1] - 62:9

**3rd** [2] - 172:23;
184:20

---

**4**

**4** [5] - 47:8; 49:2;
54:25; 98:2; 143:14

**4,000** [2] - 83:23; 84:4

**4.1** [2] - 136:19; 139:8

**4.2** [1] - 157:15

**40** [3] - 62:13; 66:9;
156:15

**400** [1] - 1:24

**403** [1] - 42:2

**41** [5] - 54:24; 62:21;
168:24; 169:2

**41.4** [1] - 148:3

**410** [1] - 67:17

**42** [2] - 62:25; 173:17

**429** [1] - 87:21

**43** [1] - 63:5

**44** [1] - 63:9

**45** [3] - 63:11; 84:15;
102:7

**46** [2] - 63:15; 155:5

**47** [1] - 63:18

**48** [1] - 63:22

**488** [1] - 97:6

**49** [1] - 64:1

---

**5**

**5** [9] - 47:14; 48:8;
55:12; 63:18, 22;
80:21; 111:24; 112:21;
144:6

**5(b** [1] - 59:9

**5.3** [1] - 67:12

**50** [12] - 20:15; 24:19,
25; 32:16, 18; 64:3;
106:16; 135:13; 148:19;
169:2; 194:15

**50,000** [1] - 149:4

**51** [4] - 32:16, 18;
64:8; 169:4

**52** [5] - 64:14; 151:11;
153:16, 19; 155:2

**53** [2] - 64:16; 156:17

**53.1** [1] - 148:5

**54** [1] - 64:20

**55** [1] - 64:22

**556** [1] - 2:1

**56** [9] - 64:25; 92:25;
128:23, 25; 155:8;
157:4; 172:25; 173:19,
23

**57** [1] - 65:3

**58** [1] - 65:5

**59** [1] - 65:7

**5:00** [2] - 53:22;
193:13

**5B** [4] - 111:21, 24;
115:10

---

**6**

**6** [7] - 26:25; 27:3, 8;
47:15; 55:19; 77:21;
147:6

**6,000** [3] - 84:6; 94:15

**6,485** [1] - 67:16

**60** [3] - 65:10; 168:24;
169:4

**61** [2] - 65:15; 139:10

**615** [1] - 50:23

**62** [2] - 65:19; 153:19

**63** [2] - 44:10; 65:22

**63.32** [1] - 59:11

**631** [1] - 2:13

**64** [1] - 65:24

**65** [2] - 66:2; 153:22

**66** [1] - 66:5

**67** [1] - 66:11

**68** [1] - 66:14

**69** [3] - 6:12; 66:16;
155:24

**691** [1] - 67:18

---

**7**

**7** [8] - 47:17, 21-22;
55:22; 152:12, 14, 19;
162:24

**70** [1] - 163:14

**700,000** [3] - 175:22;
177:6; 191:6

**702** [2] - 11:13; 14:3

**712-6102** [1] - 2:13

**75** [7] - 60:9; 61:10;
77:23; 155:14; 156:7;
157:5, 11

**78** [2] - 84:16; 155:24

---

**8**

**8** [43] - 14:22; 26:16;
41:1; 47:19, 24; 48:2;
49:10; 56:1; 63:5, 9,
21; 92:21; 100:22;

153:4; 155:15, 23-24;
156:8, 13-15; 157:6,
12, 18, 22; 158:15;
159:3, 21, 24; 163:24;
164:5, 8, 20; 165:16;
166:16, 21; 167:3, 6,
8; 181:12; 182:23

**80** [5] - 152:25;
170:15; 171:23; 180:6

**80,000** [1] - 180:6

**803** [2] - 40:25; 42:11

**803(16** [1] - 26:7

**84.76** [1] - 56:19

**84.76-acre** [1] - 58:7

**844** [1] - 97:5

**85** [1] - 154:18

**875** [1] - 1:18

**88** [8] - 155:22;
156:14, 21; 165:18;
166:8, 12, 18, 20

**8th** [1] - 100:12

---

**9**

**9** [4] - 47:18, 22;
48:1; 56:3

**90** [8] - 62:20; 64:9;
104:9; 115:17; 171:24;
188:15; 189:2; 190:6

**901** [1] - 26:15

**902** [6] - 26:24;
27:2-4; 30:3; 37:24

**922** [1] - 105:21

**926** [1] - 97:5

**95** [2] - 170:14; 171:25

**97.4** [1] - 70:19

**9:15** [1] - 108:3

**9:30** [4] - 1:12; 53:21;
193:19, 21

---

**A**

**A-R-D-L-E** [1] - 120:16

**a.m** [3] - 1:12; 53:21;
193:22

**ability** [4] - 130:14;
132:1; 157:3; 169:19

**able** [30] - 22:13;
27:18; 59:10; 78:6;
108:22; 121:19; 128:15,
19; 129:1, 7; 152:6;
153:10, 17, 24; 154:24;
155:4, 18; 156:11, 18;
159:1; 160:18; 169:11,
16; 171:10; 181:7, 24;
182:3, 12; 183:1

**abrupt** [1] - 88:9

**2**

**absence** [1] - 11:14
**absolutely** [3] - 29:23; 36:8; 80:4
**academic** [2] - 150:13; 179:8
**accept** [3] - 102:17; 113:7; 114:6
**acceptable** [2] - 117:8; 179:7
**accepted** [3] - 15:21; 78:25; 179:8
**access** [4] - 39:14, 16, 19; 179:6
**accessibility** [3] - 138:14; 140:1, 6
**accomplish** [1] - 110:7
**accordance** [1] - 58:20
**according** [8] - 104:1, 4; 105:4; 108:8; 148:21; 150:3; 159:13; 160:6
**accordingly** [2] - 20:5; 126:5
**account** [5] - 88:6; 166:1; 170:19, 24; 171:5
**accounting** [1] - 122:23
**accounts** [1] - 170:8
**accurate** [3] - 12:3; 30:4; 191:6
**accurately** [2] - 158:24
**accused** [1] - 119:2
**accusers** [1] - 119:1
**achieve** [1] - 97:15
**ACORN** [12] - 15:19; 39:16; 43:4, 9; 55:10, 13; 101:20, 23; 128:17; 189:18; 193:1
**acre** [7] - 60:5; 61:6; 62:16; 74:19; 77:19; 83:6, 15
**acres** [8] - 56:19; 57:3, 5; 59:11; 64:23; 74:10; 101:7; 117:22
**acronym** [1] - 15:20
**acronyms** [1] - 121:3
**act** [2] - 104:22; 106:4
**Act** [15] - 13:2; 14:20; 91:11, 16; 92:12; 94:19; 96:16, 19; 104:19; 123:21; 177:17, 19; 178:5
**acted** [1] - 115:5
**acting** [1] - 78:20
**action** [2] - 36:7;
55:21
**actions** [11] - 36:9; 41:21; 43:23; 44:1, 3, 12; 91:9; 92:4; 96:14; 107:14
**active** [2] - 103:14, 17
**activities** [1] - 124:19
**acts** [1] - 178:9
**actual** [12] - 3:21, 23; 11:22; 41:18; 101:3; 150:20; 172:18, 21; 173:5; 174:9; 175:9; 179:19
**actuality** [2] - 37:1; 104:4
**adapt** [1] - 126:5
**added** [2] - 81:23; 165:2
**adding** [1] - 156:20
**addition** [6] - 125:12; 131:15; 167:5, 8; 189:1
**additional** [11] - 11:20; 56:25; 57:5; 67:2, 11, 19; 98:21; 104:3; 131:22; 157:3
**additionally** [2] - 39:18; 172:22
**address** [8] - 10:23; 14:13; 23:10; 25:19; 29:8, 10; 31:16; 130:6
**addressed** [3] - 15:15, 17; 90:18
**adequate** [1] - 19:3
**adjoining** [1] - 149:5
**adjourned** [1] - 193:21
**adjust** [2] - 161:3; 170:1
**adjusted** [1] - 180:20
**adjusting** [2] - 148:16; 170:9
**administered** [1] - 159:5
**administrative** [1] - 164:13
**administrator** [1] - 51:20
**Administrator** [1] - 38:9
**admissibility** [4] - 14:5; 16:6; 20:4; 132:4
**admissible** [16] - 20:21; 21:3, 23; 24:9; 25:11; 28:7; 30:23; 32:6, 23; 33:10, 13; 39:24; 40:2, 7; 132:16
**admission** [3] - 42:24;
46:4; 131:21
**admit** [8] - 20:14; 21:7, 24; 23:2, 24; 31:2; 36:17; 39:12
**admitted** [11] - 23:22; 25:9; 27:8; 36:23; 39:17; 50:5, 9, 13; 130:17; 132:5
**admitting** [2] - 15:9; 28:4
**adopted** [5] - 65:8; 72:5; 82:16; 97:9
**adopting** [1] - 91:9
**Adoption** [1] - 65:2
**adoption** [1] - 48:16
**adoptive** [2] - 129:8; 169:12
**ads** [1] - 38:5
**Advancement** [1] - 125:3
**adversaries** [1] - 46:1
**adverse** [2] - 16:14; 76:25
**advertisement** [2] - 37:23; 38:1
**advise** [1] - 75:21
**advisement** [1] - 131:10
**advisor** [1] - 69:16
**Advisory** [1] - 125:22
**aesthetic** [1] - 89:23
**aesthetics** [2] - 95:12, 17
**affect** [7] - 125:15; 156:25; 157:7, 12; 182:6, 13, 16
**affirm** [1] - 107:4
**affirmed** [1] - 97:5
**Affluent** [1] - 70:19
**afford** [39] - 19:13, 16; 91:1; 121:19; 128:15, 19; 129:7; 153:10, 18, 24; 154:24; 155:4, 19; 156:11, 18; 157:3; 159:1, 23; 160:19; 162:3, 5, 9, 11, 18-20; 163:8; 169:16, 19; 171:11; 172:17; 177:15; 180:22; 181:4, 7, 24; 182:3, 12; 183:1
**affordability** [9] - 17:9, 11; 139:25; 150:5; 152:7; 157:23; 161:24; 162:7; 190:6
**affordable** [98] - 22:1, 12, 14, 20-21;
33:16; 34:1, 25; 54:12; 55:7; 68:19, 24; 69:8, 13, 24; 70:1, 10, 13; 71:13, 16, 19, 23; 78:16; 79:21; 80:8, 10, 15, 23; 81:8, 14, 17; 82:2, 5, 7, 19; 84:11, 16, 18, 20; 88:10; 89:7, 12; 90:25; 91:2, 10; 92:19; 93:15, 19, 25; 94:1, 4, 6, 8, 16, 20; 96:3, 22; 97:24; 98:4, 7; 101:4; 107:14; 108:18; 109:11; 112:16; 116:3; 117:2, 5, 17; 118:3, 8; 138:14; 153:2, 16, 18, 21; 154:20; 155:2, 7; 156:8, 16, 19; 157:18, 22; 158:17; 167:1, 8-9, 14, 17; 168:21, 23; 182:22; 187:23; 188:2; 189:14
**Affordable** [1] - 29:21
**afforded** [1] - 92:24
**afraid** [1] - 103:19
**African** [1] - 54:12
**African-American** [1] - 54:12
**afternoon** [4] - 97:20; 120:21; 183:12
**age** [1] - 31:15
**agencies** [3] - 43:5, 10, 15
**agency** [2] - 105:19; 164:13
**aggregate** [1] - 128:17
**ago** [4] - 43:25; 97:7; 102:7; 142:14
**agree** [1] - 11:12
**agreed** [9] - 42:15; 45:12; 50:22, 24; 53:10; 54:5; 66:16, 22; 90:7
**agreed-upon** [1] - 66:16
**agreement** [3] - 53:9; 89:2
**ahead** [4] - 45:8; 67:25; 68:10; 137:20
**aid** [1] - 154:7
**aided** [1] - 2:16
**aids** [1] - 134:15
**air** [1] - 106:14
**align** [1] - 79:10
**allegation** [1] - 21:25
**allegations** [7] -

**3**

22:10; 35:11; 40:13; 55:9; 56:22; 115:4; 131:19

**allege** [1] - 119:2

**alleged** [2] - 31:14; 90:1

**allegedly** [1] - 43:16

**allocation** [1] - 150:12

**allow** [22] - 9:2; 42:2; 60:6; 61:7-9; 62:17-19; 63:16; 73:1; 74:24; 75:5; 77:5, 20-22; 82:13; 159:6; 173:8; 188:22

**allowed** [11] - 59:15; 64:22; 69:20, 22; 77:25; 84:13; 115:25; 117:6; 130:20; 158:23; 189:3

**allowing** [2] - 63:13; 78:17

**allows** [5] - 60:4; 61:5; 62:16; 77:19; 159:7

**almost** [3] - 20:15; 43:12; 93:11

**alternative** [3] - 92:20; 95:3, 11

**alternatives** [2] - 16:24; 92:6

**amended** [4] - 14:20; 55:9; 56:22; 65:5

**Amendment** [2] - 98:12; 103:20

**amenities** [1] - 176:13

**America** [2] - 124:18; 126:2

**American** [3] - 54:12; 123:19; 165:9

**Amorgianos** [1] - 12:7

**AMORGIANOS** [1] - 12:7

**amount** [16] - 83:13; 112:10; 160:7; 171:9; 173:17, 24; 176:23; 178:22; 180:1, 3, 9, 15, 19, 23-24; 191:9

**amounts** [10] - 161:16; 169:25; 170:2, 10; 171:6; 177:22; 179:12, 25; 180:16

**Amtrak** [2] - 12:1, 8

**analyses** [1] - 170:18

**analysis** [64] - 12:16; 13:4; 14:9; 16:9, 11; 17:25; 18:1, 7; 91:17; 92:10; 96:12, 14;

104:17; 116:2, 10, 15; 122:22; 123:2, 10; 124:6, 17; 125:4; 131:2; 134:5; 136:23; 139:15; 142:25; 144:18; 145:13, 19, 23; 146:1, 5; 148:21; 149:17; 150:14; 158:2, 11, 22; 160:13; 161:24; 164:3, 7, 21; 165:17; 166:1; 167:13; 169:22; 171:8, 14, 21; 172:6, 15-16; 179:1; 181:20; 188:4; 189:13, 25; 190:3, 6; 193:4, 9

**analyst** [1] - 124:24

**analyze** [2] - 126:4; 192:7

**analyzed** [2] - 13:20; 93:3

**analyzing** [2] - 146:21; 163:20

**ancient** [13] - 21:9, 15; 23:5; 24:5, 9; 25:19, 23; 26:11, 14, 16; 28:7, 10, 16

**ancillary** [1] - 56:25

**AND** [1] - 2:6

**ANDREW** [1] - 1:21

**Andrew** [3] - 3:12; 23:8; 51:24

**animated** [1] - 69:11

**animus** [5] - 33:1; 70:3; 88:12; 96:2; 119:12

**Ann** [3] - 51:6, 9

**Anne** [2] - 120:15; 121:9

**ANNE** [1] - 120:15

**announce** [1] - 41:5

**announcement** [2] - 40:9; 41:2

**announcing** [1] - 40:10

**annual** [1] - 162:10

**answer** [8] - 34:16; 79:21, 23; 95:21; 118:5; 184:25; 185:1, 4

**apartment** [4] - 66:7; 100:15, 18; 111:6

**apartments** [15] - 60:1, 18; 61:1; 62:3, 11; 64:5, 10; 67:18; 77:16, 18, 25; 78:5; 100:16; 112:6, 11

**Appeals** [1] - 105:17

**appear** [1] - 118:18

**appearances** [1] - 2:17

**APPEARANCES** [1] - 1:16

**appeared** [1] - 76:4

**apples** [1] - 115:16

**applicable** [1] - 179:1

**application** [4] - 42:1; 178:9, 18, 20

**applied** [14] - 17:7; 101:15; 153:19; 155:19, 23; 156:12, 15, 19; 165:11; 166:20; 168:15; 169:17; 178:13

**apply** [5] - 25:24; 30:11; 60:8; 153:12; 178:10

**applying** [4] - 59:13; 154:25; 155:4; 163:5

**appoint** [1] - 103:16

**appointed** [2] - 75:8; 108:17

**appreciate** [2] - 53:7; 121:5

**Approach** [1] - 58:23

**approach** [1] - 154:10

**appropriate** [11] - 23:23; 24:22; 45:6; 50:23; 105:19; 116:6; 127:17; 146:9, 12; 163:19; 168:8

**appropriately** [1] - 18:22

**approved** [1] - 93:6

**April** [14] - 29:22; 48:10, 12, 23; 49:1, 5-6; 59:7, 12; 63:24; 64:1, 4, 9; 78:8

**Area** [1] - 149:16

**area** [47] - 57:19; 67:11; 71:4, 9; 73:10, 13; 74:18; 79:15; 83:15, 20; 98:25; 100:8; 105:24; 107:21; 111:4; 125:5; 127:3, 12; 135:9, 12-13; 136:8; 140:3; 146:22; 148:13, 20, 22, 24-25; 149:7, 11; 151:7, 25; 161:7; 166:24; 167:25; 168:25; 169:3, 6, 9, 14; 193:13

**area's** [1] - 148:16

**areas** [18] - 70:5; 79:9; 122:4; 123:11; 125:5, 13; 135:21, 24; 146:8; 149:1, 3, 8; 168:13

**Areas** [2] - 149:10, 14

**argue** [7] - 30:10;

36:22; 38:5; 101:13; 105:9; 107:6; 109:18

**argued** [1] - 37:15

**argues** [3] - 35:18; 92:11; 93:21

**arguing** [2] - 20:11; 94:7

**argument** [4] - 14:14; 15:2; 20:22; 94:23

**arguments** [5] - 70:6; 89:18, 21; 90:12

**Ariel** [2] - 4:16; 20:9

**ARIEL** [2] - 2:9; 4:16

**arises** [2] - 10:2; 98:11

**Arkansas** [1] - 55:17

**Arlington** [9] - 35:2; 36:2, 6; 40:5; 41:12, 16-17; 87:19

**arms** [1] - 82:4

**arose** [3] - 78:16; 90:15; 127:19

**art** [2] - 100:25; 104:25

**ARTHUR** [1] - 1:14

**article** [21] - 21:14, 18-19; 24:24; 25:8, 10-11; 27:13, 20, 24; 29:18, 20; 176:1, 10; 184:19; 186:22; 188:18, 20, 23; 189:5

**articles** [25] - 20:16; 21:8, 11, 13, 21, 25; 22:9, 15, 18, 24; 23:11, 21; 24:4, 9, 14; 25:1, 24-25; 28:10; 30:11, 20; 42:12

**articulated** [1] - 90:6

**Asian** [1] - 138:3

**Asians** [3] - 138:3, 8, 14

**aside** [1] - 115:4

**aspect** [2] - 11:5; 112:23

**aspects** [1] - 123:13

**asserted** [7] - 7:1, 4, 10, 23; 32:24; 37:12; 44:18

**assessment** [6] - 48:1, 15; 61:19; 64:15; 104:19

**assist** [2] - 69:16; 71:22

**Assistance** [3] - 147:17; 149:25; 151:23

**assistant** [1] - 123:22

**associate** [1] - 123:6

associated [1] - 58:19

association [1] - 82:10

Association [6] - 55:12, 15; 68:23; 79:14; 105:21; 177:1

associations [4] - 59:2; 79:6, 10; 175:1

assume [1] - 187:17

assumed [1] - 179:25

assumes [2] - 76:23; 88:22

assuming [1] - 93:7

assumption [2] - 76:17; 93:9

assumptions [9] - 76:3, 7; 170:3, 9, 11; 177:23; 179:24; 180:12

asunder [1] - 97:8

attached [7] - 38:8, 13; 43:22; 173:16, 22; 190:25; 191:1

attaches [1] - 159:11

attend [2] - 51:21; 79:10

attendance [2] - 47:16; 51:23

attendants [1] - 39:20

attention [2] - 8:7; 50:21

attitude [6] - 34:2, 5-6; 40:3, 6, 20

attitudes [4] - 34:2; 43:23; 96:2; 124:13

Attorney [1] - 41:3

attorney [5] - 2:25; 39:13; 40:10, 12, 20

attorneys [1] - 190:17

audibility [1] - 4:22

AUGELLO [3] - 2:9; 4:12

Augello [1] - 4:13

August [2] - 47:25; 49:3

authentic [1] - 26:20

authenticated [3] - 36:18; 37:9; 38:17

authenticating [8] - 27:1, 5-6; 29:14, 25; 30:3; 37:24; 38:6

authentication [2] - 37:25; 38:6

authenticity [5] - 26:13, 15, 20, 23; 27:7

author [7] - 21:17; 122:1-3; 123:23; 124:1

authored [2] - 123:25

authority [3] - 28:15; 75:1; 132:19

authorization [1] - 78:20

avail [1] - 118:5

available [19] - 26:9; 52:21; 87:25; 92:6; 116:19, 21; 130:21; 142:2, 21; 163:6; 164:12; 165:15, 24-25; 169:24; 174:10, 13; 178:25; 179:18

Avenue [7] - 1:18, 24; 22:4; 74:3, 17; 105:7, 25

average [5] - 93:7; 173:2; 174:15; 176:1, 19

awarded [2] - 66:11; 184:21

awarding [1] - 172:25

aware [8] - 11:13; 12:18; 98:24; 107:22; 108:2; 185:11; 189:1; 191:2

---

## B

B-R-A-N-D-R-I-S-S [1] - 3:8

BA [1] - 84:10

bachelor's [1] - 122:14

background [16] - 33:15; 35:1, 11, 19, 24; 36:2, 7, 12; 40:5; 41:14, 18, 20; 70:15; 72:3; 121:22; 122:13

backlash [1] - 33:17

backs [1] - 74:17

baker [1] - 59:9

balance [1] - 56:9

balanced [1] - 97:13

Balboni [5] - 81:25; 82:7, 11; 89:12; 98:9

bar [5] - 141:16, 20; 144:21, 24; 182:1

Barbara [1] - 118:14

Barnard [1] - 84:10

bars [2] - 139:19; 181:22

base [1] - 151:23

based [18] - 55:7; 93:9; 101:25; 111:8; 141:22; 150:24; 152:6; 157:3; 166:2; 169:18; 174:11; 180:1, 19, 22;

181:7; 184:19; 189:19; 192:11

basic [3] - 84:24; 107:7

basis [4] - 24:15; 28:3; 119:5; 124:5

bear [1] - 160:7

bears [1] - 110:24

beautiful [1] - 4:22

became [3] - 80:24; 124:9, 24

bedroom [7] - 158:13, 19; 160:16; 162:25; 163:2; 167:18; 168:13

Bee [9] - 58:9, 12; 75:12; 79:18; 80:5, 22; 81:13; 112:18; 118:13

BEE [3] - 58:9; 75:12; 112:19

BEFORE [1] - 1:14

began [2] - 56:5; 80:14

begin [1] - 119:21

beginning [3] - 6:25; 87:6; 101:18

behalf [6] - 3:14, 16; 4:4, 13; 11:7; 120:1

beings [1] - 118:18

belief [1] - 166:2

beliefs [1] - 114:18

belong [1] - 30:6

below [2] - 66:8; 73:23

bench [5] - 15:3; 16:2; 18:22; 19:1; 130:11

benefit [5] - 60:12; 61:17; 63:2; 107:6; 123:2

Benjamin [2] - 3:15; 14:13

best [3] - 141:24; 146:10; 160:21

better [2] - 134:22; 137:5

between [27] - 15:18; 19:11; 66:9; 124:21; 128:9, 21, 23; 129:9; 133:20, 23, 25; 147:21; 149:18; 157:17; 161:3; 165:6, 13; 168:24; 169:2-4; 170:19; 175:2; 180:10; 181:10; 189:17

BFJ [34] - 7:9, 12; 47:24; 58:16, 22; 59:7, 12, 20, 22; 60:13, 20; 61:18, 22; 62:5; 63:1; 64:1, 14; 75:22, 25; 76:1; 77:4, 7; 78:1, 8, 13; 81:2, 21; 82:15;

88:8, 15; 90:17; 95:6

BFJ's [5] - 60:10; 61:16; 64:16; 76:4; 78:23

BH [1] - 115:10

Bianco's [1] - 95:22

bid [13] - 15:20; 172:9; 173:11, 16, 18, 20, 22; 184:13; 187:14; 188:5, 7

bidder [1] - 93:4

bids [12] - 174:12; 176:13; 186:11, 23, 25; 187:3, 6, 9, 16, 20, 22, 25

big [2] - 11:1; 98:22

bill [4] - 81:24; 82:7; 89:12; 98:9

binders [1] - 50:17

Biofluid [1] - 18:24

bit [4] - 17:1; 33:15; 137:4; 184:8

black [6] - 70:23; 137:25; 139:11; 165:4, 6; 171:2

blacks [7] - 133:20; 138:5, 12, 18-19; 165:10, 13

bland [1] - 99:8

blanket [1] - 26:5

block [6] - 7:2; 69:8; 70:12; 91:10; 94:20; 118:7

blocked [1] - 8:15

blocking [2] - 93:15; 96:22

Bloomingdale's [1] - 99:3

blow [1] - 152:12

blue [4] - 141:20; 144:24; 145:10; 181:22

Blvd [2] - 2:1, 6

board [45] - 7:3, 25; 8:1, 14, 21, 23; 39:20; 47:15; 51:20, 22; 75:3; 78:23; 82:18; 88:18; 90:17; 102:13; 103:18; 105:12; 110:6; 111:11, 13, 15, 17-18; 112:20; 113:1, 3, 7, 17-19, 23; 114:2, 8, 15-16, 18, 24; 115:2

Board [5] - 2:4; 6:3, 8; 34:7; 56:1

BOARD [1] - 1:11

Bob [1] - 118:14

body [4] - 7:5; 56:2;

113:21; 125:18

**Bohn** [4] - 4:4; 10:21; 18:13; 127:6

**BOHN** [20] - 2:8; 4:4; 10:20; 12:5, 7; 13:1, 3; 18:13; 127:6; 129:25; 131:15; 137:13; 145:9; 159:19; 167:15; 171:16; 183:11; 193:12, 17; 194:8

**book** [1] - 124:1

**borders** [2] - 102:25; 103:5

**Bordon** [1] - 105:21

**born** [1] - 110:18

**borne** [5] - 104:6; 105:16; 106:8; 107:8; 118:23

**borrow** [1] - 76:17

**borrower** [3] - 177:21; 178:12; 179:13

**borrowers** [2] - 170:1; 180:21

**Boston** [3] - 124:8, 10

**bound** [1] - 74:1

**boundaries** [1] - 56:13

**BRAN** [1] - 126:9

**Branch** [2] - 97:4; 102:23

**brand** [1] - 111:23

**branded** [3] - 119:4, 7

**Brandeis** [1] - 126:9

**BRANDRISS** [24] - 1:20; 3:4, 7; 45:24; 46:8, 11, 14, 19, 23, 25; 47:2, 6, 11, 22, 24; 48:12, 14, 25; 49:13, 19; 50:8; 67:2, 8, 10

**Brandriss** [4] - 3:4, 8; 45:19, 24

**Bravo** [1] - 111:21

**break** [1] - 100:3

**Brewington** [1] - 2:23

**BREWINGTON** [3] - 2:1, 23; 10:5

**brief** [2] - 28:3; 40:24

**briefed** [1] - 79:16

**briefly** [3] - 122:19, 24; 159:2

**briefs** [1] - 15:16

**bring** [5] - 8:6; 14:24; 41:16; 50:20; 145:15

**bringing** [2] - 14:23; 84:23

**brings** [1] - 89:7

**broad** [3] - 97:1, 9;

119:1

**brokers** [1] - 175:3

**Brooklyn** [1] - 100:17

**brought** [3] - 87:7, 9; 135:1

**brown** [5] - 101:14; 103:9, 14; 108:9; 118:7

**BROWN** [56] - 1:19; 2:19, 21; 3:20, 22; 5:19, 21, 25; 6:4, 11, 13, 15, 18; 45:3, 9, 18, 21, 23; 50:16; 51:4, 9, 11; 52:1, 15; 53:6, 14, 18, 24; 54:16; 55:1, 4; 66:20, 24; 67:21; 68:1, 6, 9, 12; 71:3; 72:13, 18; 73:2, 5, 8, 12, 15, 19; 75:20; 80:4; 81:4; 83:17, 19; 85:2, 6; 87:3; 107:9

**Brown** [2] - 2:19; 87:4

**brush** [1] - 119:1

**Buckhurst** [4] - 7:7; 58:1, 14; 75:17

**BUCKHURST** [2] - 7:7; 58:1

**Budget** [1] - 149:2

**budget** [1] - 117:15

**build** [11] - 13:20; 17:3; 33:16; 69:23; 78:4, 6; 80:9, 15; 166:10; 187:5

**build-out** [1] - 187:5

**building** [15] - 56:17, 24-25; 57:4, 7; 70:10; 73:14, 23; 78:6; 89:10; 100:15; 101:16; 112:3; 117:5

**buildings** [9] - 56:15; 57:18; 74:12, 15-16; 83:19; 100:19; 105:24; 112:9

**built** [17] - 17:13; 59:16; 81:19; 82:1; 84:5; 89:9; 90:16; 101:8; 117:23; 187:13, 19; 188:11, 16; 189:11

**bulk** [3] - 57:19; 110:17; 131:18

**bunch** [1] - 74:15

**burden** [3] - 87:14; 110:10; 115:1

**burdens** [3] - 77:1; 88:25; 90:9

**bureau** [3] - 150:3; 151:2; 170:25

**Bureau** [5] - 142:3, 22;

150:23; 161:5; 177:1

**business** [6] - 22:5; 79:12; 109:12; 132:18; 176:11; 188:19

**Business** [4] - 172:23; 175:25; 184:20; 186:22

**buttressed** [1] - 109:16

**buy** [4] - 121:19; 129:7; 170:5; 177:15

**buyers** [1] - 93:10

**buying** [1] - 169:23

**BY** [4] - 120:20; 183:11; 194:6, 8

---

**C**

**C-H-A-S** [1] - 147:19

**CO** [1] - 112:21

**calculate** [5] - 146:20; 160:18; 162:2, 14; 168:4

**calculated** [6] - 145:2; 150:21; 163:4, 14; 164:22; 180:19

**calculating** [4] - 139:9; 142:11; 177:14

**calculation** [5] - 116:10; 163:10; 179:10; 181:3, 6

**calculations** [1] - 117:19

**cannot** [16] - 13:8; 15:11; 31:22; 35:23; 36:11, 18; 42:12; 91:6; 94:3, 25; 96:9; 110:12; 112:12; 185:4

**capitulated** [1] - 115:6

**caps** [1] - 55:10

**care** [2] - 21:12; 53:15

**careful** [2] - 76:23; 88:23

**Carnegie** [1] - 122:15

**carry** [1] - 72:1

**cars** [1] - 108:5

**case** [98] - 4:21; 7:1; 9:11; 10:23; 11:3; 12:1, 17; 13:6; 15:15, 24; 19:5; 24:15; 30:12; 31:7, 9; 32:1; 35:23; 36:10; 39:19; 41:4, 14; 43:8, 19; 44:9; 50:23; 52:3, 10, 12-13, 16, 19, 22; 53:1, 5; 69:1, 6; 72:9; 84:24; 87:5, 7, 20, 22-23; 88:2, 5; 91:23; 92:3; 94:4;

97:4, 6; 98:11; 101:1, 6, 13, 15, 22; 102:12; 107:16; 108:16, 18; 109:20; 111:8; 112:24; 114:5; 115:5, 8; 117:8; 119:15; 121:10, 21; 126:19; 128:4; 129:11; 130:11, 23, 25; 132:25; 137:22; 138:13; 139:24; 142:1; 146:14, 25; 150:25; 159:13; 167:23; 170:21; 183:15; 193:21

**case-by-case** [1] - 24:15

**cases** [24] - 11:11; 18:4, 18, 24; 29:17; 30:14; 43:3, 7, 10-11; 73:17; 87:11; 91:19; 102:22, 24; 103:1; 126:13, 16; 127:19; 132:12; 171:4; 174:1

**categorical** [1] - 26:5

**categories** [1] - 148:15

**categorization** [3] - 164:25; 165:1; 181:1

**category** [7] - 127:12; 136:19; 160:3; 163:24; 166:25; 167:2; 185:23

**causation** [5] - 17:20; 18:3, 15

**caused** [1] - 169:20

**causes** [1] - 124:11

**Cavanaugh** [1] - 51:24

**Census** [4] - 142:3, 22; 150:23; 177:1

**census** [32] - 11:9; 70:17; 123:19; 126:3; 135:20; 137:10; 143:21; 144:17; 145:24; 146:3, 11-12, 14-15; 150:3, 23, 25; 151:1-3; 160:22, 25; 161:10; 163:4, 14, 23; 167:22; 168:3; 170:25

**censuses** [1] - 141:12

**center** [3] - 21:12; 80:24; 168:17

**Center** [4] - 123:7, 24; 124:4; 125:3

**center's** [1] - 124:1

**central** [2] - 116:18; 163:12

**Central** [3] - 1:6; 2:13; 79:6

**centralized** [1] - 140:3

**certain** [8] - 19:17;

20:12; 25:2; 143:1; 149:8; 169:2; 178:6, 10

**certainly** [3] - 25:7, 9; 185:10

**certificate** [1] - 12:16

**certificates** [1] - 159:8

**chair** [1] - 79:19

**chairman** [3] - 58:12; 75:12; 112:19

**challenge** [5] - 19:7; 92:1; 114:10; 127:15

**challenged** [1] - 88:4

**challenges** [1] - 138:17

**chance** [2] - 21:17; 147:13

**CHANGE** [1] - 1:7

**Change** [5] - 5:23; 6:6; 51:5; 55:19; 68:15

**change** [25] - 101:16, 18; 102:18; 105:23; 109:2, 6, 13, 15; 110:11; 113:14; 114:12, 20; 121:14; 122:6; 127:3, 10, 17; 133:4, 7, 18; 142:5, 12; 146:10, 21; 183:17

**changed** [2] - 79:3; 108:24

**Changes** [1] - 58:24

**changing** [3] - 89:19, 22; 126:4

**chapter** [1] - 55:14

**character** [10] - 89:10, 13; 96:6; 100:23; 104:23; 105:13, 18; 110:4

**characteristics** [5] - 134:4; 173:7; 174:5, 10; 175:4

**characterized** [1] - 84:21

**charge** [1] - 126:21

**charged** [2] - 41:23; 58:5

**charges** [1] - 103:3

**Charley** [1] - 111:21

**Charlie** [1] - 59:9

**charters** [1] - 124:1

**CHAS** [9] - 147:18; 149:24; 150:1, 7-8, 15; 151:5, 22

**Chava** [3] - 3:4, 7; 45:24

**CHAVA** [2] - 1:20; 3:7

**Cherry** [2] - 77:16, 18

**Chicago** [1] - 124:8

**chicken** [2] - 99:20, 22

**children** [16] - 61:12; 62:22; 81:20; 89:24; 95:10, 14, 18; 98:22; 103:23, 25; 104:3, 9, 13; 110:3; 125:12, 16

**Chinese** [1] - 105:20

**choose** [1] - 14:8

**chose** [1] - 109:14

**chosen** [2] - 106:22, 25

**Christmastime** [1] - 30:17

**chunk** [1] - 11:1

**circuit** [2] - 15:13; 97:2

**Circuit** [10] - 9:11; 11:25; 18:18; 92:13, 16; 97:5; 102:21; 132:7, 13

**circuits** [1] - 30:14

**circumstances** [1] - 87:24

**circumstantial** [1] - 87:24

**citation** [1] - 30:1

**cite** [3] - 24:13; 97:4; 102:23

**cited** [3] - 18:4; 41:12; 184:19

**citizen** [2] - 109:1; 114:3

**citizen's** [2] - 97:24; 98:7

**citizens** [7] - 36:20; 95:22; 98:12; 99:4; 107:24; 114:1, 8

**citizens'** [5] - 78:15; 99:9; 103:10, 12; 111:5

**CITY** [2] - 1:11

**City** [185] - 2:4, 7; 4:3, 5, 7, 14; 6:3, 8; 7:10, 13, 22, 24; 11:19; 12:19; 16:7; 17:2, 18, 23; 19:11; 20:10; 21:12; 22:16; 29:21; 31:14, 17, 21; 33:10, 13, 17, 25; 34:3, 7, 13, 19-20, 22, 24; 35:1, 20; 39:2, 14; 40:12, 14, 18; 41:23; 43:5; 51:16; 54:7; 55:23; 56:1, 14; 57:16; 58:17; 59:5, 21; 60:21; 62:6; 65:8; 67:5, 12, 14; 69:3, 11, 13; 70:2,

5, 19; 71:6, 9, 14-15, 24-25; 72:8, 10; 75:1, 7, 23; 76:19, 21; 78:3; 79:1, 5, 20; 81:1; 82:4, 21; 84:19; 88:7; 89:13, 18, 21; 90:11, 22-23; 91:1, 6-7; 92:11; 93:12, 21; 94:7, 11, 25; 95:1, 8, 15, 21; 96:7, 9, 22; 97:21; 98:12, 19; 100:23; 101:18; 102:4; 103:13; 105:11; 107:12; 109:24; 110:20; 112:10; 113:10; 114:8; 115:12; 118:16; 119:4; 121:14, 20; 128:6, 8; 133:4, 8, 12, 14; 134:2, 8; 136:7, 9, 17, 24; 139:6, 8, 11, 17, 20; 141:14; 143:2, 23, 25; 144:22; 145:3, 6; 146:7; 157:1, 8, 10, 13; 163:13, 15; 173:3; 174:16; 175:16, 23; 176:1, 4, 21; 182:7, 17, 19; 183:3; 184:15; 185:14; 186:2; 191:2

**city** [2] - 75:11; 78:3

**City's** [8] - 7:5; 20:11; 35:10; 91:9; 95:16; 96:14; 106:9; 144:25

**Civil** [3] - 14:21; 96:18; 125:21

**civil** [5] - 41:2, 5; 97:8; 124:6, 9

**CIVIL** [1] - 1:23

**claim** [12] - 12:21-23; 31:23; 33:2; 70:9; 87:9; 90:23; 99:5; 102:8; 109:25; 118:16

**claimed** [1] - 104:15

**claiming** [2] - 16:7; 99:7

**claims** [8] - 11:21; 12:21; 14:23; 54:23; 92:12; 103:9; 115:7; 118:19

**clarification** [1] - 186:14

**clarify** [1] - 186:13

**class** [2] - 116:23; 126:2

**classes** [6] - 122:20, 25; 123:1; 126:7

**classification** [1] - 82:22

**classifications** [1] - 82:25

**Clause** [1] - 96:17

**clear** [5] - 8:8; 14:16; 15:24; 71:5; 141:21

**clearly** [4] - 74:5; 117:21; 120:25; 173:17

**Cleary** [1] - 107:4

**clients** [1] - 109:23

**close** [1] - 131:14

**closed** [1] - 66:15

**CMSA** [1] - 149:9

**CMSAs** [1] - 149:12

**co** [4] - 67:18; 112:5; 123:25; 124:1

**CO** [5] - 59:8; 111:21, 24; 115:10

**CO-5** [4] - 65:6; 77:13, 21

**CO-5(a** [1] - 59:10

**CO-5(b** [12] - 59:9, 14; 60:4, 7; 61:5, 8, 24; 62:15, 18; 63:12, 15; 64:18

**co-author** [1] - 124:1

**co-authored** [1] - 123:25

**co-ops** [1] - 67:18; 112:5

**CO3** [1] - 115:11

**CO4** [1] - 115:11

**coalition** [1] - 71:21

**Code** [1] - 57:16

**code** [9] - 58:21; 65:5; 76:19, 21; 78:3; 88:11; 102:16; 105:2, 11

**cognizable** [1] - 92:12

**cold** [1] - 101:25

**colleague** [1] - 45:19

**collect** [2] - 179:11, 14

**collected** [5] - 150:24; 176:25; 178:11; 179:12; 180:25

**collection** [2] - 178:6, 9

**collective** [1] - 114:9

**college** [1] - 122:20

**color** [3] - 91:13; 135:24; 136:16

**column** [5] - 166:24; 168:11, 14, 16

**columns** [3] - 160:10; 162:24; 163:3

**combination** [8] - 110:5; 116:16, 21; 163:16; 177:23; 182:23; 189:2

**8**

combine [1] - 161:22

combined [3] - 153:22; 156:1; 170:15

combining [2] - 153:20; 155:7

comfortable [1] - 177:12

commence [1] - 119:14

commenced [1] - 35:23

comment [5] - 19:24; 63:10, 23; 100:21; 114:9

commented [1] - 44:8

comments [13] - 8:2, 23; 29:8, 11; 98:14, 19, 21; 99:10; 102:17; 104:14; 113:22, 25

commercial [3] - 105:24; 106:5, 13

Commission [1] - 125:20

COMMITTEE [1] - 1:23

Committee [1] - 59:22

committee [18] - 58:9, 13; 59:1, 3, 8; 75:9; 76:2; 78:22; 79:16, 19; 82:17; 88:9; 90:1, 17; 95:7; 111:10; 112:19; 113:1

common [2] - 139:15; 162:7

commonly [6] - 134:5; 146:20; 147:18; 150:8; 161:24; 166:7

communications [2] - 33:23; 40:1

communities [7] - 70:20; 71:7; 126:4; 135:10; 136:12; 176:15

COMMUNITIES [1] - 1:7

Communities [5] - 5:23; 6:6; 51:5; 55:19; 68:15

community [19] - 40:3, 7, 20; 43:24; 55:7; 88:10; 93:13; 95:13; 96:7; 102:25; 103:4, 14-15, 17; 110:6; 125:23; 126:2; 140:7; 176:21

Community [3] - 55:13, 16; 165:9

community's [1] - 91:12

community-based [1] - 55:7

commuting [1] - 149:6

Company [3] - 15:19; 55:11; 128:18

company's [1] - 125:4

comparable [2] - 161:9; 191:2

compare [3] - 161:2; 162:13; 167:22

compared [3] - 138:5; 151:13; 168:8

comparing [2] - 141:21; 142:8

comparison [6] - 13:16; 15:18; 115:17; 142:7, 15

compel [1] - 105:12

compelled [3] - 113:7, 10, 24

compelling [1] - 88:2

compels [1] - 114:5

compensated [1] - 126:18

compilation [2] - 26:18; 49:24

compilations [1] - 26:17

complaint [3] - 39:16; 55:9; 56:22

complaints [1] - 32:24

complete [1] - 151:19

completely [2] - 21:25; 108:3

complex [3] - 108:7; 110:19; 111:6

compliant [1] - 93:3

component [11] - 59:14, 24; 60:4; 61:5, 21, 25; 62:15; 77:13; 159:7, 11; 187:23

components [3] - 157:18; 159:4; 178:6

comported [1] - 88:16

composition [23] - 19:10, 13, 16; 71:4; 93:10; 121:14; 133:3, 6-7, 17; 134:2; 136:23; 143:22; 144:2; 145:1; 146:6; 147:22; 157:1; 165:23; 177:15; 182:6, 9, 13

compositions [1] - 182:17

Comprehensive [3] - 147:17; 149:24; 151:22

comprehensive [2] - 123:21; 130:22

comprised [2] - 19:20; 113:1

compute [1] - 168:6

computer [1] - 2:16

computerized [1] - 174:25

conceivably [1] - 165:5

concept [3] - 106:10, 14; 107:7

concern [10] - 31:24; 89:14, 24; 91:5; 98:21; 102:24; 107:25; 110:16; 175:14

concerned [5] - 67:22; 103:3; 107:25; 132:3

concerning [9] - 65:17; 104:2; 106:10; 114:19; 123:12; 185:18; 186:5, 12; 189:13

concerns [25] - 89:9, 11; 90:2, 14; 91:6; 95:7, 9-10, 22-23; 96:1; 103:10, 12; 110:8; 111:5, 7; 113:22, 24; 130:16; 131:18; 175:11, 13, 21; 190:19

conclude [4] - 137:11; 138:25; 139:5; 177:5

concluded [10] - 93:11; 95:16; 97:17; 133:11, 19; 134:7; 139:2, 7; 147:23; 169:15

concludes [1] - 53:1

conclusion [9] - 17:8; 96:11; 118:13; 143:22; 144:1; 151:21; 165:18; 169:13; 189:18

conclusions [20] - 11:15; 13:18; 128:4; 130:25; 131:19; 133:16; 134:1; 136:2; 145:19; 147:20; 149:17; 151:8; 153:5, 8; 154:21; 155:16; 156:9, 24; 162:23

conclusive [1] - 174:3

condition [1] - 26:19

condominiums [2] - 67:17; 176:12

condone [1] - 102:5

condoned [1] - 118:17

condos [1] - 112:5

conduct [1] - 116:15

conducted [1] - 40:11

confer [1] - 10:5

conference [1] - 10:11

configuration [1] - 188:1

confined [1] - 7:19

confirming [1] - 191:20

conflict [1] - 27:10

conflicting [2] - 174:6, 11

conforming [1] - 84:22

Congress [2] - 97:9; 178:5

connection [3] - 75:10; 147:21; 157:17

connections [1] - 19:11

consciousness [1] - 23:18

consent [1] - 45:25

consequently [2] - 113:16; 119:7

conservative [3] - 93:9; 175:22; 177:6

consider [8] - 5:6; 24:15, 21; 29:1; 35:3; 105:13; 114:3; 131:3

consideration [10] - 8:24; 15:18; 30:6; 36:14; 91:24; 105:15, 18; 112:21; 113:4; 131:6

considerations [1] - 177:4

considered [9] - 15:12; 27:23; 32:4; 36:3, 7; 56:12; 63:11; 65:4; 138:2

considering [3] - 63:6, 20; 139:23

considers [1] - 90:18

consisted [1] - 58:9

consistent [4] - 89:4; 97:2; 146:16; 188:18

consistently [1] - 166:8

consists [1] - 57:2

Consolidated [2] - 149:9, 15

consolidation [2] - 56:6; 72:5

Consortium [1] - 71:21

constituents [5] - 40:2; 95:24; 96:1, 5; 113:23

Constitution's [1] - 96:17

constitutional [1] - 18:5

9

**constitutionally** [1] - 98:16

**constructed** [1] - 94:11

**constructing** [1] - 70:12

**construction** [5] - 59:18; 64:20; 96:24; 118:8; 183:25

**consultant** [16] - 7:13; 75:16, 25; 78:19; 81:2, 21; 89:25; 95:16; 108:16; 109:20; 117:18; 122:1, 3; 124:5, 15

**consulting** [1] - 7:7

**Consumer** [4] - 161:5, 18; 167:24

**consumers** [1] - 167:24

**contact** [1] - 7:14

**contain** [5] - 30:21; 37:10; 65:20; 132:15

**contained** [5] - 67:14; 76:18; 84:15; 172:13, 21

**Containing** [2] - 60:22; 62:7

**containing** [1] - 77:6; 92:19

**contains** [3] - 21:13; 39:15; 175:3

**contemplated** [11] - 19:23; 59:23; 60:16, 24; 62:1, 9; 64:3, 8; 66:3, 6; 78:11

**contend** [11] - 102:1; 103:21; 105:15; 107:20; 109:9; 111:13, 15; 112:18; 114:2; 117:1, 7

**contended** [1] - 17:18

**contending** [1] - 22:11

**contention** [2] - 27:19; 30:12

**contents** [2] - 28:4; 46:1

**context** [6] - 15:5; 16:3; 17:11; 18:5; 23:23; 24:22

**continue** [4] - 7:18; 41:16; 52:21; 93:12

**continued** [4] - 29:18; 85:10; 94:9; 102:7

**continues** [1] - 53:25

**contract** [5] - 46:17; 66:11; 84:2; 161:14, 22

**contracted** [1] - 84:1

**contrary** [2] - 90:2; 95:23

**contrast** [1] - 70:20

**contributing** [1] - 35:11

**Control** [1] - 104:19

**control** [3] - 83:8; 112:13; 116:6

**controls** [10] - 57:20; 59:13, 17; 60:3; 61:4; 62:15; 77:13; 111:14, 16, 19

**convenience** [1] - 50:18

**convenient** [1] - 66:24

**conversation** [1] - 80:6

**conversely** [1] - 106:25

**cooperating** [1] - 175:3

**copy** [4] - 29:23; 154:1; 173:11; 189:8

**cords** [1] - 5:12

**core** [3] - 149:3, 6

**Corp** [1] - 18:25

**corporate** [1] - 55:15

**Corporation** [1] - 87:21

**corporation** [1] - 55:23

**corporations** [1] - 118:17

**correct** [34] - 5:16, 19, 21; 6:4, 10-11, 13; 27:11; 32:21; 37:10; 45:23; 54:20; 73:12; 101:23; 183:15, 18, 20, 23; 184:1, 3, 7, 15; 185:15; 187:20; 190:11, 14, 20; 191:1, 8, 15; 192:13, 16; 193:11

**correctly** [2] - 33:3; 186:20

**corresponded** [1] - 173:23

**corresponding** [4] - 158:14; 171:25; 172:1

**corresponds** [1] - 171:24

**cost** [9] - 94:1, 3; 104:2, 5; 117:16; 123:1; 148:12, 16; 178:24

**costs** [2] - 98:22; 151:18

**Council** [1] - 179:4

**counsel** [12] - 10:6; 14:15, 19; 18:14, 19;

52:18; 95:21; 128:1; 130:3; 152:20; 190:19; 191:24

**Counsel** [1] - 1:22

**counsel's** [1] - 14:14

**count** [1] - 31:3

**counties** [2] - 70:18; 149:5

**country** [2] - 125:5; 148:12

**Country** [2] - 73:7; 77:15

**county** [22] - 19:12, 21; 31:3; 33:21; 56:7, 10, 15, 17; 57:6; 58:18; 59:6; 73:6; 74:12; 131:18, 23; 132:3; 149:4; 186:9; 188:15; 189:3, 8

**County** [118] - 5:24; 11:18; 17:22; 19:11; 31:4; 32:1; 33:7, 20, 24; 34:13, 22; 35:21; 40:2; 54:13; 55:24; 56:3, 5, 16-17, 24; 57:3, 6, 8, 12, 14, 21; 58:14; 60:22; 62:7; 64:23; 65:15, 22, 25; 66:4, 9, 11, 18; 68:20; 70:18; 71:10, 17-18; 72:5, 7; 74:3, 11, 14-15, 22; 75:2; 82:1; 83:16; 91:4; 93:5, 10; 107:22; 112:11; 121:15, 17; 128:7, 9, 13; 133:4, 8, 12, 14, 17, 19; 134:9, 11; 135:7, 10, 15; 136:3, 7, 23; 137:12; 138:2, 6; 139:1, 4; 141:19; 143:1; 144:2, 5, 8; 145:1, 4, 7; 146:6; 147:5, 23; 148:1; 149:19; 151:9; 160:22; 162:14; 163:9, 13, 16, 19, 22; 164:16; 166:3; 169:24; 177:20, 25; 179:16; 182:20, 25; 184:17; 185:12, 25; 186:19

**county's** [4] - 56:11; 93:22; 111:1; 188:10

**County's** [6] - 57:10; 58:3; 65:13, 16, 19; 84:14

**county-owned** [1] - 57:6

**couple** [2] - 50:20; 76:9

**course** [11] - 12:5; 74:8, 16, 20; 75:1; 84:4; 87:17; 108:23, 25; 114:14; 132:18

**court** [17] - 5:1, 4; 38:10; 41:17; 50:19; 57:17; 73:6, 10-11, 14, 23; 98:25; 119:22, 24; 120:3; 121:2, 4

**Court** [49] - 2:12; 4:25; 11:1, 13; 12:18; 14:3; 15:4; 16:2, 10, 12, 18, 20; 24:16; 35:9; 43:3, 6, 17, 20; 44:6, 11; 45:4, 7; 46:1; 56:17, 23; 66:24; 69:10; 87:8, 19, 22; 90:5; 92:15; 96:20, 25; 97:14; 105:17; 107:22; 108:2; 111:3; 114:5, 21; 119:9; 121:22; 126:16; 127:2; 130:23; 131:5; 146:24

**COURT** [220] - 1:1, 15; 2:17, 20; 3:6, 19, 21, 25; 4:10, 18, 20; 5:20, 22; 6:2, 5, 12, 14, 17, 20; 8:9, 17; 9:2, 7, 15, 19, 24; 10:3, 7, 13, 15, 18; 12:2, 6, 25; 13:2; 18:12; 19:5; 20:19, 21, 25; 21:3, 5; 22:2, 4; 23:4, 7, 13; 24:1, 7, 17, 25; 25:7, 16, 21; 26:7; 27:2, 4, 19; 28:5, 17, 20; 29:4, 9, 12; 30:2, 8, 15, 20, 25; 31:12, 18, 20; 32:5, 11, 14, 17, 19, 22; 33:9; 34:5, 10, 15, 18; 35:7, 15; 36:14, 16; 37:4, 6, 8, 9, 19; 38:21; 39:6, 9, 11, 22; 41:9; 42:1, 5, 7, 15, 25; 44:8, 25; 45:2, 8, 17, 20, 22; 46:7, 10, 13, 16, 22, 24; 47:1, 5, 10, 20, 23; 48:11, 13, 24; 49:11, 18; 50:7, 10, 12; 51:3, 8, 10, 25; 52:12, 16, 23; 53:4, 13, 16, 20, 25; 54:19, 21; 55:3, 5; 66:23; 67:1, 6, 9, 19, 25; 68:3, 7, 10; 71:2; 72:23; 73:1, 3, 6, 9, 13, 17; 75:19; 80:2; 81:3; 83:14, 18; 84:25; 85:4, 8; 97:18; 99:14, 16, 19; 100:6; 107:17;

119:14; 120:5, 12, 17;
122:2; 125:10; 127:18;
128:22, 25; 129:4, 15,
17, 21; 130:5, 7;
131:11; 132:3, 10, 23;
133:5; 134:16, 19, 21;
135:4; 137:4, 18;
140:8; 141:1; 144:7;
145:15; 147:9, 12;
152:3; 154:9, 11;
160:2; 167:16; 171:17;
181:9; 183:8; 184:6,
23; 185:3; 193:15, 18

**Court's** [2] - 8:6;
100:20

**courthouse** [1] - 73:4

**Courthouse** [1] - 1:5

**courtroom** [3] - 4:22;
51:14; 63:14

**Courts** [5] - 88:3, 13;
91:18; 130:11, 18

**courts** [4] - 44:16;
73:17; 98:24

**cover** [3] - 38:8, 13;
124:20

**covered** [1] - 79:9

**CPI** [2] - 161:8; 167:23

**create** [6] - 63:12;
150:9; 161:23; 162:17;
168:9; 191:17

**created** [14] - 33:23;
37:11, 13; 58:5; 70:7;
108:6, 13; 125:3;
150:2, 15; 174:25;
181:3; 192:20, 22

**creates** [2] - 26:19;
148:15

**creation** [1] - 106:6

**credibility** [1] - 20:3

**credits** [1] - 167:7

**crime** [1] - 68:21

**crises** [1] - 72:4

**criteria** [1] - 88:14

**critical** [1] - 112:23

**critically** [1] -
117:25

**cross** [6] - 42:13;
99:20, 22; 145:15;
183:8; 184:24

**CROSS** [2] - 183:10;
194:7

**cross-examination** [3]
- 145:15; 183:8; 184:24

**CROSS-EXAMINATION** [2]
- 183:10; 194:7

**crowded** [1] - 151:18

**crystalized** [1] -

116:18

**Cullen** [3] - 4:2, 13;
20:9

**CULLEN** [1] - 2:6

**cum** [1] - 122:15

**curiam** [1] - 97:6

**current** [1] - 123:20

**curtail** [1] - 20:6

**cut** [1] - 162:12

**cutoff** [1] - 162:15

**Cynthia** [1] - 4:12

**CYNTHIA** [1] - 2:9

---

**D**

**D.C** [1] - 1:25

**danger** [1] - 130:12

**darkest** [1] - 135:24

**data** [46] - 11:10, 14;
26:16, 18; 123:16;
124:24; 131:3; 141:10;
142:2-4; 143:20;
144:15; 145:21; 146:9,
13; 149:23; 150:14, 22;
151:20, 22; 152:21;
163:1; 167:12; 169:24;
170:10; 174:2; 176:18,
25; 177:11, 17, 19, 22;
178:6, 8-10, 25; 179:2,
6, 10, 21; 180:21;
181:18

**database** [16] -
123:21; 147:18; 149:25;
150:1, 7-8; 177:18;
178:3-5; 179:7, 11, 18

**databases** [5] -
122:11; 123:18; 126:4;
145:25; 146:13

**date** [8] - 29:19;
46:24; 47:10, 20;
48:11; 50:2; 131:11

**dated** [28] - 47:6,
13-14, 18, 25; 48:4, 8,
10, 15, 17-18, 20, 22;
49:1-3, 5-7, 10, 14-15,
17, 19-20, 22; 58:23

**dates** [1] - 52:5

**Daubert** [5] - 11:13;
14:2; 15:14; 19:1, 5

**day-care** [1] - 21:12

**days** [2] - 52:7, 9

**deal** [3] - 23:25; 31:5;
138:13

**dealing** [2] - 140:6;
163:17

**deals** [2] - 139:25;
142:10

**dealt** [2] - 32:8; 92:14

**debate** [2] - 28:19, 25

**December** [6] - 46:25;
55:18, 20; 172:23;
184:20

**decennial** [13] -
123:19; 143:21; 144:17;
145:24; 146:3, 11;
150:23, 25; 151:3;
160:22; 163:14, 23;
168:3

**decide** [3] - 35:5;
38:16; 44:4

**decided** [4] - 44:10;
74:22; 80:17; 110:6

**decision** [33] - 8:3;
19:18; 23:20; 32:2, 8;
33:4; 35:2, 15, 24;
36:4, 13; 39:7; 41:16,
19; 44:22; 69:19;
87:12, 16; 88:4; 91:24;
96:10; 100:20; 102:8;
106:21; 108:10; 115:8,
15; 118:24; 131:7;
132:7; 163:18

**decision-maker** [1] -
32:3

**decision-making** [1] -
8:3

**decisions** [4] - 35:19;
40:4; 97:10; 118:23

**declarant** [1] - 26:9

**decline** [1] - 42:2

**dedicated** [1] - 68:16

**deed** [1] - 46:17

**deems** [1] - 159:15

**defendant** [6] - 19:6;
55:22; 56:1; 87:15;
92:3; 107:24

**defendant's** [3] -
52:24; 87:12; 129:15

**Defendants** [2] - 1:12;
2:4

**defendants** [25] - 4:3,
5, 7, 14; 7:1, 10; 8:5,
21; 10:22; 11:12, 24;
15:1, 17; 16:7; 18:4,
21; 20:1, 10; 24:19;
37:21; 43:9; 54:23;
97:22; 110:10; 127:7

**defendants'** [5] -
10:18; 11:6, 8; 29:5;
52:13

**defense** [3] - 3:25;
90:11; 95:8

**defense's** [1] - 27:19

**defenses** [1] - 7:25

**defer** [2] - 23:20; 39:7

**define** [1] - 137:16

**defined** [8] - 64:6;
137:23, 25; 138:18;
148:18; 149:2, 8;
151:16

**definition** [1] -
137:21

**definitions** [1] -
146:17

**definitive** [1] -
174:10

**deflate** [3] - 161:8,
17; 168:1

**deflated** [3] - 161:4,
21; 167:23

**deflator** [1] - 161:8

**degree** [4] - 122:14;
123:5; 133:19; 135:8

**delete** [1] - 65:5

**deliberately** [1] -
116:15

**deliberations** [2] -
8:13; 105:14

**delta** [1] - 13:23

**demand** [1] - 93:22

**demands** [1] - 176:22

**democracy** [3] -
113:13; 114:4, 13

**demographer** [4] -
11:7; 103:6; 160:1;
183:15

**demographers** [1] -
104:11

**demographic** [4] -
14:9; 17:24; 18:1; 91:3

**demographics** [12] -
17:8, 23; 123:11;
125:25; 127:4, 8, 16;
136:3; 143:1; 166:2

**demography** [3] -
122:6; 183:16

**demonstrate** [2] -
32:24; 116:14

**demonstrative** [1] -
145:10

**demonstratives** [1] -
134:14

**denied** [3] - 94:3;
178:18

**DENNIN** [46] - 1:20;
3:2; 119:16, 21;
120:20; 127:1; 128:2;
129:10, 13, 16, 18, 23;
130:6, 8; 131:14, 25;
132:9, 20; 134:13, 17,
20, 23; 135:1, 5;

**10**

136:25; 137:19; 141:2; 143:14; 144:6; 145:17; 152:4, 12; 154:4, 10, 14; 155:10; 156:3, 23; 160:9; 163:25; 181:12; 183:4; 184:4; 194:6

**Dennin** [2] - 3:2; 119:16

**density** [12] - 60:8; 61:9; 62:19; 70:10; 77:22; 78:2; 98:22; 101:6; 110:17; 117:5, 24

**denying** [2] - 20:5; 96:25

**Department** [2] - 125:22; 148:14

**departure** [1] - 88:14

**deposed** [1] - 114:16

**deposition** [8] - 7:11; 9:17, 20; 36:22; 37:3; 192:3, 8

**depositions** [1] - 39:1

**describe** [16] - 18:1; 94:23; 122:12, 19, 24; 123:3; 128:3; 136:8; 144:18; 146:4, 24; 153:3; 159:2; 160:12; 164:6; 177:13

**described** [9] - 59:6; 83:7; 142:14; 145:20; 146:5; 171:15, 22; 176:11, 14

**describing** [4] - 107:15; 175:23; 176:9, 13

**description** [10] - 50:3; 159:21, 24; 172:10; 173:12, 15, 22, 24; 174:1; 184:12

**descriptions** [4] - 46:6, 9; 174:12; 185:22

**descriptive** [1] - 18:1

**design** [1] - 117:18

**designated** [5] - 50:24; 57:16; 59:8; 149:9; 169:2

**designation** [2] - 65:18; 129:23

**designed** [4] - 97:12; 125:3; 150:4; 159:6

**desired** [2] - 54:7; 74:22

**desires** [1] - 114:19

**desperately** [1] - 68:19

**despite** [5] - 105:9-11; 106:2

**detached** [2] - 175:16, 19

**detailed** [4] - 81:6; 131:2; 158:23; 173:7

**details** [1] - 158:1

**determination** [1] - 130:15

**determine** [2] - 87:18; 189:11

**determined** [2] - 72:7; 166:17

**determining** [2] - 36:3; 150:11

**detonate** [1] - 168:22

**develop** [2] - 65:25; 66:11

**developed** [20] - 82:21; 83:25; 84:15; 92:19; 126:1; 152:7; 153:13, 20; 155:1, 5, 20; 156:19; 158:13, 16, 18; 166:21; 167:19; 168:15; 176:9, 22

**developer** [7] - 55:7; 57:9; 68:24; 79:24; 84:11; 93:25; 101:4

**developers** [1] - 80:9

**development** [33] - 13:13, 21; 17:9, 12; 57:23; 58:20; 61:13; 62:23; 66:7; 69:20; 71:16, 23; 75:6; 95:19; 101:2; 106:4; 110:25; 116:5; 117:16, 23; 118:11; 121:20; 126:3; 156:25; 157:2; 173:9; 183:22; 188:7; 189:14, 25; 193:1

**Development** [3] - 87:21; 125:23; 148:14

**developments** [5] - 11:23; 82:1; 157:17; 167:4; 188:24

**devising** [1] - 57:14

**DeVita** [6] - 5:17; 54:6, 10, 17; 69:1

**Diego** [1] - 124:8

**differ** [1] - 148:12

**difference** [3] - 13:24; 180:8; 189:17

**different** [21] - 11:23; 52:16; 117:7; 161:18; 163:2; 166:9; 167:3; 168:13; 170:3, 9, 19, 24; 171:5, 7; 172:11; 173:25; 175:15; 180:12, 15, 18; 193:13

**differently** [1] -

138:4

**digesting** [1] - 23:17

**dim** [2] - 134:21; 137:4

**direct** [3] - 31:11; 52:19; 87:24

**DIRECT** [2] - 120:19; 194:5

**directed** [1] - 88:13

**directing** [1] - 120:2

**directly** [4] - 35:1; 41:4; 159:18; 190:16

**director** [4] - 51:6; 84:9; 123:7; 124:9

**disagree** [1] - 9:5

**disbanded** [2] - 43:9; 55:17

**disclose** [1] - 9:13

**disclosure** [1] - 177:17

**Disclosure** [3] - 123:21; 177:18; 178:4

**discovered** [1] - 139:10

**discovery** [5] - 7:20, 23; 8:16; 9:1, 12

**discrimination** [8] - 40:11; 41:24; 87:23; 94:9; 107:10; 110:1; 118:22

**discriminatory** [15] - 18:6; 36:5; 39:17; 40:15; 83:12; 87:15; 88:2; 91:22; 92:5, 8; 95:3, 11; 96:13; 110:11

**discuss** [4] - 24:23; 87:6; 137:3; 152:17

**discussed** [7] - 52:4; 91:15; 97:25; 108:8; 130:18; 145:23; 158:7

**discussion** [4] - 11:9; 48:22, 25; 113:6

**disingenuous** [1] - 78:9

**dismiss** [1] - 113:24

**dismissed** [1] - 54:23

**disparate** [8] - 12:22; 15:25; 16:8, 11, 13, 17; 18:9; 35:12

**disparity** [5] - 13:6; 15:22; 18:7, 16; 135:8

**dispersed** [1] - 135:7

**dispirit** [10] - 91:15, 17; 92:8, 10-11; 96:13; 115:3, 7; 116:15

**disproportionally** [1] - 91:25

**disproportionate** [2]

**disproportionately** [6] - 93:16, 18; 116:22; 128:10; 147:1, 24

**dispute** [1] - 117:9

**disputes** [1] - 16:4

**distribution** [2] - 157:21; 182:24

**District** [3] - 60:22; 62:7; 130:19

**DISTRICT** [3] - 1:1, 15

**district** [6] - 12:20; 61:20; 64:17; 65:6, 10

**districts** [1] - 106:5

**diversity** [2] - 71:20; 182:19

**DIVERSITYDATA** [1] - 125:1

**diversitydata.org** [1] - 124:25

**diversitydatakids** [1] - 125:11

**Diversitydatakids.org** [2] - 125:9, 12

**divided** [4] - 138:23; 162:18; 180:6; 181:2

**dividing** [1] - 162:4

**document** [11] - 21:15; 24:9; 26:12, 18; 28:10, 16; 38:7, 19; 79:25; 109:5

**documents** [28] - 21:9; 23:5; 24:6; 25:20, 23; 26:3, 11, 15-16; 27:23; 28:7; 29:2; 33:3, 19, 23; 37:20; 42:17, 20-21; 44:17; 108:13; 109:5, 9, 12, 16; 146:14

**dollar** [2] - 171:1, 3

**dollars** [10] - 161:25; 162:1, 12; 167:21; 171:1; 173:1, 17, 23

**done** [10] - 16:15; 43:16; 52:22, 24; 103:2; 116:8; 117:12; 125:24; 162:25

**dormitories** [4] - 139:12, 22; 140:5; 142:1

**dorms** [2] - 139:20; 140:2

**dot** [1] - 125:1

**double** [6] - 27:20; 28:8; 30:11, 16, 21, 23

**Doubleday** [2] - 22:1,

**12**

20

**DOUBLEDAY** [1] - 22:3

**doubt** [1] - 18:21

**Douglas** [4] - 4:4;
10:20; 18:13; 127:6

**DOUGLAS** [1] - 2:8

**down** [24] - 10:12;
28:5, 20; 99:14;
117:15; 125:14; 145:17;
170:4, 6, 14, 16,
22-23; 171:10, 24-25;
172:1; 179:25; 180:9,
11

**downtown** [2] - 108:20;
109:21

**Dr** [3] - 11:3; 14:15,
17

**draft** [6] - 47:4-6, 17;
48:5; 61:18

**drafting** [1] - 56:5

**drawn** [2] - 14:17;
152:20

**drive** [1] - 96:9

**Drive** [8] - 57:4, 6;
64:24; 74:2, 11, 14;
83:16

**driven** [1] - 96:1

**due** [1] - 95:25

**duly** [1] - 120:10

**during** [19] - 7:11, 19,
23-24; 8:8, 16, 20;
9:1, 12, 17; 20:13;
37:3; 42:23; 74:8, 20;
103:10; 114:14; 192:8

**dwelling** [1] - 67:15

**dwellings** [3] - 59:19;
64:21

**Dykman** [3] - 4:2, 13;
20:9

**DYKMAN** [1] - 2:6

---

**E**

---

**e-mails** [11] - 23:3;
31:2, 4, 8, 18; 32:3,
6, 9, 23; 33:19; 35:8

**EAF** [3] - 61:19; 64:25;
104:17

**early** [2] - 68:2; 78:15

**earn** [2] - 91:6

**earning** [1] - 123:4

**ease** [1] - 42:22

**easier** [1] - 129:19

**easily** [1] - 131:25

**East** [1] - 79:7

**east** [2] - 74:3; 105:6

**Eastern** [3] - 79:13,

18; 130:19

**eastern** [1] - 57:3

**EASTERN** [1] - 1:1

**easy** [1] - 55:4

**economics** [5] - 90:23;
112:13; 122:22; 123:1

**economy** [1] - 15:10

**editor** [1] - 82:11

**educate** [1] - 104:5

**educating** [1] - 104:3

**education** [2] -
124:12; 125:7

**educational** [1] -
122:13

**effect** [6] - 16:14;
71:6; 91:22; 171:5;
189:21

**effectively** [1] - 63:7

**effects** [3] - 77:1;
88:25; 90:9

**efficient** [2] - 45:11;
52:20

**eight** [2] - 113:19;
136:1

**either** [8] - 15:2;
54:18; 91:24; 96:12;
142:2, 21; 146:13;
165:23

**elderly** [5] - 128:12;
147:3; 148:5; 150:18;
166:7

**elected** [4] - 56:2;
98:14; 113:9, 21

**electrical** [1] - 5:11

**electronic** [1] -
146:15

**element** [2] - 18:16

**elementary** [1] - 100:1

**eligibility** [6] -
158:20; 167:10, 19-20;
168:2, 19

**eligible** [7] - 153:17;
155:3; 156:17; 164:12;
168:10, 19, 23

**eliminate** [1] - 165:8

**elimination** [1] -
93:18

**eminently** [1] - 17:10

**emphasize** [1] - 76:22

**emphasized** [1] -
105:18

**employees** [1] - 7:6

**employment** [3] - 18:5;
124:12; 125:7

**enact** [1] - 113:11

**enacted** [9] - 17:2, 15;

35:21; 69:12; 101:22;
119:10; 178:5

**enacting** [3] - 95:1;
96:15; 110:3

**enactment** [6] - 102:2;
109:7; 115:9, 12;
118:25

**enclave** [2] - 70:4;
71:7

**enclosing** [1] - 47:8

**encompasses** [2] -
56:19; 65:10

**encourage** [1] - 96:23

**encouragement** [1] -
94:19

**end** [6] - 50:17; 80:9;
101:18; 170:12; 176:16

**endeavor** [1] - 119:23

**ended** [1] - 113:6

**endorsed** [1] - 78:23

**energy** [1] - 161:19

**enforced** [1] - 40:15

**engage** [1] - 117:18

**enter** [1] - 191:5

**entered** [1] - 192:19

**Enterprises** [1] -
18:18

**entire** [8] - 15:24;
29:15; 36:2; 56:19;
58:7; 78:24; 98:6;
101:17

**entirely** [15] - 21:10,
21; 22:9, 25; 31:9;
32:4; 39:18; 42:20;
43:18; 44:11; 101:17;
111:20; 115:14; 152:21;
170:24

**entities** [1] - 149:2

**entitled** [3] - 63:3,
24; 64:12

**entity** [2] - 55:15, 20

**entry** [1] - 40:14

**Environmental** [1] -
104:18

**environmental** [9] -
48:1, 15; 61:19; 64:15;
76:23, 25; 88:22, 24

**EPOA** [1] - 79:13

**Equal** [1] - 96:17

**equal** [1] - 175:18

**equalled** [2] - 145:1,
7

**equation** [1] - 191:5

**equity** [7] - 116:20;
124:10; 125:6; 189:23,
25; 190:3, 7

**erased** [1] - 119:6

**especially** [5] - 16:1;
18:7; 150:23; 157:22;
176:21

**ESQ** [13] - 1:19-21, 25;
2:1, 7

**essentially** [4] -
36:23; 37:13; 87:8;
178:24

**establish** [3] - 44:13,
19; 87:15

**established** [1] -
26:13

**estate** [8] - 43:5, 10,
15; 56:6; 72:6, 8;
175:1; 183:22

**Estates** [1] - 79:7

**estimate** [10] - 152:5;
159:23; 164:4; 165:10;
166:13; 170:2; 177:6,
24; 179:21

**estimated** [12] -
121:18; 128:14; 129:6;
153:14; 161:16; 165:13;
166:21; 169:1, 10;
170:25; 180:13, 23

**estimates** [7] -
158:24; 170:11; 171:14,
21, 23; 177:13; 182:2

**estimation** [1] -
179:23

**etcetera** [1] - 125:7

**ethnic** [3] - 19:10;
164:25; 165:22

**ethnicities** [1] -
138:1

**ethnicity** [2] -
137:24; 165:3

**euphemisms** [1] - 99:8

**evaluate** [5] - 16:3;
90:3; 130:24; 193:8, 10

**evaluating** [2] - 88:4;
146:21

**event** [11] - 35:8;
71:5; 74:22; 75:21;
77:7; 79:16; 80:7;
81:5; 94:18; 111:5;
185:4

**events** [4] - 82:11;
88:3; 102:6; 108:9

**evidence** [51] - 6:23;
7:3, 19; 8:13; 15:6, 9,
11; 20:12; 22:14; 23:1;
26:16, 18; 27:4, 6-7;
29:16; 30:4; 34:6;
35:9; 36:9; 37:11;
41:13; 43:11; 45:14;
50:15; 71:1; 72:14;

78:21; 80:1, 5; 82:3,
18; 87:25; 88:2; 91:3,
11; 92:7; 96:12; 110:2;
116:14, 25; 119:5;
130:1, 4, 17, 20;
132:22; 134:18; 154:7;
192:19; 194:16

**Evidence** [3] - 20:24;
29:14; 42:11

**evolutionary** [1] -
109:3

**evolved** [1] - 80:13

**evolving** [1] - 109:7

**exact** [1] - 131:13

**exactly** [4] - 51:1;
78:13; 83:17; 119:2

**EXAMINATION** [4] -
120:19; 183:10; 194:5,
7

**examination** [3] -
145:15; 183:8; 184:24

**Examination** [1] -
179:4

**examine** [1] - 177:19

**examined** [1] - 120:10

**examining** [1] - 124:10

**example** [6] - 17:21;
78:6; 115:19; 138:7;
176:10; 180:4

**except** [1] - 53:23

**exception** [12] - 21:9,
15; 23:25; 24:1, 4, 10;
25:24; 27:18; 28:16;
40:25; 41:7

**excess** [1] - 20:14

**exclude** [5] - 10:24;
20:12; 107:14; 139:13,
19

**excluded** [6] - 14:6;
21:21; 24:20; 25:4;
26:8; 131:8

**excludes** [1] - 93:23

**excluding** [2] - 15:5;
141:25

**exclusionary** [3] -
69:8; 91:19; 96:16

**exclusive** [2] - 154:6;
176:14

**exclusively** [1] -
93:11

**excuse** [5] - 12:3;
13:9; 133:6; 147:9;
187:20

**Executive** [2] - 33:20;
56:5

**executive** [6] - 31:3;
33:21; 56:17; 59:6;

72:5; 84:9

**exemption** [1] - 94:18

**exercised** [1] - 98:12

**exercising** [1] -
103:19

**exhibit** [12] - 42:9;
43:22; 46:6; 50:2;
72:14, 17, 19; 76:8;
77:10; 129:15, 18, 24

**Exhibit** [41] - 46:2, 5,
11, 16, 21; 47:2, 4, 8,
14-15, 17, 19, 24;
48:1, 3, 5, 7, 9, 14,
16, 18, 20, 22; 49:2,
5-7, 9, 13, 15, 17, 20,
22, 24; 50:3; 100:11,
16; 129:16; 152:22;
154:5

**Exhibits** [2] - 50:14;
194:15

**EXHIBITS** [1] - 194:13

**exhibits** [16] - 20:15;
24:19; 42:13; 43:21;
44:5; 45:13, 20-22;
46:3; 50:2, 5, 12, 18;
72:15

**exist** [1] - 44:3

**existed** [1] - 107:21

**existence** [3] - 43:7;
70:1; 84:20

**existing** [18] - 55:17;
56:11; 59:13; 60:3;
61:4; 62:14; 76:11,
16-17; 77:12; 88:18,
21; 90:8; 105:13;
112:4; 176:20, 24;
177:3

**exists** [2] - 76:21;
118:22

**exit** [1] - 107:7

**expect** [1] - 52:8

**expectedly** [1] - 20:13

**expeditious** [1] -
45:11

**experience** [5] -
110:18; 123:4; 151:10;
163:17; 173:9

**experienced** [1] - 5:7

**expert** [43] - 11:3;
15:6; 16:5; 17:10;
19:5, 7, 24; 42:9;
53:11; 92:22; 93:24;
99:6; 106:18-20, 23;
107:3, 7; 110:22, 24;
115:19; 121:10; 126:12;
127:3, 8-9, 12, 16;
129:11; 130:16; 131:21;
133:9; 154:5; 157:16;

182:5, 15; 183:16, 19,
22, 25; 184:3

**expert's** [6] - 15:23,
25; 130:20, 24; 159:23

**expertise** [3] - 17:7;
127:15; 159:25

**experts** [4] - 10:24;
42:12; 53:10; 90:12

**explain** [7] - 23:23;
27:18; 93:15; 138:21;
142:15; 143:4, 6

**explained** [1] - 143:3

**explanation** [3] -
102:1; 185:5

**explore** [1] - 117:1

**express** [2] - 98:14;
103:19

**expressed** [1] - 147:22

**expressing** [1] - 95:22

**extend** [2] - 23:24;
30:17

**extent** [8] - 12:11;
28:10; 30:10; 127:11;
130:3; 133:3, 5; 190:24

**extracted** [1] - 146:13

**extremely** [1] - 15:24

**extrinsic** [1] - 27:7

**F**

**F-I-S-H** [1] - 7:12

**F.2d** [1] - 97:5

**face** [4] - 69:24;
82:21; 88:9; 99:6

**faced** [3] - 82:18;
138:17; 151:9

**faces** [1] - 73:6

**facie** [2] - 91:23; 92:3

**facilities** [5] -
56:25; 77:1; 88:25;
90:9; 151:19

**facsimile** [2] - 38:13;
58:16

**fact** [34] - 15:4, 10;
16:1; 29:1, 23; 33:19;
35:10; 37:22; 44:3, 13,
19; 67:11, 13; 81:21;
89:25; 90:2; 94:12;
104:1, 8; 105:9-12;
106:3; 107:1; 108:5;
114:22; 130:10; 136:14;
140:1; 163:13; 166:12;
172:11

**factor** [3] - 28:25;
87:12; 130:17

**factors** [2] - 88:5;
110:5

**facts** [11] - 6:10, 12;
54:3; 57:24; 66:16;
67:3, 20; 70:16; 95:24;
192:18

**factual** [2] - 23:23;
24:22

**Fair** [7] - 14:20;
91:11, 16; 92:12;
94:18; 96:16; 125:21

**fair** [3] - 102:23;
159:15; 191:9

**FAIRHAVEN** [1] - 66:12

**Fairhaven** [33] -
15:20; 17:13; 66:12,
14; 93:5; 129:8, 10;
169:11, 16; 172:6, 14,
20, 25; 173:12; 176:22;
177:16; 182:4, 12;
184:9, 11, 14, 22;
185:11; 186:6, 18;
187:14; 188:5, 7;
189:18; 190:1, 10, 23

**fairly** [1] - 98:18

**fall** [5] - 23:25;
27:17; 41:6; 168:23;
185:22

**falls** [1] - 40:24

**familiar** [2] - 73:18;
190:22

**families** [2] - 66:8;
116:20

**family** [45] - 59:19,
25; 60:7, 17, 25; 61:8,
14; 62:2, 10, 18, 24;
63:16; 64:4, 9, 21;
67:16; 77:21, 25; 83:2;
94:16; 95:10, 15;
98:23; 99:1; 104:10;
105:5-7; 115:17;
148:18; 151:6; 166:5;
175:16, 19; 187:17, 19;
188:16; 189:2; 190:7,
25; 191:1, 3

**far** [6] - 10:12; 67:21;
90:8; 97:14; 114:17;
168:14

**fashion** [1] - 97:1

**faster** [2] - 99:17, 22

**favor** [1] - 92:9

**fax** [5] - 38:8;
46:21-23; 49:22

**fear** [2] - 82:6; 89:6

**feared** [1] - 96:4

**fears** [2] - 81:24;
90:16

**feasibility** [1] -
117:12

**feasible** [2] - 84:19;

117:7

**February** [8] - 48:8; 54:10; 63:4, 18, 22; 80:21; 97:25; 98:2

**fed** [3] - 13:12; 16:22

**Fed.Supp** [1] - 44:10

**Federal** [8] - 2:12; 13:2; 20:24; 29:13; 42:10; 54:24; 179:3

**federal** [5] - 15:8, 13; 71:22; 148:10; 159:5

**fee** [1] - 89:25

**feet** [2] - 83:23; 84:4

**fell** [2] - 168:5, 7

**felt** [2] - 151:10; 174:3

**few** [8] - 14:13; 66:21; 100:8; 102:6; 120:23; 172:20; 184:9; 190:19

**FFIEC** [1] - 179:4

**FHA** [8] - 12:22, 25; 14:19; 16:12, 17; 18:8; 89:17; 91:18

**fields** [1] - 125:24

**fifty** [1] - 98:4

**Figuel** [1] - 3:17

**FIGUEL** [1] - 3:17

**figure** [1] - 175:12

**filed** [5] - 10:22; 39:16; 43:4; 44:17; 130:21

**files** [2] - 38:18; 146:2

**filing** [1] - 11:2

**filings** [2] - 44:14, 20

**Filippon** [1] - 118:15

**FILIPPON** [1] - 118:15

**final** [8] - 17:16; 64:14; 66:16; 109:14; 130:15; 173:18, 22

**finalized** [2] - 173:2; 192:7

**finally** [5] - 16:21; 76:22; 94:25; 103:8; 114:14

**finance** [1] - 123:13

**Financial** [1] - 179:3

**finder** [2] - 15:4; 130:10

**findings** [1] - 41:5

**fine** [4] - 47:1; 120:22; 134:24; 186:24

**finish** [1] - 188:22

**finished** [1] - 141:3

**firm** [3] - 7:7; 58:14; 75:16

**firmly** [1] - 9:10

**first** [39] - 3:12; 4:20; 10:23; 14:24; 23:10; 35:3; 37:22; 38:4; 45:12; 59:21; 73:6; 76:4, 11; 80:20, 22; 81:9; 83:5, 12; 84:24; 87:10; 94:12; 100:5; 101:19, 21; 119:21; 120:9; 127:18; 130:8; 133:1; 135:15; 146:8; 153:6, 8; 160:12; 164:6; 177:14; 178:15; 191:25

**First** [2] - 98:12; 103:20

**fiscal** [1] - 72:4

**Fish** [7] - 7:7, 12; 38:10; 46:11; 58:1, 15; 75:17, 24; 90:6; 106:10; 107:4; 108:13, 21, 23, 25; 109:13, 19; 111:9; 113:8, 11, 21; 114:6, 11; 118:15

**FISH** [3] - 7:8; 38:11; 58:1

**Fish's** [3] - 109:6; 112:20; 114:10

**fit** [1] - 24:1

**five** [11] - 52:9; 113:3, 6; 126:13; 135:25; 136:15, 19-20; 170:14, 22; 172:1

**fixed** [1] - 65:20

**flavor** [1] - 100:23

**flawed** [1] - 17:19

**FLEMING** [3] - 3:15; 14:12

**Fleming** [2] - 3:15; 14:13

**flow** [1] - 106:12

**flyer** [7] - 36:25; 37:2, 17-18, 22; 38:8, 12

**flyers** [9] - 36:18; 37:8, 21; 38:4, 21, 24; 39:3; 82:11

**fold** [1] - 145:8

**folks** [1] - 119:3

**follow** [3] - 52:11, 13; 88:8

**followed** [1] - 90:7

**following** [7] - 26:8; 27:5; 54:4; 67:14; 77:8; 85:10

**follows** [2] - 30:13; 120:11

**foot** [3] - 84:7; 94:15

**footage** [1] - 173:14

**footnote** [1] - 30:13

**FOR** [2] - 1:7, 23

**force** [1] - 22:19

**form** [9] - 48:2, 15; 61:19; 64:15, 17; 109:13; 112:5; 113:14; 179:23

**forma** [1] - 192:25

**formal** [3] - 5:6; 79:1; 80:18

**formas** [6] - 191:14, 18, 25; 192:7, 10, 20

**formed** [1] - 55:20

**former** [10] - 31:3; 33:21; 38:11; 54:19, 21; 55:12, 14; 56:24; 59:6; 69:1

**forming** [1] - 150:14

**forth** [3] - 40:24; 58:21; 145:12

**fortification** [1] - 85:6

**fortified** [1] - 85:4

**forward** [1] - 69:23

**forwarded** [3] - 111:10; 112:19; 113:2

**four** [31] - 15:18; 16:24; 19:14; 79:5; 92:20; 103:15; 114:15-17, 23; 128:16, 19; 135:25; 149:20; 151:6, 25; 152:1, 3, 10; 158:4, 7, 10; 181:22, 24; 182:16, 18; 185:22, 24; 193:7

**fourth** [1] - 156:3

**fox** [1] - 65:16

**Francine** [2] - 5:20; 54:11

**Frank** [5] - 7:11; 38:10; 75:24; 111:9; 118:15

**Franklin** [4] - 22:4; 74:16; 105:25; 106:1

**Frederick** [1] - 2:23

**FREDERICK** [1] - 2:1

**free** [1] - 31:16

**Friday** [1] - 53:23

**Fridays** [2] - 5:9

**frolic** [1] - 78:19

**front** [2] - 80:24; 154:1

**full** [6] - 78:23; 102:14; 108:3; 120:13;

160:7

**fully** [3] - 92:14; 98:24; 130:23

**function** [2] - 14:4; 19:2

**fund** [1] - 56:11

**fundamental** [1] - 70:11

**funds** [5] - 71:22; 92:21; 150:10

**furthered** [1] - 92:4

**furthermore** [2] - 113:14; 138:10

---

## G

**G-A-J-E-W-S-K-I** [1] - 4:9

**GAJEWSKI** [3] - 2:10; 4:8, 11

**Gajewski** [1] - 4:9

**game** [1] - 46:18

**garage** [3] - 56:24; 57:7; 83:18

**GARDEN** [2] - 1:10

**garden** [1] - 78:4

**Garden** [193] - 2:4, 7; 4:3, 5, 7, 14; 6:3, 8; 7:5, 10, 13, 22, 24; 11:19; 12:18; 16:7; 17:2, 18, 23; 19:10; 20:10; 21:12; 22:16; 29:21; 31:14, 17, 21; 33:10, 13, 17, 25; 34:3, 7, 13, 18-19, 22, 24-25; 35:10, 20; 39:2, 14; 40:12, 14, 18; 41:23; 43:5; 51:16; 54:7; 55:22; 56:1, 14; 57:16; 58:17; 59:5, 21; 60:21; 62:6; 65:8; 67:5, 12, 14; 69:3, 10, 12; 70:2, 5, 19; 71:6, 9, 14-15, 24-25; 72:8, 10; 74:25; 75:2, 7, 23; 76:18, 21; 78:3, 25; 79:5, 20; 81:1; 82:4, 21; 84:19; 88:7; 89:13, 18, 21; 90:11, 22-23; 91:1, 6-7, 9; 92:11; 93:12, 21; 94:7, 11, 25; 95:1, 8, 15-16, 21; 96:7, 14, 22; 97:21; 98:12, 19; 100:23; 101:18; 102:4; 103:13; 105:11; 106:9; 107:12; 109:24; 110:20; 112:10; 113:10; 114:8; 115:11; 118:16; 119:4; 121:14,

19; 128:6, 8; 133:4, 8,
12-13; 134:2, 8; 136:7,
9, 17, 24; 139:6, 8,
11, 17, 20; 141:14;
143:2, 23, 25; 144:22,
25; 145:3, 6; 146:7;
157:1, 8, 10, 13;
163:12, 15; 173:3;
174:16; 175:15, 23;
176:1, 4, 21; 182:6,
17, 19; 183:2; 184:15;
185:14; 186:2; 191:2

**gate** [2] - 14:4; 19:2

**gate-keeping** [2] -
14:4; 19:2

**gender** [1] - 178:12

**general** [4] - 16:4;
39:13; 58:17; 149:1

**general's** [3] - 40:10,
12, 21

**General's** [1] - 41:3

**generally** [27] -
16:18; 24:20; 27:13;
30:20, 22; 122:7-9, 12,
19, 24; 123:3, 16, 18;
124:19; 135:6; 145:21;
146:4, 8; 148:8; 150:7;
159:16; 160:4; 168:24;
169:20, 24; 175:7

**generate** [3] - 60:11;
61:16; 63:1

**generated** [2] - 61:12;
62:22

**genuine** [1] - 108:8

**geographic** [4] - 79:9;
122:10; 146:8; 149:1

**Geographic** [1] -
146:19

**geography** [1] - 125:14

**Gerard** [2] - 58:10;
75:13

**GERARD** [1] - 75:13

**ghettos** [1] - 97:12

**Ghullkie** [1] - 54:22

**given** [9] - 9:21;
29:16; 52:5; 68:1;
130:10; 167:21; 180:9;
190:13, 15

**glad** [1] - 85:2

**glaring** [1] - 116:17

**Gmail** [1] - 31:16

**goal** [4] - 57:10;
97:14; 160:18

**goals** [2] - 58:21;
164:2

**Goord** [1] - 44:9

**GOORD** [1] - 44:10

**governing** [2] - 56:2;
92:15

**Government** [1] -
122:18

**government** [6] - 56:8;
57:17; 83:19; 89:14;
95:1; 125:17

**governmental** [3] -
75:4; 92:4; 98:13

**governments** [1] -
150:9

**Governor's** [1] -
125:21

**governs** [1] - 112:2

**grade** [2] - 99:19;
100:5

**graduate** [2] - 122:25;
126:7

**Graduate** [1] - 125:2

**grant** [1] - 42:1

**granted** [2] - 83:10

**great** [1] - 10:14

**greater** [3] - 19:25;
136:6

**GREGORY** [15] - 1:21;
3:9; 6:21; 8:10, 19;
9:4, 10, 18, 23; 10:1,
4, 8, 14, 17

**Gregory** [2] - 3:10;
6:22

**gross** [1] - 161:23

**ground** [3] - 8:8, 20;
73:24

**ground-level** [1] -
73:24

**grounded** [1] - 9:10

**grounds** [3] - 8:25;
16:15; 20:2

**group** [7] - 13:17;
69:17; 72:3; 79:19;
138:3; 141:25; 192:9

**groups** [2] - 93:23;
103:15

**grown** [1] - 125:8

**growth** [4] - 128:7;
133:13; 141:13, 18

**guarantee** [1] - 89:8

**guarantees** [1] - 81:19

**guarded** [1] - 130:13

**Guerrido** [1] - 54:22

**GUERRIDO** [1] - 54:22

**guest** [1] - 126:6

---

## H

**half** [11] - 52:6; 76:6;
78:4; 83:15; 90:19;

114:24; 115:2; 117:19;
146:5; 156:7

**hand** [7] - 50:18; 98:3;
120:6; 132:15, 17;
140:6; 175:21

**handed** [6] - 36:19, 25;
37:1, 15

**Handed** [1] - 154:13

**hands** [1] - 116:12

**handwritten** [1] -
29:19

**hard** [3] - 96:8; 153:7;
154:1

**harms** [1] - 93:16

**Harvard** [7] - 122:17;
123:7, 24; 124:3, 5;
125:2; 126:7

**head** [8] - 134:8;
143:4, 9-10, 12;
153:14; 157:7; 187:19

**headquarters** [1] -
56:16

**heads** [1] - 104:8

**Health** [2] - 125:2

**health** [1] - 125:7

**hear** [24] - 5:1; 16:2;
32:5; 38:16; 39:6, 9,
22; 46:13; 74:8; 84:8;
85:4; 92:23; 93:14, 24;
99:12; 100:24; 103:13;
107:3; 108:15, 22;
110:16; 112:7; 113:16;
114:14

**heard** [9] - 63:10, 23;
75:24; 96:6; 101:14;
103:8, 14; 112:3; 191:9

**hearing** [20] - 48:8;
49:9; 63:6, 9, 19,
21-22; 65:4; 74:19;
79:1; 80:18, 21-23, 25;
98:10; 100:12, 21;
103:8, 10

**hearings** [9] - 36:20;
63:4; 80:18, 20;
102:15-17; 111:12;
113:17

**hearsay** [40] - 20:23;
21:1, 3, 14-16, 22-23;
23:25; 24:1, 3, 10;
26:8; 27:17, 20; 28:8,
13; 30:11, 16, 21, 23;
31:10; 33:3; 35:8;
37:11; 38:3; 39:15;
40:23, 25; 41:6; 130:1,
12, 14; 131:22; 132:15

**hearts** [1] - 107:13

**heavily** [2] - 17:22;
92:9

**Heights** [8] - 36:2, 6;
40:5; 41:13, 17; 87:20

**Heights'** [1] - 35:2

**held** [6] - 11:25; 59:1, **15**
5; 63:6, 19; 111:12

**hello** [1] - 51:10

**help** [6] - 45:10;
97:15; 119:22; 130:23;
134:18; 154:2

**helped** [1] - 71:17

**helpful** [6] - 16:1;
46:5, 8; 74:1; 120:3;
137:16

**Hempstead** [4] - 2:2;
70:21; 108:19; 109:21

**hereinafter** [2] -
57:1, 18

**high** [7] - 78:6; 80:9;
122:13; 133:19; 175:14;
176:16; 178:24

**high-end** [1] - 80:9

**high-rise** [1] - 78:6

**higher** [13] - 15:5;
138:8, 15; 166:3;
171:10; 175:24; 176:7,
23; 177:3; 182:25

**highlight** [5] -
154:14; 155:10; 156:3;
160:9; 163:25

**highlighted** [3] -
162:24; 168:11, 13

**Hill** [1] - 44:9

**himself** [1] - 114:11

**hire** [1] - 102:10

**hired** [2] - 69:16;
75:21

**hiring** [1] - 75:15

**Hispanic** [6] - 70:23;
137:24; 138:9; 165:3,
7, 11

**Hispanics** [7] -
133:24; 138:5, 12,
18-19; 165:14; 171:3

**historical** [8] -
35:10, 19, 24; 36:6,
12; 41:14, 20; 146:13

**history** [6] - 41:18;
70:3; 108:10; 109:13

**HMDA** [8] - 177:18;
178:2-4; 179:6, 11, 21;
180:21

**HOGAN** [1] - 1:18

**Hogan** [5] - 3:3, 10,
13, 16; 6:22

**hold** [3] - 43:14;
49:11; 98:2

**holdings** [3] - 72:8;

Page 15 of 15 of 34

170:19, 24

**Holdings** [1] - 18:25

**Home** [3] - 123:20;
177:18; 178:4

**home** [15] - 93:10;
116:13; 123:12; 169:23,
25; 170:2, 5; 173:13;
176:1; 177:17, 21;
178:17; 180:4; 182:3

**homeowners** [3] -
19:16; 105:5

**homes** [58] - 59:25;
60:8, 17, 25; 61:9, 14;
62:2, 10, 19, 24; 64:4,
9; 67:16; 69:21; 77:21,
25; 93:7; 94:16; 99:1;
104:10; 105:7; 115:17;
116:17, 20; 121:19;
128:16, 19; 129:2;
169:11, 23; 172:12,
17-18; 173:8; 175:19;
177:16, 19, 24; 180:22;
181:2, 5, 7, 24;
187:18; 188:16; 189:2,
15; 190:3, 7, 25;
191:1, 3

**Honor** [175] - 2:21, 24;
3:15, 20, 24; 4:1, 8,
11-12, 15; 6:1, 4, 11,
13, 21, 25; 8:19; 9:4,
10; 10:4, 8, 17, 20;
12:5, 15; 13:3, 23;
14:7, 12; 16:21; 17:16;
18:11; 20:8; 23:6, 10,
20; 24:3, 18, 20-21;
25:15, 18, 22-23; 26:2;
27:3, 12, 14, 22; 28:2,
6, 9, 15, 18, 24;
30:19, 24; 32:7, 12,
16, 20; 33:3; 34:9, 17,
23; 35:3, 14, 17;
36:15; 37:20; 38:12,
15; 39:4, 10, 25; 40:5,
7, 19; 41:11, 25; 42:4,
6, 18-19; 43:21; 44:2,
4, 23-24; 45:3, 10, 12,
24; 50:16; 52:1, 17;
53:6, 14; 54:14, 16,
20; 66:20; 67:22; 68:6,
9, 12, 18, 25; 70:22,
25; 71:3; 72:12, 20,
25; 73:2, 5; 77:3;
78:18; 79:6, 25; 80:4;
82:3, 23; 83:17; 84:23;
85:2; 87:3, 6; 88:1;
89:2; 92:17; 95:4, 25;
96:11; 97:16, 20; 98:3,
11, 24; 99:11, 15;
100:4; 106:21; 107:9,
18; 108:11; 118:13;

119:13, 16; 127:1, 6,
14; 128:2; 129:13, 24;
130:10, 13, 23; 131:3,
7, 9, 15-16; 132:1, 9;
134:13; 137:13; 141:2;
145:9; 154:4; 159:19;
183:7; 193:12

**HONORABLE** [1] - 1:14

**hoped** [1] - 57:12

**horrendous** [1] -
100:10

**horrific** [1] - 107:20

**host** [1] - 99:3

**Hotel** [1] - 110:21

**Hotmail** [1] - 31:16

**hour** [3] - 126:21;
146:6

**hours** [2] - 126:23, 25

**house** [3] - 92:19;
100:18; 143:11

**household** [22] -
134:4; 142:23; 143:1,
3-4, 6-7, 9, 23; 144:2;
148:7; 154:24; 159:21;
161:19; 162:3, 10;
163:5; 164:25; 165:24;
166:9; 168:8; 183:16

**householder** [1] -
143:10

**households** [136] -
19:21; 71:11; 93:2;
94:21; 121:16-18;
128:10-12, 15, 18, 21,
24; 129:7, 9; 134:4, 8;
136:6; 139:14, 16;
141:25; 142:4, 20;
143:24; 144:4, 22-25;
145:3-6, 8; 147:1-4,
23, 25; 148:2-4, 6, 18;
149:20-22; 150:6,
16-18; 151:12, 14;
152:6; 153:9, 14, 17,
20, 22-23; 155:1, 3, 6,
8, 18, 21-22, 25;
156:2, 10, 13, 16-17,
20-21; 157:4, 7-9, 14,
21, 24; 158:19; 159:1,
16; 160:19; 162:8, 18,
20; 163:7; 164:4, 12,
18-19; 165:2, 23;
166:4-7, 22; 167:11;
168:4, 9, 22; 169:10,
15-16, 18; 170:13,
15-16; 171:2, 9;
172:17; 178:1; 181:4,
8, 11, 23; 182:2, 11,
24; 183:1

**houses** [4] - 12:11;
56:23; 74:11; 108:18

**housing** [166] - 11:23;
16:25; 17:3; 19:12, 22;
22:1, 12, 15, 19, 22;
33:16; 34:1, 25; 55:8;
57:20; 59:18; 68:19,
24; 69:7, 14, 24; 70:1,
10, 13; 71:13, 16, 19,
23; 74:23; 77:6; 78:16;
79:22; 80:8, 11, 15,
23; 81:8, 14, 16,
18-19; 82:2, 5, 7, 15,
20; 83:4; 84:11, 18,
20; 88:11; 89:6-8, 12,
15; 90:16, 21; 91:1,
10; 93:4, 15, 19, 25;
94:1, 4, 6, 8, 10, 17,
20; 95:15; 96:3, 23;
97:25; 98:8, 23; 101:5,
7, 9-12; 102:23; 104:9;
106:7; 107:14; 109:11;
110:18; 112:4; 116:2,
19; 117:2, 5, 17;
118:3, 8; 122:6; 123:2,
10-13, 19, 21; 124:16;
125:6, 23, 25; 126:5;
127:4; 128:13; 134:5;
138:7, 14; 139:15, 25;
140:2, 6; 143:8; 147:4;
149:25; 150:5, 10, 18;
151:8, 11-12, 15-16,
18; 152:7; 157:17;
163:17, 19; 166:11;
167:3, 7; 172:11;
175:4, 15-17; 176:9;
182:22; 183:17; 187:23;
188:2; 189:14, 21-22;
190:23

**Housing** [22] - 13:2;
14:20; 15:19; 29:21;
55:10; 68:22; 87:21;
91:11, 16; 92:12;
94:19; 96:16; 123:7,
24; 124:2, 4; 125:21;
128:17; 147:17; 149:24;
151:23

**HUD** [7] - 148:14;
150:3, 11; 151:16;
159:5, 14

**HUD's** [1] - 150:3

**huge** [1] - 73:24

**human** [1] - 118:18

**hundred** [1] - 98:4

**hundreds** [1] - 104:8

**Hunter** [1] - 54:23

**Huntington** [4] - 97:3;
102:22

**hurt** [1] - 93:18

**hurting** [1] - 94:20

**hypothetical** [2] -

11:22; 13:13

---

**I**

16

**idea** [1] - 18:20

**ideally** [3] - 141:24;
142:19; 179:15

**ideas** [3] - 98:18;
113:22, 25

**identification** [3] -
40:16; 42:22; 129:14

**identified** [3] -
137:17; 146:8; 190:19

**identifies** [1] - 38:23

**identify** [1] - 56:7

**identifying** [3] -
137:24; 146:12; 192:6

**ignore** [4] - 101:12;
113:22, 24; 132:1

**ignored** [2] - 69:15, 17

**illegal** [1] - 89:16

**image** [2] - 74:5, 13

**immediate** [1] - 10:11

**immediately** [2] -
75:15; 99:23

**impact** [38] - 12:22;
13:5, 7-10, 24; 15:22;
16:1, 9, 13, 17; 18:7,
9, 17; 19:25; 76:23;
81:17; 88:22, 24;
89:10, 12; 90:3; 91:15,
17; 92:10; 94:4; 96:14;
102:7; 104:15, 22;
115:3, 7; 116:15;
130:25; 138:20

**impacts** [8] - 76:25;
90:8; 104:14; 108:6;
110:4; 115:9, 24

**import** [1] - 15:14

**importance** [2] -
76:10; 77:12

**important** [8] - 29:1;
54:4; 70:15, 24; 92:7;
111:14; 112:23; 174:4

**importantly** [1] - 28:9

**impression** [1] - 24:13

**improvement** [1] -
178:17

**improving** [1] - 68:16

**inadmissible** [1] -
20:23; 35:8; 42:10

**Inc** [7] - 5:17, 23;
6:5; 55:6, 11, 20

**INC** [2] - 1:3, 7

**incidents** [1] - 43:25

**include** [11] - 25:25;
63:13; 88:18; 139:21;

151:16; 161:15; 167:17; 173:12; 176:20; 179:18

**included** [3] - 58:19; 152:25; 175:16

**includes** [1] - 107:21

**including** [23] - 3:23; 38:10; 56:15; 58:8; 61:24; 68:21; 72:8; 75:10; 77:1; 82:9; 90:7; 104:20; 122:9; 123:19; 124:1, 12; 126:7, 24; 127:4; 146:18; 175:19; 178:11, 13

**income** [59] - 19:11; 66:10; 68:17; 91:4, 6; 96:8; 112:16; 121:16; 123:12; 128:11; 138:7; 147:2; 148:4, 7-8, 16, 19; 149:19, 21; 150:6, 17, 20; 151:6, 17; 153:17; 155:3; 156:17; 157:20; 158:19; 159:16; 162:2, 5-6, 10, 12; 163:21; 167:7, 10, 19-20; 168:2, 5, 9-10, 18-19, 22, 25; 169:3-5; 182:24

**incomes** [16] - 91:8; 150:24; 151:3; 160:19, 21, 23, 25; 161:2, 10; 162:8, 13-14, 21; 167:22; 168:1

**inconsistent** [1] - 145:11

**Incorporated** [4] - 2:5; 6:2, 7; 55:22

**INCORPORATED** [1] - 1:10

**incorporated** [4] - 8:2; 36:3; 55:8; 67:4

**incorporates** [1] - 56:15

**increase** [6] - 145:8; 157:9, 15, 23; 182:19

**increased** [3] - 82:6; 139:3, 8

**increasing** [4] - 133:25; 157:21; 176:5; 183:2

**indeed** [5] - 91:17; 93:17; 113:24; 114:11

**Index** [4] - 161:5, 18; 167:24

**INDEX** [1] - 194:1

**indicate** [1] - 33:1

**indicating** [1] - 88:11

**indicators** [2] -

**individual** [3] - 21:17; 24:12; 43:5

**Individual** [1] - 1:17

**individually** [3] - 26:6; 27:23; 29:2

**individuals** [8] - 38:10, 14, 20; 41:21; 68:17; 93:23; 102:4; 164:18

**inextricably** [1] - 91:4

**infeasible** [4] - 94:2; 116:9, 12

**inferential** [1] - 11:24

**inferior** [1] - 68:21

**inflation** [1] - 161:3

**influx** [1] - 91:5

**inform** [1] - 119:23

**Information** [1] - 146:19

**information** [81] - 8:12; 9:14; 16:23; 23:17; 90:24; 122:10; 135:18; 137:9; 141:10; 143:20; 144:15; 145:22; 146:16; 150:4; 151:20; 158:10, 12, 18, 21, 23; 160:15, 17, 21; 161:11, 15; 162:25; 163:9; 164:24; 165:9, 15, 22, 25; 167:9, 12, 18; 168:3; 169:22, 25; 170:1; 172:3, 5, 8, 10, 13, 18, 21-22; 173:13, 20; 174:4, 6, 9, 13, 15, 17, 20; 175:2, 4; 176:3, 6; 178:11, 14-15, 17, 19, 21, 23; 179:12, 14-15, 19, 25; 180:17, 25; 181:18; 187:2, 18; 190:13, 18; 192:6

**informed** [1] - 186:17

**infrastructure** [1] - 104:20

**inhabit** [2] - 96:3; 118:10

**inhabited** [1] - 118:8

**inherent** [1] - 131:4

**initial** [3] - 114:7; 173:20, 25

**initiative** [1] - 124:10

**innocuous** [1] - 98:18

**input** [2] - 114:3; 158:9

**inputs** [1] - 158:6

**inquire** [2] - 8:13; 52:2

**inquiring** [1] - 7:2

**inquiry** [1] - 87:24

**insofar** [1] - 179:17

**inspections** [1] - 159:14

**instances** [1] - 176:8

**instead** [6] - 32:24; 70:7; 96:6; 142:22; 169:25; 174:14

**Institute** [1] - 126:8

**Institutions** [1] - 179:4

**instructing** [1] - 7:17

**integrated** [5] - 54:8; 69:3, 7; 97:12; 138:10

**integration** [2] - 97:10; 138:16

**integrity** [1] - 109:22

**intend** [3] - 30:18; 42:23; 103:6

**intended** [3] - 12:10; 57:8; 166:10

**intends** [1] - 80:2

**intent** [15] - 8:14; 18:6; 36:5; 87:10, 22; 88:2, 5; 92:8; 96:13; 99:9; 114:18; 115:1

**intentional** [1] - 87:23

**interagency** [1] - 179:5

**interdepartmental** [1] - 33:22

**interest** [3] - 92:5; 95:1; 146:9

**interested** [1] - 79:14

**internet** [1] - 40:1

**interpretation** [1] - 185:21

**interrupt** [1] - 53:4

**intertwined** [1] - 91:4

**intervened** [1] - 55:21

**Intervenor** [1] - 1:8

**intervenor** [2] - 5:23; 6:7

**Intervenor-Plaintiff** [1] - 1:8

**intervenor-plaintiff** [2] - 5:23; 6:7

**introduce** [2] - 78:21; 82:3

**introduced** [3] - 3:24; 81:24; 128:17

**investigation** [6] - 40:11, 13, 21; 41:2, 6

**invocations** [1] - 28:11

**involve** [3] - 39:20; 43:19

**involved** [4] - 32:1; 92:21; 101:17; 118:24

**involves** [2] - 39:19; 69:6

**ironically** [1] - 109:8

**irony** [1] - 95:4

**irrational** [1] - 81:22

**irrefutable** [1] - 93:20

**irrelevant** [13] - 16:19; 21:10, 22; 22:9, 25; 31:9; 32:4; 39:19; 43:12, 19; 94:24; 102:6; 115:14

**Island** [14] - 71:9, 21; 149:11; 161:7, 20; 167:25; 172:22; 175:25; 176:3, 11; 184:20; 186:22; 188:19

**Islip** [2] - 1:6; 2:13

**Ismene** [1] - 84:8

**ISMENE** [1] - 51:13

**ISMI** [1] - 51:12

**issue** [35] - 10:11; 12:12, 19; 13:15; 15:14; 16:22; 18:19; 25:3, 20; 31:7; 32:7; 37:25; 38:3, 6; 52:1; 53:8; 54:9; 56:20; 72:21; 80:23; 81:23; 92:14; 102:3; 104:13; 107:18; 108:8; 110:6; 115:8; 116:18, 22, 25; 117:8; 118:4; 133:1

**issued** [6] - 41:15; 59:7; 61:18; 64:14; 65:15; 76:6

**issues** [24] - 8:6; 16:19; 25:4; 26:4; 35:6; 40:22; 45:6; 50:20; 81:20; 90:4, 18; 95:17, 23; 99:3; 103:21, 23-24; 104:2; 124:12; 138:13; 139:15; 183:16

**items** [2] - 27:6; 42:12

**itself** [2] - 130:1; 131:21

---

**J**

**J-A-C-Q-U-E-M-A-R-T**

[1] - 7:8

**J-A-Q-U-E-M-A-R-T** [1] - 58:2

**Jacquemart** [4] - 7:8; 58:2, 15; 75:17

**JAMES** [1] - 2:7

**James** [2] - 4:2; 97:21

**January** [8] - 49:10; 63:3, 5, 9, 21; 79:18; 80:20; 100:12

**JENNIFER** [1] - 2:8

**Jennifer** [1] - 4:6

**Jerry** [1] - 118:14

**Jersey** [4] - 149:11; 161:7, 19; 167:25

**Jets** [1] - 46:18

**join** [1] - 71:24

**joined** [1] - 71:20

**Joint** [8] - 49:24; 50:14; 100:11, 16; 123:7, 24; 124:3; 194:15

**joint** [46] - 6:9; 45:13, 21-22; 46:2, 5, 11, 21; 47:2, 4, 8, 14-15, 17, 19, 24; 48:1, 3, 5, 7, 9, 14, 16, 18, 20, 22; 49:2, 5-7, 9, 13, 15, 17, 20, 22; 50:2, 4, 12; 72:15, 19; 76:8; 77:9

**Joseph** [1] - 2:25

**JOSEPH** [1] - 1:25

**Judge** [7] - 10:5; 95:21; 97:3, 6; 108:16; 130:19; 132:5

**JUDGE** [1] - 1:15

**judge** [4] - 15:10; 118:19; 121:4; 127:20

**judges** [1] - 127:23

**judgment** [11] - 19:18; 26:5; 32:2, 8, 10-11, 15; 33:4; 96:25; 106:21; 110:9

**judicial** [9] - 15:9; 43:3, 6, 17, 20; 44:3, 6, 12, 16

**July** [8] - 47:18, 22; 60:20, 25; 61:3, 11, 15; 65:15

**jump** [2] - 11:24; 137:20

**June** [7] - 1:11; 47:16; 48:17; 55:21; 58:3; 65:7; 193:22

**jury** [5] - 15:3, 11; 68:7; 130:22; 193:16

**justice** [1] - 69:5

**justification** [1] - 87:17

**K**

**Kaufman** [2] - 97:3, 6

**keep** [3] - 4:23; 77:3; 164:14

**keeping** [4] - 14:4; 19:2; 106:7; 176:14

**Kennedy** [1] - 122:17

**kept** [1] - 31:4

**key** [1] - 72:9

**kids** [1] - 104:6

**KIDS** [1] - 125:11

**kind** [5] - 36:4; 41:20; 78:20; 89:7; 96:9

**kinds** [3] - 8:24; 89:18, 21

**kitchen** [1] - 151:19

**knowledge** [5] - 17:7; 30:4; 126:15, 17; 132:9

**known** [3] - 55:10; 110:19; 147:18

**knows** [4] - 11:1; 84:23; 87:8; 108:21

**L**

**L-U-G-O** [1] - 3:18

**L-U-N-D-Q-U-I-S-T** [2] - 58:11; 75:14

**labor** [1] - 161:5

**laced** [1] - 88:11

**lacking** [1] - 151:19

**laid** [2] - 35:2; 40:25

**land** [9] - 56:13; 72:9; 83:6; 84:14; 88:20; 94:1, 3, 5; 117:22

**landlord** [1] - 159:18

**large** [11] - 6:10; 11:9; 122:10; 123:18; 131:17; 135:8; 139:10; 140:7; 149:9, 12; 182:12

**largely** [2] - 70:13; 176:20

**larger** [7] - 125:8; 140:5; 149:15; 166:4, 10, 12; 171:10

**laser** [1] - 135:1

**last** [19] - 3:7, 13, 17; 4:16, 18; 23:11; 28:18, 25; 65:12; 67:13; 69:2; 105:17; 120:13; 146:5; 169:6,

8; 184:8; 192:4, 8

**lastly** [3] - 18:20; 129:3, 6

**laude** [1] - 122:15

**Law** [10] - 30:1; 63:7, 10-11, 20, 23; 65:1-3, 5

**LAW** [1] - 1:23

**law** [25] - 9:11; 13:8; 14:21; 15:22, 24; 16:4; 30:12; 41:4; 48:17; 79:1; 92:15; 97:2, 11; 102:15; 104:17, 21; 105:1, 10-11; 113:15; 132:11; 183:19; 189:10

**lawfully** [1] - 119:10

**laws** [1] - 14:20

**lawyer** [4] - 5:13; 120:1; 127:19

**lawyers** [1] - 5:7

**LAWYERS'** [1] - 1:23

**lead** [2] - 33:14; 75:25

**leadership** [1] - 56:4

**leading** [6] - 88:4; 109:7; 167:15; 171:16, 18

**learn** [1] - 99:19

**learned** [2] - 127:12; 173:18

**learning** [2] - 23:17

**lease** [1] - 143:15

**leasing** [1] - 66:3

**least** [13] - 21:22; 26:12, 22; 57:12; 80:13; 96:23; 102:5; 108:11; 149:3; 170:18, 21; 171:4; 175:18

**leave** [4] - 28:21; 156:23; 182:8

**leaves** [1] - 119:5

**LeBlanc** [1] - 102:24

**lecturer** [1] - 126:6

**led** [4] - 70:3; 163:18; 177:4

**left** [3] - 52:7; 100:18; 168:16

**legal** [2] - 16:4; 28:3

**legally** [2] - 103:4; 112:12

**legislative** [3] - 7:1, 5, 16

**legislators** [1] - 103:16

**legitimate** [9] - 87:15; 89:14, 16; 92:4; 94:25; 107:25; 110:7, 13; 111:7

**lender** [1] - 178:14

**length** [1] - 73:21

**less** [12] - 24:8, 10; 54:8; 65:20; 92:5; 95:2, 11, 14; 104:9; 133:12; 136:15; 148:19

**lesser** [1] - 15:14

**letter** [6] - 31:17; 47:8, 10, 12; 49:15, 20

**letters** [3] - 33:24; 82:11; 108:12

**level** [16] - 73:24; 117:6, 24; 125:14; 126:7; 133:20, 23-24; 138:11, 16; 148:9-11; 150:20; 151:6

**levels** [2] - 159:15; 163:21

**liable** [2] - 43:14; 103:4

**liberal** [1] - 15:9

**lieu** [1] - 179:21

**life** [1] - 68:16

**lift** [1] - 97:7

**lighted** [1] - 81:18

**lightest** [1] - 136:16

**lights** [2] - 134:21; 137:4

**likely** [64] - 19:12, 15; 26:21; 60:11; 61:16; 63:1; 69:9; 70:13; 80:8; 82:20; 118:8; 121:19; 128:15, 18, 20; 129:1, 7, 9; 149:20; 151:10; 152:6; 153:10, 14, 17, 24; 154:24; 155:3, 18, 22; 156:11, 14, 18, 25; 157:2, 7, 9, 12, 15, 24; 159:1; 163:7; 164:4; 165:12; 166:4, 15; 168:10, 14, 16; 169:10, 15, 18; 175:16, 20; 177:15; 181:24; 182:2, 6, 8, 11, 16, 18

**lily** [1] - 70:4

**limine** [12] - 6:14; 7:15; 10:16, 19, 22; 20:5, 12; 25:5; 29:6; 36:24; 45:2, 4

**limit** [1] - 10:24

**limited** [5] - 4:23; 56:16; 83:9, 20; 193:9

**line** [2] - 145:11; 164:14

**lines** [1] - 176:24

**Lisbett** [1] - 54:22

**list** [20] - 42:9; 43:22; 45:15; 46:15; 50:1; 164:8, 10, 13, 16, 20, 22, 24; 165:2, 16, 19, 21, 23; 166:18; 174:24

**listed** [5] - 7:24; 42:8; 50:2; 119:3; 132:24

**listen** [4] - 68:7; 95:24; 96:1; 106:9

**listening** [1] - 97:17

**Listing** [5] - 174:22-24; 175:8; 176:19

**listing** [1] - 175:3

**litigation** [5] - 44:13, 18-19; 54:9; 126:12

**live** [7] - 54:7; 71:12; 91:1; 92:24; 115:20; 121:23; 166:15

**lived** [1] - 40:17

**lives** [1] - 99:25

**living** [14] - 97:13; 139:11, 14, 16, 20; 140:5; 142:4, 20; 143:8; 148:12, 17; 151:18; 157:14

**LLC** [1] - 20:9

**LLP** [5] - 2:6; 3:3, 11; 4:2; 6:22

**loan** [16] - 170:7; 171:12; 177:23; 178:16, 24; 179:25; 180:1-3, 5, 7, 10, 13, 20

**local** [5] - 48:17; 55:14; 102:15; 113:15; 150:8

**Local** [9] - 63:7, 10-11, 20, 23; 65:1-3, 5

**located** [10] - 43:15; 55:24; 56:13; 57:3, 5; 136:17; 140:3; 149:5; 178:14

**location** [2] - 77:18; 163:12

**logical** [1] - 81:21

**logistical** [2] - 45:6; 50:21

**logs** [4] - 31:4, 8, 10

**long-standing** [1] - 91:12

**look** [24] - 18:21; 26:15; 41:17; 79:8; 88:3; 99:10; 101:1;

103:12, 24; 105:3; 108:11, 23-24; 109:4; 110:14; 115:6; 119:9; 139:13, 16; 141:24; 180:14; 187:10; 186:8

**looked** [4] - 109:2; 134:4; 180:20, 25

**looking** [11] - 104:21; 125:5, 13, 15; 134:3; 135:15; 139:15; 142:7; 146:9; 157:5; 188:5

**looks** [4] - 13:21; 29:24; 102:14; 125:13

**lost** [2] - 114:9, 11

**louder** [1] - 82:8

**loudly** [1] - 120:25

**LOVELLS** [1] - 1:18

**Lovells** [5] - 3:3, 10, 13, 16; 6:22

**low** [21] - 68:17; 121:16; 123:12; 128:11; 136:20; 147:2; 148:4, 7-8; 149:19, 21; 150:16, 20; 151:5; 167:7; 170:12; 175:22

**lower** [9] - 128:6; 134:8; 136:20; 138:11; 145:13; 150:6; 157:20; 173:18; 182:24

**lowering** [1] - 101:6

**lowest** [2] - 78:2; 136:19

**LTV** [9] - 170:7, 12, 14-15, 17; 171:23; 172:1

**LTVs** [1] - 171:12

**LUGO** [1] - 3:17

**Lugo** [1] - 3:17

**Lumber** [1] - 15:15

**lunch** [4] - 53:21; 68:1; 85:1

**Lundquist** [3] - 58:10; 75:13; 118:14

**luxury** [6] - 93:4; 100:15; 110:19; 112:15; 176:10

---

**M**

**mails** [11] - 23:3; 31:2, 4, 8, 18; 32:3, 6, 9, 23; 33:19; 35:8

**main** [1] - 12:19

**maintained** [3] - 174:25; 179:2

**major** [2] - 24:3; 124:7

**majority** [4] - 135:10,

12; 136:8, 13

**majority/minority** [1] - 135:21

**maker** [1] - 32:3

**malice** [1] - 119:11

**man** [1] - 54:6

**MANAGEMENT** [1] - 1:3

**Management** [9] - 5:17, 22; 6:5; 51:12; 55:2, 6; 68:23; 84:9; 149:2

**management** [3] - 92:18; 122:15; 123:15

**mandate** [1] - 105:12

**mandated** [3] - 104:18; 105:1; 178:6

**manifestly** [1] - 96:16

**manner** [2] - 39:17; 40:15

**MANNY** [1] - 55:1

**map** [11] - 13:14; 70:22, 25; 71:3; 72:21; 73:25; 135:3, 15-16, 19, 22

**mapped** [1] - 77:15

**mapping** [1] - 146:19

**March** [2] - 58:25; 59:4

**Marcuse** [4] - 11:3; 14:15, 17; 106:18

**mark** [2] - 119:6; 127:20

**marked** [2] - 42:22; 129:13

**market** [33] - 66:8, 10; 124:17; 140:2; 153:1, 9-10, 13, 15, 21; 154:19, 23; 155:7, 14, 19; 156:7, 10-12; 157:6, 11; 158:12; 159:6; 160:3-6, 10, 13, 15; 163:19; 188:1; 189:14

**markets** [2] - 123:14; 163:18

**Massachusetts** [4] - 121:24; 125:21; 126:8

**master** [1] - 108:17

**master's** [2] - 122:16; 123:4

**match** [1] - 81:18

**material** [1] - 42:9

**materials** [1] - 27:9

**matter** [17] - 9:25; 13:7; 23:1; 25:13; 28:1, 14; 32:23; 33:6; 35:25; 37:12; 38:2; 43:8, 11; 44:4; 113:16; 131:1; 150:21

**matters** [2] - 43:18; 44:18

**maximize** [5] - 56:10; 57:10; 76:15; 88:21

**maximum** [3] - 70:10; 74:24; 83:24

**mayor** [2] - 75:7; 78:22

**MC** [1] - 120:16

**McArdle** [67] - 11:6, 16-17, 20; 12:9, 12, 22, 24; 13:4; 14:6; 16:8, 15, 22-23; 17:19; 18:15; 19:8; 20:1, 6; 53:11; 92:22; 93:3, 14; 103:6; 120:4, 16, 21; 121:9; 122:12; 125:18; 126:11, 18; 127:2, 7; 128:3; 131:4; 132:24; 134:10; 135:1, 16; 136:22; 137:1, 14; 143:15; 144:10; 145:18; 147:20; 151:24; 152:14; 154:5, 16; 155:12; 156:5; 157:16; 158:3; 160:12; 168:18; 169:6; 177:11; 181:13; 182:15; 183:4, 12, 14; 184:8, 23

**McArdle's** [2] - 17:17; 145:12

**McCray** [3] - 5:20; 54:11, 14

**McLaughlin** [3] - 2:8; 4:7; 51:17

**MCLAUGHLIN** [5] - 4:6; 50:11; 51:18; 52:17; 53:3

**Meade** [1] - 18:24

**mean** [7] - 83:15; 129:22; 168:19; 182:25; 184:13; 186:13; 189:22

**meaning** [1] - 8:12

**means** [4] - 51:3; 105:2; 129:21; 138:22

**meant** [2] - 18:2; 83:24

**mechanical** [1] - 2:16

**media** [1] - 23:16

**median** [10] - 66:10; 138:7; 148:16, 19; 168:25; 169:3-5; 176:4; 177:2

**meeting** [11] - 47:15, 24; 58:25; 59:5; 63:12; 79:17; 81:15; 82:9; 98:1, 3

**Meeting** [1] - 63:25

**meetings** [5] - 79:11; 82:9, 11; 103:18;

109:17

**Mellon** [1] - 122:16
**member** [1] - 51:21
**members** [18] - 40:3; 51:22; 68:18; 75:11; 90:1; 102:12; 112:25; 113:3, 7, 19, 23; 114:3, 15-17, 23; 193:16
**membership** [1] - 68:16
**memo** [9] - 47:2, 14; 48:18, 20; 49:2, 5
**memorandum** [4] - 44:9; 58:22; 59:7, 12
**memorized** [1] - 131:5
**memos** [2] - 33:22; 108:12
**mentioned** [13] - 80:16, 19; 92:17; 98:9; 113:15; 136:5; 139:14; 141:23; 142:19; 150:22; 160:23; 175:25; 179:24
**mentions** [1] - 81:7
**merely** [1] - 42:22
**merits** [1] - 24:23
**messages** [5] - 33:20; 34:12, 21; 40:1; 72:2
**met** [7] - 76:2; 89:5; 91:24; 95:7
**methodology** [2] - 11:15; 158:24
**methods** [1] - 122:23
**metropolitan** [14] - 124:8, 10-11; 125:5, 13; 148:16, 20, 22-23, 25; 149:1, 7-8; 151:6
**Metropolitan** [4] - 87:21; 149:10, 13, 15
**MHANY** [11] - 1:3; 5:17, 22; 6:5; 51:11; 54:25; 55:6; 68:23; 84:9; 92:17; 117:14
**microphones** [1] - 4:23
**middle** [4] - 53:4; 112:16; 164:1; 166:24
**might** [3] - 26:4; 73:25; 84:21
**Miguel** [4] - 143:14; 156:3; 160:9; 163:25
**Mike** [6] - 19:14; 59:13, 17; 112:1; 118:14; 129:4
**miles** [2] - 54:9; 67:12
**Miller** [1] - 118:14
**million** [7] - 57:13; 65:21; 84:14; 172:25; 173:17, 19, 23

**mind** [4] - 77:4; 108:24; 109:2; 114:12
**minimum** [1] - 94:15
**minorities** [26] - 19:20; 40:15; 70:14; 71:10; 89:15; 93:16; 96:3; 115:20; 118:4, 9-10; 138:19; 141:13, 18; 143:24; 144:4; 151:9-11; 157:23; 165:12; 166:15; 170:20, 23
**minority** [145] - 19:25; 69:9; 70:5, 20; 71:7, 11-12; 82:20; 91:25; 93:1; 94:20; 121:15, 18; 128:5, 7, 9, 14, 18, 21, 23; 129:6, 9; 133:3, 5-6, 11, 13; 134:8, 10, 12; 135:6, 9, 11-12, 14; 136:5, 8, 13-15, 18, 20; 137:11, 15, 17, 21, 23; 138:3, 15, 20, 22-23; 139:1, 5, 7, 17; 143:4, 9, 13; 144:22, 25; 145:4, 6, 8; 147:1, 23; 148:2, 5-6; 149:20, 22; 150:15; 151:12; 152:5; 153:11, 14, 18-20, 22, 25; 154:25; 155:1, 4-5, 8, 19, 21, 23-24; 156:1, 12-13, 15-16, 18, 20-21; 157:4, 7, 13, 18, 21, 24; 158:25; 160:18; 162:16, 20; 163:3, 5, 7; 164:4, 22; 165:19; 166:3, 5, 13, 18, 22; 168:6, 9, 14, 17; 169:10, 15, 18; 170:15; 172:16; 177:25; 181:2, 8, 10, 23; 182:2, 24; 183:1
**minute** [6] - 47:20; 48:11; 53:16; 137:1; 140:8; 147:9
**minutes** [5] - 47:16; 53:17; 109:18; 184:9; 193:13
**mischaracterizing** [1] - 98:17
**misquoted** [2] - 21:17
**misrepresented** [1] - 41:23
**missing** [4] - 29:18; 174:1, 6, 11
**mix** [2] - 138:14; 188:1
**mixed** [1] - 170:17

**mixes** [1] - 117:2
**mobility** [1] - 163:18
**model** [1] - 112:13
**moderate** [1] - 133:24
**modifications** [2] - 88:19; 112:21
**modify** [3] - 101:21; 102:18; 114:10
**modulated** [1] - 99:25
**mold** [1] - 102:18
**moment** [8] - 5:6; 32:12; 115:4; 141:5; 143:15; 144:10; 147:6; 152:16
**Mondale** [1] - 97:11
**money** [1] - 72:6
**month** [1] - 78:24
**monthly** [3] - 162:4, 8
**months** [1] - 82:12
**moot** [1] - 14:16
**moreover** [6] - 31:9; 36:11; 41:19; 83:22; 84:3
**morning** [18] - 2:24; 3:9, 12; 4:1, 4, 6, 8, 12, 15; 6:21; 10:20; 14:12; 20:8; 23:8; 51:18; 52:5; 108:3; 193:20
**mortgage** [16] - 169:25; 170:2, 10; 171:9; 177:22; 178:10, 13, 15-16, 20-21; 179:12; 180:5, 13, 15, 19
**Mortgage** [3] - 123:20; 177:18; 178:4
**mortgages** [3] - 177:17, 19; 178:7
**most** [17] - 14:7; 20:16, 19; 28:11; 31:5; 45:11; 50:21; 52:18; 69:6; 70:18; 82:20; 94:23; 134:5; 139:15; 146:9, 16; 150:8
**mostly** [1] - 184:24
**motion** [17] - 6:23; 7:15; 10:24; 11:2, 5-6, 8; 14:16, 25; 20:5, 7, 11; 25:5; 32:15; 36:24; 37:4; 110:9
**motions** [8] - 6:14; 10:15, 18, 22; 29:5; 45:2; 52:6
**motivated** [1] - 87:14
**motivating** [1] - 87:11
**move** [8] - 42:23;

45:13; 102:18; 105:24; 146:22; 159:19; 163:24; 166:25
**moved** [8] - 24:19; 79:1; 100:17; 130:8; 133:21; 159:9; 163:15
**moving** [2] - 119:23; 130:3
**MR** [177] - 2:19, 21, 23, 25; 3:2, 12, 15, 17, 20, 22; 4:1, 4, 8, 11; 5:19, 21, 25; 6:4, 11, 13, 15, 18; 10:5, 20; 12:5, 7; 13:1, 3; 14:12; 18:13; 23:8, 14; 24:3, 12, 18; 25:2, 14, 18, 22; 26:24; 27:3, 12, 22; 28:6, 18, 24; 32:7, 12, 16, 18, 20; 33:2, 14; 34:9, 12, 17, 21; 35:13; 37:20; 38:25; 39:7, 10, 25; 42:17; 43:21; 44:24; 45:3, 9, 18, 21, 23; 50:16; 51:4, 9, 11; 52:1, 15; 53:6, 14, 18, 24; 54:14, 16-17, 20; 55:1, 4; 66:20, 24; 67:21; 68:1, 6, 9, 12; 70:25; 71:3; 72:12-14, 18, 25; 73:2, 5, 8, 12, 15, 19; 75:20; 79:25; 80:4; 81:4; 83:17, 19; 85:2, 6; 87:3; 97:20; 99:15, 18; 100:4, 7; 107:9, 18; 119:16, 21; 120:20; 127:1, 6; 128:2; 129:10, 13, 16, 18, 23, 25; 130:6, 8; 131:14, 25; 132:9, 20; 134:13, 17, 20, 23; 135:1, 5; 136:25; 137:13, 19; 141:2; 143:14; 144:6; 145:9, 17; 152:4, 12; 154:4, 10, 14; 155:10; 156:3, 23; 159:19; 160:9; 163:25; 167:15; 171:16; 181:12; 183:4, 11; 184:4; 193:12, 17; 194:6, 8
**MS** [78] - 3:4, 7, 9; 4:6, 12, 15, 19; 6:21; 8:10, 19; 9:4, 10, 18, 23; 10:1, 4, 8, 14, 17; 20:8, 20, 22; 21:2, 4, 7; 22:3, 7; 23:6; 29:7, 10, 13; 30:7, 9, 19, 24; 31:1, 13, 19, 22; 35:17; 36:15, 17; 37:5,

7, 10; 39:12; 41:11; 42:4, 6, 8; 43:2; 44:23; 45:1, 24; 46:8, 11, 14, 19, 23, 25; 47:2, 6, 11, 22, 24; 48:12, 14, 25; 49:13, 19; 50:8, 11; 51:18; 52:17; 53:3; 67:2, 8, 10

**multi** [1] - 115:22

**multi-rental** [1] - 115:22

**multifamilies** [3] - 110:15; 112:3; 190:4

**multifamily** [47] - 59:18; 63:16; 64:22; 69:21; 74:23; 77:5; 78:2, 10, 17; 81:16; 82:12, 14; 83:3, 9, 24; 84:12; 88:15; 89:4, 10, 22; 90:4, 19; 95:5, 13, 18; 104:9; 106:3, 7, 12; 110:18; 112:2, 4, 9, 11; 115:14, 18; 116:16, 20; 187:8; 189:3, 15; 190:7; 191:11

**Multiple** [5] - 174:21, 23-24; 175:7; 176:19

**multiplied** [1] - 162:9

**multiplying** [1] - 145:3

**municipal** [7] - 55:23; 97:9; 102:10; 105:19; 106:18, 23

**municipalities** [4] - 71:18, 22; 135:9; 136:16

**municipality** [3] - 43:14; 75:2; 103:1

**municipality's** [1] - 96:10

**must** [6] - 15:25; 87:17; 92:4; 96:22; 105:13; 159:14

**muster** [1] - 30:1

**Mutual** [1] - 68:22

---

**N**

---

**N.W** [1] - 1:24

**NAACP** [1] - 97:4

**name** [18] - 2:19; 3:6, 9, 12-13, 17; 4:16, 18; 5:3; 6:21; 29:21; 75:24; 120:13-15; 121:8; 143:11

**names** [3] - 5:4; 46:14,

20

**Nancy** [7] - 11:6; 19:7; 20:6; 92:22; 120:4, 15; 121:9

**Nas** [1] - 31:25

**Nassau** [99] - 5:24; 11:18; 17:22; 19:11; 31:4; 32:1; 33:8, 23; 34:13, 22; 35:21; 54:13; 55:25; 56:3, 5, 16-17, 23; 57:10; 65:13; 66:9; 68:20; 70:18; 71:10, 17-18; 72:5, 7; 74:15; 75:2; 82:1; 84:14; 91:4; 93:5, 10; 107:22; 112:11; 121:14, 17; 128:7, 9, 13; 133:4, 8, 12, 14, 17, 19; 134:9, 11; 135:7, 9, 15; 136:3, 7, 23; 137:12; 138:2, 6; 139:1, 4; 141:19; 143:1; 144:2, 5, 7; 145:1, 4, 7; 146:6; 147:4, 23; 148:1, 23; 149:14, 19; 151:9; 160:22; 162:13; 163:9, 13, 16, 19, 22; 164:16; 166:3; 169:24; 177:20, 25; 179:16; 182:20, 24; 184:18; 185:12, 25; 186:19

**Nassau/Suffolk** [2] - 151:7; 168:25

**Natalie** [1] - 54:21

**nation** [1] - 125:14

**Nation's** [1] - 124:2

**National** [1] - 177:1

**nationwide** [1] - 55:14

**nature** [3] - 5:10; 38:22; 110:17

**near** [1] - 112:9

**nearby** [1] - 70:21

**nearness** [1] - 68:1

**necessarily** [1] - 13:24

**necessary** [5] - 104:2, 5; 127:13; 137:15; 162:5

**necessity** [1] - 17:4

**need** [9] - 10:10; 68:19; 71:19; 91:20; 102:16; 121:21; 150:6; 162:3, 9

**needed** [7] - 18:7; 56:7; 72:6; 169:22; 170:1; 177:12

**needs** [1] - 162:10

**nefarious** [3] - 36:8; 41:20

**negative** [1] - 90:8

**Negri** [3] - 58:10; 75:13; 118:14

**NEGRI** [2] - 58:10; 75:13

**Neighbor** [1] - 126:2

**neighbor** [1] - 124:18

**neighborhood** [16] - 76:12; 88:23; 89:11, 14; 100:14; 104:23; 105:3, 5, 14, 19; 108:7; 110:4; 124:17; 125:14

**neighborhoods** [6] - 76:24; 88:19, 21; 90:8; 108:1; 125:7

**neighbors** [1] - 69:4

**nerves** [1] - 99:18

**net** [3] - 60:11; 61:17; 63:2

**neutral** [7] - 91:21; 99:6, 8; 115:8, 15; 116:21; 118:4

**never** [19] - 17:5; 22:13, 17; 41:23; 66:15; 69:12; 71:14; 82:22; 95:2; 101:19; 111:17, 25; 114:16; 127:20; 184:14

**nevertheless** [1] - 34:23

**NEW** [2] - 1:1, 7

**new** [24] - 61:13; 62:23; 63:12, 15; 65:7; 69:12; 79:20; 82:21, 25; 94:10; 98:18; 102:15; 111:20, 23, 25; 113:15, 25; 114:1; 152:7; 176:18, 22; 177:2, 19

**New** [35] - 1:6, 19, 24; 2:13; 5:22; 6:6; 15:19; 41:2; 51:5; 54:7; 55:8, 10, 12-13, 19, 23-24; 56:3; 68:14, 17; 104:18; 105:10, 17, 21; 124:18; 128:17; 130:20; 149:11, 15; 161:6, 19; 167:24

**news** [3] - 172:23; 175:25; 188:19

**News** [2] - 184:20; 186:22

**Newsday** [2] - 29:22; 176:3

**newspaper** [22] -

**nefarious** ...

**nefarious**

20:15; 23:11, 21; 24:2, 4, 25; 25:2, 8, 10; 27:9, 13; 28:10; 29:15; 30:16, 20; 37:23; 38:2, 5, 23; 173:19; 184:19

**newspapers** [6] - 23:5, 14; 26:25; 27:8; 29:14, 17

**next** [21] - 20:7; 31:1; 42:7; 52:1; 57:24; 63:3, 24; 64:12; 65:2, 12; 76:6; 91:14; 120:2; 124:4; 146:22; 151:24; 161:12; 164:14, 21; 166:19; 180:17

**nine** [3] - 100:14; 117:19; 136:1

**nobody** [1] - 38:23

**non** [13] - 84:22; 87:15; 110:11; 128:12; 130:14; 138:9; 148:5; 149:22; 150:18; 151:11, 13; 170:16, 23

**non-discriminatory** [2] - 87:15; 110:11

**non-elderly** [3] - 128:12; 148:5; 150:18

**non-hearsay** [1] - 130:14

**non-Hispanic** [1] - 138:9

**non-minorities** [2] - 151:11; 170:23

**non-minority** [3] - 149:22; 151:13; 170:16

**non-RT-conforming** [1] - 84:22

**nonconforming** [1] - 84:21

**none** [4] - 103:1-3; 172:20

**nonetheless** [1] - 101:25

**nonhearsay** [5] - 23:15; 27:16, 25; 28:12

**nonlegislative** [1] - 7:6

**nonminorities** [1] - 40:17

**nonprivileged** [2] - 7:18; 8:12

**nonprofit** [3] - 51:12; 55:20; 68:15

**nonpublic** [2] - 7:2; 8:13

**noon** [1] - 65:23

**north** [3] - 73:24;

74:2; 77:15

**Northeastern** [1] - 126:9

**northern** [4] - 149:11; 161:6, 19; 167:25

**not-for-profit** [3] - 55:7, 14; 68:24

**notations** [1] - 29:19

**note** [2] - 35:18; 68:25

**noted** [7] - 14:15; 32:1; 41:19; 78:1; 116:24; 149:6; 173:2

**notes** [2] - 48:22, 25

**NOTES** [1] - 48:25

**nothing** [5] - 29:23; 31:22; 38:1; 45:1; 104:4

**notice** [9] - 43:3, 7, 17, 20; 44:3, 6, 12, 16; 48:16

**November** [16] - 47:3; 48:6, 20; 49:7; 58:23; 62:5, 10, 13, 21, 25; 76:5; 78:21; 111:8; 112:25; 113:20; 131:12

**number** [73] - 3:22; 6:10; 7:24; 15:7; 20:1; 21:8, 24; 23:2; 30:14; 31:2; 42:9; 43:3; 45:13; 50:2; 61:12; 62:22; 70:4; 76:15; 110:14; 119:22; 119:18, 24; 136:12; 138:13, 23; 144:21, 25; 145:2, 7, 10, 13; 152:9; 153:22; 157:21, 24; 158:13, 15, 18; 163:6; 164:12; 165:11; 166:15, 20, 22; 167:18; 168:4-8, 15; 169:1; 172:10; 175:13, 21, 24-25; 176:8; 181:2, 23; 182:2, 11, 25; 187:18; 189:19; 190:10; 191:14

**numbers** [9] - 46:6, 9; 129:17; 141:21; 142:8, 11, 14, 16; 154:8

**numerous** [3] - 56:15; 78:11; 81:16

**NY** [3] - 1:19; 2:2, 7

**NYACH** [10] - 166:10; 167:4, 13; 181:25; 182:16, 18; 185:22, 24; 186:4; 191:11

**NYAHC** [11] - 15:20; 16:24; 65:24; 66:3; 128:16, 19; 129:2; 151:25; 152:2, 4, 8

**NYAHC's** [1] - 65:12

**NYCC** [2] - 68:15; 117:14

**NYU** [2] - 108:14; 109:19

---

**O**

**o'clock** [1] - 193:21

**object** [10] - 8:24; 10:1, 10; 107:9, 15; 127:7, 11; 129:25; 130:4; 145:9

**objected** [1] - 109:8

**objecting** [1] - 37:8

**objection** [16] - 24:23; 29:3; 50:10; 70:25; 72:12; 79:25; 127:21, 25; 131:16; 132:12; 137:13; 159:19; 167:15; 184:5

**objections** [3] - 5:8; 20:2; 81:16

**obligated** [1] - 113:23

**obligation** [1] - 70:9

**oboe** [1] - 59:9

**obscure** [1] - 138:17

**obstacles** [1] - 69:7

**obtain** [1] - 142:2

**obtained** [2] - 161:15; 164:8

**obtaining** [1] - 164:20

**obtrusive** [3] - 110:23, 25; 111:6

**obviously** [4] - 52:5; 54:17; 130:2

**occupants** [1] - 82:20

**occupation** [1] - 121:25

**occupied** [3] - 69:9; 70:13; 89:15

**occupy** [3] - 153:14; 155:23; 156:14

**occurred** [2] - 102:7; 103:5

**October** [4] - 48:4; 49:20; 61:22; 62:2

**OF** [4] - 1:1, 10-11, 14

**offer** [9] - 6:24; 13:8, 19; 14:10; 17:21; 19:9; 25:7; 27:15; 185:5

**offered** [19] - 20:12; 23:15; 25:3; 26:22; 27:16, 25; 28:11-13; 33:5; 35:4; 37:12; 38:2; 42:14; 116:25; 129:25; 134:17; 183:14

**offering** [3] - 14:6; 110:10; 127:16

**offers** [1] - 90:11

**office** [3] - 33:21; 40:10; 63:14

**Office** [2] - 41:3; 149:2

**official** [3] - 34:19; 36:7; 39:21

**officials** [2] - 98:15; 113:10

**Old** [2] - 73:7; 77:15

**old** [6] - 21:6, 8; 24:9; 26:12, 22; 30:22

**older** [4] - 24:5, 8; 25:25; 176:21

**omissions** [1] - 116:18

**once** [19] - 27:22; 87:13; 92:3; 98:9; 100:3; 112:18; 113:19; 114:6; 116:17; 117:12, 15, 17, 19; 154:18; 166:18; 167:20; 168:12; 180:17; 191:22

**one** [75] - 5:13; 7:22; 10:6, 8; 12:12, 21; 16:10, 14, 22; 22:21; 23:4; 25:3; 28:18, 21, 24; 29:2, 20; 32:12; 36:25; 37:2, 13, 22; 38:22; 47:20; 48:11; 52:2; 53:8; 56:12; 69:6; 70:18; 74:6, 20; 78:11; 82:23; 87:10; 88:5; 100:9; 101:1, 4; 111:9, 22; 117:3; 120:24; 129:10; 130:16; 132:15; 135:25; 136:17; 139:23; 143:9, 11; 146:2; 147:9; 149:12, 14; 155:10; 156:3; 159:7; 160:5; 163:12; 170:18, 21; 171:1, 3; 175:14, 22; 178:5; 179:5; 182:1; 193:4, 7

**one's** [1] - 119:6

**ones** [7] - 21:5; 24:4, 8, 10; 185:20; 192:7; 193:9

**open** [1] - 68:12

**opening** [3] - 66:19; 67:24; 97:17

**operate** [1] - 56:7

**operating** [1] - 7:18

**operational** [1] - 107:23

**operations** [1] - 56:11

**opine** [3] - 133:2;

146:23; 169:7

**opining** [1] - 11:21

**opinion** [15] - 13:8, 24; 16:5; 17:22; 35:7; 130:2; 133:9; 137:14; 146:24; 157:16, 20; 182:5, 8, 15, 18

**opinions** [11] - 12:14; 13:25; 19:10; 98:14; 103:19; 121:10, 13, 21; 132:13, 25; 183:14

**opponent** [2] - 32:5; 39:23

**opportunities** [1] - 116:19

**opportunity** [6] - 9:21; 23:22; 25:16; 27:15; 125:6; 132:10

**oppose** [1] - 20:1

**opposed** [4] - 33:25; 93:4; 99:13; 100:7

**opposition** [7] - 17:18; 32:25; 36:24; 82:8, 19; 88:10

**ops** [2] - 67:18; 112:5

**options** [3] - 58:6; 78:11

**oranges** [1] - 115:16

**order** [16] - 6:9, 16, 19; 10:11; 27:7; 46:2; 50:4; 56:10; 146:20; 150:9; 161:3; 165:8; 167:22; 169:22; 172:16; 174:6

**ordering** [1] - 8:11

**ordinance** [2] - 96:15

**ORG** [1] - 125:1

**organization** [3] - 51:7; 68:16; 71:20

**Organizations** [2] - 55:13, 16

**organized** [2] - 55:16, 23

**original** [2] - 19:23; 191:22

**originally** [1] - 173:11

**originated** [2] - 178:20

**Oscar** [1] - 111:21

**otherwise** [4] - 9:8, 17, 24; 92:15

**ought** [1] - 54:3

**outcry** [1] - 69:25

**outlining** [1] - 58:17

**outside** [9] - 7:6, 13; 14:10; 22:4; 103:5;

**22**

159:22, 24-25; 189:5

**outwardly** [1] - 91:20

**overall** [3] - 157:13; 177:25; 182:20

**overcome** [1] - 9:17

**overestimate** [1] - 175:20

**overlap** [3] - 165:6, 8, 13

**overnight** [1] - 132:11

**override** [1] - 30:14

**overruled** [5] - 107:17; 145:16; 160:2; 167:16; 184:6

**overruling** [1] - 127:25

**overview** [1] - 59:3

**overwhelming** [2] - 76:24; 88:23

**OWEN** [1] - 2:12

**own** [9] - 38:18; 69:19; 83:8; 89:25; 95:16; 110:22, 24; 114:1, 11

**owned** [4] - 56:10; 57:6; 72:6; 143:12

**owner** [2] - 19:21; 160:5

**Owners** [1] - 79:13

**owners** [2] - 79:5; 82:10

**owners'** [1] - 59:2

**ownership** [2] - 112:14; 123:12

**P**

**p.m** [1] - 53:21

**page** [9] - 29:18; 32:13, 21; 38:8, 13; 85:10; 131:1, 5, 17

**pages** [2] - 32:16, 18

**paid** [1] - 159:17

**paint** [2] - 90:22; 118:24

**Panel** [1] - 125:22

**paper** [2] - 109:5; 146:14

**papers** [3] - 15:2; 102:22; 123:25

**parameter** [1] - 159:22

**parameters** [12] - 13:12; 17:6; 58:21; 152:24; 154:16; 155:12; 156:5; 158:6, 8; 189:10; 191:18, 20

**parcel** [2] - 56:13, 19

**pardon** [5] - 6:17;

29:9; 32:17; 46:7; 50:7

**park** [5] - 39:13, 16, 19-20; 108:4

**park's** [1] - 40:14

**parking** [10] - 56:23, 25; 57:4, 7; 73:10, 13, 25; 74:17; 108:2, 5

**parks** [1] - 40:12

**part** [16] - 4:21; 23:17; 28:11; 33:17; 35:18, 23; 36:11; 38:19; 76:8; 77:9; 140:2; 150:25; 151:3; 164:2; 192:18

**participate** [1] - 98:13

**participated** [1] - 101:15

**particular** [21] - 6:16, 19; 23:21; 24:24; 25:11; 30:16; 34:12, 21; 37:18; 44:5; 52:10; 76:10; 139:24; 142:1; 145:23; 148:13, 20; 159:12; 162:3; 173:15

**particularly** [10] - 7:11; 8:2; 74:7; 76:12, 25; 79:14; 88:20, 24; 123:11; 125:15

**parties** [16] - 7:17; 8:11; 14:18; 27:21; 43:19; 45:12; 46:3; 50:8, 22, 25; 53:9; 54:5; 66:22; 67:22; 68:14

**parties'** [2] - 46:3; 50:4

**partly** [1] - 87:14

**party** [4] - 7:6; 9:11; 131:19

**pass** [3] - 22:5; 30:1; 159:14

**passage** [1] - 12:20

**passages** [1] - 24:14

**passed** [7] - 12:19; 54:10; 69:2; 73:19; 91:18; 192:15, 23

**past** [3] - 20:17; 72:1; 96:6

**pasted** [1] - 29:24

**Patrick** [1] - 107:4

**pattern** [2] - 94:9; 133:17

**patterns** [4] - 92:1; 97:13; 124:13; 149:7

**pause** [3] - 119:19; 147:10; 177:9

**Pause** [1] - 28:23

**pay** [2] - 159:16; 160:7

**paying** [3] - 151:17; 162:6, 21

**payment** [14] - 170:4, 6, 14, 16, 22-23; 171:11, 24-25; 172:1; 180:1, 9, 11

**pending** [2] - 45:4; 82:7

**Peninsula** [1] - 2:1

**people** [36] - 3:23; 22:20; 28:21; 33:25; 34:13; 46:15; 67:5, 10; 80:13; 83:11; 89:7; 91:5, 13; 96:4, 7-8; 99:16, 25; 118:24; 137:25; 139:13, 16; 143:7, 11; 148:8; 149:4; 151:2; 157:14; 165:6; 169:23; 178:10; 180:21; 181:1, 7

**people's** [1] - 46:19

**per** [8] - 14:17; 22:22; 60:5; 61:6; 62:16; 77:19; 97:5; 126:21

**percent** [100] - 66:9; 70:19; 82:1; 92:25; 93:1; 112:6, 9; 134:12; 135:6, 13; 136:15, 19-20; 138:24; 139:3, 8-10, 18; 141:15, 20; 143:24; 144:4, 9, 23; 145:2, 5; 148:1, 3-5, 19; 151:12, 17; 153:1, 9, 16, 19, 23; 154:19, 23; 155:2, 9, 14-15, 18, 22; 156:2, 7-8, 10, 14, 17, 22; 157:5, 9, 11, 15; 159:16; 162:6, 21; 163:4, 15; 165:18; 166:8, 13, 18, 20; 168:24; 169:2-4; 170:14-16, 22-23; 171:23-25; 172:1; 177:3; 180:6

**percentage** [6] - 70:23; 71:10; 139:2; 142:12; 144:7; 163:4

**perform** [6] - 14:3; 18:25; 158:11; 167:13; 172:15

**performed** [7] - 16:8; 123:10; 124:14; 144:19; 146:4; 158:2; 160:13

**performing** [9] - 124:6; 137:22; 145:19; 158:21; 164:7, 21; 166:1; 171:14, 21

**perhaps** [1] - 90:23

**period** [3] - 9:20; 78:12; 124:19

**periodical** [1] - 27:9

**periodically** [1] - 26:25

**periodicals** [1] - 27:8

**permeated** [1] - 102:2

**permit** [9] - 57:20; 64:24; 83:10, 22, 25; 84:5; 88:16; 101:16

**permits** [2] - 18:8; 64:20

**permitted** [19] - 14:7; 17:5; 57:17; 59:18; 60:1, 18; 61:1; 62:3, 11; 64:5, 10; 78:3; 84:2; 90:20; 94:12, 14; 95:6, 19; 115:17

**permitting** [1] - 78:10

**permutation** [1] - 117:2

**permutations** [1] - 116:24

**perpetuate** [1] - 71:17

**perpetuation** [1] - 18:9

**persistent** [1] - 69:6

**person** [2] - 102:2; 143:11

**persons** [1] - 137:24

**Peter** [13] - 3:2; 57:17; 58:9; 65:16; 75:12; 81:13; 106:18; 112:18; 118:13; 119:16

**PETER** [1] - 1:20

**phenomenon** [1] - 15:14

**phone** [5] - 31:4, 8-9; 33:24

**phonetic** [1] - 55:1

**phrased** [1] - 171:17

**physical** [1] - 110:17

**picture** [1] - 90:22

**piece** [3] - 72:9; 74:6

**pieces** [3] - 109:5; 174:8; 176:6

**place** [5] - 23:22; 26:20; 82:25; 83:12

**places** [1] - 67:15

**Plaintiff** [2] - 1:5, 8

**plaintiff** [36] - 2:18; 3:16; 5:18, 23; 6:6; 9:16; 18:8; 42:15; 52:22, 24; 53:1; 54:6, 11, 15, 18, 25; 55:6, 12, 19; 66:3; 68:22;

69:1; 87:13; 91:20; 92:10; 103:6; 104:1; 106:2, 18; 109:8, 18; 110:12; 111:8; 116:4; 187:2

**Plaintiff's** [1] - 129:16

**plaintiff's** [7] - 92:22; 115:19; 119:14; 129:17, 24; 152:20; 191:24

**plaintiffs** [111] - 2:22, 25; 3:3, 5, 14; 6:24; 7:2, 15, 19, 21; 8:4, 10, 15; 10:10, 25; 11:2, 7, 9; 13:13, 21; 14:8, 13, 22; 16:23; 20:13; 21:7, 24; 22:11, 23; 23:2, 9; 29:16; 30:10; 31:2; 36:17, 22; 37:15; 39:12; 41:12, 16, 22; 42:8; 43:2; 45:25; 51:4; 54:19, 21; 68:13; 87:4; 96:11; 98:17; 99:5; 101:12, 15, 17; 102:1, 21; 103:9, 21; 104:4, 14, 21; 105:1, 4, 9, 15; 106:11, 24; 107:6, 20, 24; 108:8; 109:18, 25; 110:22, 24; 111:2, 13, 15; 112:18; 113:5, 9, 18; 114:2, 5, 22; 115:13, 16; 116:7, 14, 25; 117:1, 4, 22; 118:16; 119:17; 120:2, 4; 126:18; 133:2; 146:23; 158:5; 161:16; 164:9; 169:7; 172:7; 174:18; 186:17

**Plaintiffs** [2] - 1:18, 22

**plaintiffs'** [8] - 10:15; 31:23; 35:11; 43:22; 52:12, 19; 118:19; 190:17

**Plaintiffs'** [1] - 29:20

**plan** [13] - 8:5; 23:24; 25:25; 56:6, 13; 57:15; 59:3, 6; 72:5; 80:14; 81:6; 102:19

**Plan** [1] - 29:21

**planned** [2] - 82:23; 167:5

**planner** [7] - 58:5; 102:13; 106:9, 23, 25; 107:3; 109:19

**planner's** [1] - 113:2

**planners** [1] - 102:10

**planning** [18] - 11:3; 58:17; 75:15; 76:3; 84:10; 88:17; 100:25; 104:25; 106:8, 15, 19; 107:1, 7; 108:15; 111:6; 184:3

**Plaza** [1] - 2:12

**plumbing** [1] - 151:19

**plus** [2] - 161:22; 165:3

**PMSA** [1] - 151:7

**PMSAs** [2] - 149:13, 15

**POA** [1] - 79:18

**POA's** [1] - 79:17

**point** [23] - 11:11; 14:2; 17:16; 18:19; 19:2; 24:20; 26:24; 28:18, 25; 35:13; 41:4; 66:25; 74:7; 76:9, 22; 112:8; 130:6; 134:13; 135:2, 22; 161:13

**pointed** [2] - 104:14; 127:14

**pointer** [1] - 135:2

**points** [3] - 14:14; 16:21; 33:3

**police** [1] - 56:16

**policy** [10] - 118:4; 122:15, 17, 22; 123:2, 10; 126:5; 134:6; 150:13; 179:9

**polite** [1] - 94:23

**pool** [3] - 19:13; 92:24; 93:1

**population** [37] - 67:4, 6; 123:20; 128:6, 8; 133:11, 13; 134:3, 10; 135:13; 136:6, 14, 18, 21; 138:11, 15, 23-24; 139:3, 7, 11, 17; 140:4; 141:22, 24; 142:3, 5, 10-11, 17, 19, 22-23; 149:3; 157:13; 163:15

**populations** [2] - 146:16; 148:9

**portable** [1] - 159:10

**portion** [3] - 14:15; 56:20; 154:14

**portions** [1] - 132:1

**position** [1] - 97:15

**possession** [1] - 113:20

**possibilities** [1] - 188:8

**possibility** [9] -

69:13, 25; 70:12; 81:17; 82:5, 19; 84:19; 93:19; 180:14

**possible** [15] - 31:15; 45:11; 52:18; 55:4; 68:2; 69:23; 76:17; 80:10; 94:6, 8; 116:11; 154:3; 175:18; 188:24

**possibly** [1] - 166:14

**post** [1] - 122:13

**potential** [2] - 17:3; 189:14

**Potential** [1] - 58:23

**poverty** [2] - 148:9, 11

**power** [1] - 97:1

**PowerPoint** [6] - 47:8; 48:3, 9; 60:14; 61:23; 64:2

**PowerPoints** [1] - 108:12

**powers** [1] - 96:23

**practice** [3] - 91:21; 92:1; 106:8

**precedents** [1] - 103:2

**precisely** [5] - 25:14; 35:13; 190:15; 192:1, 9

**preclude** [2] - 6:23; 69:13

**precluding** [1] - 94:16

**predictably** [1] - 91:21

**predicts** [2] - 11:21; 12:10

**predominantly** [2] - 70:4, 20

**preference** [2] - 173:6, 10

**preferred** [1] - 117:24; 165:22

**prefix** [1] - 129:19

**prejudice** [2] - 9:16; 131:22

**prejudiced** [2] - 9:5, 7

**prejudicial** [1] - 42:3

**preliminaries** [2] - 52:6; 53:15

**preliminary** [1] - 173:16

**premium** [1] - 176:23

**prepare** [2] - 135:19; 181:19

**prepared** [13] - 126:13; 131:7; 135:16; 137:7; 141:8; 143:18; 144:13; 147:15; 152:19-21; 181:16, 20

**Prepared** [1] - 57:25

**preparing** [2] - 126:24; 144:16

**present** [6] - 14:21; 24:13; 27:15; 40:16; 52:21; 53:12

**presentation** [11] - 48:9; 52:9; 60:14, 17; 61:23; 62:2; 64:2, 4, 9; 81:6, 9

**presented** [15] - 16:24; 24:24; 25:6; 35:6; 38:3; 40:22; 44:5; 58:22; 59:20; 60:20; 62:5; 63:20; 101:3; 117:21; 191:14

**presenting** [1] - 6:23

**presently** [1] - 121:23

**press** [10] - 39:13, 15, 18; 40:9; 41:1, 5, 13, 15, 22

**pressure** [1] - 69:11

**pretext** [1] - 103:23

**pretextual** [1] - 87:18

**pretrial** [3] - 6:9; 46:2; 50:4

**prevented** [1] - 8:25

**previous** [7] - 19:15, 18; 136:10; 141:23; 151:4; 160:24; 163:17

**previously** [2] - 64:18; 94:11

**Price** [4] - 161:5, 18; 167:24

**price** [26] - 65:20; 84:14; 93:7, 22; 170:10; 171:11; 172:21; 173:2, 9, 22; 174:7, 15; 175:20; 176:1, 4, 20, 23; 177:2; 179:16, 19; 180:3, 14; 189:19; 190:9; 191:7

**prices** [16] - 169:23; 170:2; 172:18; 173:1, 5; 174:10; 175:4, 7, 10, 23-24; 176:7; 177:24; 179:22; 180:19

**prima** [2] - 91:23; 92:3

**Primary** [1] - 149:13

**primary** [5] - 7:13; 148:23, 25; 174:8; 175:2

**prime** [1] - 178:24

**principal** [3] - 7:12; 76:1; 124:24

**principle** [3] - 104:25; 105:1; 106:15

**25**

**principles** [10] - 58:17, 19; 76:3; 77:3; 82:24; 88:17; 89:3-5; 90:6

**printed** [2] - 25:12; 27:8

**private** [5] - 43:10, 15; 57:9; 140:1; 159:6

**privilege** [10] - 7:1, 4, 11, 16, 23; 9:3, 9, 12-13, 15

**pro** [7] - 191:14, 18, 25; 192:7, 9, 20, 25

**probability** [1] - 122:22

**probative** [2] - 15:25; 16:19

**problem** [1] - 11:25

**problems** [13] - 19:12; 38:21; 121:17; 128:13; 131:22; 147:4; 150:5, 19; 151:9, 11-12, 15

**procedure** [1] - 185:6

**proceed** [7] - 45:10; 97:19; 120:17; 131:8; 132:21, 23; 141:1

**proceedings** [7] - 28:23; 44:13; 45:10, 15; 119:20; 147:11; 177:10

**Proceedings** [1] - 2:16

**process** [17] - 8:3; 45:14; 46:20; 76:4; 79:4; 98:13; 101:15, 18; 102:9, 20; 103:10; 107:2; 109:4, 7; 118:25; 178:10

**Process** [1] - 57:25

**produce** [3] - 22:14; 104:9; 129:11

**produced** [3] - 2:16; 38:18; 95:14

**producer** [1] - 191:23

**production** [1] - 50:3

**professional** [7] - 106:9, 15; 109:19, 22; 113:2; 117:18; 123:4

**professionals** [2] - 126:3; 175:1

**professor** [2] - 108:14; 109:19

**proffered** [2] - 10:24; 159:25

**profit** [4] - 55:7, 14; 68:24; 184:12

**program** [5] - 124:16; 159:5, 7, 22

**programs** [1] - 164:11

**progress** [1] - 79:17

**prohibit** [1] - 9:21

**project** [17] - 75:25; 84:15; 93:11; 98:23; 108:24; 123:6, 14; 124:6, 24; 125:1, 8-9; 172:9; 173:12; 176:14; 184:21

**projects** [3] - 75:23; 124:10; 159:12

**promote** [1] - 97:10

**promoted** [1] - 94:10

**promoting** [1] - 94:22

**prong** [2] - 35:1; 40:5

**pronounce** [1] - 54:25

**proof** [2] - 27:25; 41:25

**proper** [8] - 11:7, 15; 16:3, 8; 17:10, 24; 44:11; 90:15

**properly** [3] - 15:12; 44:16; 90:18

**Properties** [5] - 60:23; 62:8; 66:13; 93:5

**properties** [4] - 56:7, 9, 12; 58:18

**Property** [1] - 79:13

**property** [10] - 31:6; 57:13; 59:2; 79:5; 82:10; 172:24; 175:5; 178:13

**proportion** [1] - 180:2

**proposal** [59] - 19:23; 22:1, 13, 15, 17; 33:15, 18; 34:1, 25; 60:11; 61:16; 63:1; 65:20, 25; 66:2, 5-6; 78:7, 14; 84:12, 22; 93:5, 8; 113:25; 129:8; 151:25; 152:23-25; 153:6, 8; 154:17, 22; 155:13, 17; 156:6; 157:5, 12; 166:10; 168:21; 169:11, 17; 172:6, 14; 177:16; 182:4, 6; 184:9, 11, 13-14; 185:12, 21; 190:23; 191:11

**proposals** [39] - 15:19; 16:25; 17:6; 65:22; 84:17; 92:23; 101:3; 121:20; 128:16, 20; 129:2; 152:2, 4, 8, 10-11; 156:25; 157:2; 158:4, 7-8, 11, 25; 167:13, 17; 172:19;

181:25; 182:16, 18; 185:17, 22, 24; 186:4, 9, 18; 188:11; 189:18; 193:7

**Proposals** [1] - 65:16

**propose** [4] - 60:3; 61:4; 62:14; 77:12

**proposed** [43] - 13:21; 19:22; 21:12; 23:19; 58:20; 59:12, 14, 17, 23; 60:16, 24; 61:20; 62:1, 9; 63:7, 10-11, 20, 23; 64:3, 6, 8, 17-18, 25; 65:3; 77:24; 78:16; 88:19; 90:20; 95:6, 18; 97:11; 128:20; 129:5; 152:8; 160:16; 169:17; 187:5, 8, 12, 19

**proposing** [1] - 59:8

**proposition** [7] - 70:11; 93:17; 99:7; 114:6; 116:4; 117:20; 133:10

**prospect** [2] - 78:16; 88:10

**prospective** [1] - 178:11

**protect** [1] - 116:22

**protected** [4] - 16:14; 93:23; 98:17; 116:22

**Protection** [1] - 96:17

**protest** [1] - 84:22

**prove** [11] - 15:23; 18:14; 28:14; 33:5; 40:17; 80:2; 91:10; 107:12, 14; 110:12

**proved** [2] - 91:17; 96:12

**provide** [6] - 79:11; 101:4; 109:13; 117:17; 121:22; 179:6

**provided** [12] - 29:20; 101:10; 106:20; 164:24; 167:9; 172:8-10; 191:15, 21, 24

**provides** [2] - 9:11; 140:1

**proving** [2] - 18:15; 107:11

**provision** [2] - 189:20

**proxy** [2] - 17:12, 14

**prudent** [1] - 8:6

**prudently** [1] - 90:24

**PTX** [15] - 129:14, 16, 20; 134:20; 136:25; 141:3; 142:6, 13; 143:14; 144:6; 147:6;

152:14, 19; 181:12

**public** [50] - 8:2, 23; 23:17; 34:1, 5; 36:20; 41:1; 48:7; 49:9; 56:14; 59:5; 62:7; 63:4, 9, 19, 21, 23; 65:4; 76:20; 77:1; 79:1; 80:18, 21-22; 88:25; 89:6; 90:9; 100:11, 21; 102:15-17; 103:10; 106:5, 13; 109:1, 16-17; 111:12; 113:17; 122:14, 16; 123:14; 124:14; 179:6

**Public** [4] - 59:22; 60:22; 63:25; 125:2

**publicly** [4] - 90:12; 142:2, 21; 179:17

**pulled** [1] - 106:14

**pun** [1] - 12:10

**purchase** [19] - 19:16; 65:20; 93:7; 111:1; 169:11, 16; 170:10; 173:1, 5; 177:24; 178:16; 179:16, 22; 180:3, 13, 16, 18; 181:4; 182:3

**purchased** [7] - 84:13; 92:18; 143:12; 177:20, 25; 180:23; 181:1

**purchaser** [3] - 170:5; 179:17, 20

**purchases** [2] - 179:18; 182:12

**purely** [1] - 33:6

**purport** [1] - 116:4

**purportedly** [3] - 29:22; 35:20; 36:19

**purporting** [1] - 27:9

**purpose** [9] - 23:15, 24; 28:12, 14; 36:8, 10; 56:6; 138:18; 175:2

**purposes** [6] - 27:16; 63:6, 19; 75:22; 129:14

**pursuant** [3] - 18:17; 54:24; 78:25

**put** [27] - 52:12, 24; 53:2; 54:3; 70:22; 76:7; 77:8; 82:24; 88:17; 94:5; 108:18; 109:22; 111:2, 17-18; 118:2; 136:25; 141:3; 143:14; 152:12; 154:4, 7; 170:22; 171:10; 181:12; 190:23

**putting** [1] - 115:4

**PX** [1] - 152:12

**Q**

**Quad** [1] - 18:18
**qualifications** [2] - 19:7, 24
**qualified** [4] - 127:13, 20, 23; 159:13
**quality** [1] - 159:14
**quantitative** [2] - 122:11; 123:18
**quantities** [1] - 67:15
**quarter** [2] - 173:3; 176:2
**quarters** [2] - 52:9; 141:25
**Quentin** [1] - 2:6
**questioning** [2] - 8:8, 20
**questions** [17] - 8:4, 16, 21, 25; 9:1, 6; 10:9; 18:11; 34:15; 82:9; 98:18; 103:22; 113:25; 142:14; 183:5; 184:24; 185:3
**quick** [2] - 46:10; 120:23
**quite** [3] - 17:1; 138:4; 173:25
**quotations** [1] - 27:24
**quote** [7] - 19:19; 35:7; 44:11; 60:11; 61:16; 62:14; 63:1
**quotes** [5] - 21:13, 16, 22; 31:11; 104:24
**quoting** [1] - 100:20

**R**

**R-O-N-N-E-B-U-R-G-E-R** [3] - 4:17, 19; 20:10
**R-T** [2] - 13:20; 65:9
**R-T'** [1] - 64:17
**R6** [2] - 60:8; 61:9
**R8** [1] - 62:19
**RA** [2] - 100:8; 115:11
**race** [14] - 19:12; 87:11, 14; 90:23; 91:3, 7; 137:25; 142:4; 149:18; 165:4; 178:12; 179:13, 16, 19
**races** [2] - 100:1; 138:1
**racial** [49] - 19:10, 15; 33:1; 34:2, 5; 40:15; 69:5; 70:3; 71:4; 88:12; 93:9; 96:2; 119:11; 121:13;

122:5; 124:7, 13; 125:6; 127:3, 9-10, 16; 133:7, 17; 134:2; 136:23; 142:5; 143:22; 144:1; 146:6, 10, 17, 21; 147:21; 157:1; 164:25; 165:22; 177:15; 181:1; 182:6, 9, 13, 16, 19; 183:17
**racially** [1] - 69:11
**racism** [15] - 102:1, 5; 103:11, 23; 104:6; 105:16; 106:8; 107:8, 10; 110:1; 115:5; 118:17, 23; 119:1
**racist** [12] - 99:9; 102:4; 104:10, 22; 105:4; 107:12; 109:23; 114:24; 118:17, 20; 119:4, 7
**racists** [1] - 104:15
**rails** [1] - 12:9
**raise** [2] - 24:23; 120:5
**raised** [11] - 14:14; 24:23; 81:15, 20; 89:9, 11; 90:16; 95:8; 99:4; 103:21; 104:3
**raising** [1] - 104:15
**range** [8] - 123:10; 168:9, 19-20; 169:20; 171:23; 175:15; 180:14
**ranged** [1] - 92:25
**ranges** [10] - 158:20; 167:10, 19-20; 168:2, 5, 7, 22; 171:13, 20
**rarely** [1] - 119:6
**rate** [26] - 128:7; 133:13; 141:13, 18; 153:1, 9-10, 13, 15, 21; 154:19, 23; 155:7, 15, 19; 156:7, 10-12; 158:12; 160:3-5, 10, 14
**rated** [1] - 126:1
**rates** [1] - 177:20
**rather** [6] - 19:22; 26:5; 41:7; 44:18; 71:11; 84:4
**ratio** [9] - 170:8, 17; 180:1, 6, 10, 13, 20
**ratios** [2] - 171:12; 177:24
**raw** [1] - 146:13
**reach** [7] - 11:15; 121:10; 133:16; 134:1; 149:18; 151:8; 155:16
**reached** [6] - 121:13; 128:4; 132:25; 136:2;

146:24; 169:13
**reaches** [1] - 14:1
**reaching** [1] - 145:19
**read** [20] - 4:25; 22:10, 18; 35:4; 46:1, 6, 8, 19; 66:25; 77:11; 78:7; 99:14, 16, 20; 100:1, 4; 172:22; 184:19; 188:18
**reading** [1] - 154:7
**ready** [16] - 88:7; 121:6; 137:2, 6; 141:6; 143:16; 144:11; 147:7; 152:17; 181:14
**real** [9] - 43:5, 10, 15; 56:5; 72:6, 8; 131:17; 174:25; 183:22
**realistic** [1] - 69:13
**realized** [1] - 71:19
**really** [6] - 11:21; 12:21; 20:2; 93:20; 127:13; 175:14
**Realtors** [1] - 177:1
**reason** [8] - 40:1, 8, 19; 41:8; 107:24; 109:10; 110:11; 114:9
**reasonableness** [1] - 177:12
**reasoning** [2] - 8:1, 14
**reasons** [14] - 7:3; 15:7; 28:2; 40:23; 87:16; 89:23; 100:9; 109:6; 110:1, 12; 114:12, 18; 163:11
**receive** [4] - 33:11; 57:12; 71:22; 191:25
**received** [13] - 22:17; 29:23; 32:25; 33:7, 24; 50:15; 65:23; 122:14; 160:15; 173:11, 21; 192:9; 194:15
**recent** [2] - 44:1; 146:15
**recently** [3] - 29:19; 38:25; 178:23
**recess** [7] - 53:17, 19; 85:8; 140:9, 11; 193:19
**recognize** [1] - 127:2
**recognized** [3] - 91:18; 97:1, 3
**recognizes** [1] - 16:12
**recommend** [3] - 69:18; 79:20
**recommendation** [13] - 69:15, 17; 75:9; 77:8; 78:23; 82:13, 15-17;

88:8; 112:20, 22; 113:2
**recommendations** [7] - 77:5; 113:8, 11, 20; 114:1, 7, 10
**recommended** [1] - 95:7
**recommends** [1] - 78:13
**record** [11] - 12:3; 29:3; 47:25; 54:3; 66:25; 75:20; 101:24; 120:14; 132:17; 143:7
**recorded** [1] - 2:16
**records** [2] - 41:1; 109:12
**rectified** [1] - 29:17
**red** [3] - 141:16; 144:21; 182:1
**redevelopment** [2] - 58:18; 108:19
**redirect** [1] - 183:6
**reduced** [1] - 95:13
**redundancy** [1] - 130:17
**refer** [4] - 29:13; 32:13; 38:7; 102:21
**reference** [2] - 22:19; 32:9
**referenced** [3] - 7:25; 15:1; 64:25
**referred** [5] - 14:19; 15:13; 42:19
**referring** [2] - 7:9; 37:21
**refers** [2] - 29:15; 40:6
**refinance** [1] - 178:16
**reflect** [1] - 158:25
**reflected** [1] - 175:14
**reflective** [1] - 182:20
**reflects** [4] - 40:3, 6, 20; 151:5
**Reform** [2] - 55:13, 16
**refused** [1] - 71:24
**refuted** [1] - 9:20
**regard** [6] - 26:14; 35:10; 53:10; 153:5; 154:21; 187:17
**regarding** [9] - 39:13; 118:25; 152:1; 155:16; 160:13; 172:3; 188:24; 189:18; 190:9
**regardless** [4] - 21:14; 26:9; 28:8; 104:21
**region** [1] - 167:25
**regular** [1] - 132:18

**27**

**regulations** [1] - 76:18

**reinforce** [1] - 92:1

**rejected** [5] - 70:8; 90:13; 111:13, 16; 126:16

**relate** [1] - 43:22

**related** [8] - 34:25; 39:2; 43:8; 44:12, 14, 19; 95:22; 133:17

**relates** [1] - 142:5

**relationship** [2] - 149:18; 180:10

**relative** [6] - 121:13; 141:23; 147:24; 148:15; 163:12; 173:13

**release** [9] - 39:13, 15-16, 18; 40:9; 41:1, 13, 15, 22

**releases** [1] - 41:5

**relevance** [2] - 15:1; 26:2

**relevant** [18] - 14:24; 19:6, 19; 26:4; 34:23; 35:1, 6; 40:22; 41:8; 43:23; 44:1; 55:9; 56:22; 140:5; 148:21; 165:16; 171:7

**reliability** [1] - 12:13

**reliable** [5] - 11:15; 14:11; 19:6; 175:7, 9

**relied** [1] - 106:20

**relief** [1] - 97:1

**relitigate** [1] - 7:16

**rely** [3] - 15:11; 28:2; 174:5

**remain** [3] - 5:5; 100:22

**remained** [1] - 78:8

**remaining** [3] - 7:25; 11:5; 59:10

**remains** [1] - 35:9

**remedy** [1] - 96:21

**remember** [3] - 82:23; 131:13; 192:3

**remind** [1] - 169:8

**renovations** [1] - 56:11

**rent** [21] - 19:14; 121:19; 128:15, 19; 129:1; 152:6; 159:6, 14, 17; 160:6, 8, 16; 161:23; 162:7, 22; 163:5, 8; 164:5; 181:24

**rental** [21] - 19:22; 115:21-23; 116:2, 5,

11, 19; 117:16; 118:11; 121:16; 128:10-12; 147:21; 152:7; 159:4; 189:21

**rentals** [2] - 116:8; 117:13

**rented** [1] - 143:12

**renter** [12] - 19:20; 147:2; 148:2-4, 6; 149:21; 150:16

**renters** [9] - 19:13; 92:24; 93:1; 147:24; 149:19; 159:6; 162:13; 163:22

**renting** [1] - 147:21

**rents** [22] - 66:8, 10; 158:14; 160:16, 20; 161:1, 4, 6, 9, 14, 22; 162:1, 3-5, 9, 11, 18; 163:3, 8; 164:1, 21

**repair** [1] - 123:13

**repeat** [2] - 133:1; 185:9

**repeated** [2] - 76:5; 77:4

**repeatedly** [1] - 89:11

**repeating** [1] - 110:24

**replace** [4] - 64:18; 65:6; 97:12; 167:6

**reply** [2] - 37:5

**report** [55] - 16:16; 19:19; 59:21, 24; 60:2, 10, 14, 21, 25; 61:3, 11, 15; 62:6, 10, 13, 21, 25; 76:4, 6; 77:7; 78:1, 8, 18, 25; 104:18; 111:9, 20; 124:2; 126:15, 24; 129:11; 130:1, 16, 20, 22; 131:1, 5, 7-8, 11, 17, 21; 132:2, 4, 12, 21; 145:12, 14; 152:22; 154:5; 159:23; 169:22; 181:21

**reported** [12] - 23:16; 152:21; 165:1, 3-5; 172:24; 173:1, 19; 176:19; 177:2; 186:22

**reporter** [6] - 50:19; 119:22, 24; 120:3; 121:2, 4

**Reporter** [1] - 2:12

**reporters** [2] - 5:1, 4

**reporting** [3] - 150:10; 159:25; 176:3

**Reports** [1] - 57:25

**reports** [10] - 78:9; 108:12; 123:25; 124:7; 126:13; 132:6, 8;

160:23, 25

**represent** [3] - 181:22; 188:7

**representation** [3] - 121:15; 147:25; 183:2

**representative** [5] - 51:5, 11, 15; 79:8; 118:16

**representatives** [2] - 50:24; 117:4

**represented** [10] - 128:10; 141:16, 20; 144:19; 147:2; 162:23; 166:23; 168:11

**representing** [6] - 2:22; 72:16, 18; 87:4; 144:23; 182:1

**represents** [1] - 144:21

**reputation** [2] - 109:22; 119:6

**Request** [1] - 65:15

**request** [5] - 58:4; 142:3, 21; 186:8; 188:11

**requested** [1] - 57:21

**require** [1] - 27:6

**required** [11] - 18:8; 65:19, 22; 81:25; 83:2; 84:5; 94:14; 104:16; 107:12; 111:11; 113:17

**requirements** [1] - 40:14

**requires** [2] - 87:23; 104:19

**requiring** [1] - 131:4

**research** [5] - 122:22; 123:6, 17; 124:9; 126:24

**researcher** [2] - 122:1

**researchers** [3] - 150:12; 179:9

**reservation** [1] - 123:13

**reserve** [3] - 35:15; 44:22; 183:6

**reside** [2] - 12:10; 157:24

**resided** [2] - 54:7

**residence** [1] - 54:13

**residences** [2] - 83:2; 112:14

**resident** [5] - 11:22; 36:23, 25; 37:1; 69:2

**residential** [43] - 57:20, 22; 59:14, 24; 60:4; 61:5, 21, 25;

62:15; 63:13, 15; 64:17; 67:15; 75:5; 76:13, 20; 77:5, 13; 78:2, 10, 16; 82:12; 83:1; 84:12; 88:15, 21; 89:3, 19, 22-23; 90:3, 19; 95:5, 18; 105:23; 111:4; 112:2; 122:5; 124:7; 161:6; 183:17

**residents** [31] - 19:25; 31:14; 34:24; 35:20; 36:19; 37:14; 39:1; 59:5; 64:2; 69:9, 12, 25; 70:23; 71:8, 25; 79:9; 81:15; 82:4; 89:8, 11; 90:1, 15, 24; 95:15; 98:20; 103:13; 104:7; 107:13; 157:19

**residents'** [1] - 81:23

**residing** [1] - 141:25

**resistance** [2] - 71:16; 91:13

**resistant** [1] - 71:15

**resolution** [2] - 49:17, 19

**resolve** [1] - 10:11

**resolved** [2] - 11:2, 4

**resources** [2] - 104:2, 5

**respect** [9] - 40:4; 76:11; 83:3; 88:18; 90:7; 95:25; 142:17; 190:20

**respectfully** [10] - 9:4; 20:18; 21:20; 24:18; 32:7; 36:1; 38:4, 15; 39:14; 42:10

**responded** [2] - 11:9; 31:23

**respondent's** [1] - 31:24

**Response** [1] - 65:13

**response** [7] - 11:8; 31:24; 33:18; 69:11; 97:9; 111:1; 159:20

**responses** [1] - 186:8

**responsibility** [1] - 179:5

**responsible** [1] - 103:4

**responsive** [1] - 34:16

**rest** [2] - 53:23; 159:17

**restrain** [1] - 8:11

**restricted** [2] - 83:5; 94:5

**restrictions** [1] -

93:25

**result** [6] - 9:16;
68:20; 88:9; 136:3;
181:6

**resulted** [1] - 170:12

**resulting** [1] - 145:5

**results** [5] - 40:10;
72:2; 124:11; 166:14;
169:21

**retained** [1] - 58:14

**retaining** [1] - 58:5

**return** [1] - 142:25

**returning** [1] - 138:25

**revealed** [1] - 153:13

**revenue** [2] - 56:10;
74:24

**review** [11] - 137:2;
141:5; 143:15; 144:10;
147:6, 13; 152:16;
181:13; 186:25; 188:23;
189:10

**Review** [1] - 30:1

**reviewing** [2] - 58:6

**revitalize** [1] -
109:21

**revolt** [3] - 78:15;
97:24; 98:7

**rezone** [5] - 57:22;
58:4; 63:7; 75:3; 76:19

**rezoned** [1] - 65:9

**rezones** [1] - 75:4

**rezoning** [9] - 7:3;
8:3, 14; 58:19; 75:10;
99:13; 100:7; 105:20;
117:12

**Rezoning** [1] - 57:25

**RF** [1] - 61:20

**RFP** [10] - 65:13, 16,
19, 22; 111:1; 188:10,
15; 189:3, 8, 11

**RFT** [1] - 192:15

**RICH** [2] - 1:25; 2:25

**Rich** [1] - 3:1

**rights** [5] - 98:13, 16;
103:20; 124:6, 9

**Rights** [3] - 14:21;
96:18; 125:21

**RIGHTS** [1] - 1:23

**Ring** [5] - 31:6; 32:25;
33:15, 18, 25

**RING** [1] - 32:25

**rise** [2] - 5:7; 78:6

**risk** [1] - 130:12

**RM** [39] - 16:25; 17:2,
13; 19:14; 59:13, 17,
23; 60:3, 24; 61:4, 24;

62:9, 14, 16; 77:12,
14, 19; 78:1, 5; 80:10;
84:2; 89:3, 19; 90:3,
7, 14; 94:12; 95:13;
111:14, 16, 19, 25;
112:1; 115:10; 116:6;
128:20; 129:4; 152:8

**RN** [1] - 95:11

**Road** [7] - 31:6; 32:25;
33:15, 18, 25; 73:7;
77:16

**road** [2] - 4:20; 10:12

**Robert** [3] - 38:9, 13;
51:19

**Rochester** [1] - 124:18

**Roebuck** [2] - 74:17

**Roger** [7] - 19:14;
59:13, 17; 64:12;
65:16; 112:1; 129:4

**role** [1] - 123:9

**roles** [1] - 124:14

**Ronneburger** [2] -
4:16; 20:9

**RONNEBURGER** [37] -
2:9; 4:15, 19; 20:8,
20, 22; 21:2, 4, 7;
22:3, 7; 23:6; 29:7,
10, 13; 30:7, 9, 19,
24; 31:1, 13, 19, 22;
35:17; 36:15, 17; 37:5,
7, 10; 39:12; 41:11;
42:4, 6, 8; 43:2;
44:23; 45:1

**Roosevelt** [2] - 2:6;
70:21

**rose** [1] - 89:6

**rotating** [1] - 51:23

**Rothschild** [1] - 38:11

**ROTHSCHILD** [1] - 38:12

**routinely** [1] - 44:16

**RPR** [1] - 2:12

**RT** [64] - 12:19; 13:5,
9, 14-15; 15:21; 17:15;
64:12, 18, 20, 22;
65:6, 10, 17; 66:6;
83:1; 84:6, 17-18, 22;
89:23; 91:9, 12; 93:3;
94:1, 7, 14; 95:1;
96:15; 101:11; 102:2,
19; 109:4, 15; 110:3;
111:24; 115:9, 12, 17,
21; 116:2, 8, 16-17,
22; 117:2, 13, 17;
118:4, 10-11, 25;
119:10; 129:8; 169:12;
188:4, 8; 190:1

**rubber** [1] - 113:10

**Rule** [9] - 26:7, 15,

24; 29:13; 37:24;
40:25; 42:11; 50:23;
54:24

**rule** [8] - 8:8; 14:4;
15:8; 24:10; 26:8;
30:11; 50:22; 127:21

**ruled** [2] - 25:5; 132:7

**Rules** [1] - 20:24

**rules** [4] - 4:20; 8:20;
27:10; 92:15

**ruling** [5] - 7:17; 8:7,
9-10; 23:10

**rumors** [2] - 80:13;
97:23

**rural** [1] - 71:8

**RYAN** [16] - 2:7; 4:1;
54:14, 17, 20; 70:25;
72:12, 14, 25; 79:25;
97:20; 99:15, 18;
100:4, 7; 107:18

**Ryan** [2] - 4:2; 97:21

---

**S**

**sake** [1] - 145:10

**sale** [5] - 66:17;
74:24; 172:12, 24;
175:5

**sales** [9] - 172:21;
173:2; 174:15; 175:9,
24; 176:20; 179:16, 19;
190:9

**Salzburg** [1] - 53:12

**San** [1] - 124:8

**Sands** [1] - 108:16

**Sarah** [2] - 3:9; 6:22

**SARAH** [2] - 1:21; 3:10

**Saratoga** [1] - 102:23

**satellite** [2] - 72:21;
74:13

**satisfy** [1] - 110:10

**saw** [9] - 83:6; 88:17;
94:12; 172:20; 174:1,
12; 176:9, 13

**scenarios** [4] - 11:24;
19:14; 92:20; 180:18

**schedule** [1] - 53:20

**Schoelle** [1] - 118:14

**school** [17] - 61:12;
62:22; 81:20; 89:24;
95:10, 14, 18; 98:22;
100:2; 103:22, 25;
104:3, 13; 110:3;
122:13, 25; 124:16

**School** [2] - 122:17;
125:2

**schools** [6] - 68:21;

77:2; 89:1; 90:10;
104:16, 20

**science** [1] - 122:14

**screen** [5] - 76:7;
77:9; 82:24; 83:7;
152:14

**scrutinized** [1] -
87:18

**se** [1] - 22:22

**Seaboard** [1] - 15:15

**SEAN** [2] - 2:10; 4:10

**Sean** [1] - 4:8, 10

**Sears** [3] - 74:17; 99:2

**Seat** [7] - 57:3, 6;
64:24; 74:3, 11, 14;
83:16

**seated** [3] - 5:5; 15:4;
120:12

**second** [16] - 10:6;
14:19; 15:17; 38:7;
60:21; 63:18; 68:22;
80:20; 81:12; 94:14;
146:24; 154:14; 173:6,
10; 178:16; 186:16

**Second** [8] - 9:11;
11:25; 18:17; 92:13;
97:5; 102:21; 132:7, 13

**secondly** [1] - 176:8

**section** [9] - 26:25;
27:3; 41:1; 63:3;
64:12; 65:2; 103:15;
153:13; 164:1

**Section** [30] - 92:21;
153:4; 155:15, 23-24;
156:8, 13-15; 157:6,
12, 18, 22; 158:15;
159:3, 21, 24; 163:24;
164:5, 8, 20; 165:16;
166:16, 21; 167:3, 6,
8; 182:23

**Sections** [1] - 96:18

**see** [25] - 9:8; 26:3;
30:15; 32:19; 44:15,
21; 69:3; 73:22; 74:14;
78:17; 80:25; 88:13;
100:13, 18; 104:17;
132:13, 18; 134:22, 24;
152:14; 153:7; 186:5;
189:8; 192:25; 193:18

**seeing** [1] - 26:6

**seek** [11] - 6:24; 7:15;
8:7, 10; 20:14; 21:7,
24; 23:2; 25:4; 36:17;
39:12

**seeking** [3] - 7:17;
8:19; 54:12

**seem** [1] - 70:6

**segregated** [4] -

**28**

17:22; 70:18; 93:12;
112:8

**segregation** [20] -
16:18; 18:10; 68:20;
71:17; 92:2; 97:7;
102:24; 103:5; 122:6;
124:8, 11-12, 16;
127:3, 10; 133:20, 23;
138:12; 183:18

**SEIN** [40] - 1:21; 3:12;
23:8, 14; 24:3, 12, 18;
25:2, 14, 18, 22;
26:24; 27:3, 12, 22;
28:6, 18, 24; 32:7, 12,
16, 18, 20; 33:2, 14;
34:9, 12, 17, 21;
35:13; 37:20; 38:25;
39:7, 10, 25; 42:17;
43:21; 44:24

**Sein** [4] - 3:13; 23:8;
34:15; 35:18

**Sein's** [2] - 29:8, 11

**selectively** [1] - 9:13

**self** [9] - 27:1, 5-6;
29:14, 25; 30:3; 37:24;
38:6, 17

**self-authenticated**
[1] - 38:17

**self-authenticating**
[8] - 27:1, 5-6; 29:14,
25; 30:3; 37:24; 38:6

**sell** [3] - 57:8; 72:7;
74:23

**Senator** [2] - 81:25;
97:11

**send** [1] - 31:17

**sense** [2] - 43:13;
52:20

**sensitive** [3] - 76:12;
87:23; 88:20

**sensitivity** [2] -
170:4; 180:14

**sent** [14] - 31:2, 18;
33:20; 34:9, 12-13, 21,
24; 35:20; 38:8, 13,
19; 58:16; 186:9

**sentencings** [1] - 5:9

**separate** [3] - 15:11;
16:12; 108:12

**separately** [2] -
165:1, 5

**September** [12] - 48:2,
18; 49:15, 22; 58:16;
61:18; 65:23; 66:2, 5;
131:14

**SEQRA** [3] - 104:18;
105:12

**sequence** [4] - 52:10,

14; 88:3; 108:9

**series** [8] - 57:24;
121:20; 170:3, 8, 11;
177:23; 179:24; 180:12

**served** [2] - 98:25;
126:11

**Service** [4] -
174:22-24; 176:19

**Service's** [1] - 58:6

**services** [3] - 7:4;
23:19; 124:17

**Services** [62] - 56:18,
24; 57:1, 4, 9, 11, 15,
22; 58:4, 8; 59:10, 16,
25; 60:5, 19; 61:1, 6,
21; 62:4, 12, 17;
63:13, 17; 64:6, 11,
23; 65:8, 11, 13, 17,
25; 66:4, 12, 17;
69:21; 72:10; 73:3, 14,
16, 23; 74:23; 75:11;
76:14; 77:14, 20; 81:7;
82:5, 14; 92:18, 25;
93:19, 23; 100:8;
107:23; 111:2, 7;
115:21; 118:3; 175:8;
185:18; 193:2

**set** [8] - 8:19; 40:24;
52:5; 58:21; 114:7;
139:19; 160:6; 163:3

**sets** [1] - 146:9

**setting** [2] - 8:7;
145:12

**seven** [2] - 136:1;
171:2

**several** [10] - 18:4,
24; 39:1; 74:11;
102:21; 122:21; 126:1;
163:11; 174:1; 184:12

**severely** [1] - 9:5

**shaded** [1] - 166:24

**shall** [1] - 105:13

**share** [48] - 19:20;
121:18; 128:5, 14, 18;
129:6; 133:11; 134:7,
10; 135:6; 136:5, 20;
137:11, 15; 138:20, 22;
139:1, 5, 7, 10, 17;
145:4, 6; 150:16;
152:5; 157:7; 158:25;
160:19; 162:17, 20;
164:4, 22; 165:2,
10-11; 166:3, 14, 18,
20; 168:6, 10; 169:10,
15; 172:16; 175:2;
181:4; 182:25

**shares** [1] - 136:14

**sheet** [3] - 47:16;

172:9; 173:16

**Shelly** [5] - 38:9, 13,
19; 46:12; 51:19

**Shelly's** [1] - 38:16

**shield** [1] - 9:12

**shift** [1] - 182:14

**shifts** [1] - 87:14

**short** [2] - 46:10;
90:11

**shortly** [1] - 91:18

**show** [29] - 15:22;
16:13, 17; 18:2, 6, 9;
23:15; 25:17; 28:1;
33:6; 34:1, 5; 41:20;
70:7; 71:4; 82:18;
88:1, 7; 91:3, 20;
92:4; 94:25; 95:2;
110:2; 115:1; 116:11;
168:14; 171:4

**showed** [3] - 36:7;
37:3; 146:20

**showing** [4] - 16:14,
18; 74:1; 91:24

**shown** [1] - 130:3

**shows** [7] - 70:22;
74:5; 87:13; 91:12;
101:4; 145:5; 163:1

**shunned** [1] - 69:4

**side** [9] - 5:13; 8:12;
13:7; 52:8; 57:3, 6;
74:11; 109:22

**signature** [1] - 124:2

**significance** [1] -
16:5

**significant** [7] -
18:19; 76:24; 88:24;
108:6; 110:16; 138:3

**significantly** [1] -
145:13

**silent** [1] - 76:14

**similar** [1] - 42:12

**similarly** [2] - 59:4;
161:17

**simple** [3] - 21:3;
87:11; 102:10

**simply** [9] - 7:17;
25:12; 45:10; 52:1;
71:3; 94:24; 113:11;
116:18; 117:4

**single** [46] - 16:11;
59:19, 25; 60:7, 17,
25; 61:8, 14; 62:2, 10,
18, 24; 63:16; 64:4, 9,
21; 67:16; 71:13;
77:21, 25; 83:2; 94:16;
95:9, 14; 98:23; 99:1;
104:10; 105:5-7;

106:12; 115:17; 116:20;
131:2; 175:16, 19;
187:17; 188:16; 189:2;
190:7, 25; 191:1, 3

**single-family** [33] -
59:19, 25; 60:7, 17,
25; 61:8, 14; 62:2, 10,
18, 24; 63:16; 64:4, 9,
21; 67:16; 77:21, 25;
83:2; 94:16; 99:1;
104:10; 105:5; 115:17;
187:17; 188:16; 189:2;
190:7, 25; 191:1, 3

**sit** [4] - 28:20; 57:7;
117:15; 193:17

**Site** [1] - 65:14

**site** [87] - 7:4; 17:3;
22:1, 7, 20; 23:19;
54:9; 56:20; 57:1, 9,
11, 15, 22; 58:4, 6, 8;
59:10, 16, 25; 60:5,
19; 61:2, 6, 21; 62:4,
12, 17; 63:13, 17;
64:6, 11, 23; 65:8, 11,
17; 66:1, 4, 12, 17;
69:19, 21, 24; 72:10,
21; 73:3, 16, 19; 74:1,
5, 10, 23; 75:3, 5,
10-11; 76:20; 77:6, 14,
20; 81:7; 82:6, 13-14;
83:15, 21; 92:18, 25;
93:19, 23; 106:7;
107:23; 111:2, 7;
115:21; 116:6; 118:3;
185:18; 186:6, 12;
188:12, 16; 193:2

**sitting** [1] - 119:24

**situated** [1] - 138:4

**situation** [3] -
127:19; 170:21; 182:22

**situations** [1] -
138:17

**six** [10] - 78:9; 98:5;
125:13; 129:9; 135:25;
145:8; 169:18, 21;
181:8, 10

**six-fold** [1] - 145:8

**size** [14] - 94:15;
110:17; 138:3; 158:13,
19; 160:16; 162:25;
165:24; 167:18; 168:8;
173:25; 174:2, 4

**sizes** [6] - 83:23;
163:2; 166:9; 168:13;
173:13, 20

**skewing** [1] - 22:23

**slide** [21] - 137:2, 7;
141:5, 8, 23; 142:7;
143:15, 18; 144:11, 13,

16, 20-21; 147:13, 22; 154:1, 7; 162:24; 181:13, 16, 19

**slides** [5] - 47:9, 12; 48:3; 134:15

**slightly** [1] - 166:14

**sliver** [3] - 74:20; 83:6, 25

**slow** [3] - 28:5; 45:15; 99:14

**slower** [2] - 128:8; 133:14

**slowly** [5] - 4:25; 99:20; 120:14, 25; 133:21

**small** [3] - 74:12; 136:14; 165:13

**smaller** [4] - 61:12; 62:22; 149:13; 166:6

**so-called** [3] - 22:14; 69:18, 21

**Social** [62] - 56:18, 24; 57:1, 4, 8, 11, 15, 22; 58:4, 6, 8; 59:9, 16, 25; 60:5, 18; 61:1, 6, 21; 62:3, 11, 16; 63:13, 17; 64:5, 11, 23; 65:8, 10, 13, 17, 25; 66:3, 12, 17; 69:21; 72:10; 73:3, 14-15, 23; 74:23; 75:11; 76:13; 77:14, 19; 81:7; 82:5, 14; 92:18, 25; 93:19, 22; 100:8; 107:23; 111:2, 6; 115:20; 118:3; 185:18; 193:1

**social** [3] - 7:4; 23:19; 73:15

**society** [1] - 97:8

**socioeconomic** [3] - 138:5, 16; 149:6

**software** [4] - 122:9; 146:18

**sold** [4] - 56:10; 75:5; 175:5

**solely** [1] - 189:19

**solved** [1] - 131:25

**someone** [6] - 31:16; 51:8; 117:23; 173:8; 174:7; 180:5

**sometime** [1] - 192:1

**sometimes** [1] - 143:10

**somewhat** [4] - 11:22; 27:10; 134:22; 166:13

**Somverville** [1] - 121:24

**sorry** [8] - 3:6; 4:18; 47:12; 51:12; 122:2; 126:9; 136:10; 144:8

**sort** [1] - 130:14

**sought** [1] - 23:22

**source** [17] - 135:18; 137:9; 141:10; 143:20; 144:15; 145:21; 151:20; 154:6; 158:3; 160:21; 163:21; 172:3, 5; 174:17, 20; 181:18; 190:18

**sources** [4] - 122:7; 123:16; 142:21; 145:24

**south** [7] - 73:5, 9-10, 24; 74:2; 105:5

**spaced** [1] - 131:2

**SPATT** [1] - 1:14

**speaking** [8] - 114:25; 122:7; 123:14; 124:14; 145:21; 150:7; 160:4; 169:20

**special** [6] - 64:24; 84:5; 108:16; 142:2, 21; 150:2

**specialize** [2] - 122:4

**specific** [7] - 24:13, 22; 29:3; 32:9; 103:1, 3; 145:25

**specifically** [9] - 25:6; 60:2; 61:3; 62:13; 104:19; 150:4, 6; 158:10; 182:23

**specifications** [1] - 150:4

**specified** [2] - 158:19; 167:19

**speculative** [1] - 14:10

**SPELIOTIS** [1] - 51:13

**Speliotis** [10] - 84:8; 93:24; 117:10; 190:14, 16-17; 191:15, 21, 23

**spell** [6] - 5:4; 75:18; 120:13; 121:2

**spend** [1] - 126:23

**spread** [2] - 80:12; 97:23

**spreadsheet** [1] - 49:25

**square** [6] - 67:12; 83:23; 84:4, 7; 94:15; 173:14

**square-foot** [1] - 84:7

**squarely** [1] - 40:24

**staff** [1] - 105:20

**stage** [2] - 44:6; 79:2

**stain** [1] - 119:11

**stamp** [1] - 113:10

**Stan** [2] - 2:19, 21

**stand** [3] - 51:8; 117:10; 120:4

**standard** [4] - 14:24; 15:2; 91:19; 162:7

**standing** [3] - 28:22; 91:12; 120:5

**stands** [2] - 75:4; 112:1

**STANLEY** [1] - 1:19

**Stanley** [2] - 2:20; 87:4

**stark** [1] - 70:20

**start** [9] - 2:18; 8:21; 10:9; 50:1; 68:2; 70:15; 89:20; 134:14; 152:23

**started** [4] - 5:15; 109:3; 111:23; 178:9

**starting** [1] - 124:23

**starts** [1] - 14:4

**State** [4] - 41:3; 55:17; 104:18; 124:2

**state** [13] - 18:2; 55:24; 73:4; 80:19; 98:25; 104:17, 21; 105:1, 10; 114:12; 120:13; 121:8

**statement** [7] - 26:12; 28:1; 66:19; 67:24; 80:12, 22; 97:17

**statements** [10] - 24:12; 26:11; 27:21; 28:7; 33:6; 98:18; 99:5, 8; 109:17; 132:16

**states** [9] - 60:2, 10; 61:3, 11, 15; 62:14, 21, 25; 142:11

**STATES** [2] - 1:1, 15

**States** [2] - 1:5; 69:7

**station** [1] - 124:15

**statistic** [1] - 122:21

**Statistic** [1] - 149:14

**Statistical** [2] - 149:10, 16

**statistical** [4] - 122:9; 148:23, 25; 149:7

**statisticians** [1] - 104:12

**statistics** [12] - 11:10, 18; 13:12; 14:9; 16:15; 17:17, 19, 21; 18:5; 123:1; 139:10

**Statistics** [1] - 161:5

**stats** [1] - 131:2

**status** [2] - 138:5, 16

**statutes** [2] - 43:4; 96:21

**steadily** [1] - 133:25

**stenography** [1] - 2:16

**step** [6] - 11:21; 80:17; 160:12; 161:13; 164:6; 178:2

**steps** [2] - 177:13

**stereotypical** [1] - 96:2

**stereotyping** [1] - 96:9

**still** [8] - 18:25; 19:3; 21:16; 22:7; 33:9; 70:6; 106:16

**stipulated** [12] - 6:10, 12; 46:4; 54:3, 5; 57:24; 66:16; 67:2, 11, 13, 19; 192:18

**stipulation** [1] - 14:17

**stipulations** [1] - 66:21

**stone** [1] - 114:7

**stop** [3] - 96:22; 193:14

**story** [2] - 78:4; 100:14

**strategies** [1] - 150:9

**strategy** [2] - 52:18; 123:22

**Strategy** [2] - 147:18; 151:23

**street** [4] - 99:21, 23; 105:8; 108:4

**Street** [3] - 74:2; 77:15; 105:6

**strenuously** [1] - 130:13

**strident** [1] - 81:16

**strike** [3] - 159:20; 188:14; 191:10

**strong** [1] - 149:5

**struck** [1] - 81:18

**structure** [3] - 117:7; 118:12; 190:22

**students** [3] - 139:20, 22; 140:4

**studies** [1] - 90:2

**Studies** [2] - 123:8, 24; 124:4

**study** [5] - 47:4, 6, 17; 48:5; 117:13

**Study** [3] - 59:22;

60:22; 62:7

**studying** [1] - 134:5

**style** [1] - 176:12

**sub** [1] - 178:24

**subcommittee** [1] - 58:5

**subdivided** [1] - 149:13

**subdivision** [3] - 26:16; 63:24; 65:12

**subject** [4] - 12:16; 17:24; 35:16; 132:14

**submit** [12] - 16:10; 21:20; 26:1; 38:15; 39:14; 42:10; 44:2; 84:21; 88:1; 96:12; 192:18

**submitted** [12] - 20:18; 36:1; 65:24; 84:17; 184:15, 17; 185:12, 14, 25; 186:2, 18, 23

**subsequent** [1] - 88:14

**subsequently** [1] - 173:21

**subsidies** [2] - 158:16; 167:6

**subsidized** [4] - 153:3; 155:15; 164:11

**subsidy** [9] - 159:4, 11, 15, 17; 160:8; 164:15; 167:5

**substantial** [1] - 112:10

**subtracted** [1] - 165:12

**sued** [2] - 101:20; 118:1

**suffered** [1] - 68:20

**sufficient** [2] - 15:21; 35:9

**Suffolk** [2] - 148:23; 149:14

**suggested** [1] - 193:11

**suggestions** [4] - 102:11, 13; 113:12, 22

**suggests** [1] - 116:5

**suite** [1] - 1:24

**Suite** [1] - 2:12

**Sullivan** [3] - 51:6, 9

**sum** [1] - 163:1

**summa** [1] - 122:15

**summarize** [1] - 33:22

**summarizing** [2] - 33:24; 61:24

**summary** [20] - 19:18;

32:2, 8, 10-11, 15; 33:4; 96:25; 106:21; 110:9; 128:3, 5; 132:24; 133:18; 134:2; 146:2, 25; 156:24; 164:2; 168:12

**summation** [1] - 163:1

**Suozzi** [11] - 31:3, 17, 19, 25; 56:4; 72:6; 81:5, 11, 21-22; 90:25

**Suozzi's** [1] - 33:20

**support** [6] - 22:10; 30:12; 31:22; 91:25; 99:7; 109:23

**Supreme** [5] - 56:17, 23; 87:19; 92:15; 107:22

**supreme** [4] - 73:4, 10-11, 14

**surely** [2] - 10:13; 53:13

**surprise** [1] - 70:2

**surrounded** [4] - 70:4; 71:7; 76:13; 98:24

**surrounding** [7] - 88:20; 95:12; 104:20; 105:3, 23; 108:1, 7

**survey** [2] - 123:20

**Survey** [1] - 165:9

**suspect** [1] - 73:19

**suspicion** [1] - 26:19

**sustained** [4] - 42:5; 71:2; 130:5; 131:17

**sweeping** [1] - 119:1

**switch** [1] - 91:12

**sworn** [2] - 5:5; 120:10

**System** [1] - 146:19

**system** [1] - 98:25

**systems** [1] - 122:10

---

**T**

**T'** [1] - 64:17

**table** [1] - 111:25

**tabulated** [1] - 150:22

**tabulations** [2] - 150:2, 15

**tailor** [1] - 158:24

**tailored** [1] - 96:21

**taint** [1] - 119:11

**tainted** [2] - 103:9, 11

**tasked** [2] - 69:18; 107:11

**taught** [1] - 126:1

**tax** [3] - 60:12; 61:17; 167:7

**teaching** [2] - 125:24; 126:2

**Technology** [1] - 126:8

**television** [1] - 124:15

**ten** [5] - 53:16; 82:1; 98:5; 139:3

**ten-minute** [1] - 53:16

**tenant** [1] - 160:7

**tenants** [1] - 159:7

**tend** [1] - 166:6

**tendency** [1] - 99:16

**tends** [1] - 92:1

**tenor** [1] - 79:4

**term** [12] - 17:1; 64:6; 100:25; 104:25; 107:10, 15; 136:8; 138:20; 153:2; 168:18; 170:7; 184:10

**termed** [1] - 170:7

**terminology** [1] - 185:25

**terms** [16] - 52:2; 74:1; 111:25; 138:4; 143:23; 144:2; 148:9; 150:11; 157:14; 158:8; 159:4; 165:20; 173:13; 174:2; 176:7, 9

**test** [1] - 170:3

**testified** [9] - 22:16; 37:1; 120:10; 125:17, 20; 126:14; 154:6; 190:9; 191:17

**testifies** [2] - 53:11; 137:14

**testify** [9] - 11:17; 14:8; 17:20; 19:9; 38:9; 84:11, 18; 117:5; 130:2

**testifying** [3] - 7:23; 8:22; 192:3

**testimonial** [1] - 134:14

**testimony** [23] - 14:6; 15:6, 23, 25; 16:2, 6, 16; 17:17; 18:22; 20:3, 6; 38:16, 25; 39:2, 5; 71:6; 106:20, 23; 126:15; 127:13; 130:12, 24; 192:11

**tests** [1] - 170:18

**THE** [231] - 1:14; 2:17, 20; 3:6, 19, 21, 25; 4:10, 18, 20; 5:20, 22; 6:2, 5, 12, 14, 17, 20; 8:9, 17; 9:2, 7, 15, 19, 24; 10:3, 7, 13,

15, 18; 12:2, 6, 25; 13:2; 18:12; 19:5; 20:19, 21, 25; 21:3, 5; 22:2, 4; 23:4, 7, 13; 24:1, 7, 17, 25; 25:7, 16, 21; 26:7; 27:2, 4, 19; 28:5, 17, 20; 29:4, 9, 12; 30:2, 8, 15, 20, 25; 31:12, 18, 20; 32:5, 11, 14, 17, 19, 22; 33:9; 34:5, 10, 15, 18; 35:7, 15; 36:14, 16; 37:4, 6, 8, 19; 38:21; 39:6, 9, 11, 22; 41:9; 42:1, 5, 7, 15, 25; 44:8, 25; 45:2, 8, 17, 20, 22; 46:7, 10, 13, 16, 22, 24; 47:1, 5, 10, 20, 23; 48:11, 13, 24; 49:11, 18; 50:7, 10, 12; 51:3, 8, 10, 25; 52:12, 16, 23; 53:4, 13, 16, 20, 25; 54:19, 21; 55:3, 5; 66:23; 67:1, 6, 9, 19, 25; 68:3, 7, 10; 71:2; 72:23; 73:1, 3, 6, 9, 13, 17; 75:19; 80:2; 81:3; 83:14, 18; 84:25; 85:4, 8; 97:18; 99:14, 16, 19; 100:6; 107:17; 119:14; 120:5, 12, 15, 17; 122:2; 125:10; 127:18; 128:22, 25; 129:1, 4-5, 15, 17, 21; 130:5, 7; 131:11; 132:3, 10, 23; 133:5; 134:16, 19, 21; 135:4; 137:4, 18; 140:8; 141:1; 144:7, 9; 145:15; 147:9, 12; 152:3; 154:9, 11-12; 160:2; 167:16; 171:17; 181:9; 183:8; 184:6, 23; 185:2, 7; 193:15, 18

**themselves** [1] - 21:13; 31:10; 118:5

**theoretical** [2] - 11:23; 13:21

**theories** [5] - 84:24; 85:1, 5; 87:7

**theory** [2] - 18:17; 91:14

**therefore** [8] - 8:20; 22:25; 23:1; 31:8; 107:15; 114:5; 150:24; 183:2

**thereof** [1] - 116:21

**they've** [2] - 29:17;

**32**

50:23

**thin** [1] - 106:14

**thinking** [2] - 163:17; 170:6

**Third** [1] - 1:18

**third** [9] - 7:6; 27:21; 62:6; 139:19; 155:10; 157:5; 166:25; 173:3; 176:2

**third-party** [1] - 7:6

**thirds** [1] - 66:8

**Thomas** [4] - 31:3, 19, 25; 56:4

**thoroughly** [1] - 173:15

**thoughts** [1] - 114:19

**threatened** [1] - 97:7

**three** [20] - 18:24; 52:9; 67:2; 74:10, 19; 75:8, 11; 83:6, 15; 102:12; 112:25; 129:9; 135:25; 160:10; 162:23; 169:18, 20; 170:13; 181:8, 10

**three-acre** [2] - 74:19; 83:6

**three-and-a-half-acre** [1] - 83:15

**three-quarters** [1] - 52:9

**threshold** [1] - 15:5

**throughout** [3] - 97:25; 98:6; 135:7

**throw** [1] - 116:12

**thrust** [2] - 15:8

**ticket** [1] - 46:18

**tie** [1] - 149:6

**tiger** [1] - 64:13

**timeframe** [2] - 142:9

**timing** [1] - 52:2

**tiny** [1] - 83:5

**Title** [1] - 14:22

**title** [2] - 5:16; 57:25

**titled** [4] - 58:23; 59:21; 60:21; 62:6

**today** [13] - 15:2; 21:19; 51:14, 24; 68:13; 69:10; 92:23; 93:14; 97:14; 102:22; 103:3; 118:2; 191:9

**today's** [1] - 31:15

**together** [5] - 29:24; 143:8; 156:21; 165:2; 177:4

**Tom** [3] - 31:17; 81:2, 4

**tomorrow** [1] - 193:19

**tone** [1] - 99:25

**took** [8] - 122:20, 25; 123:1; 164:6; 177:13; 181:2

**tool** [1] - 70:12

**tools** [3] - 76:16; 88:22; 122:7

**top** [2] - 126:1; 176:16

**topic** [1] - 31:1

**total** [39] - 60:6; 61:7, 9; 62:17; 77:20, 22; 78:8; 89:2; 113:8; 138:24; 141:22; 142:5, 10, 17, 23; 145:2; 152:9, 25; 153:12, 23; 155:1, 8, 14, 20, 24; 156:12, 21; 162:15, 19; 163:6; 165:11; 168:5, 8, 15-16; 172:10; 181:3

**touch** [1] - 91:14

**toward** [1] - 105:24

**towards** [3] - 34:2; 50:17; 106:1

**towers** [3] - 110:20, 22

**Town** [2] - 97:4; 110:19

**town** [10] - 38:20; 43:16; 77:25; 79:11; 112:7; 115:18; 116:17, 20; 189:15; 190:3

**townhomes** [1] - 64:7

**townhouse** [2] - 64:17; 176:12

**townhouses** [21] - 59:19, 25; 60:18, 25; 62:3, 11; 64:5, 10, 21; 83:1; 89:23; 94:10, 13-14, 19, 22; 115:22; 187:12; 188:11; 189:1; 191:1

**towns** [1] - 70:24

**track** [1] - 164:14

**traffic** [17] - 76:25; 81:20; 88:24; 89:24; 90:9, 14; 95:11, 13, 17; 98:21; 100:9; 103:22; 107:19, 25; 108:6; 110:3

**transaction** [1] - 66:14

**transcript** [10] - 2:16; 48:7; 49:9, 13; 80:25; 81:1; 98:2, 6, 10

**TRANSCRIPT** [1] - 1:14

**transcription** [1] - 2:16

**transient** [1] - 140:4

**transition** [10] - 90:15; 98:23; 105:22; 106:5, 10, 13; 107:8; 110:4, 14

**transitions** [1] - 95:9

**treatise** [3] - 30:12

**treatises** [1] - 42:11

**treatment** [1] - 35:12

**TRIAL** [1] - 1:14

**trial** [35] - 3:21, 23; 7:24; 8:7, 20; 9:14; 14:4; 15:3; 16:2; 18:23; 19:1; 20:13, 15; 25:8; 26:4; 29:3; 30:17; 35:4, 6; 40:22; 42:23; 43:22; 44:7; 46:4; 52:4; 74:9, 20; 75:22; 114:15; 117:21; 126:14; 130:11; 193:21

**tried** [4] - 7:25; 73:17; 95:2; 115:9

**trier** [2] - 15:10; 16:1

**trip** [1] - 5:11

**triple** [1] - 30:21

**true** [9] - 16:11; 18:23; 27:4; 110:13; 113:21; 118:20; 188:10, 15; 189:17

**truly** [1] - 97:12

**Trustee** [1] - 79:18

**trustee** [2] - 38:11; 51:21

**TRUSTEES** [1] - 1:11

**trustees** [23] - 8:22; 34:11, 19; 39:21; 47:15; 58:9; 69:17; 75:3, 8; 79:7; 80:17; 82:18; 83:11; 90:12; 111:11, 15; 112:20; 113:1, 19; 114:8

**Trustees** [5] - 2:4; 6:3, 8; 34:7; 56:1

**trustees'** [3] - 7:3; 8:1, 14

**truth** [9] - 25:9, 12; 27:25; 28:14; 32:23; 33:5; 37:12; 38:2; 44:17

**try** [8] - 55:4; 90:22; 165:8; 170:18, 24; 171:4; 174:7; 184:25

**trying** [5] - 4:21; 22:24; 31:2; 103:2; 115:2

**Tuesday** [1] - 193:22

**turn** [9] - 45:18;

51:16; 100:18; 136:22; 145:18; 151:24; 158:1; 160:3; 169:6

**turned** [1] - 69:19

**turning** [3] - 98:17; 149:17; 179:10

**twisting** [1] - 98:18

**two** [33] - 10:22; 16:12, 21; 27:10; 35:22; 36:18; 37:20; 38:4; 54:8; 66:8; 68:14; 78:4, 12; 80:18, 20; 84:24; 85:5; 87:8; 92:21; 101:3, 7; 110:20; 126:14; 135:25; 142:14; 146:2; 153:21; 161:4; 165:6; 172:11; 174:8; 193:13

**two-and-a-half-story** [1] - 78:4

**two-thirds** [1] - 66:8

**two-year** [1] - 78:12

**type** [9] - 67:14; 83:9; 94:10; 122:19, 25; 136:9; 158:23; 167:5; 190:22

**types** [5] - 98:19; 172:11; 175:15, 17; 178:8

**typically** [2] - 43:7; 176:22

## U

**U.S** [1] - 70:19

**ugly** [2] - 71:25; 96:5

**ultimate** [1] - 191:22

**ultra** [1] - 110:19

**ultra-luxury** [1] - 110:19

**unable** [2] - 18:14; 142:1

**unanimously** [1] - 78:25

**unattractive** [3] - 83:6, 8, 25

**unavailable** [1] - 142:20

**unchanged** [2] - 182:8

**uncorroborated** [1] - 21:25

**undated** [1] - 49:24

**UNDER** [1] - 1:23

**under** [100] - 11:13, 23; 12:16; 13:4, 14-15, 20; 14:22; 15:21; 16:11, 17, 25; 17:2, 4, 13-14; 18:7, 16; 19:5,

14; 21:8, 15; 24:9; 28:15; 37:24; 42:2, 10; 50:23; 55:17; 56:4, 12; 57:24; 59:23; 60:16, 24; 62:1, 9; 64:3, 8; 65:17; 77:24; 78:3, 5; 80:9; 83:1; 84:12, 17, 24; 87:7, 9; 89:16; 92:12, 23; 93:8; 95:18; 96:12; 104:17; 115:21; 116:16, 21; 117:7; 118:10; 121:20; 128:16, 19-20; 129:2, 4-5, 7-8; 131:9; 152:7; 153:8, 13; 154:18; 159:15; 160:10; 163:3; 166:13, 21; 168:3; 169:11, 16; 177:16; 181:24; 182:3, 12; 187:5, 9, 14, 16; 188:8, 10, 15

**under-estimate** [1] - 166:13

**underestimate** [1] - 166:15

**underlying** [8] - 13:18, 25; 14:8; 17:20; 142:11; 174:19; 181:20; 182:13

**underscores** [1] - 29:1

**understandably** [1] - 104:7

**undertaken** [1] - 90:3

**undisputed** [1] - 70:17

**unduly** [1] - 42:3

**unfairly** [1] - 119:7

**unfairness** [1] - 131:4

**unfamiliar** [1] - 5:3

**unfold** [1] - 26:4

**unforgivable** [1] - 119:8

**unfortunate** [1] - 70:2

**unhighlight** [1] - 156:23

**Uniondale** [2] - 112:7

**unit** [14] - 71:13; 100:15; 110:23; 134:5; 139:15; 143:8; 153:10; 160:4, 10; 165:24; 177:2; 193:1

**UNITED** [2] - 1:1, 15

**United** [2] - 1:5; 69:7

**units** [141] - 19:17, 22-23; 59:15; 60:5, 9; 61:6, 10; 62:16, 20; 63:17; 66:7; 77:6, 19-20, 23; 78:11, 17; 82:2, 13-14; 83:24; 84:2, 13, 16; 88:16;

90:20; 95:6, 20; 101:11; 111:3; 112:4; 115:14, 22, 24; 116:11; 117:6, 16; 118:5; 152:9, 25; 153:1-3, 9, 12, 15-16, 18-19, 21-22, 24; 154:18-20, 23-25; 155:2, 4-5, 8, 14, 19-20, 23-24; 156:10-15, 17-19; 157:3, 22, 25; 158:12-18; 159:1, 9, 13; 160:14; 163:5, 8; 164:5; 166:11, 16, 20; 167:1, 8-10, 14, 17-18; 168:15, 21, 23; 169:1, 17, 19; 172:11; 173:24; 174:2, 4, 7, 11; 176:17, 20, 22, 24; 183:1; 187:8; 189:4, 11, 15, 19; 190:7; 191:11

**universe** [2] - 7:18; 8:11

**university** [1] - 140:1

**University** [5] - 122:16; 124:6; 126:8

**University's** [4] - 122:17; 123:7, 24; 124:3

**unjustly** [1] - 119:7

**unknown** [1] - 114:20

**unless** [2] - 18:11; 92:14

**unnamed** [1] - 36:19

**unrelated** [1] - 102:6

**unreliable** [1] - 13:19

**unusual** [2] - 52:23; 121:1

**up** [47] - 4:24; 7:21; 11:11; 14:24; 28:5, 22; 41:16; 45:7, 15; 50:18; 51:8; 52:5; 59:15; 69:5; 70:22; 74:18; 76:2; 77:8; 82:4, 24; 83:12; 88:4; 90:11; 100:3; 101:11; 102:18; 111:2; 112:6; 116:12; 134:23; 136:25; 141:3; 143:14, 24; 144:4; 145:15; 152:12; 156:23; 162:12, 19; 181:12; 188:11, 15; 189:1, 3

**updates** [1] - 79:11

**upscale** [4] - 81:10, 13, 19; 89:8

**urban** [6] - 84:10; 148:14; 149:3, 6; 151:18; 167:24

**urbanized** [1] - 71:9

**US** [6] - 3:3, 10; 87:21; 97:6; 125:20; 177:1

**useful** [1] - 158:21

**uses** [4] - 75:5; 106:13; 135:2; 150:7

**utilities** [2] - 161:15, 22

**utility** [1] - 161:16

**utilize** [3] - 66:6; 122:8; 123:16

**utilized** [1] - 11:11

**utilizing** [1] - 19:14

**utterances** [1] - 24:13

**V**

**vagueness** [1] - 184:4

**Valley** [2] - 77:16, 18

**valuable** [1] - 73:22

**valuation** [1] - 171:12

**value** [11] - 57:11; 170:7, 9; 177:24; 180:1, 5, 7, 10, 13, 20

**variation** [2] - 135:8; 170:8

**various** [10] - 38:10; 59:1; 70:23; 79:11; 124:14; 132:25; 146:18, 20; 159:9; 172:19

**vehicle** [1] - 110:7

**verifying** [1] - 191:6

**Vernon** [1] - 54:22

**versa** [1] - 53:12

**version** [1] - 109:14

**versions** [1] - 184:12

**versus** [6] - 12:8; 19:21; 87:20; 97:4; 101:2; 105:21

**Vic** [3] - 5:17; 54:6; 68:25

**vice** [1] - 53:12

**view** [3] - 72:21; 184:11; 189:20

**viewed** [1] - 184:12

**views** [1] - 79:10

**VILLAGE** [1] - 1:10

**village** [41] - 31:23, 25; 34:7, 11; 36:3; 38:11; 51:20; 58:9; 59:1; 60:12; 64:2; 69:4, 25; 71:8; 75:2, 8; 78:24; 79:7; 80:17; 83:11; 90:17; 100:15; 101:3, 10, 19; 102:16; 105:10; 106:4, 6,

16-17; 109:9; 112:5, 12, 14; 119:9; 131:24

**Village** [38] - 2:5; 6:3, 7; 11:18; 12:18; 31:21; 33:10, 13; 34:6, 18-19, 22; 35:2; 38:9; 39:2; 51:19; 55:22; 56:14; 57:16, 21; 58:4, 22; 59:21; 60:15, 21; 61:17, 23; 62:6; 63:2; 67:4, 7; 74:25; 79:15; 87:20; 109:23; 184:15

**village's** [1] - 38:18

**Villager** [1] - 103:16

**villagers** [1] - 119:3

**violates** [3] - 96:16

**violation** [3] - 91:10, 16; 93:22

**violations** [2] - 96:20

**virtually** [2] - 76:5; 106:3

**visual** [3] - 77:1; 88:25; 90:9

**vocal** [1] - 82:19

**voices** [1] - 4:24

**voluntary** [1] - 112:25

**volunteer** [2] - 51:22; 113:3

**volunteers** [1] - 119:9

**vote** [1] - 111:18

**vouchers** [2] - 159:8, 10

**W**

**wait** [7] - 26:3; 29:2; 38:15; 39:4, 6, 9; 44:4

**waiting** [12] - 164:8, 13, 16, 20, 22, 24; 165:2, 16, 19, 21, 23; 166:18

**waive** [5] - 9:3, 9, 13, 24

**waiver** [1] - 9:15

**walked** [1] - 100:17

**warned** [1] - 33:17

**Washington** [5] - 1:25; 74:3; 99:1; 105:7; 106:1

**water** [1] - 177:7

**ways** [1] - 16:12

**wealth** [8] - 170:19, 24; 171:1-3, 6-7, 10

**web** [1] - 33:20

**website** [1] - 125:4

**week** [3] - 53:20, 23; 176:11

**33**

**34**

weigh [1] - 18:21

weighs [1] - 92:9

weight [5] - 16:3, 5;
18:20, 23; 20:3

Weinstein [2] -
130:19; 132:5

west [6] - 64:23; 74:4,
11, 14, 16; 83:15

West [1] - 79:7

Westchester [2] -
108:18; 109:21

western [1] - 57:6

WFX [1] - 18:25

whereas [1] - 40:16

whims [1] - 109:23

white [9] - 54:6; 69:2;
70:4, 19; 71:7; 93:12;
118:24; 138:11; 166:7

whites [5] - 133:20,
24; 138:9; 170:20;
171:1

whole [3] - 79:3;
119:4; 157:1

WICKER [1] - 2:12

wide [1] - 123:10

widely [1] - 179:8

wider [1] - 140:2

widespread [1] - 97:7

wildfire [2] - 80:12;
97:23

willing [1] - 71:22

winning [1] - 93:4

wise [1] - 174:5

wish [3] - 66:19;
67:23; 193:14

withdraw [1] - 186:16

withdrawn [1] - 172:4

withdrew [1] - 11:3

WITNESS [12] - 120:15;
122:3; 125:11; 128:23;
129:1, 5; 131:12;
144:9; 154:12; 181:10;
185:2, 7

witness [17] - 5:13;
26:10; 52:21; 106:11,
20; 107:1; 119:22;
120:2, 9; 126:12;
127:20-22; 134:18;
154:10, 13

witness' [1] - 131:1

WITNESSES [1] - 194:2

witnesses [7] - 5:5;
7:22; 8:5; 22:16;
50:22; 52:19, 24

woman [1] - 54:12

word [4] - 5:2; 98:3;

100:24; 129:10

words [11] - 22:23;
27:20; 71:25; 76:19;
77:17; 78:4; 88:11;
96:6; 113:8; 114:2;
121:1

workers [1] - 105:20

Works [1] - 126:2

works [6] - 113:13;
114:4, 13; 123:23;
124:18; 135:5

workshop [1] - 109:1

workshops [1] - 109:17

world [2] - 18:2;
119:10

worth [1] - 35:5

wrap [1] - 104:8

writing [5] - 30:5;
123:14, 17; 124:7;
126:24

written [5] - 20:16;
21:18; 101:25; 130:22

wrote [2] - 78:22;
111:10

Wyndham [2] - 100:13;
110:20

wyndham [1] - 100:14

---

**Y**

Y-A-R-D-L-E-Y [1] -
81:4

Yardley [3] - 46:12;
81:2, 4

year [10] - 67:10;
69:2; 76:6; 78:12;
90:19; 105:17; 151:4;
160:24; 192:4, 8

yearly [1] - 162:10

years [25] - 20:17, 19,
25; 21:6, 8; 23:12;
24:5, 7-8, 11; 25:24;
26:12, 22; 30:22;
35:22; 43:25; 70:5;
97:7; 102:7; 106:16;
117:11, 19; 123:6;
126:1; 161:4

yellow [1] - 136:16

yield [6] - 155:20, 24;
156:16; 157:2; 163:7;
169:18

yielded [1] - 162:5

yielding [2] - 168:16;
180:15

yields [7] - 153:20,
22; 155:1, 5; 156:13,
20

Yonkers [2] - 108:15;
109:20

YORK [2] - 1:1, 7

York [31] - 1:6, 19,
24; 2:13; 5:23; 6:6;
15:19; 41:2; 51:5;
54:7; 55:8, 10, 12-13,
19, 23-24; 56:4; 68:14,
17; 104:18; 105:10, 17,
21; 124:18; 128:17;
130:20; 149:15; 161:6,
19; 167:25

yourself [1] - 38:16

---

**Z**

zero [1] - 172:2

Zone [4] - 13:5; 58:24;
59:22; 64:13

zone [85] - 13:14;
41:19; 56:14, 20;
57:18; 58:8, 12; 59:1,
8, 11, 14; 60:7; 61:8,
24; 62:16, 18; 63:8,
12, 15; 64:19, 22;
65:6; 69:12, 14, 18;
70:10; 75:3, 9-10;
76:2; 77:13, 21; 78:22;
79:1, 14, 16-17, 19;
82:16, 24; 83:2; 88:8;
89:25; 90:15, 17; 94:8;
95:7; 101:11, 16-17;
102:19; 109:13, 15;
111:10, 21, 23; 112:17,
19, 21; 113:1, 14;
114:20; 115:9, 21;
116:2, 22; 117:7, 13,
17; 118:4, 11, 25;
119:10; 192:15

zone...R [2] - 60:4;
61:5

zone...R-M [2] - 60:4;
61:5

zoned [3] - 69:25;
84:19; 117:22

zones [1] - 115:11

Zoning [4] - 15:21;
59:21; 60:21; 62:6

zoning [121] - 8:1;
12:16, 19-20; 13:5;
17:2, 4, 13-15; 19:15,
23; 23:19; 32:3; 35:19,
21-22, 24; 36:4, 13,
21; 41:15; 47:4, 6, 17;
48:5; 57:15; 58:6, 21;
59:13, 17, 23; 60:3,
11, 16, 24; 61:4, 16,
20, 24; 62:1, 9, 14;
63:1; 64:3, 6, 8; 65:7,

17; 66:6; 69:8, 16, 18,
20, 22; 70:12; 75:1,
16; 76:3, 16, 19;
77:12, 24; 78:2, 5, 10,
17; 79:20; 80:10;
82:22; 83:8, 12; 84:6,
17; 87:13; 88:15, 22;
89:4, 19, 22; 90:4, 7,
19; 91:9, 19; 93:3;
94:5; 95:5, 14, 16, 19;
96:15, 23; 100:25;
101:22; 102:9, 19;
104:25; 109:6; 110:11;
111:14, 16, 19; 116:6,
21; 118:7, 11; 128:20;
129:5, 8; 152:8;
169:12; 183:19; 189:10;
192:23

## CERTIFICATE OF SERVICE

I, Michael A. Carvin, hereby certify that on August 1, 2014, I filed an electronic copy of the foregoing JOINT APPENDIX and SPECIAL JOINT APPENDIX on the Court's ECF service, which caused it to be served on all other parties or their counsel of record.


/s/ Michael A. Carvin
Michael A. Carvin


Dated:  August 1, 2014